**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com

*Counsel to the Liquidating Trustee and the Wind-Down Debtors*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>LAKEHURST AND BROADWAY CORPORATION,<br><br>             Debtor.[1] | Chapter 11<br><br>Case No. 25-14831 (MBK) |

**NOTICE OF THE LIQUIDATING TRUSTEE'S MOTION TO ENFORCE THE**
**CHAPTER 11 PLAN AND CONFIRMATION ORDER**

      **PLEASE TAKE NOTICE** that on __March 24, 2026, at 10:00 a.m. (prevailing Eastern__

__Time)__, or as soon thereafter as counsel may be heard, Eric Kaup, the Liquidating Trustee, on behalf

of on behalf of the Liquidating Trust and the above-captioned debtor and the other Wind-Down

Debtors, by and through his undersigned counsel, shall move (the "Motion") before the Honorable

Michael B. Kaplan, Chief United States Bankruptcy Judge, in Courtroom #8 of the United States

---

[1] On December 30, 2025, the Court entered the *Order Granting Debtors' Motion for Final Decree Closing Certain of the Chapter 11 Cases in New Rite Aid, LLC, et al.*, closing all cases listed therein except for the above captioned Debtor [Case No. 25-14861 (MBK), Docket No. 3695] (the "Order on Final Decree"). The Court has entered a text order on the affiliated dockets listed in the Order on Final Decree requiring that all remaining matters be filed under the above captioned case, Lakehurst and Broadway Corporation, Case No. 25-14831 (MBK). Except as otherwise provided herein, references to the "Docket" herein shall refer to the docket in the formerly jointly administered cases captioned *In re New Rite Aid, LLC*, Case No. 25-14861 (MBK).

Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), 402 East State Street, Trenton, New Jersey 08608, or such other physical or virtual location as may be determined by the Court, for entry of an order, substantially in the form submitted herewith.

**PLEASE TAKE FURTHER NOTICE** the Motion sets forth the relevant factual bases upon which the relief requested should be granted.  A Proposed Order granting the relief requested in the Motion is also submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Motion shall: (i) be in writing, (ii) state with particularity the basis of the objection; (iii) conform with the Bankruptcy Court's *Chapter 11 Complex Case Management Order* [Docket No. 502], and (iv) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received no later than seven (7) days before the hearing date set forth above.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these Chapter 11 Cases may be obtained free of charge by visiting the website of Kroll Restructuring Administration at https://restructuring.ra.kroll.com/RiteAid2025.  You may also obtain copies of any pleadings by visiting the Court's website at www.njb.uscourts.gov in accordance with the

procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that unless responses are timely filed and served,

the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief

requested may be granted without further notice or hearing.

Dated: March 3, 2026

/s/ Michael D. Sirota
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            dbass@coleschotz.com
            fyudkin@coleschotz.com

*Counsel to the Liquidating Trustee and the Wind-Down Debtors*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
dbass@coleschotz.com
fyudkin@coleschotz.com

*Counsel to the Liquidating Trustee and the Wind-Down Debtors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>LAKEHURST AND BROADWAY CORPORATION,<br><br>                  Debtor.[1] | Chapter 11<br><br>Case No. 25-14831 (MBK)<br><br>Hearing Date: March 24, 2026, at 10:00 a.m.<br>Objection Deadline: March 17, 2026<br>Oral Argument Waived Unless Objection Timely Filed |

## LIQUIDATING TRUSTEE'S MOTION TO ENFORCE THE CHAPTER 11 PLAN AND CONFIRMATION ORDER

### Introduction

Eric Kaup, in his capacity as Liquidating Trustee (as defined below), and on behalf of the above-captioned debtor and other Wind-Down Debtors (the "<u>Wind-Down Debtors</u>"), brings this motion (this "<u>Motion</u>") because one counterparty—WellDyneRx, LLC ("<u>WellDyne</u>")—has refused to deliver contractually required quarterly reporting and to complete the agreed

---

[1] On December 30, 2025, the Court entered the *Order Granting Debtors' Motion for Final Decree Closing Certain of the Chapter 11 Cases in New Rite Aid, LLC, et al.*, closing all cases listed therein except for the above captioned Debtor [Case No. 25-14861 (MBK), Docket No. 3695] (the "<u>Order on Final Decree</u>"). The Court has entered a text order on the affiliated dockets listed in the Order on Final Decree requiring that all remaining matters be filed under the above captioned case, Lakehurst and Broadway Corporation, Case No. 25-14831 (MBK). Except as otherwise provided herein, references to the "Docket" herein shall refer to the docket in the formerly jointly administered cases captioned *In re New Rite Aid, LLC*, Case No. 25-14861 (MBK).

reconciliation process that determines the Liquidating Trust's receivable.  Those reports—and the annual reconciliation they support—have historically yielded a seven-figure payment to the Debtors[2] (e.g., approximately $1 million for 2025), and thus are material to the orderly wind-down and value preservation mandated by the Plan and this Court's Confirmation Order.  WellDyne's refusal rests on legally incorrect premises about the effect of the Debtors' bankruptcy filing and the deemed rejection of the Agreement on the Effective Date.  Prior to the Agreement's deemed rejection, WellDyne ignored the Debtors' repeated requests that WellDyne perform its contractual duties, including its duty to provide the quarterly reporting.  WellDyne's actions violated the automatic stay and the requirement that it continue to perform pending assumption or rejection.  And the fact that the Agreement has now been rejected does not excuse WellDyne from its obligations under the Agreement.   Rejection is merely a breach—not a rescission of the Agreement—and does not serve to alleviate WellDyne from its obligations under the Agreement.  To that end, the Plan expressly preserves preexisting obligations owed to the Debtors for rejected contracts.  This Court has retained jurisdiction to enforce the Plan and its own orders, and the arbitration clause in the parties' Agreement, to the extent still enforceable against the Debtors, and which WellDyne has insisted prevents this Court from considering its refusal to perform, expressly permits judicial proceedings for equitable relief.  Accordingly, the Liquidating Trustee seeks an order compelling WellDyne to complete and deliver the required reports and reconciliation and such other relief as is just and proper.

---

[2] References to "Debtors" throughout refer to New Rite Aid, LLC and its affiliated debtors in *In re New Rite Aid, LLC*, Case No. 25-14861 (MBK).

**Relief Requested**

1.      Pursuant to sections 105, 365, 524 and 1141 of title 11 of the United States Code,

11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Articles IV, V, and X of the *Second Amended*

*Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates (Technical*

*Modifications)* [Docket No. 3445, Ex. A] (the "Plan"),[3] the Liquidating Trustee seeks entry of an

order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) enforcing

the discharge and injunction provisions of the Plan to prohibit WellDyne from taking any actions

to interfere with the implementation or consummation of the Plan, (ii) compelling WellDyne to

perform the Reports and Reconciliation Process (each defined below), and (iii) granting related

relief.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of*

*Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the

District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.) and

Article XIII of the Plan.  The Liquidating Trustee confirms consent to the Court entering a final

order in connection with this Motion to the extent that it is later determined that the Court, absent

consent of the parties, cannot enter final orders or judgments in connection herewith consistent

with Article III of the United States Constitution.

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  This

Court has authority to enforce its own orders. 11 U.S.C. § 105(a); *see Travelers Indem. Co. v.*

---

[3] Capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Plan.

*Bailey*, 557 U.S. 137, 150 (2009) ("[W]here the plain terms of a court order unambiguously apply, as they do here, they are entitled to their effect.").

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought in this Motion are sections 105, 365, 524, and 1141 of the Bankruptcy Code.

**Background**

**I.      Overview of the Chapter 11 Cases**

6.      On May 5, 2025, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Debtors").[4]  On May 7, 2025, the Court entered an order authorizing the joint administration of the Chapter 11 Cases for administrative purposes [Docket No. 122] pursuant to Bankruptcy Rule 1015(b) under the lead case *In re New Rite Aid, LLC*, Case No. 25-14861 (MBK).

7.      On November 26, 2025, the Court confirmed the Plan and entered the *Order Approving the Disclosure Statement and Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 3445] (the "Confirmation Order").

8.      On December 30, 2025, the Court entered the Order on Final Decree, closing all cases listed therein except for the Wind-Down Debtor, and ordered that all remaining matters be filed under the Wind-Down Debtor's case [Docket No. 3695].

9.      On December 31, 2025, the *Notice of (I) Entry of Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC (Technical*

---

[4] A detailed description of the facts and circumstances of these Chapter 11 Cases is set forth in the *Declaration of Marc Liebman, Chief Transformation Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 24].

*Modifications) and its Debtor Affiliates and (II) Occurrence of Effective Date* was docketed,
providing that the effective date of the Plan, December 31, 2025 (the "Effective Date"), had
occurred [Docket No. 3699].

## II.     Material Provisions of the Plan and Confirmation Order

10.     Article IV(C) of the Plan establishes the Liquidating Trust and provides that, as of
the Effective Date, the "Liquidating Trustee shall be appointed as the sole manager, sole director,
and sole officer of each Wind-Down Debtor, succeed to the powers of, and act for each Wind-Down Debtor in the same fiduciary capacity as, each of the Wind-Down Debtors' managers,
directors, and officers . . . and have all the rights, powers, and duties necessary to carry out
his . . . responsibilities under this Plan."  [Docket No. 3445, Ex. A, p. 26].  Eric Kaup serves as the
Liquidating Trustee (the "Liquidating Trustee").  *See* [Docket No. 3305, Ex. A, p. 2].

11.     Article IV(L) of the Plan provides that the Liquidating Trustee "shall retain and
may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of
Action[5] allocated to them in the Schedule of Retained Causes of Action, whether arising before or
after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired
Lease during the Chapter 11 Cases or pursuant to the Plan."  [Docket No. 3445, Ex. A, p. 33].

12.     On November 11, 2025, the Debtors filed the *Notice of Filing of Plan Supplement*,
including the Schedule of Retained Causes of Action, which states that "in accordance with section
1123(b) of the Bankruptcy Code, but subject to Article X of the Plan," all causes of action that a
debtor or estate may hold as of the Effective Date, "whether or not specifically enumerated in the

---

[5] "Causes of Action" is defined in the Plan to include, among other things, "any claim based on or relating to, or in
any manner arising from, in whole or in part, … breach of contract …"  *See* Plan, Art. I.A.27.

Schedule of Retained Causes of Action, shall vest in the Wind-Down Debtor." [Docket No. 3218, p. 48].

13.    Article V(A) of the Plan, provides that, on the Effective Date, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected "shall be deemed automatically rejected by the applicable Debtor, unless otherwise agreed by the applicable counterparty." [Docket No. 3445, Ex. A, p. 34].

14.    Article V(D) of the Plan (Preexisting Obligations of the Debtors Under Executory Contracts and Unexpired Leases) states:

> Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise ***shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts*** or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

[Docket No. 3445, Ex. A, p. 37] (emphasis added).

15.    Pursuant to Article XIII of the Plan, "on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction . . . over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan," including matters related to "the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom." [Docket No. 3445, Ex. A, p. 58-59].

16.    Article X(F) of the Plan provides that "[u]pon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any

actions to interfere with the implementation or Consummation of the Plan."  [Docket No. 3445, Ex. A, p. 54].

### III.    The Debtor's Relationship with WellDyne

17.    On April 3, 2025, Rite Aid Hdqtrs. ("Rite Aid") executed a Pharmacy Network Participation Agreement (the "Agreement") with WellDyne, attached hereto as **Exhibit B**.

18.    The term of the Agreement was for a term of one year, effective January 1, 2025 and expiring by its terms on December 31, 2025.[6]  [Ex B., p. 8, § 6].  Under the Agreement, Rite Aid's pharmacy chain codes 011, 045, 056, and 181 (the "Pharmacies") would serve as participating pharmacies in WellDyne's commercial and Medicare Part D Pharmacy networks (the "Program").  [Ex B., p. 1].

19.    Under the Program, the Pharmacies fulfilled prescriptions and provided covered pharmacy programs to members of health plans managed by WellDyne.  [Ex B., p. 1].  In that role, the Pharmacies would dispense covered drugs and services per WellDyne's processing system and rules, verify member eligibility, substitute generic drugs where allowed, maintain prescription

---

[6] The Agreement has an auto-renewal provision, which provides as follows:

> Unless this Agreement is terminated sooner in accordance with its terms, the initial term of this Agreement shall begin on the Effective Date and continue for one year. Thereafter, the term of this Agreement shall automatically be extended for successive periods of one year each unless a party gives written notice to the other at least one-hundred and eighty (180) calendar days prior to the last day of the initial term or ninety (90) calendar days prior to the renewal term, as the case may be, that this Agreement shall not be further extended.

[Ex B., p. 8, § 6].  Neither party gave written notice to the other within the time limits of the Agreement that the Agreement would not be further extended, though the Debtors submit that WellDyne should have been well aware that the Agreement would not be extended given the Debtors' wind-down and cessation of operations.  That notwithstanding, the Debtors recognize that the Agreement, by its terms, though set to expire coterminous with the Effective Date, would have auto-renewed and the Agreement, as extended for a successive one-year term, would have been deemed rejected on the Effective Date.

logs, and collect member cost-sharing (co-pays). The Pharmacies were also required to follow applicable pharmaceutical and health laws and allow WellDyne to conduct audits.

20.    WellDyne acts as a pharmacy benefit manager on behalf of certain health plan sponsors. [Ex B., p. 1]. Under the Agreement, WellDyne processes claims submitted by the Pharmacies and reimburses Rite Aid in accordance with specified reimbursement schedules.

21.    The Agreement also includes a reconciliation process (the "Reconciliation Process") between Rite Aid and WellDyne. [Ex B., p. 20-25]. As part of the Agreement and Reconciliation Process, the Pharmacies dispensed covered drugs and services and billed WellDyne at the average wholesale price. [Ex B., p. 17-19]. WellDyne would then respond with the contract rate owing to the Pharmacies for each drug included in a particular claim. In order to correct mistakes occurring during those transactions, the Reconciliation Process aggregates all claims by generic and brand and calculates the "actual reimbursement" rate which is then compared to the contract rate. [Ex B., p. 21-24]. To aid in the Reconciliation Process, the Agreement establishes reporting periods in which relevant data is reported.

22.    For the calendar year included in the Agreement, WellDyne was required to provide the following reports needed for reconciliation: (a) initial summary report, (b) initial claims report, (c) quarterly summary reports, (d) quarterly claims reports (the "Quarterly Reports") and (e) annual summary reports (collectively, the "Reports") [Ex B., p. 21-23].

23.    Exhibit B, Section 1.3 to the Agreement states "[w]ithin thirty (30) calendar days after the end of the first, second, and third calendar quarter, WellDyne will provide [the Pharmacies] with a quarterly performance report . . . for all Brand Drugs and Generic Drugs adjudicated Claims processed and paid during the applicable quarter." [Ex B., p. 22, § 1.3].

8

24.    WellDyne was to calculate the reconciliation payment for the Agreement term based on the Reports and distribute the payment to Rite Aid.  The 2025 reconciliation payment to Rite Aid, i.e., the 2024 Settlement Amount, was $1,003,231 [Ex B., p. 8].

25.    The Agreement provides that it would terminate if either party provided notice that the other party committed a material breach that remained uncured for 90 days after notice.  [Ex B., p. 8].    Another terminating event was a party's bankruptcy filing, which provision is unenforceable under 11 U.S.C. § 365(e).  [Ex B., p. 8, § 7.1.3.].

26.    Upon termination, the Agreement states that "neither party shall have any further rights or obligations hereunder except (1) as otherwise expressly provided in this Agreement; (2) for those accruing prior to such termination date; and (3) for those arising as a result of any uncured breach of this Agreement by the party prior to such termination date."  [Ex B., p. 9, § 7.6].

27.    The Agreement further provides that disputes are to be resolved through arbitration in Tampa, Florida.  [Ex B., p. 14, § 16].  However, "[n]otwithstanding any contrary provision in th[e] Agreement, a party may commence a judicial proceeding, without having first complied with the provisions of this section, to seek injunctive or other equitable relief necessary to prevent irreparable harm."  [Id.].

28.    Although requests had been made informally throughout the year, in November 2025, Rite Aid provided formal notice to WellDyne, informing WellDyne that the Quarterly Reports for Q1-Q3 of 2025 were missing (the "Missing Reports").  Rite Aid requested that the Missing Reports be provided within five business days.  A copy of the November 2025 notice is attached hereto as **Exhibit C**.[7]

---

[7] Having received no response to the November 2025 notice, in December 2025, Rite Aid again reached out to WellDyne seeking the required Reports.  WellDyne failed to respond thereto.  Thereafter, on January 15, 2026, Rite

29.    WellDyne failed to comply with the request in the November 2025 notice or any of the subsequent requests for the Reports (noted above).

30.    Instead, approximately three (3) months later, on February 5, 2026, counsel for WellDyne responded ("<u>WellDyne's Letter</u>"), attached hereto as **Exhibit D**, stating that "although the Agreement called for reporting 30 days after the end of each quarter, the actual reconciliation practice between the two parties was significantly different," and that it was "not uncommon for several months to pass before [WellDyne] issu[ed the] reports." WellDyne's Letter also stated that when it was given notice of the Debtors' Chapter 11 Cases, "it was unsure of the enforceability of the Agreement or how the new bankruptcy case impacted future dealings between the parties."

31.    Further, WellDyne's Letter asserted that any litigation would be subject to the Agreement's mandatory arbitration clause requiring binding arbitration in Tampa, Florida.

32.    Finally, WellDyne's Letter asserted that the Agreement was "neither assumed nor assigned and [was] thus deemed rejected" and that upon rejection, WellDyne "arguably had no obligation to perform under the Agreement at that point in time going forward."

### <u>Basis for Relief</u>

### I.    <u>WellDyne Was Required to Perform under the Agreement Prior to Rejection</u>

33.    Although WellDyne contends "it was unsure of the enforceability of the Agreement or how the new bankruptcy case impacted future dealings between the parties," "there is overwhelming authority to the effect that other parties to a contract with the debtor must perform under such contract with the debtor prior to the debtor's decision to assume or reject." *In re Mirant*

---

Aid again emailed WellDyne, this time advising that it would be escalating matters to outside counsel. WellDyne once again failed to respond. On February 3, 2026, Rite Aid again wrote to WellDyne indicating that if there was no response by the following day, it would take further legal action against WellDyne. That finally prompted a response from WellDyne's counsel the following day, wherein counsel advised he would be responding to Rite Aid's previous correspondence, including the November 2025 notice, the following day.

*Corp.*, 303 B.R. 319, 328 (Bankr. N.D. Tex. 2003) (citing *In re Pub. Serv. Comm'n of New Hampshire*, 884 F.2d 11, 14 (1st Cir. 1989) (stating that creditors are bound to honor executory contracts until the debtor commits itself to assumption or rejection). Before an executory contract is assumed or rejected, that contract continues to exist, enforceable by the debtor-in-possession. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 532 (1984). *See also In re FBI Distrib. Corp.*, 330 F.3d 36, 43 (1st Cir. 2003); *United States ex rel. Postal Serv. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir. 1994); *In re University Med. Ctr.*, 973 F.2d 1065, 1075 (3d Cir. 1992); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 378 (7th Cir. 1983); *St. Francis Physician Network, Inc. v. Rush Prudential HMO, Inc. (In re St. Francis Physician Network, Inc.)*, 213 B.R. 710, 714, 716–17 (Bankr. N.D. Ill. 1997); *S.N.A. Nut Co. v. Haagen-Dazs Co., Inc. (In re S.N.A. Nut Co.)*, 191 B.R. 117, 120 (Bankr. N.D. Ill. 1996); *Goldin v. Putnam Lovell, Inc. (In re Monarch Capital Corp.)*, 163 B.R. 899, 907 (Bankr. D. Mass. 1994); *In re Providence Television Ltd. P'ship*, 113 B.R. 446, 451 (Bankr. N.D. Ill. 1990); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 700 (Bankr. W.D. Tex. 1988); *Skeen v. Denver Coca–Cola Bottling Co. (In re Feyline Presents, Inc.)*, 81 B.R. 623, 626 (Bankr. D. Colo. 1988); *Wilson v. TXO Prod. Corp. (In re Wilson)*, 69 B.R. 960, 965–66 (Bankr. N.D. Tex. 1987).

34.    Thus, there is no question that upon the filing of the Chapter 11 Cases, WellDyne was required to perform, including providing all Reports on a timely basis.

35.    Moreover, to the extent WellDyne believed that the Agreement terminated by virtue of the bankruptcy filing under Section 7.1.2. of the Agreement as a result of the Debtors "undergo[ing] a Bankruptcy Event," it could have easily sought guidance that such a provision was unenforceable (including from the Debtors). Section 365 of the Bankruptcy Code provides that "an executory contract or unexpired lease of the debtor may not be terminated or modified,

11

and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of" the debtors insolvency, the commencement of a bankruptcy case, or the appointment of a trustee.  11 U.S.C. § 365(e)(1); *see also In re Seven Hills, Inc.*, 403 B.R. 327, 335 (Bankr. D.N.J. 2009) ("Bankruptcy interdicts *ipso facto* clauses because they lead to the forfeiture of valuable assets and hamper the debtor's rehabilitation or liquidation.").

36.    Thus, WellDyne's claimed ignorance of the effect of the bankruptcy filing is dubious but, regardless, never served to terminate the Agreement nor relieve it of its obligations to perform.

## II.    Confirmation of the Plan, Occurrence of the Effective Date and the Deemed Rejection of the Agreement Did Not Release WellDyne from its Obligations Under the Agreement

37.    WellDyne also suggests in the WellDyne Letter (albeit "arguably") that the Debtors' rejection of the Agreement extinguished WellDyne's obligation to perform under the Agreement following the rejection.  WellDyne's position is based on a misunderstanding of the effect of contract rejection under 11 U.S.C. § 365(g) and, therefore, lacks merit.

38.    "Under § 365(g), rejection of an executory contract constitutes a breach immediately before the date of filing for bankruptcy and creates a pre-petition claim for breach of contract."  *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 n.8 (3d Cir. 2001).  However, such, "rejection does not affect the parties' substantive rights under the contract."  *Id.* (citing 3 *Collier on Bankruptcy* ¶¶ 365.09, 365.09[1] (Lawrence P. King ed., 15th ed. 1999)); *and see Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 387 (2019) (a "debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy.  Such an act cannot rescind rights that the contract previously granted").

12

39.     Rejecting an argument similar to WellDyne's position here, the bankruptcy court

in *In re Dowent Family LLC* explained as follows:

> Rejection of a lease or contract "does not rescind the lease [or
> contract] or defeat any pending claims or defenses that the debtor
> had in regard to that lease [or contract]." *In re Onecast Media, Inc.*,
> 439 F.3d 558, 563 (9th Cir. 2006), *citing*, 3 Resnick and Sommer,
> *Collier on Bankruptcy* § 365.09[1] (15th rev. ed. 2005) ("Rejection
> does not ... affect the parties' substantive rights under the contract
> or lease, such as the amount owing or a measure of damages for
> breach and does not waive any defenses to the contract).  Rather,
> "'[a] rejection of an unexpired lease removes the lease from the
> bankruptcy estate,'" and "'constitutes a breach of such contract or
> lease' that is effective immediately before the petition for
> bankruptcy." *Id.*; *see also* 11 U.S.C. § 365(g).  When Debtor rejected
> the contract, the Sale Agreement, the rejection constituted a breach,
> not a rescission.   Because the contract was not rescinded, the
> attorneys' fee provision of the contract was not extinguished and
> remains enforceable.

*In re Dowent Family LLC*, 2018 WL 3468986, *5 (Bankr. C.D. Cal. July 13, 2018).

40.     As set forth above, the Agreement with WellDyne had a term of one (1) year (from

January 1, 2025 to December 31, 2025).  Pursuant to the Plan, the Agreement (to the extent it was

automatically renewed for another year) was deemed rejected as of the Effective Date of the Plan,

December 31, 2025 (the same day the Agreement would have expired by its own terms if not

automatically extended).  As explained above, WellDyne's position that it had no obligation to

perform under the Agreement for the entire period leading up to the deemed rejection of the

Agreement is untenable and not supported by the case law.  Similarly, the case law from both the

United States Supreme Court and the Third Circuit is clear: rejection did not rescind the Agreement

or release WellDyne from its substantive obligations after rejection either.  *See Cinicola*, 248 F.3d

at 119.

41.     What's worse is that WellDyne's position, even if legally correct, and to be clear it

is not, ignores *the very terms of the Agreement itself*, which expressly provides that termination of

13

the Agreement does *not* relieve either party from obligations "accruing prior to such termination date" or "arising as a result of any uncured breach of th[e] Agreement by [a] party prior to such termination date."  [Ex B., p. 9, § 7.6].  Accordingly, WellDyne's position is troubling in that it still remained obligated to provide the Reports and participate in the Reconciliation Process even if the Agreement was terminated, as those obligations "accru[ed] prior" to the date of the misunderstood "termination" and its failure to provide the Reports was an "uncured breach" as of that "termination."  WellDyne's failures, therefore, not only violate the Bankruptcy Code, but fly in the face of the Agreement itself.[8]

### III.    WellDyne's Refusal to Provide the Reports and Participate in the Required Reconciliation Process Violates the Plan and Confirmation Order

42.    As set forth above, Article V(D) of the Plan (Preexisting Obligations of the Debtors Under Executory Contracts and Unexpired Leases) expressly preserves the obligation of a contract counterparty to continue performing under the terms of any rejected contract.  Specifically, it provides as follows:

> Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise ***shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts*** or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

[Docket No. 3445, Ex. A, p. 37] (emphasis added).

---

[8] WellDyne's Letter does not deny that it failed to provide the Quarterly Reports as required; rather, it asserts that the "actual reconciliation practice between the two parties was significantly different" than the Agreement's 30-day reporting requirement, and that "[w]hen WellDyne became aware of the bankruptcy, "it was unsure of the enforceability of the Agreement or how the new bankruptcy case impacted future dealings between the parties." Putting aside that WellDyne's past breaches were not tolerable – and required the Debtors to engage counsel to enforce, those past breaches do not excuse WellDyne from any obligation to timely perform under the Agreement.

43. WellDyne never objected to the Plan's requirements in this regard and the Confirmation Order is now a final, non-appealable order and binding on all parties in interest, including WellDyne. Thus, even if WellDyne believed the rejection of the Agreement legally relieved it from ongoing compliance (though, of course, it did not), maintaining that position, as it has insisted on doing (requiring this Motion), now violates the provisions of the Plan and the Confirmation Order.

44. Additionally, under the discharge injunction in Article X(f) of the Plan, WellDyne is enjoined from refusing to honor the Agreement and provide the required Reports. WellDyne's refusal to conform to the Plan and Confirmation Order's requirements is an "action[] to interfere with the implementation or Consummation of the Plan" prohibited by the discharge injunction. [Docket No. 3445, Ex. A, p. 54].

45. WellDyne's ignorance of binding law governing the effect of rejection of the Agreement and its refusal to perform on that faulty basis runs afoul of the Plan's provisions and discharge injunction provided thereunder. Pursuant to the Plan, the Liquidating Trustee has standing and authority to demand WellDyne's performance under the Agreement. WellDyne's failure to deliver the Reports and complete the Reconciliation Process deprives the Wind-Down Debtors of a potentially valuable asset and interferes with the implementation of the Plan.

**IV.  The Current Dispute with WellDyne is Not Subject to Arbitration and is Properly Before the Court**

46. Section 105(a) provides, in relevant part, that, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). A bankruptcy court "may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y. 1987) (quoting *In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985)). When a party fails to honor its

contractual commitments to a debtor, this Court is empowered to compel the counterparty's performance. *Continental Energy Assocs. L.P. v. Hazleton Fuel Management Co. (In re Continental Energy Assocs. L.P.)*, 178 B.R. 405 (1995) ("consistent with 11 U.S.C. § 105, [the bankruptcy court] can issue an order that would allow such debtor to enforce the contract until such time that it accepts or rejects the contract, provided that we diligently guard the interests of the non-debtor party to the contract."); *see also Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d at 378 n. 4 ("The Bankruptcy Code provides a sufficient legal basis for a bankruptcy court to issue an injunction or restraining order in appropriate situations. Section 105(a) empowers a bankruptcy court to issue any order that is necessary or appropriate to carry out the provisions of the Code, 11 U.S.C. § 105(a) …").

47.    Further, parties must comply with Court orders in their entirety. *See Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450 (1911) ("If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery."). It is "axiomatic that a court possesses the inherent authority to enforce its own orders." *In re Protarga, Inc.*, 329 B.R. 451, 479, (Bankr. D. Del. 2005) (quoting *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) (citations omitted), *aff'd*, 279 F.3d 226 (3d Cir. 2002)). *See also Travelers Indem. Co.*, 557 U.S. at 138 (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *In re Congoleum Corp.*, 636 B.R. 362, 372 n.3 (Bankr. D.N.J. 2022). This includes where parties have potentially violated orders of the Court. *See In re McLean Indus., Inc.*, 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("All courts, whether created pursuant to Article I or Article III, have inherent contempt power to enforce compliance with their lawful orders.").

48.     As stated in WellDyne's Letter, while the Agreement contains an arbitration provision, it expressly excepts injunctive or other equitable relief and allows the unoffending party to commence a judicial proceeding without first attempting arbitration.  [Ex B., p. 14, § 16].[9]

49.     The Liquidating Trustee's request that the Court enforce the Plan under section 105 of the Bankruptcy Code is a request for this Court to exercise its equitable powers and is not subject to the arbitration provision in the Agreement (to the extent even enforceable at this point).  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (noting the power given to the bankruptcy court under section 105(a) is consistent with the understanding that bankruptcy court are courts of equity).

50.     Accordingly, the Debtors request that this Court grant the equitable relief requested in this Motion and not require that the Debtors seek WellDyne's compliance with its obligations through arbitration.

### No Prior Request

51.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

### Notice

52.     The Liquidating Trustee will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the office of the U.S. Trustee; (b) any party that has requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002; and (c) counsel

---

[9] While the Liquidating Trustee is, through this Motion, only seeking equitable relief, *e.g.*, to compel WellDyne to provide the required Reports, he is not conceding that he would be otherwise forced to arbitrate other disputes under the Agreement, including disputes relating to the amount WellDyne would be required to pay the Debtors. *See, e.g.*, *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Cap. Mgmt., L.P.)*, 2021 WL 5769320, *5 (Bankr. N.D. Tex. Dec. 3, 2021) (where Bankruptcy Court held that a limited partnership agreement and the arbitration clause contained therein were separate executory contracts, both of which had been rejected by the debtor, and, accordingly, the debtor could not be forced to specifically perform under the arbitration clause.)

to WellDyne.  The Liquidating Trustee submits that, in light of the nature of the relief requested,

no other or further notice need be given.

[<em>Remainder of page intentionally left blank</em>]

WHEREFORE, the Liquidating Trustee respectfully requests entry of the Proposed Order

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated: March 3, 2026

*/s/ Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
               wusatine@coleschotz.com
               dbass@coleschotz.com
               fyudkin@coleschotz.com

*Counsel to the Liquidating Trustee and the Wind-Down Debtors*

19

**EXHIBIT A**

**PROPOSED ORDER**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>David M. Bass, Esq.<br>Felice R. Yudkin, Esq.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>dbass@coleschotz.com<br>fyudkin@coleschotz.com<br><br>*Counsel to the Liquidating Trustee and the Wind-Down Debtors* | |
| In re:<br><br>LAKEHURST AND BROADWAY CORPORATION,<br><br>                   Debtor.[1] | Chapter 11<br><br>Case No. 25-14831 (MBK) |

## ORDER GRANTING LIQUIDATING TRUSTEE'S MOTION TO ENFORCE THE PLAN AND CONFIRMATION ORDER

The relief set forth on the following pages, numbered two (2) through four (4), is **ORDERED**.

---

[1] On December 30, 2025, the Court entered the *Order Granting Debtors' Motion for Final Decree Closing Certain of the Chapter 11 Cases in New Rite Aid, LLC, et al.*, closing all cases listed therein except for the above captioned Debtor [Case No. 25-14861 (MBK), Docket No. 3695] (the "Order on Final Decree"). The Court has entered a text order on the affiliated dockets listed in the Order on Final Decree requiring that all remaining matters be filed under the above captioned case, *Lakehurst and Broadway Corporation*, Case No. 25-14831 (MBK).

(Page | 2)

| | |
|---|---|
| Debtor: | **LAKEHURST AND BROADWAY CORPORATION** |
| Case No.: | 25-14831 (MBK) |
| Caption of Order: | Order Granting Liquidating Trustee's Motion to Enforce the Plan and Confirmation Order |

Upon the *Liquidating Trustee's Motion to Enforce the Plan and Confirmation Order* (the "Motion")[1] pursuant to sections 105, 365, 524, and 1141 of the Bankruptcy Code, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final decree consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Effective Date of the Plan having occurred; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED as set forth herein

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Motion.

(Page | 3)

| | |
|---|---|
| Debtor: | **LAKEHURST AND BROADWAY CORPORATION** |
| Case No.: | 25-14831 (MBK) |
| Caption of Order: | Order Granting Liquidating Trustee's Motion to Enforce the Plan and Confirmation Order |

2.     In accordance with the binding provisions of the Plan and Confirmation Order, WellDyneRx, LLC ("<u>WellDyne</u>") is enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

3.     WellDyne shall timely perform any and all obligations under the Agreement, including, without limitation, providing to the Liquidating Trustee's counsel within seven (7) days, all required Reports due as of the date of this Order and WellDyne is hereby directed to participate meaningfully in any Reconciliation Process as set forth in the Agreement.

4.     The Liquidating Trustee is authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

5.     The terms, conditions, and provisions of this Order shall be immediately effective and enforceable upon its entry.

6.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Wind-Down Debtors or the Liquidating Trust; (b) a waiver of the Liquidating Trustee right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Liquidating Trustee rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Liquidating Trustee that any liens (contractual, common law, statutory, or otherwise) are valid,

(Page | 4)

| | |
|---|---|
| Debtor: | LAKEHURST AND BROADWAY CORPORATION |
| Case No.: | 25-14831 (MBK) |
| Caption of Order: | Order Granting Liquidating Trustee's Motion to Enforce the Plan and Confirmation Order |

and the Liquidating Trustee expressly reserve its rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

7.      Nothing contained herein is intended or should be construed to modify the terms of the Plan or Confirmation Order or any rights, claims or defenses the Liquidating Trust provided thereunder.

8.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

## EXHIBIT B

PHARMACY NETWORK PARTICIPATION AGREEMENT

This Pharmacy Network Participation Agreement ("Agreement") has an effective date of January 1, 2025 ("Effective Date") and is between WellDyneRx, LLC, a Florida limited liability company ("WellDyne"), and Rite Aid Hdqtrs. Corp., ("Rite Aid"), a Delaware Corporation, Chain Code(s) 011, 045, 056, and 181 ("Participating Pharmacy").

WellDyne maintains retail pharmacy networks and processes pharmacy claims for WellDyne's client's pharmacy benefit plans.

Participating Pharmacy owns or operates one or pharmacies and desires to participate in WellDyne pharmacy networks in accordance with this Agreement.

The parties therefore agree as follows:

1.    Definitions.

1.1.    "AWP" means the average wholesale price of a Product as reported by Medi-Span or other nationally recognized source.

1.2.    "Bankruptcy Event" means, as to a party, the party (1) files an application for or consents to the appointment of a trustee, receiver, or custodian of its assets, (2) is subject to an order for relief entered with respect to the party in proceedings under the U.S. Bankruptcy Code, as amended from time to time, (3) makes a general assignment for the benefit of creditors, (4) is subject to the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of the party unless the proceedings and the trustee, receiver, or custodian appointed are dismissed within 90 days, or (5) generally fails to pay the party's debts as the debts become due within the meaning of section 303(h)(1) of the U.S. Bankruptcy Code as determined by a bankruptcy court, or the admission in writing of such party's inability to pay its debts as they become due.

1.3.    "Brand Drug" means an FDA approved prescription drug where the Medi-Span multisource indicator attached to the 11-digit NDC indicates: (i) an "N" (single-source product available from one labeler) together with Brand Name Code "B" (branded generic name) or "T" (trademark name); (ii) an "M" (co-licensed product available from multiple labelers) together with Brand Name Code "B" (branded generic name) or "T" (trademark name); or an "O" (an original branded drug product available from one or more manufacturers as a generic) together with Brand Name Code "T" (trademark name). If the multisource code of a Brand Drug is "O" and there is a DAW Code of 1,2,7,8 or 9, or does not meet the criteria of a Generic Drug, the drug shall be considered and reimbursed as a Brand Drug. The parties agree that when a drug is identified as a Brand Name Drug, it shall be considered a Brand Name Drug for all purposes under this Agreement.

1.4.    "Brand Effective Rate" or "BER" means the combined aggregate average percentage discount off of AWP, calculated cumulatively on an annual calendar year basis, for all Brand Drugs dispensed for Covered Products or Covered Services to Members pursuant to this Agreement other than Excluded Claims during the respective calendar year.

WellDyne - Pharmacy Network Participation Agreement

1.5.    The term "business day" means Monday through Friday except Federal Reserve Bank holidays.

1.6.    "Claim" means a claim by Participating Pharmacy for payment for Covered Products or Covered Services.

1.7.    "Clean Claim" means an electronic Claim in the then most current National Council for Prescription Drug Programs (NCPDP) standard format which contains all of the information necessary for processing (including, but not limited to, the Member identification number, the Member's name and date of birth, NDC number, drug quantity, days' supply, health care provider DEA/NPI number, date of service, submitted cost amount, and U&C).

1.8.    "Cost Sharing" means a copayment, coinsurance, deductible or other payment a Member is required to pay for a Covered Product or Covered Service under a Plan.

1.9.    "Covered Products" means Products or prescription drugs, supplies, and other items prescribed by an authorized, licensed medical practitioner that are covered by a Sponsor's prescription drug program.

1.10.    "Covered Services" means services that are covered under the applicable prescription drug program issued by Sponsors, and shall include services usually and customarily rendered by retail pharmacies in the normal course of dispensing medications, including product and dosage counseling and product consultation.

1.11.    "Dispensing Fee(s)" shall mean the Pharmacy professional fee added to the Ingredient Cost Submitted and associated with the delivery of a Covered Service for Net Paid Claims. Such Dispensing Fee shall be expressed on the Net Paid Claim as the dispensing fee paid (NCPDP Field 507-F7), for the amount set forth in the Network Reimbursement Schedules.

1.12.    "Dispensing Fee Effective Rate" or "DFER" means the combined aggregate average dispensing fees, calculated cumulatively on an annual calendar year basis for all Claims for Brand Drug Dispensing Fees and Generic Drug Dispensing Fees that are Covered Services dispensed to Members pursuant to this Agreement other than Excluded Claims 2 during the respective calendar year.

1.13.    The term "Federal health care program" shall be as defined in section 1128B(f) of the Social Security Act, and includes the Medicare and Medicaid programs.

1.14.    "Generic Drug" means an FDA approved prescription drug that is not a Brand Drug. The parties agree that when a drug is identified as a Generic Drug, it shall be considered a Generic Drug for all purposes under this Agreement.

    1.14.1.    "Single Source Generic(s)" or "SSG(s)" means a drug which is indicated when using Medi-Span by (i) a code identifier of "M" or "N" with a Brand Name Code "G" or "B", or (ii) a code identifier of "Y" which is available from one (1) or two (2) manufacturers.

1.15.    "Generic Effective Rate" or "GER" means the combined aggregate average percentage discount off of AWP, calculated cumulatively on an annual calendar year basis, for all Generic Drugs dispensed for Covered Products or Covered Services to Members pursuant to this Agreement other

WellDyne - Pharmacy Network Participation Agreement

than Excluded Claims during the respective calendar year. NADAC Claims are excluded from the GER.

1.16.  "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and regulations implementing the act, as amended from time to time, including by the Health Information Technology for Economic and Clinical Health (HITECH) Act.

1.17.  "Ineligible Person" means an individual or entity who is excluded from participation in any Federal health care program.

1.18.  "MAC" means the maximum allowable cost set by WellDyne for a Generic Drug or other multisource Product.

1.19.  "Member" means an individual who is eligible for Covered Products or Covered Services under a Plan.

1.20.  "NADAC" or National Average Drug Acquisition Cost shall mean the NADAC per unit value for Generic Drugs and Brand Drugs as published by CMS, using the eleven (11) digit NDC dispensed. WellDyne shall update NADAC issued by CMS based on the effective dates for the service date of the claim.

1.21.  "NADAC Claims" means all Net Paid Claims for Generic Drugs with a published NADAC value dispensed to Members excluding: (1) Brand Drug Claims, (2) U&C Claims, (3) compound prescriptions, (4) vaccines, (5) Generic Drugs that do not have a published NADAC value as of the date of service, (6) Over-the-Counter Drugs, (7) and drugs priced on a basis other than NADAC per the Network Reimbursement Schedules.

1.22.  "Net Paid Claim" means the final paid transaction which adjudicated for dispensed Covered Products or Covered Services in accordance with the contracted reimbursement rates of the Network Reimbursement Schedules. For purposes of clarity, incomplete Claim, rejected Claim, reversal Claim, reversal reject Claim, reversal due to Claim adjustments and duplicate transactions adjudicated to WellDyne are not considered a Net Paid Claim.

1.23.  "Network Reimbursement Schedules" means a document describing the pricing and other Plan-specific terms of participation in pharmacy networks for a Plan. Initial Network Reimbursement Schedules are attached as Exhibit A.

1.24.  "Over-the-Counter Drugs" or "OTC Drugs" means an FDA approved drug that can be purchased by a Member, and does not require a prescription written by a licensed healthcare practitioner and has a Medi-Span Rx-OTC indicator of "O" or "P".  OTC Drugs shall be reimbursed in accordance with the Network Reimbursement Schedules.

1.25.  "Pharmacy Manual" means the pharmacy manual maintained by WellDyne including instructions and administrative and compliance policies and procedures for participation in WellDyne pharmacy networks.

1.26.  "Plan" means WellDyne's client's pharmacy benefit plan.

WellDyne - Pharmacy Network Participation Agreement

Docusign Envelope ID: 62337F3B-D347-4626-B175-929664FB46AB

1.27.    "Products" means, regardless of dosage form (1) FDA approved prescription drugs, (2) over the counter ("OTC") drugs, and (3) other pharmaceutical or medicinal products and supplies.

1.28.    "Specialty Drug(s)" means drugs that are more complex than most prescription medications and are used to treat patients with serious and often life-threatening conditions including, without limitation, cancer, hepatitis C, rheumatoid arthritis, HIV/AIDS, multiple sclerosis, cystic fibrosis, organ transplantation, human growth hormone deficiencies, hemophilia and other bleeding disorders. These medications may be taken orally but often must be injected or infused and may have special administration, storage and delivery requirements. Specialty Drugs shall be reimbursed in accordance with the Network Reimbursement Schedules.

1.29.    "Usual and Customary Retail Price" or "U&C" shall mean the lowest price Participating Pharmacy would charge a cash-paying customer for the identical Drug on the same date and at the same Pharmacy location at which the Drug is dispensed (in the quantity dispensed). Usual and Customary Price must include any dispensing fee and/or level of effort fee. Usual and Customary Price must also include any applicable discounts offered to attract customers and shall exclude third party cash discount card networks and/or other discount programs that require program enrollment.

1.30.    "WellDyne Processing System" means the online claims processing and adjudication system used by WellDyne.

1.31.    "WellDyne Proprietary Information" means proprietary, confidential and other non-public information relating to WellDyne's business, including Plan Sponsor information, business processes, software, the WellDyne Processing System, pricing, including MAC pricing; the Pharmacy Manual; formulary information, Member materials, and organizational structure of WellDyne, exclusive of any such information that (1) becomes generally available to the public through no act, omission or fault of Participating Pharmacy, or (2) at the time of disclosure was already in the possession of the Participating Pharmacy and not subject to any existing restriction on disclosure or use.

2.    Participation in Networks. Participating Pharmacy shall participate in WellDyne's retail pharmacy networks for Plans in accordance with this Agreement.

2.1.    Network Changes. Participating Pharmacy acknowledges that WellDyne establishes and maintains multiple retail pharmacy networks and from time to time may move clients between networks, and agrees WellDyne may restrict, suspend or terminate Participating Pharmacy participation in one or more WellDyne pharmacy networks for business reasons, or as requested by a Plan Sponsor or governmental authority. WellDyne shall notify Participating Pharmacy with ninety (90) calendar days advance written notice. WellDyne does not guarantee Participating Pharmacy a minimum amount of business under any pharmacy network under this Agreement. Removal of Participating Pharmacy from any WellDyne retail pharmacy network shall only be made effective in the subsequent calendar term.

2.2.    Changes to Network Participation. WellDyne may reduce, suspend or terminate Participating Pharmacy's network participation privileges based on Participating Pharmacy's failure to comply with this Agreement, based on behavior or practices that pose significant risk to the health, welfare or safety of Members, or promotes fraud and abuse, or is in violation of applicable laws,

WellDyne - Pharmacy Network Participation Agreement

Docusign Envelope ID: 62337F3B-D347-4626-B175-929654FB46AB

rules and regulations.

2.3.    Credentialing. Participating Pharmacy shall participate in credentialing or re-credentialing activities of WellDyne from time to time, as deemed necessary by WellDyne for compliance with applicable laws, rules and regulations, or accreditation standards.

3.    Pharmacy Services. Participating Pharmacy shall fill prescriptions and orders for Covered Products or Covered Services for Members in accordance with this Agreement, and WellDyne instructions as communicated through the WellDyne Processing System.

3.1.    Eligibility Verification. Before dispensing Covered Products to Member, Participating Pharmacy shall verify the individual's eligibility as a Member via the WellDyne Processing System.

3.2.    Messaging. When providing pharmacy services to a Member, Participating Pharmacy shall cooperate with messages sent via the WellDyne Processing System for Plan coverage, drug utilization review, formulary compliance and clinical programs.

3.3.    Generic Substitution. If a prescription allows, Participating Pharmacy will fill a prescription using a Generic Drug if in the professional opinion of the pharmacist, the Generic Drug fulfills the requirements of the prescription and applicable laws, rules and regulations.

3.4.    Signature Log. Participating Pharmacy shall maintain a signature log with signature of a Member or Member's representative for all Covered Products received by the Member, including via off-site delivery, and other information as required by applicable laws, rules and regulations.

3.5.    Cost Sharing. Participating Pharmacy shall collect Cost Sharing amounts from Members as communicated via the WellDyne Processing System.

3.6.    Member Hold Harmless. Participating Pharmacy agrees that in no event, including, but not limited to, non-payment by WellDyne or Plan Sponsor, insolvency of WellDyne or Plan Sponsor, or breach of this Agreement, shall Participating Pharmacy bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against Members or persons other than WellDyne or Plan Sponsor for Covered Products provided pursuant to this Agreement. This provision shall not prohibit collection of Cost Sharing or amounts for services which are not Covered Products in accordance with the terms of the applicable Plan, provided in the case of non-Covered Products that Participating Pharmacy has informed the Member in advance and in writing of the cost and the Member elected to have non-Covered Products provided. Participating Pharmacy further agrees that this provision (1) shall survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of Members, and (2) supersedes any oral or written contrary agreement existing or hereafter entered into between Participating Pharmacy and Members or persons acting on their behalf.

3.7.    Member Grievances. Participating Pharmacy shall participate in Member grievance processes as requested by WellDyne or Plan Sponsor, including by providing such information and cooperation in connection with the proceeding as may be reasonably appropriate.

3.8.    Pharmacy Manual. The Pharmacy Manual includes WellDyne's policies and procedures for

WellDyne - Pharmacy Network Participation Agreement

Pharmacies participating in WellDyne's pharmacy benefit management programs. WellDyne shall maintain the Pharmacy Manual and update the manual from time to time. WellDyne shall publish the most current version of the Pharmacy Manual on its website. In the event there is a conflict between the Pharmacy Manual and this Agreement, the Agreement shall prevail. To the extent the Pharmacy Manual does not conflict with this Agreement, Participating Pharmacy will comply with the Pharmacy Manual.

3.9.  <u>Dispute Resolution</u>. The parties agree that they will attempt in good faith to resolve any dispute, claim or controversy that may directly or indirectly arise out of or relate to this Agreement. If the parties are unable to resolve such dispute within thirty (30) calendar days after initial notice, either Party may, by notice to the other, have such dispute referred to a senior officer of each Party. Such officer shall attempt to resolve the dispute by good faith negotiation within thirty (30) calendar days after receipt of such notice. If the designated officers are not able to resolve such dispute within such thirty (30) calendar-day period, then the parties will be free to pursue other available remedies consistent with sections 16 and 17.5.

3.10.  <u>Standard of Care</u>.

3.10.1.  Participating Pharmacy will render pharmacy services to Members in a professional and competent manner in accordance with the standards and practices of well managed pharmacies in the United States.

3.10.2.  Participating Pharmacy shall ensure its pharmacies are properly licensed and the pharmacies operate in accordance with applicable laws, rules and regulations governing the practice of pharmacy.

3.10.3.  Participating Pharmacy shall ensure that all services, both clinical and non-clinical, are provided in a culturally competent manner and are accessible to all Members, including those with limited English proficiency, limited reading skills, hearing incapacity, or those with diverse cultural and ethnic backgrounds.

3.10.4.  Nothing in this Agreement is intended to override the professional judgement of Participating Pharmacy's licensed pharmacists.

3.11.  <u>Non-Discrimination</u>. Participating Pharmacy shall not exclude Members or treat them differently based on membership in a Plan, health status, age, gender, sex, race, color, disability, ethnic group, national origin, religion, or protected class under applicable laws, rules and regulations, or making a distinction in favor of or against, the Member based on the group, class, or category to which the Member belongs rather than on personal merit.

3.12.  <u>FDA NDC Directory</u>. Participating Pharmacy shall not submit Claims to WellDyne for drugs that are not listed in the NDC Directory maintained by the U.S. Food and Drug Administration. WellDyne may deny or reverse a Claim for a drug that is not listed in the NDC Directory, and may recover amounts paid for such Claims as overpayments.

4.  <u>Claims Submission</u>. Participating Pharmacy shall submit Clean Claims to WellDyne via the WellDyne Processing System for Covered Products or Covered Services dispensed to a Member within 30 days of the date of dispensing.

WellDyne - Pharmacy Network Participation Agreement

4.1.   Participating Pharmacy shall reverse a Claim via the WellDyne Processing System where the Covered Product is not delivered to the Member within 14 days of the date of the Claim transmission.

5.   <u>Reimbursement</u>.

5.1.   WellDyne shall pay Participating Pharmacy for Covered Products dispensed to Members or Covered Services in accordance with this Agreement. Reimbursement rates may vary from Plan to Plan as determined by the Network Reimbursement Schedules and online transaction response via the WellDyne Processing System as follows:

5.1.1.   Participating Pharmacy agrees to WellDyne's zero balance pricing logic: If the Cost Sharing amount for a Covered Product or Covered Service is more than Participating Pharmacy's U&C Retail Price for the Product, Participating Pharmacy shall collect the U&C Retail Price from the Member.

5.1.2.   Reimbursement will be limited by Participating Pharmacy's submitted ingredient cost plus dispensing fee (plus tax, if applicable), total submitted gross amount due, or U&C Retail Price.

5.2.   WellDyne shall process Clean Claims and pay Participating Pharmacy for approved Clean Claims on a twice monthly basis.

5.2.1.   For Clean Claims approved between the first and 15th of the month, WellDyne will pay Participating Pharmacy by the 15th of the following month. For Clean Claims approved between the 16th and end of the month, WellDyne will pay Participating Pharmacy by the end of the following month. All Clean Claims shall be paid via ACH.

5.2.2.   Notwithstanding the foregoing section, if applicable laws, rules or regulations respecting prompt payment of Clean Claims require payment within a shorter timeframe than is required by the foregoing section, WellDyne will pay Participating Pharmacy for approved Clean Claims within the timeframe required by such applicable laws, rules or regulations.

5.3.   Remittance Files

5.3.1.   At the time of adjudication for electronic claims or the time of reimbursement for nonelectronic claims, WellDyne shall provide Participating Pharmacy with a remittance, including such detailed information as is necessary for the pharmacy or pharmacist to identify the reimbursement schedule for the specific network applicable to the claim and which is the basis used by WellDyne to calculate the amount of reimbursement paid. This information must include, but is not limited to, the applicable Network ID or plan ID as defined in the most current version of the National Council for Prescription Drug Programs (NCPDP) Telecommunication Standard Implementation Guide, or its nationally recognized successor industry guide.

5.3.2.   WellDyne must ensure that the Electronic Remittance Advice contains claim level payment adjustments in accordance with the American National Standards Institute

WellDyne - Pharmacy Network Participation Agreement

Accredited Standards Committee, X12 format, and includes or is accompanied by the appropriate level of detail for Participating Pharmacy to reconcile any debits or credits, including, but not limited to, pharmacy NCPDP or NPI identifier, date of service, prescription number, refill number, adjustment code, if applicable, and transaction amount.

5.3.3.   Participating Pharmacy shall dispute any amount on a WellDyne remittance by giving notice to WellDyne within 15 days of the remittance date specifying in reasonable detail the nature of the dispute. If Participating Pharmacy fails to dispute remittance in a timely manner pursuant to this paragraph, (1) the remittance shall be deemed to be correct in all respects, and (2) Participating Pharmacy shall be deemed to have waived all rights to contest the remittance.

5.4.   Participating Pharmacy acknowledges that Claim payments are funded by Plan Sponsors, and agrees that WellDyne is not liable to Participating Pharmacy for Claims payments, interest or late fees where Plan Sponsor does not timely provide WellDyne sufficient funds to pay the Claims. WellDyne will require Plan Sponsors to fund Claims in a timely manner and will use best efforts to collect Claims funding from Plan Sponsors; provided that in the event of late payment or non-payment by a Plan Sponsor, WellDyne shall not be required to commence litigation or other legal proceedings against the Plan Sponsor to obtain payment.

6.   Term. Unless this Agreement is terminated sooner in accordance with its terms, the initial term of this Agreement shall begin on the Effective Date and continue for one year. Thereafter, the term of this Agreement shall automatically be extended for successive periods of one year each unless a party gives written notice to the other at least one-hundred and eighty (180) calendar days prior to the last day of the initial term or ninety (90) calendar days prior to the renewal term, as the case may be, that this Agreement shall not be further extended.

7.   Termination.

7.1.   Termination for Cause. Either party may terminate this Agreement immediately by giving notice to the other upon the occurrence of either of the following:

7.1.1.   The other commits a material breach of this Agreement that remains uncured for a period of 90 days after notice of such breach is given to the breaching party specifying in reasonable detail the nature of the breach.

7.1.2.   The other party undergoes a Bankruptcy Event.

7.1.3.   WellDyne shall remit, on or before March 23, 2025 ("Final Settlement Date"), to Participating Pharmacy at least $1,003,231.00 in its entirety (the "2024 Settlement Amount"). Furthermore, WellDyne will provide the outstanding quarter three and quarter four reconciliation reports ("Outstanding Reconciliation Report") for 2024 by March 23, 2025.  If either the 2024 Settlement Amount is not paid, in full, by the aforementioned date, and/or the Outstanding Reconciliation Reports are not provided to Participating Pharmacy by the aforementioned date, then Participating Pharmacy may without the need for notice, move for immediate termination of any and all agreement(s) by and between the Parties.

WellDyne - Pharmacy Network Participation Agreement

7.2.    <u>Immediate Termination</u>. WellDyne may terminate this Agreement immediately by giving notice to Participating Pharmacy upon the occurrence of any of the following:

    7.2.1.    Participating Pharmacy's pharmacy license is limited, suspended or revoked.

    7.2.2.    Participating Pharmacy has violated or is under investigation by a governmental authority for violation of applicable laws, rules and regulations, including:

        7.2.2.1. Board of Pharmacy regulations related to practice standards, including as to proper filling and labeling of prescriptions.

        7.2.2.2. Laws, rules and regulations related to patient confidentiality, including HIPAA.

        7.2.2.3. Laws, rules and regulations related to control or diversion of controlled substances.

        7.2.2.4. Laws, rules and regulations related to fraud, waste and abuse.

    7.2.3.    Participating Pharmacy fails to comply with WellDyne credentialing or recredentialing programs, compliance programs, or pharmacy audit programs.

    7.2.4.    An employee or contractor performing this Agreement for Participating Pharmacy is an Ineligible Person.

7.3.    <u>Termination for Convenience by WellDyne or Participating Pharmacy</u>. WellDyne or Participating Pharmacy may terminate this Agreement for any reason by giving ninety (90) calendar days' advance written notice to the other party.

7.4.    <u>Prospective Termination for Convenience by Participating Pharmacy</u>. Participating Pharmacy may prospectively terminate the addition of new Plans to the Agreement by giving ninety (90) calendar days' notice to WellDyne.

7.5.    <u>Termination by Network</u>. Pharmacy may elect to discontinue participation in a network by providing thirty (30) calendar days prior written notice to WellDyne, unless a longer period is required by applicable state law.

7.6.    <u>Effect of Termination</u>. As of the termination date of this Agreement, neither party shall have any further rights or obligations hereunder except (1) as otherwise expressly provided in this Agreement; (2) for those accruing prior to such termination date; and (3) for those arising as a result of any uncured breach of this Agreement by the party prior to such termination date.

8.    <u>Record Keeping and Audit</u>.

8.1.    <u>Record Keeping</u>. Participating Pharmacy shall, in accordance with prudent record-keeping procedures, industry best practices, and applicable laws, rules and regulations, keep all books, records, documentation, data files, accounts, drug purchase invoices and pedigrees, signature logs of Claim transactions including original prescription order and other information required to validate the accuracy, completeness of the purchase of Products, dispensing of Covered

WellDyne - Pharmacy Network Participation Agreement

Products to Members, submission of Claims, and verification of pharmacy, pharmacist, pharmacy technician licenses and credentials ("Records").

8.2.    <u>Retention Period</u>. Participating Pharmacy shall maintain each Record for 10 years from the date of creation of the Record, or such longer period required by applicable laws, rules and regulations.

8.3.    <u>WellDyne Right to Audit</u>. WellDyne shall, subject to and in accordance with applicable laws, rules and regulations, have the right upon reasonable notice and at reasonable times to examine and audit Participating Pharmacy's Records and facilities with respect to items or services provided by Participating Pharmacy under this Agreement or other aspects of Participating Pharmacy's performance of the Agreement. An audit may include a desk audit or on-site audit. Participating Pharmacy shall cooperate with WellDyne and promptly provide access to all Records and facilities for conduct of the examination or audit. Records include prescription files, signature logs, wholesaler, manufacturer, and distributor purchase records excluding pricing information, related to covered prescription services.

8.3.1.    WellDyne shall have the right to audit claims for up to two (2) years from the date of Claim submission or as otherwise required by law.  WellDyne may report audit findings to Plan Sponsors, appropriate governmental entities, regulatory agencies and professional review and audit organizations. Further details regarding WellDyne's pharmacy audit program are in the Pharmacy Manual. In the event there is a conflict between the Pharmacy Manual and this Agreement, the Agreement shall prevail. Furthermore, WellDyne shall have the right to audit no more than ten percent (10%) of Participating Pharmacy Claims per calendar year, and no more than five percent (5%) of Participating Pharmacy store locations per month. However, if an audit uncovers indications of waste, fraud or abuse, WellDyne may expand the audit, as mutually agreed upon by WellDyne and Participating Pharmacy.

8.3.2.    Desk-Top Audits. Participating Pharmacy will allow no more than fifteen percent (15.0%) of store locations to have desk-top audits per month. Desk-top audits shall account for no more than sixty percent (60%) of Participating Pharmacy's claims audited annually. However, if an audit uncovers indications of waste, fraud or abuse, WellDyne may expand the audit, as mutually agreed upon by WellDyne and Participating Pharmacy. WellDyne shall provide Participating Pharmacy at least fifteen (15) calendar days' notice (or as required by applicable Law) to provide the requested records. The desktop audit notice shall be provided to Participating Pharmacy by electronic mail to <u>rxaudit@riteaid.com</u> and will include a list of requested materials for review, including, but not limited to, a list of prescription numbers and deadline for submitting materials. Participating Pharmacy may request an extension, which shall not be unreasonably withheld by WellDyne.

8.3.3.    <u>On-Site Audits</u>. <u>WellDyne</u> shall provide Participating Pharmacy written notice by electronic mail at least twenty (20) calendar days before conducting the initial on-site audit. Pharmacy shall have the ability to reschedule the on-site audit within seven (7) calendar days if necessary for each audit cycle. WellDyne shall disclose the specific Claim and prescription order for Covered Products and Covered Services to be included in the audit. WellDyne must provide 48-hour notice should an on-site audit need to be

rescheduled. The on-site audit notice will be provided to Participating Pharmacy by electronic mail to rxaudit@riteaid.com. WellDyne nor its auditor shall conduct an on-site audit at a particular pharmacy more than one time annually, except for investigations into alleged fraud, willful misrepresentation, or potential harm to Members.

Unless otherwise consented to by Participating Pharmacy, an on-site audit shall (i) take place during Participating Pharmacy's normal business hours, (ii) not be initiated or scheduled during the first five (5) calendar days of any month, or (iii), not occur on the day of, before or after a federal holiday, except for investigations into alleged fraud or willful misrepresentations that require an urgent, time-sensitive review (iii), audits shall not be scheduled during the last week of December or the first week of January of each year and shall not be scheduled on a weekend, (iv) require an auditor to be escorted by a pharmacy employee in order to enter the area of any pharmacy where patient-specific information is available and (iv) to the extent possible, each auditor is required to remain out of the sight and hearing range of any pharmacy customer.

8.3.4.   Audit Findings. The preliminary audit report shall be delivered to Participating Pharmacy within thirty (30) calendar days, with reasonable extensions allowed and communicated to Participating Pharmacy, after conclusion of the audit, and shall contain Claim level information for any discrepancy found and total dollar amount of Claims subject to recovery. Participating Pharmacy shall be allowed at least thirty (30) calendar days, or such longer time as communicated by WellDyne, following receipt of the preliminary audit report in which to produce documentation to address any discrepancy found during an audit or to file an appeal.

8.4.   Audit by Governmental Entity. Participating Pharmacy shall cooperate with and promptly provide access to all Records and facilities as part of any audit of Participating Pharmacy conducted by a governmental entity of appropriate jurisdiction with respect to items or services provided by Participating Pharmacy under this Agreement or other aspects of Participating Pharmacy's performance of the Agreement.

9.   Indemnification.

9.1.   Each party ("Indemnitor") shall indemnify, defend, and hold harmless the other party and its officers, directors, shareholders, employees, and agents ("Indemnitees") from and against any and all nonparty claims, or actions for damages, liabilities (including strict liability), penalties, costs and expenses (including reasonable legal fees, expenses and costs) to the extent caused by (1) the negligence or willful misconduct of the Indemnitor or any of its employees or agents in connection with the performance of this Agreement, or (2) any breach of any representation, warranty or covenant under this Agreement by the Indemnitor or any of its employees or agents. This provision shall survive termination of this Agreement.

9.2.   Indemnitee shall notify Indemnitor of any matter that is subject to indemnification hereunder as soon as reasonably practicable following Indemnitee receiving notice of the matter. Such notice shall include in reasonable detail a description of the nature of the matter and the dispute underlying the request for indemnification. The failure by Indemnitee to notify Indemnitor will not relieve Indemnitor from any liability which it may have to Indemnitee under this Agreement,

Page 11 of 33

except to the extent that such failure or delay materially prejudices Indemnitor. Indemnitee shall give Indemnitor such information and cooperation in connection with the indemnification claim as may be reasonably appropriate. Indemnitor shall not be liable to indemnify Indemnitee for a settlement of a proceeding (or any part thereof) without the Indemnitor's prior written consent, which shall not be unreasonably withheld, conditioned or delayed. Indemnitor may not settle any proceeding (or any part thereof) in a manner that imposes a penalty or liability on Indemnitee without Indemnitee's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

10.    Insurance. Participating Pharmacy shall secure and maintain the following insurance or self-insurance coverages with respect to itself and its employees, covering events occurring during the term of this Agreement, which insurance shall not be cancelable except upon 30 days' prior notice to WellDyne:

   10.1.    Commercial general liability insurance covering bodily injury and property damage to third parties and including blanket contractual liability with limits of $1 million per claim or occurrence and $3 million general aggregate.

   10.2.    Professional liability (errors and omissions) insurance with limits of $1 million per claim or occurrence and $3 million aggregate.

   10.3.    Workers' compensation in accordance with state law and employers' liability insurance in the minimum amount of $100,000.

Participating Pharmacy shall provide WellDyne with certificates of insurance (or comparable evidence of self-insurance) reflecting satisfaction of the foregoing requirements of this section and, in the case of insurance, naming WellDyne as an additional insured promptly, but in no event later than three business days, following request by WellDyne.

11.    Limited Liability. Neither party will be liable to the other for special, incidental, or exemplary damages. The foregoing limitation shall not exclude or limit liability of a party for indemnity or contribution claims from the other arising out of or with respect to third party claims or breach of the confidentiality provisions of this Agreement.

12.    WellDyne Proprietary Information.

   12.1.    In carrying out this Agreement, WellDyne may disclose WellDyne Proprietary Information to Participating Pharmacy, and Participating Pharmacy agrees that it shall (1) hold the WellDyne Proprietary Information in confidence and protect it with the same degree of care that Participating Pharmacy uses to protect its own confidential and proprietary information, but in no event shall Participating Pharmacy use less than reasonable care, and (2) not use such information for Participating Pharmacy's own business other than as necessary to carry out this Agreement.

   12.2.    If Participating Pharmacy receives a subpoena or other request to disclose WellDyne Proprietary Information pursuant to law, legal process or regulatory authority, then unless prohibited by law Participating Pharmacy shall promptly give notice to WellDyne of the subpoena or other request in order to enable WellDyne to (1) seek an appropriate protective order or other remedy; (2) consult with Participating Pharmacy as to WellDyne's taking steps to resist or narrow the scope of the subpoena or other request; or (3) waive compliance, in whole or in part, with the terms of

this confidentiality provision. If a protective order or other remedy is not obtained in a timely manner, or WellDyne waives compliance, in whole or in part, with the terms of this confidentiality provision, Participating Pharmacy shall limit the disclosure of WellDyne Proprietary Information to only that portion of the information which it is legally required to disclose and, to the extent possible, require that WellDyne Proprietary Information that is disclosed will be accorded confidential treatment.

12.3.    WellDyne Proprietary Information shall remain the sole property of WellDyne.

13.    <u>Use of Names</u>. WellDyne will include Participating Pharmacy locations in lists of participating pharmacies for Plans where Participating Pharmacy is in network. WellDyne may use Participating Pharmacy's name, trademarks, service marks or logos in promotional materials provided to prospective Plan Sponsors and Members.

14.    <u>Compliance</u>. This Agreement is subject to applicable laws, rules and regulations, and accreditation standards, including during the term of this Agreement new or changes to (1) applicable laws, rules or regulations, (2) decisions of a Court or guidance of an administrative body interpreting any of the foregoing, or (3) accreditation standards that apply to WellDyne or a Plan Sponsor.

14.1.    In carrying out its responsibilities under this Agreement, each party shall comply with all applicable laws, rules and regulations, including (1) Federal laws, rules and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Social Security Act); and (2) HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164.

14.2.    WellDyne may require, and Participating Pharmacy shall provide, access to Member records for purposes of managing pharmacy benefits under a Plan and any other lawful purpose.

14.3.    <u>Ineligible Persons</u>. Participating Pharmacy shall ensure that no individual or entity carrying out Participating Pharmacy's responsibilities under this Agreement is an Ineligible Person.

14.4.    <u>Compliance Programs</u>. Participating Pharmacy shall participate in programs instituted by WellDyne for prevention of fraud, waste and abuse.

14.5.    <u>Regulatory Addenda</u>. WellDyne maintains and updates regulatory addenda as part of the Provider Manual. The regulatory addenda are incorporated into this Agreement. Current copies of the regulatory addenda are attached to this Agreement.

15.    <u>Required Notices</u>. Participating Pharmacy shall give notice to WellDyne within five business days of any of the following events:

15.1.    Participating Pharmacy's pharmacy license is limited, suspended or revoked.

15.2.    Participating Pharmacy receives notice that it is under suspicion or investigation by a governmental authority for violation of laws, rules or regulations, including:

15.2.1.  Board of Pharmacy regulations related to practice standards, including as to proper filling

WellDyne - Pharmacy Network Participation Agreement

and labeling of prescriptions.

15.2.2.  Laws, rules and regulations related to patient confidentiality, including HIPAA.

15.2.3.  Laws, rules and regulations related to control or diversion of controlled substances.

15.2.4.  Laws, rules and regulations related to fraud, waste and abuse.

15.3.   An employee or contractor performing this Agreement for Participating Pharmacy is an Ineligible Person.

15.4.   Participating Pharmacy becomes non-compliant with the requirements to maintain insurance set forth in this Agreement.

15.5.   Participating Pharmacy receives a complaint or grievance from a Member or individual, including a practitioner, acting on a Member's behalf.

15.6.   Participating Pharmacy suspects identity theft by an individual professing to be a Member or acting for a Member.

15.7.   Participating Pharmacy suspects a Member or a participating provider, including a practitioner, is engaged in activity that is conducive to fraud, waste or abuse.

15.8.   Participating Pharmacy undergoes a Bankruptcy Event.

16.   <u>Arbitration</u>. Any dispute arising out of or relating to this Agreement or the subject matter of this Agreement, or any breach of this Agreement, including any dispute regarding the scope of this section, will be resolved through arbitration administered by the American Health Lawyers Association Dispute Resolution Service and conducted pursuant to the AHLA Rules of Procedure for Arbitration. Such arbitration shall take place in Tampa, Florida. Judgment on the award may be entered and enforced in any court having jurisdiction. Notwithstanding any contrary provision in this Agreement, a party may commence a judicial proceeding, without having first complied with the provisions of this section, to seek injunctive or other equitable relief necessary to prevent irreparable harm. This arbitration provision shall survive termination of this Agreement.

17.   <u>Miscellaneous</u>.

17.1.   <u>Force Majeure</u>. A party shall be excused for any delay or failure in performing this Agreement (except for any delay or failure related to the payment of money) to the extent that the delay or failure is caused by acts of God, terrorism, fires, explosions, labor disputes, accidents, civil disturbances, epidemic or pandemic, material shortages or other similar causes beyond its reasonable control, even if such delay or failure is foreseeable.

17.2.   <u>Disaster Recovery</u>. Notwithstanding the foregoing force majeure provision, Participating Pharmacy shall use best efforts to provide pharmacy services hereunder in the case of a disaster. Participating Pharmacy shall have in place a disaster recovery plan for business continuity and the performance of the pharmacy services hereunder in the event of a disaster, which plan shall include periodic testing by Participating Pharmacy, and which shall meet requirements of

WellDyne - Pharmacy Network Participation Agreement

applicable laws, rules and regulations and accreditation standards. Participating Pharmacy shall provide a copy of the disaster recovery plan to WellDyne upon request.

17.3.    Independent Contractors. WellDyne and Participating Pharmacy are independent contractors. This Agreement shall not be deemed to create a partnership or joint venture, or employment or agency relationship between the parties. Neither party has any right or authority to assume or create any obligation or responsibility on behalf of the other party.

17.4.    Third Parties. This Agreement has no third party beneficiaries and do not create any rights enforceable by any third party.

17.5.    Governing Law. This Agreement is governed by Florida law. Each party consents to be subject to the exclusive jurisdiction and venue of the Florida state courts of the 10th Judicial Circuit for Polk County, Florida or, as applicable, the Federal District Court for the Middle District of Florida in Tampa, Florida, in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

17.6.    Notice. All notices permitted or required under this Agreement will be in writing and will be delivered by personal delivery, U.S. mail, overnight courier, electronic mail, or facsimile transmission, and will be deemed given upon personal delivery, five (5) days after deposit in the U.S. mail, on the second business day following deposit with an overnight courier, upon acknowledgment of receipt of electronic transmission, or refusal to accept delivery. Notices will be sent to the addresses set forth at the end of this Agreement or such other address as either party may specify in writing.

17.7.    No Assignment. Participating Pharmacy may not assign any of its rights or delegate any of its duties or obligations under this Agreement, in whole or in part, without the prior written consent of WellDyne. A change of control of Participating Pharmacy, including via a sale of securities or merger, shall be considered an assignment for purposes of this paragraph. WellDyne may withhold consent for a proposed arrangement whereby control of Participating Pharmacy would be transferred to a competitor of WellDyne.

17.8.    Amendment.  This Agreement including all attachments, exhibits, amendments, addendums, and other documents to which this Agreement refers or which are attached hereto, may only be changed, amended, or altered in written form, signed by both parties, and attached hereto and incorporated herein as referenced, except as set forth in this Agreement.

17.9.    Entire Agreement. Network Reimbursement Schedules that have been agreed to by both parties and fully executed are incorporated into this Agreement. This Agreement includes the complete agreement between the parties and supersedes all previous agreements and understandings (whether verbal or in writing) related to the subject matter of this Agreement.

17.10.    No Waiver. No waiver of this Agreement shall be effective unless in writing and signed by the waiving party. A waiver by a party of a breach or failure to perform this Agreement shall not constitute a waiver of any subsequent breach or failure.

17.11.    Severability. When possible, each provision of this Agreement shall be interpreted in such manner as to be effective, valid, and enforceable under applicable law. If any provision of this

WellDyne - Pharmacy Network Participation Agreement

Agreement is held to be prohibited by, or invalid or unenforceable under, applicable law, such provision shall be ineffective only to the express extent of such prohibition, unenforceability or invalidity, without invalidating the remainder of this Agreement.

17.12.  <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

Each party is signing this Agreement on the date under the party's signature.

| WellDyneRx, LLC | Rite Aid Hdqtrs. Corp., ("Rite Aid"), Chain Code(s) 011, 045, 056, and 181 |
|---|---|
| By: _____ | By: _____ |
| Name: Michael Amiet | Name: Peter Bonnick |
| Title: Chief Supply Chain Officer | Title:  GVP, Market Access |
| Date:  March 31, 2025 | Date: 4/3/2025 \| 2:38 AM PDT |
| Notice Address: | Notice Address: |
| WellDyneRx, LLC<br>Attn: Legal Department<br>500 Eagles Landing Dr.<br>Lakeland, FL 33810 | Rite Aid Hdqtrs. Corp.<br>Attention: VP, Market Access Relations<br>200 Newberry Commons<br>Etters, PA 17319 |

WellDyne - Pharmacy Network Participation Agreement

<u>**Exhibit A**</u>
<u>**Network Reimbursement Schedules**</u>

<u>***EXTENDED RETAIL NETWORK (BROAD NETWORK) REIMBURSEMENT RATES***</u>:

For 1-83 Days' Supply

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -18.60% | $0.75 | 86.45% | $0.75 |
| 1/1/2026 | AWP -18.60% | $0.75 | 86.65% | $0.65 |

For 84+ Days' Supply

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -21.75% | $0.00 | 86.70% | $0.00 |
| 1/1/2026 | AWP -21.75% | $0.00 | 86.90% | $0.00 |

<u>***EXTENDED RETAIL COST PLUS (BROAD NETWORK) REIMBURSEMENT RATES:***</u>

For 1-83 Days' Supply

| Effective Dates | Lower of U&C or rate below (NADAC + Dispensing Fee, or AWP + Dispensing Fee) | | |
|---|---|---|---|
| 1/1/2025 – 12/31/2025 | BRAND DRUG RATE: AWP –18.90% + $1.50 | GENERIC NADAC DRUGS: NADAC + $10.00 | GENERIC NON-NADAC DRUGS*: AWP -20.00% + $1.50 |
| 1/1/2026 | BRAND DRUG RATE: AWP –18.90% + $1.40 | GENERIC NADAC DRUGS: NADAC + $9.75 | GENERIC NON-NADAC DRUGS*: AWP -21.00% + $1.40 |

For 84+ Days' Supply

| Effective Dates | Lower of U&C or rate below (NADAC + Dispensing Fee, or AWP + Dispensing Fee) | | |
|---|---|---|---|
| 1/1/2025 –1 2/31/2025 | BRAND DRUG RATE: AWP –18.90% + $1.50 | GENERIC NADAC DRUGS: NADAC + $12.50 | GENERIC NON-NADAC DRUGS*: AWP -20.00% + $1.50 |
| 1/1/2026 | BRAND DRUG RATE: AWP –18.90% + $1.40 | GENERIC NADAC DRUGS: NADAC + $12.25 | GENERIC NON-NADAC DRUGS*: AWP -21.00% + $1.40 |

* Generic Drugs that do not have a published NADAC value as of the date of service.

<u>***LIMITED RETAIL NETWORK REIMBURSEMENT RATES***</u>:

Limited Retail Pharmacy Network reimbursement rates as indicated below shall apply to benefit groups that

WellDyne - Pharmacy Network Participation Agreement

enroll in a retail pharmacy network that includes Participating Pharmacy and excludes at least one (1) national retail pharmacy chain consisting of no less than seven thousand (7,000) locations and accounting for at least 20% of open network market volume. As used herein "retail pharmacy chain" means a company the revenue for which is at least fifty percent (50%) derived from pharmacy services. WellDyne shall make best effort to provide Participating Pharmacy thirty (30) calendar days' written notice of group enrollment and shall provide data that will assist Participating Pharmacy in its efforts to measure market share gains for such groups.

For 1-83 Days' Supply

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -21.50% | $0.50 | 86.85% | $0.50 |
| 1/1/2026 | AWP -21.50% | $0.50 | 86.95% | $0.40 |

For 84+ Days' Supply

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -25.00% | $0.00 | 87.00% | $0.00 |
| 1/1/2026 | AWP -25.00% | $0.00 | 87.35% | $0.00 |

**_MEDICARE PART D  RETAIL NETWORK (BROAD NETWORK) REIMBURSEMENT RATES:_**

For 1-83 Days' Supply

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -18.60% | $0.75 | 86.45% | $0.75 |
| 1/1/2026 | AWP -18.60% | $0.75 | 86.65% | $0.65 |

For 84+ Days' Supply

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -21.75% | $0.00 | 86.70% | $0.00 |
| 1/1/2026 | AWP -21.75% | $0.00 | 86.90% | $0.00 |

**_SOUND HEALTH & WELLNESS TRUST CUSTOM RETAIL NETWORK REIMBURSEMENT RATES_:**

For 1-83 Days' Supply

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -19.35% | $0.40 | 88.50% | $0.40 |
| 1/1/2026 | AWP -19.35% | $0.35 | 88.65% | $0.35 |

For 84+ Days' Supply

WellDyne - Pharmacy Network Participation Agreement

| Effective Dates | BER | BRAND DISPENSING FEE | GER | GENERIC DISPENSING FEE |
|---|---|---|---|---|
| 1/1/2025 – 12/31/2025 | AWP -23.75% | $0.00 | 88.50% | $0.00 |
| 1/1/2026 | AWP -23.75% | $0.00 | 88.65% | $0.00 |

### *VACCINE REIMBURSEMENT RATE:*

For all Days' Supply

| Effective Date | BRAND DRUG RATE | BRAND DISPENSING FEE | ADMINISTRATION FEE |
|---|---|---|---|
| 1/1/2025 | AWP -18.00% | $1.50 | $20.00 |

### *SINGLE SOURCE GENERICS REIMBURSEMENT RATE:*

For 1-83  Days' Supply

| Effective Date | SINGLE SOURCE GENERIC DRUG RATE | SINGLE SOURCE GENERIC DRUG DISPENSING FEE | SINGLE SOURCE GENERIC DRUG RATE NON-NADAC* | SINGLE SOURCE GENERIC DRUG RATE DISPENSING FEE NON-NADAC* |
|---|---|---|---|---|
| 1/1/2025 | NADAC | $10.00 | AWP -35.00% | $ 1.00 |

For 84+ Days' Supply

| Effective Date | SINGLE SOURCE GENERIC DRUG RATE | SINGLE SOURCE GENERIC DRUG DISPENSING FEE | SINGLE SOURCE GENERIC DRUG RATE NON-NADAC* | SINGLE SOURCE GENERIC DRUG RATE DISPENSING FEE NON-NADAC* |
|---|---|---|---|---|
| 1/1/2025 | NADAC | $12.50 | AWP -35.00% | $ 1.00 |

\* Generic Drugs that do not have a published NADAC value as of the date of service.

**Exhibit B**

Page 19 of 33

WellDyne - Pharmacy Network Participation Agreement

## BER GER AND DFER CALCULATIONS AND
## RECONCILIATION PROCESS

### BER GER AND DFER CALCULATIONS

1.1    The Generic Effective Rate "GER" shall be calculated as (A-B)/A = GER, where for purposes of this formula:

**A** = the sum of the total AWP for Generic Drugs dispensed other than Excluded Claims. (i.e., the NDC's unit AWP on the day dispensed using the eleven (11) digit NDC dispensed, multiplied by the metric decimal quantity dispensed), and
**B** = the sum of all amounts paid to Participating Pharmacy by WellDyne, on the ingredient cost for Generic Drugs dispensed.

1.2.    The Brand Effective Rate "BER" shall be calculated as (A-B)/A = BER, where for purposes of this formula:

**A** = the sum of the total AWP for Brand Drugs dispensed other than Excluded Claims. (i.e., the NDC's unit AWP on the day dispensed using the eleven (11) digit NDC dispensed, multiplied by the metric decimal quantity dispensed), and
**B** = the sum of all amounts paid to Participating Pharmacy by WellDyne on the ingredient cost for Brand Drugs dispensed

1.3    The Dispensing Fee Effective Rate "DFER" shall be calculated as A/B = DFER, where for purposes of this formula:

**A** = the sum of the Dispensing Fees for applicable Claims other than Excluded Claims 2, and
**B** = the total number of applicable Claims dispensed

2.1    **Claims Excluded from BER and GER Calculations.** The following claims shall be excluded from BER and GER calculations:

Coordination of benefit ("COB") Claims where WellDyne is not the primary payer, compound prescriptions, Claims that adjudicate at Participating Pharmacy's U&C Retail Price at the point of sale, vaccines, and NADAC Claims (collectively, "Excluded Claims.") For purposes of clarity, any other reimbursement between the parties are all excluded from the BER and GER calculations.

**Brand, Generic, and Dispensing Fee Effective Rates**. Unless specifically excluded, all Participating Pharmacy Claims for Generic Drugs shall be subject to a GER, all Participating Pharmacy Claims for Brand Drugs shall be subject to a BER.

2.2    **Claims Excluded from DFER Calculations**. The following claims shall be excluded from the DFER calculations:

Coordination of benefit ("COB") Claims where WellDyne is not the primary payer, compound prescriptions, and Claims that adjudicate at Participating Pharmacy's U&C Retail Price at the point of sale, (collectively,

"Excluded Claims 2"). For purposes of clarity, any other reimbursement between the parties are all excluded from the DFER calculations.

**Dispensing Fee Effective Rates**. Unless specifically excluded, all Participating Pharmacy Claims shall be subject to a DFER.

## RECONCILIATION PROCESS

1. **Reporting**

For each report type in Exhibit B, WellDyne shall provide one report for NADAC Claims and one report for non-NADAC Claims.  WellDyne shall not mix NADAC and non-NADAC Claims in any report.

1.1. **Initial Summary Report.  "Initial Summary Report Period"** means January 1st through January 31st of the current calendar year.  On or before March 1st of each calendar year, WellDyne will provide Participating Pharmacy a summary report ("Initial Summary Report") in a CSV compliant format for all adjudicated Brand and Generic Drug Claims processed and paid during the Initial Summary Report Period of the current calendar year.  Each Initial Summary Report shall include the following information:

(a)   The actual reimbursement (**"Actual Reimbursement"**).

(b)   The difference between the Actual Reimbursement and the applicable NADAC or AWP contracted reimbursement rate set forth in this Agreement.

(c)   Identification of whether the Actual Reimbursement is less than the applicable NADAC or AWP contracted reimbursement rate set forth in this Agreement.

(d)   Identification of whether the applicable NADAC or AWP contracted reimbursement rate for all WellDyne BIN Net Paid Claims exceeds the Actual Reimbursement (**"Initial Report Variance"**) and the calculated difference ("**Initial Report Variance Amount**").

1.2. **Initial Claims Report.** On or before February 14th of each calendar year, WellDyne will provide Participating Pharmacy a Claims report ("**Initial Claims Report**") detailing all Claims paid during the Initial Summary Report Period of the current calendar year in a CSV compliant format. Such reports shall only include the final transaction for each Claim as of January 31st, for clarity WellDyne shall not combine transactions, and shall instead list the Net Paid Claim only, and include at a minimum:

a)   The prescription number associated with each Claim
b)   The dispensing pharmacy NCPDP number
c)   The fill date
d)   The 11-digit NDC
e)   The drug type Brand/Generic indicator
f)   The metric quantity of the drug
g)   The ingredient cost paid
h)   Total reimbursement made to Participating Pharmacy (total amount paid and Member's Copayment)
i)   Copayment cost-sharing amount by Member

WellDyne - Pharmacy Network Participation Agreement

j)   The Dispensing Fee paid
k)   Indicator to pricing type used  (i.e. NADAC or AWP / etc.)
l)   National Average Drug Acquisition Cost (NADAC) or Average Wholesale Price (AWP) whichever is applicable
m)   Usual and Customary Retail Price (U&C)
n)   Claim reference number
o)   A Network ID
p)   An identifier as to whether the Claim will be included or excluded from the BER, GER, and/or DFER calculation
q)   Reason for exclusion

For purposes of clarity and as example, NADAC Claims shall be excluded from the GER/BER, and stated as such in the Initial Claims Report. WellDyne and Participating Pharmacy shall work in good faith to reconcile any difference identified.

1.3.   **Quarterly Summary Reports.** Within thirty (30) calendar days after the end of the first, second, and third calendar quarter, WellDyne will provide Participating Pharmacy with a quarterly performance summary report in CSV compliant format ("**Quarterly Summary Report**") for all Brand Drugs and Generic Drugs adjudicated Claims processed and paid during the applicable quarter. Each Quarterly Report shall include the following information with respect to such calendar quarter, in a form and format as mutually agreed to by the parties:

(a) The actual reimbursement (**"Actual Reimbursement"**).

(b) The difference between the Actual Reimbursement and the applicable NADAC or AWP contracted reimbursement rate set forth in this Agreement for the applicable calendar quarter.

(c) Identification of whether the Actual Reimbursement is less than the applicable NADAC or AWP contracted reimbursement rate set forth in this Agreement.

(d) Identification of whether the applicable NADAC or AWP contracted reimbursement rate for all WellDyne BIN Net Paid Claims for the quarter exceeds the Actual Reimbursement for the quarter (**"Quarterly Variance"**) and the calculated difference ("**Quarterly Variance Amount**"). Information pertaining to the foregoing for each fourth calendar quarter shall be included in the Annual Report.

1.4.   **Quarterly Claims Reports**. Within thirty (30) calendar days after the end of the first, second, and third calendar quarter, WellDyne will provide Participating Pharmacy with a quarterly Claims report in CSV compliant format ("**Quarterly Claims Report**"), detailing only the one final transaction for all Net Paid Claims paid during the applicable quarter for each BIN including Network ID. Each Quarterly Claims Report shall include, at a minimum:

a)   The prescription number associated with each Claim
b)   The dispensing pharmacy NCPDP number
c)   The fill date
d)   The 11-digit NDC
e)   The drug type Brand/Generic indicator
f)   The metric quantity of the drug

WellDyne - Pharmacy Network Participation Agreement

g) The ingredient cost paid
h) Total reimbursement made to Participating Pharmacy (total amount paid and Member's Copayment)
i) Copayment cost-sharing amount by Member
j) The Dispensing Fee paid
k) Indicator to pricing type used  (i.e. NADAC or AWP / etc.)
l) National Average Drug Acquisition Cost (NADAC) or Average Wholesale Price (AWP) whichever is applicable
m) Usual and Customary Retail Price (U&C)
n) Claim reference number
o) A Network ID
p) An identifier as to whether the Claim will be included or excluded from the BER, GER, and/or DFER calculation
q) Reason for exclusion

Information pertaining to the foregoing for each fourth calendar quarter shall be included in the Annual Report.

Participating Pharmacy shall promptly review such reporting and shall provide notice to WellDyne of any dispute of such reporting within forty-five (45) days of receipt of the latter of (i) Quarterly Summary Report or (ii) Quarterly Claims Report detailing the dispute, and if applicable, the disputed amount and documentation supporting the alleged error (each such notice, a "Dispute Notice").

1.5. **Annual Summary Reports.** Within forty-five (45) calendar days after the end of each calendar year, WellDyne will provide Participating Pharmacy with an annual performance summary report in CSV compliant format ("Annual Summary Report") for all Brand Drugs and Generic Drugs adjudicated, processed and paid during the applicable calendar year. Each Annual Summary Report shall include the following information with respect to such calendar year, along with supporting information and documentation:

(a) The actual reimbursement **("Actual Reimbursement").**

(b) The difference between the Actual Reimbursement and the applicable NADAC or AWP contracted reimbursement rate set forth in this Agreement for the applicable calendar year.

(c) Identification of whether the Actual Reimbursement is less than the applicable NADAC or AWP contracted reimbursement rate set forth in this Agreement.

(d) Identification of whether the applicable NADAC or AWP contracted reimbursement rate for WellDyne BIN Net Paid Claims for such calendar year exceeds the Actual Reimbursement for WellDyne BIN Net Paid Claims for such calendar year ("**Annual Variance**") and the corresponding calculated dollar amount ("**Annual Variance Amount**").

**Annual Claims Reports.** Within forty-five (45) calendar days after the end of the calendar year, WellDyne will provide Participating Pharmacy with an Annual Claims report in CSV compliant format ("Annual Claims Report"), detailing only the final transaction for all Net Paid Claims paid during the applicable calendar year for each BIN including Network ID. Each Annual Claims Report shall include, at a minimum:

Page 23 of 33

a) The prescription number associated with each Claim
b) The dispensing pharmacy NCPDP number
c) The fill date
d) The 11-digit NDC
e) The drug type Brand/Generic indicator
f) The metric quantity of the drug
g) The ingredient cost paid
h) Total reimbursement made to Participating Pharmacy (total amount paid and Member's Copayment)
i) Copayment cost-sharing amount by Member
j) The Dispensing Fee paid
k) Indicator to pricing type used  (i.e. NADAC or AWP / etc.)
l) National Average Drug Acquisition Cost (NADAC) or Average Wholesale Price (AWP) whichever is applicable
m) Usual and Customary Retail Price (U&C)
n) Claim reference number
o) A Network ID
p) An identifier as to whether the Claim will be included or excluded from the BER, GER and/or DFER calculation
q) Reason for the exclusion

Participating Pharmacy shall promptly review such Annual Report and shall provide notice to WellDyne with a Dispute Notice, if any, within forty-five (45) days of receipt of the latter of i) the Annual Summary Report or ii) the Annual Claims Report.

2. **Reconciliation & Payment**

2.1. **Annual Variance.** WellDyne acknowledges and agrees that the contracted reimbursement rate must be met as set forth in this Agreement. If there is an Annual Variance where the Actual Reimbursement is less than the contracted reimbursement rate during the applicable calendar year, then WellDyne shall remit to Participating Pharmacy the Annual Variance Amount within thirty (30) calendar days. In the event WellDyne achieves an Actual Reimbursement more favorable to Participating Pharmacy than the rates set forth in this Agreement, Participating Pharmacy will have no obligation to reimburse WellDyne any such amounts for both GER/BER/DFER Claims and NADAC Claims.

2.2. In the event that the Agreement between WellDyne and Participating Pharmacy is terminated, WellDyne shall remit any monies owed to Participating Pharmacy within thirty (30) calendar days after the termination date.

3. **Network ID.** Within thirty (30) calendar days of the Effective Date of this Agreement, WellDyne will provide Participating Pharmacy with a list of identifiers for the applicable networks of the Network Reimbursement Schedules. For avoidance of doubt, identifiers shall include unique Network Identifiers ("Network ID") returned with every Claim in NCPDP field 545-2F and will be unique to each network of the Network Reimbursement Schedules.

4. **Quarterly Network Crosswalk.** WellDyne will provide Network ID mapping changes between networks or when a network is added or removed. WellDyne agrees to provide Participating Pharmacy with a

WellDyne - Pharmacy Network Participation Agreement

complete and accurate Network ID crosswalk to accompany each Quarterly Summary Report and Annual Summary Report.

5. **Offset.** A surplus for any individual network may be used to offset a deficit for a separate network, however the net result shall be subject to the payment terms outlined herein. WellDyne will be allowed to offset BER, GER, and DFER between or among the Commercial, and Medicaid lines of business, but not allowed to offset Medicare against Commercial, or Medicaid lines of business.

WellDyne - Pharmacy Network Participation Agreement

### REGULATORY ADDENDA

These Regulatory Addenda ("Addenda" or each, an "Addendum") apply to the agreement for pharmacy services between WellDyne and Participating Pharmacy ("Agreement").

1. <u>Updates</u>. WellDyne updates regulatory requirements via updates to the Regulatory Addenda in the Pharmacy Manual. The most current versions of the Regulatory Addenda are in the Pharmacy Manual on WellDyne's website.

2. The following addenda are included. An Addendum only applies to the extent the pharmacy and its services are covered by the Addendum.

   a.  Consolidated Appropriations Act Addendum

   b.  Medicare Addendum - Retail Pharmacies

   c.  Florida Addendum

WellDyne - Pharmacy Network Participation Agreement

CONSOLIDATED APPROPRIATIONS ACT ADDENDUM

This Addendum applies to Agreements governed by section 201 of title II (Transparency) of division BB of the

Consolidated Appropriations Act, 2021 ("CAA").

1. <u>Background</u>. Internal Revenue Code (Code) section 9824, Employee Retirement Income Security Act (ERISA) section 724, and Public Health Service (PHS) Act section 2799A-9(a)(1), as added by section 201 of title II (Transparency) of division BB of the CAA, prohibit group health plans and health insurance issuers offering group health insurance coverage from entering into an agreement with a health care provider, network or association of providers, third-party administrator (TPA), or other service provider offering access to a network of providers that would directly or indirectly restrict a plan or issuer from:

   a. Providing provider-specific cost or quality of care information or data, through a consumer engagement tool or any other means, to referring providers, the plan sponsor, participants, beneficiaries, or enrollees, or individuals eligible to become participants, beneficiaries, or enrollees of the plan or coverage;

   b. Electronically accessing de-identified claims and encounter information or data for each participant, beneficiary, or enrollee in the plan or coverage upon request and consistent with the privacy regulations promulgated pursuant to section 264(c) of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the Genetic Information Nondiscrimination Act of 2008 (GINA), and the Americans with Disabilities Act of 1990 (ADA), including, on a per claim basis:

      1. financial information, such as the allowed amount, or any other claim-related financial obligations included in the provider contract;
      2. provider information, including name and clinical designation;
      3. service codes; or
      4. any other data element included in claim or encounter transactions; or

   c. Sharing information or data described in (1) and (2), or directing such information be shared, with a business associate, as defined in 45 CFR 160.103, consistent with applicable privacy regulations promulgated pursuant to section 264(c) of HIPAA, GINA, and the ADA.

2. If and to the extent a provision of the Agreement is inconsistent with the requirements of section 201 of title II (Transparency) of division BB of the CAA, the provision is null and may not be enforced by WellDyne.

WellDyne - Pharmacy Network Participation Agreement

MEDICARE ADDENDUM – RETAIL PHARMACIES

Provisions of this Addendum apply to retail Participating Pharmacies participating in Medicare Plans and control over any conflicting provisions in the Agreement.

3.   Additional Definitions.

    a.   "CMS" means Centers for Medicare and Medicaid Services within HHS.

    b.   "CMS Contract" means the contract between CMS and the Medicare Plan Sponsor.

    c.   The term "date of completion of an audit" means the completion of audit by HHS, the Government Accountability Office, or their designees, or a Medicare Plan Sponsor, or Medicare Plan Sponsor contractor or related entity.

    d.   "Downstream Entity" for purposes of this Exhibit means a contractor of Participating Pharmacy providing products or services covered under a Medicare Part D or MA-PD Plan to Medicare Members.

    e.   The term "final date of the contract period" means the final term of the CMS Contract.

    f.   "HHS" means U.S. Department of Health and Human Services.

    g.   "MA-PD plan" means a Medicare Part C plan with Part D benefits.

    h.   "Medicare Plan" means a Part D plan or MA-PD plan.

    i.   "Medicare Plan Sponsor" means WellDyne or a plan sponsor of a Medicare Plan contracted with WellDyne to manage pharmacy benefits.

    j.   "Part D plan" means a prescription drug plan under Medicare Part D.

    k.   "Member" means a Member enrolled in a Medicare Plan.

4.   Participating Pharmacy agrees and shall require Downstream Entities to agree that:

    a.   HHS, the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any books, contracts, computer or other electronic systems, including medical records and documentation of Participating Pharmacy, Downstream Entity and related entities related to the CMS Contract.

    b.   HHS, the Comptroller General or their designees have the right to audit, evaluate, collect, and inspect any records under this section directly from Participating Pharmacy or Downstream Entity.

    c.   For records subject to review under the foregoing paragraph of this section, except in exceptional circumstances, CMS will provide notification to the Medicare Plan Sponsor that a direct request for information has been initiated.

    d.   HHS', the Comptroller General's, or their designee's right to inspect, evaluate, and audit any pertinent information for any particular contract period exists through 10 years from the final date of the contract

Page 28 of 33

period or from the date of completion of an audit, whichever is later. [42 CFR 422.504(i)(2); 42 CFR 423.505(i)(2)]

5. Participating Pharmacy and Downstream Entity shall not hold a Member liable for fees that are the obligation of the Medicare Plan Sponsor. [42 CFR 422.504(i)(3)(i) and 422.504(g)(1)(i); 42 CFR 423.505(i)(3)(i) and 422.505(g)(1)(i)]

6. For MA-PD Plans with Members eligible for both Medicare and Medicaid, such Members will not be held liable for Medicare Part A and B cost sharing when the state is responsible for paying such amounts. Participating Pharmacy shall be informed of Medicare and Medicaid benefits, and rules for Members eligible for Medicare and Medicaid. Medicare Plan Sponsors of MA-PD Plans may not impose cost-sharing that exceeds the amount of cost-sharing that would be permitted with respect to the individual under title XIX (Medicaid) if the individual were not enrolled in such a plan. Participating Pharmacy will (a) accept the WellDyne payment under this Agreement as payment in full, or (b) bill the appropriate state source. [42 CFR 422.504(g)(3)(iii)]

7. Participating Pharmacy agrees and shall require Downstream Entities to agree that any services or other activity performed by Participating Pharmacy or Downstream Entity in accordance with this Agreement are consistent and comply with the Medicare Plan Sponsor's contractual obligations to CMS. [42 CFR 422.504(i)(3)(iii); 42 CFR 423.505(i)(3)(iii)]

8. Participating Pharmacy agrees and shall require Downstream Entities to agree that Participating Pharmacy and Downstream Entity must comply with all applicable Federal laws, regulations, and CMS instructions. [42 CFR 422.504(i)(4)(v); 42 CFR 423.505(i)(3)(iv)]

9. Payment Provisions.

   a. For MA-PD Plans, Medicare Plan Sponsor shall reimburse Participating Pharmacy for clean claims in accordance with the payment provisions in the reimbursement section of the Agreement. [42 CFR 422.504(c) and 42 CFR 422.520(b)(1) and (2)]

   b. For Part D Plans, Medicare Plan Sponsor shall issue, mail, or otherwise transmit payment with respect to all clean claims, as defined below, submitted by network pharmacies (other than mail-order and long-term care pharmacies) within:

      (i)  14 days after the date on which the claim is received, for an electronic claim; or

      (ii) 30 days after the date on which the claim is received, for any other claim.

      As used in paragraph (b), a "clean claim" means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) or particular circumstance requiring special treatment that prevents timely payment of the claim from being made under this section. A claim is considered to have been received (1) on the date on which the claim is transferred, for an electronic claim, or (2) the 5th day after the postmark day of the claim or the date specified in the time stamp of the transmission, for any other claim, whichever is sooner. [42 CFR 423.505(i)(3)(v); 423.520(a) and (b)]

10. Participating Pharmacy agrees and shall require Downstream Entities to agree to comply with the confidentiality and Member record accuracy requirements, including (1) abiding by all Federal and state

laws regarding confidentiality and disclosure of medical records, or other health and enrollment information, (2) ensuring that medical information is released only in accordance with applicable Federal or state law, or pursuant to court orders or subpoenas, (3) maintaining the records and information in an accurate and timely manner, and (4) ensuring timely access by enrollees to the records and information that pertain to them. [42 CFR 422.504(a)(13) and 42 CFR 422.118; 42 CFR 423.505(b)(14); and 42 CFR 423.136]

11. With respect to MA-PD Plans, Participating Pharmacy acknowledges that the Medicare Plan Sponsor oversees and is accountable to CMS or any functions and responsibilities described in Medicare Advantage regulations. [CMS Medicare Managed Care Manual, Ch. 11, s. 100.4]

12. None of Medicare Plan Sponsor's activities or responsibilities under its CMS Contract are delegated to Participating Pharmacy in this Agreement. However, if Medicare Plan Sponsor delegates its activities or responsibilities under its CMS Contract, the following requirements shall apply:

   a. Each and every contract must specify delegated activities and reporting responsibilities.

   b. Each and every contract must either provide for revocation of the delegation activities and reporting responsibilities described in the foregoing paragraph or specify other remedies in instances when CMS or Medicare Plan Sponsor determine that the parties have not performed satisfactorily.

   c. Each and every contract must specify that Medicare Plan Sponsor on an ongoing basis monitors the performance of the parties.

   d. Each and every contract must specify that the related entity, contractor, or subcontractor must comply with all applicable Federal laws, regulations, and CMS instructions.

   [42 CFR 422.504(i)(4); 42 CFR 423.505(i)(4)]

13. Pricing Source. WellDyne shall, and shall require other Medicare Plan Sponsors to:

   a. Update any prescription drug pricing standard based on the cost of the drug used for reimbursement of network pharmacies by Medicare Plan Sponsor on January 1 of each contract year and not less frequently than once every 7 days thereafter;

   b. Indicate the source used for making any such updates; and

   c. Disclose all individual drug prices to be updated to the applicable pharmacies in advance of their use for reimbursement of claims, if the source for any prescription drug pricing standard is not publicly available. [42 CFR 423.505(b)(21) and 505(i)(3)(vii)]

   The term "prescription drug pricing standard" means any methodology or formula for varying the pricing of a drug or drugs during the term of a pharmacy reimbursement contract that is based on the cost of a drug, which includes, but is not limited to, drug pricing references and amounts based on any of the following:

   (1) Average wholesale price.
   (2) Wholesale acquisition cost.
   (3) Average manufacturer price.

(4) Average sales price.
(5) Maximum allowable cost.
(6) Other cost, whether publicly available or not. [42 CFR 423.501]

14. Participating Pharmacy shall submit claims to Medicare Plan Sponsor or its intermediary whenever the membership ID card is presented or on file at the pharmacy unless the Member expressly requests that a particular claim not be submitted to Medicare Plan Sponsor or its intermediary. [42 CFR 423.120(c)(3)]

15. Participating Pharmacy shall submit claims via a real-time claims adjudication system. (Note: The foregoing does not apply to Participating Pharmacies operated by Indian Health Service, or Indian tribe, tribal organization or urban Indian organization pursuant to the Indian Health Care Improvement Act.) [42 CFR 505(j) and (b)(17)]

16. The parties acknowledge and shall comply with the following: Medicare Plan Sponsor is required to provide Members with access to negotiated prices for Medicare Plan covered drugs included in the plan's formulary. Negotiated prices must be provided even if no benefits are payable to the beneficiary for Medicare Plan covered drugs because of the application of any deductible or 100 percent coinsurance requirement following satisfaction of any initial coverage limit. Negotiated prices must be provided when the negotiated price for a Medicare Plan covered drug under Medicare Plan Sponsor's benefit package is less than the applicable cost-sharing before the application of any deductible, before any initial coverage limit, before the annual out-of-pocket threshold, and after the annual out-of-pocket threshold. [42 CFR 423.104(g)]

Negotiated prices means prices for Medicare Plan covered drugs that meet all of the following:
(1) Medicare Plan Sponsor (or other intermediary contracting organization) and the network dispensing pharmacy or other network dispensing provider have negotiated as the amount such network entity will receive, in total, for a particular drug.
(2) Are inclusive of all price concessions from network pharmacies except those contingent price concessions that cannot reasonably be determined at the point-of-sale; and
(3) Include any dispensing fees; but
(4) Excludes additional contingent amounts, such as incentive fees, if these amounts increase prices and cannot reasonably be determined at the point-of-sale.
(5) Must not be rebated back to the Medicare Plan Sponsor (or other intermediary contracting organization) in full or in part. [42 CFR 423.100]

17. Medicare Plan Sponsor and Participating Pharmacy acknowledge and shall comply with CMS requirements regarding charging/applying the correct cost sharing amount. [42 CFR 423.104]

18. Except where waived by CMS in accordance with 42 CFR 432.132(c), Participating Pharmacy shall, when dispensing a Medicare Plan covered drug, inform the Member of any differential between the price of that drug and the price of the lowest priced generic version of that Medicare Plan covered drug that is therapeutically equivalent and bioequivalent and available at that pharmacy, unless the particular Medicare Plan covered drug being purchased is the lowest-priced therapeutically equivalent and bioequivalent version of that drug available at that pharmacy. [42 CFR 432.132]

WellDyne - Pharmacy Network Participation Agreement

## FLORIDA ADDENDUM

This Addendum applies to Agreements governed by Florida Statutes, s. 626.8825(3). Except to the extent not allowed by law, this Addendum shall supersede any contractual terms in the Agreement to the contrary.

1.  At the time of adjudication for electronic claims or the time of reimbursement for nonelectronic claims, WellDyne shall provide Participating Pharmacy with a remittance, including such detailed information as is necessary for the pharmacy or pharmacist to identify the reimbursement schedule for the specific network applicable to the claim and which is the basis used by WellDyne to calculate the amount of reimbursement paid. This information must include, but is not limited to, the applicable network reimbursement ID or plan ID as defined in the most current version of the National Council for Prescription Drug Programs (NCPDP) Telecommunication Standard Implementation Guide, or its nationally recognized successor industry guide.

2.  WellDyne shall ensure that any basis of reimbursement information is communicated to Participating Pharmacy in accordance with the NCPDP Telecommunication Standard Implementation Guide, or its nationally recognized successor industry guide, when performing reconciliation for any effective rate guarantee, and that such basis of reimbursement information communicated is accurate, corresponds with the applicable network rate, and may be relied upon by the pharmacy.

3.  WellDyne may not charge, withhold, or recoup direct or indirect remuneration fees, dispensing fees, brand name or generic effective rate adjustments through reconciliation, or any other monetary charge, withholding, or recoupments as related to discounts, multiple network reconciliation offsets, adjudication transaction fees, and any other instance when a fee may be recouped from Participating Pharmacy. This prohibition does not apply to:

    a.  Any incentive payments provided by WellDyne to Participating Pharmacy for meeting or exceeding predefined quality measures, such as Healthcare Effectiveness Data and Information Set measures; recoupment due to an erroneous claim, fraud, waste, or abuse; a claim adjudicated in error; a maximum allowable cost appeal pricing adjustment; or an adjustment made as part of a pharmacy audit pursuant to Florida Statutes, s. 624.491.

    b.  Any recoupment that is returned to the state of Florida for programs in Florida Statutes, chapter 409 or the state group insurance program in Florida Statutes, s. 110.123.

4.  WellDyne may not unilaterally change the terms of the Agreement.

5.  Unless otherwise prohibited by law, WellDyne may not prohibit a Participating Pharmacy or pharmacist from:

    a.  Offering mail or delivery services on an opt-in basis at the sole discretion of the Member.

    b.  Mailing or delivering a prescription drug to a Member upon his or her request.

    c.  Charging a shipping or handling fee to a Member requesting a prescription drug be mailed or delivered if the Participating Pharmacy or pharmacist discloses to the Member before the mailing or delivery the amount of the fee that will be charged and that the fee may not be reimbursable by the Member's pharmacy benefits plan or program.

WellDyne - Pharmacy Network Participation Agreement

6.  WellDyne must provide Participating Pharmacy, upon its request, a list of pharmacy benefits plans or programs in which the pharmacy is a part of the network. Updates to the list must be communicated to Participating Pharmacy within 7 days. WellDyne may not restrict Participating Pharmacy or pharmacist from disclosing this information to the public.

7.  WellDyne must ensure that the Electronic Remittance Advice contains claim level payment adjustments in accordance with the American National Standards Institute Accredited Standards Committee, X12 format, and includes or is accompanied by the appropriate level of detail for Participating Pharmacy to reconcile any debits or credits, including, but not limited to, pharmacy NCPDP or NPI identifier, date of service, prescription number, refill number, adjustment code, if applicable, and transaction amount.

8.  WellDyne shall provide a reasonable administrative appeal procedure to allow Participating Pharmacy or pharmacist to challenge the maximum allowable cost pricing information and the reimbursement made under the maximum allowable cost as defined in Florida Statutes, s. 627.64741 for a specific drug as being below the acquisition cost available to the challenging Participating Pharmacy or pharmacist.

    a.  The administrative appeal procedure must include a telephone number and e-mail address, or a website, for the purpose of submitting the administrative appeal. The appeal may be submitted by Participating Pharmacy or an agent of the pharmacy directly to WellDyne or through a pharmacy service administration organization. The Participating Pharmacy or pharmacist must be given at least 30 business days after a maximum allowable cost update or after an adjudication for an electronic claim or reimbursement for a nonelectronic claim to file the administrative appeal.

    b.  WellDyne must respond to the administrative appeal within 30 business days after receipt of the appeal.

    c.  If the appeal is upheld, WellDyne must:

        1.  Update the maximum allowable cost pricing information to at least the acquisition cost available to Participating Pharmacy;
        2.  Permit Participating Pharmacy or pharmacist to reverse and rebill the claim in question;
        3.  Provide to Participating Pharmacy or pharmacist the national drug code on which the increase or change is based; and
        4.  Make the increase or change effective for each similarly situated pharmacy or pharmacist who is subject to the applicable maximum allowable cost pricing information.

    d.  If the appeal is denied, WellDyne must provide to Participating Pharmacy or pharmacist the national drug code and the name of the national or regional pharmaceutical wholesalers operating in Florida which have the drug currently in stock at a price below the maximum allowable cost pricing information.

WellDyne - Pharmacy Network Participation Agreement

**<u>EXHIBIT C</u>**



11/07/2025

Sent via email and Fed Ex

**Re: Late Reconciliation Reports**

To Whom It May Concern,

This letter acts as formal notice that Rite Aid respectfully requests immediate resolution to the outstanding reconciliation reports for CY25 Q1 – Q3 ("Missing Reports").

Per Exhibit B of the Agreement by and between WellDyne and Rite Aid, the Missing Reports were due on or around thirty (30) calendar days after the end of first, second, and third calendar quarter. After repeated requests from the Rite Aid Team, these Missing Reports are still outstanding. *Rite Aid respectfully requests these Missing Reports within five (5) business days of this letter.*

Furthermore, as WellDyne is aware, on May 5, 2025, Rite Aid and certain of its affiliates filed for chapter 11 bankruptcy in the Bankruptcy Court for the District of New Jersey. We remind you that commencement of a bankruptcy case results in the imposition of an automatic stay, which acts as an injunction against "all entities" from taking certain actions against a debtor.  11 U.S.C. § 362(a).  Specifically, section 362(a)(4) of the Bankruptcy Code prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  In addition, section 362(a)(6) prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."

Any continued efforts to contravene the terms of the Letter or any other agreement between Rite Aid and WellDyne and/or improperly withhold funds from Rite Aid constitutes a violation of the automatic stay, and Rite Aid reserves all rights to seek damages and punitive sanctions on account of any such actions.  See 11 U.S.C.§ 362(k) (providing that debtors injured by willful violation of the automatic stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages").

However, Rite Aid would prefer to resolve this matter consensually and without litigation before the Bankruptcy Court.

The foregoing is not and shall not be deemed or construed to be a waiver of any of Rite Aid's rights, all of which are fully reserved.  We appreciate your prompt attention to this matter.

Sincerely,

*Alyssa Parrish*
 E80ED47E3F754F8...

11/11/2025 | 7:46 AM CST

**Alyssa Parrish , General Counsel**
**200 Newberry Commons, Etters, PA 17319**

**EXHIBIT D**

# LENNOX LAW

Tampa | Bushnell | Fort Lauderdale

February 5, 2026

**VIA U.S. MAIL and EMAIL**

Felice R. Yudkin Esq.
Cole Schotz P.C.
25 Main Street
Hackensack, NJ 07601
E-mail: fyudkin@coleschotz.com

RE:  *Demand for Reconciliation Reports from WellDyneRx, LLC*

Dear Counsel:

Our firm represents WellDyneRx, LLC ("WellDyne") regarding the above referenced matter. We are in receipt of Rite Aid Hdqtrs. Corp's ("Rite Aid") recent correspondence to WellDyne concerning purportedly outstanding reconciliation reports.  I understand that you represent the Liquidating Trustee (the "Trustee") in the Rite Aid bankruptcy case.  Please direct all future correspondence regarding this matter to my attention.

As you may be aware, WellDyne and Rite Aid entered into a Pharmacy Network Participation Agreement (the "Agreement") on January 1, 2025[1], for the purpose of participating in WellDyne's pharmacy network.  Pursuant to the Agreement, among other things, WellDyne was to provide certain reporting to Rite Aid on a quarterly basis.  The sole purpose of the reconciliation reports was to ensure that the subject transactions were generally "aligned", *i.e.* no money ever changed hands as part of this quarterly process.  Further, although the Agreement called for reporting 30 days after the end of each quarter, the actual reconciliation practice between the two parties was significantly different.  In fact, it was not uncommon for several months to pass before issuing reports, which was fully acceptable to Rite Aid.

Accordingly, it was similarly at the point in time when WellDyne would normally prepare such reporting for 2025Q1 when, on May 5, 2025, Rite Aid filed its Chapter 11 case, indicating it would be closing all of its stores and ceasing operations.  When WellDyne became aware of the bankruptcy filing and the impending liquidation of Rite Aid's assets, it was unsure of the enforceability of the Agreement or how the new bankruptcy case impacted future dealings between the parties, particularly in light of the imminent store closures.  No one from Rite Aid contacted WellDyne to discuss the impact of the bankruptcy filing on the Agreement.

---

[1] Rite Aid and WellDyne previously conducted business under separate annual contracts, including in 2024.

Furthermore, a cursory review of the Rite Aid bankruptcy docket indicates that the Agreement was neither assumed nor assigned and thus deemed rejected. *See* 11 U.S.C. § 365.  As you know, such rejection amounts to a prepetition breach occurring immediately prior to the date of filing.  Accordingly, WellDyne arguably had no obligation to perform under the Agreement at that point in time, and going forward.  In addition, Rite Aid, as Debtor, never provided WellDyne with notice of its ability to file a rejection damages claim in the bankruptcy case upon rejection of the Agreement.

As you may or may not be aware, among other things, Rite Aid management has sent WellDyne several emails requesting 2025Q1-3 reconciliation reporting for pre and post-petition[2] activity under the Agreement, but at the same suggested that the party to whom such reporting is required is actually the Trustee.  Regardless of the merits of any purported claim against WellDyne, which WellDyne expressly refutes, WellDyne requires further clarification as to who has standing to make such demands.

WellDyne expressly reserves to itself all rights and defenses to any action, litigation or otherwise, by the Trustee under applicable law.  I will further point out that should the Trustee decide to institute litigation against my client, which has been repeatedly threatened by Rite Aid management in their recent correspondence to WellDyne, the Agreement contains a mandatory arbitration clause, with binding arbitration to take place in Tampa, Florida.  As this would clearly be a non-core proceeding, the arbitration clause would be fully enforceable.

Notwithstanding the foregoing, my client is willing to discuss this matter further with your office.  I look forward to your response.

Respectfully submitted,

Lennox Law, P.A.

By: s/ Andrew W. Lennox, Esq.
    *Direct Phone: 813-831-3808*
    *E-mail: alennox@lennoxlaw.com*

cc:  Client

---

[2] WellDyne does not at present believe that there was any activity under the Agreement during most if not all of 2025Q3, but is conducting an internal analysis to determine this.