# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

AMERISERV FINANCIAL BANK,

   Plaintiff,

 vs.

1700 MURRAY AVENUE LLC,

   Defendant.

CIVIL DIVISION

NO.:  GD-24-003188

**JOINT MOTION OF RECEIVER AND PLAINTIFF FOR ORDER OF COURT APPROVING AMENDED SALE AGREEMENT**

FILED ON BEHALF OF RECEIVER:

Michael Ella REC
By Martin Perry, Principal

AND PLAINTIFF, AMERISERV
FINANCIAL BANK:

Michael A. Shiner, Esquire
PA ID No. 78088
mshiner@tuckerlaw.com

Maribeth Thomas, Esquire
PA ID No. 208376
mthomas@tuckerlaw.com

TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, Pennsylvania 15222

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

AMERISERV FINANCIAL BANK,          CIVIL DIVISION

        Plaintiff,               NO.:  GD-24-003188

    vs.

1700 MURRAY AVENUE LLC,

        Defendant.

### JOINT MOTION OF RECEIVER AND PLAINTIFF FOR
### ORDER OF COURT APPROVING AMENDED SALE AGREEMENT

Movants, Michael Ella RES, LLC and AmeriServ Financial Bank (together, the "**Movants**"), with the consent of the Buyer, 29 Katz Crew, LP, file this Joint Motion of Receiver and Plaintiff for Order of Court Approving Amended Sale Agreement (the "**Motion**").

### PARTIES

1.     Movant, Michael Ella RES, LLC through its principal Martin Perry (the "**Receiver**"), is the Court-appointed Receiver in this Case, appointed by Order dated January 29, 2025 (the "**Receivership Order**").  A copy of the Receivership Order is attached hereto and incorporated herein as **Exhibit A**.

2.     Movant/Plaintiff, AmeriServ Financial Bank ("**AmeriServ**"), is a financial institution with a principal place of business located at 216 Franklin Street, 5th Floor, Johnstown, Pennsylvania 15907.

3.     Defendant/Respondent, 1700 Murray Avenue LLC ("**Defendant**"), is a Pennsylvania limited liability company with a last known address at 657 Pratt Drive, Indiana, Pennsylvania 15101.

4.     Buyer, 29 Katz Crew, LP (the "**Buyer**"), is a Pennsylvania limited partnership with a last known address at 357 Lincoln Highway, North Versailles, Pennsylvania 15137.

## FACTUAL AND PROCEDURAL BACKGROUND

5.     On or about May 17, 2019, Defendant executed and delivered to AmeriServ a Promissory Note, as modified from time to time thereafter, in the original principal amount of $10,080,000 (the "**Note**").

6.     To secure its obligations under the Note, Defendant executed and delivered to AmeriServ an Open-End Mortgage (the "**Mortgage**") granting AmeriServ a lien on the real property situated at 1700-1710 Murray Avenue, Pittsburgh, Pennsylvania 15217, and 1712-1714 Murray Avenue, Pittsburgh, Pennsylvania 15217 (the "**Mortgaged Property**").  The Mortgage was recorded with the Allegheny County Recorder of Deeds on May 20, 2019, at Mortgage Book 50552, Page 477.

7.     Upon the Defendant's failure to pay the outstanding amounts due under the Note in full upon the Maturity Date, and to cure such default during the period provided under the terms of the Note after notice and demand, AmeriServ commenced a foreclosure action against the Defendant in the Court of Common Pleas of Allegheny County at the above-captioned case number on June 15, 2024 (the "**Foreclosure Action**").

8.     On January 29, 2025, this Honorable Court entered the Receivership Order upon consent of AmeriServ and Defendant.

9.     Pursuant to the terms of the Receivership Order, the Receiver is currently in control of the Mortgaged Property, as well as Defendant's personal property located thereon, such as Defendant's equipment, fixtures, general intangibles, bills and accounts receivable, cash on hand and in banks (subject to any setoff rights in favor of AmeriServ), all leases, contracts, rights, insurance policies (including, but not limited to, property, liability, errors and omissions, directors and officers liability, crime, theft, and other policies of insurance), claims, tort claims, causes of

actions (including, but not limited to, all claims, rights, and coverage available under any claim

policies or other applicable insurance policy, indemnity agreement, insured contract, fidelity bond,

or similar arrangement to pay, reimburse, or defend any loss, direct loss, damages, punitive

damages, defense costs, investigative costs, liability, or similar sums), escrow accounts, escrow

arrangements or agreements, intangibles, licenses, permits, patents, trademarks and names,

copyrights, corporate franchises, and its income and profits, books of accounts, records and other

books, papers and accounts, deeds, muniments of title, and all interests, easements, privileges,

rights and assets of every kind and whatever nature and wherever located (the Mortgaged Property

and all personal property of the Defendant located thereon, collectively referred to as the

"**Mortgaged Assets**").

10.     The Receivership Order authorizes the Receiver to sell all or part of the Mortgaged

Assets, including the Mortgaged Property.

11.     The Receivership Order authorizes the Receiver to sell the Mortgaged Assets,

including the Mortgaged Property, if an offer acceptable to AmeriServ is obtained.  Specifically,

the Receivership Order grants the Receiver the authority to:

    a.  Market and lease the space at the Mortgaged Property, including through and with the services of a Broker [Receivership Order, at ¶ 14(m)];

    b.  Negotiate and facilitate the sale or other disposition of the Mortgaged Assets and to do all acts and things necessary or advisable in connection with such sale or disposition, which sales shall be subject to Plaintiffs and the Court's approval [Receivership Order, at ¶ 14(o)];

    c.  Utilize Newmark or any other brokerage service as the exclusive leasing agent for the Mortgaged Property and to market the Mortgaged Property for lease or sale ("**Broker**") and complete a sale transaction, so long as any sale transaction is approved by Plaintiff on terms and conditions acceptable to Plaintiff, and provided such sale is approved by the Court [Receivership Order, at ¶ 18];

    d.  In connection with the marketing and sale of the Mortgaged Property,

    i.   cause the Mortgaged Property, in whole or in part, to be listed for sale at any price the Receiver determines, in the exercise of its business judgment, to be an appropriate list price [Receivership Order, at ¶ 18(a)];

    ii.   assist in marketing the Mortgaged Property for sale. The Receiver shall prepare marketing reports not less than quarterly which shall be provided to Plaintiff [Receivership Order, at ¶ 18(b)]; and

    iii.   negotiate proposed sale terms with a buyer(s) for the Mortgaged Property [Receivership Order, at ¶ 18(c)].

12.    The Receivership Order further directs that, "[i]f the Receiver reaches an agreement with a buyer of the Mortgaged Property and [AmeriServ] consents to the terms and conditions of such sale, the Receiver shall file a motion with the Court for the approval of such sale." [Receivership Order, at ¶ 18(d).]

13.    The Receiver has been dutifully performing its obligations as required by the Receivership Order and actively marketed the Mortgaged Assets, including the Mortgaged Property for sale in accordance with the authority granted to it under the Receivership Order.

14.    The Receiver contacted over 20 potential purchasers and gave tours of the Mortgaged Property to approximately eight interested purchasers.  After negotiations and discussions with several parties, the Receiver received an offer from 29 Katz Crew, LP to purchase the Mortgaged Property.  That offer is acceptable to AmeriServ.

15.    In May 2025, the Receiver entered into an agreement to sell the Mortgaged Assets, including the Mortgaged Property, to the Buyer for the purchase price of $5,100,000, with the Buyer to pay 100% of the transfer taxes.  A copy of the Agreement of Sale and Purchase for Commercial Real Estate dated May 5, 2025, as amended by the Amendment to Agreement of Sale and Purchase of Commercial Real Estate dated May 13, 2025, and as subsequently amended, (together, the "**Sale Agreement**") evidencing the Buyer's agreement to purchase, and the Plaintiff's agreement to sell, the Mortgaged Assets is attached hereto and incorporated herein as

**Exhibit B**.[1]

16.     The Court approved the Sale Agreement and the purchase of the Mortgaged Property by the Buyer by Order dated June 25, 2025 (the "**Sale Order**").

**THE NEW RITE AID BANKRUPTCY CASE**

17.     After entry of the Sale Order, the Receiver, AmeriServ, and the Buyer worked diligently towards closing.

18.     Pursuant to the terms of the Receivership Order, the Receiver also controlled all leases and contracts related to the Mortgaged Property.

19.     One such lease included the prepetition lease agreement dated August 19, 2003, by and between Rite Aid of Pennsylvania, Inc. ("**Rite Aid**") and 1700 Murray Avenue, as successor in interest to Alex-Forbes and Murray, LP, as amended or as may be amended from time to time, whereunder Rite Aid agreed to lease from 1700 Murray, *inter alia*, certain retail space, identified by Rite Aid as Store No. 274, situated at the Mortgaged Property (the "**Rite Aid Lease**").

20.     On May 5, 2025, New Rite Aid, LLC and its related affiliates (including Rite Aid) commenced voluntary chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**"), jointly administered at Case No. 25-14861 (the "**New Rite Aid Bankruptcy Case**"), which remains pending.

21.     Subsequent to entry of the Sale Order, Rite Aid notified the Receiver and AmeriServ of its intent to assume and assign the Rite Aid Lease to a newly formed single purpose entity identified as Murray Avenue Market, LLC ("**Murray Avenue Market**").

22.     The Receiver and AmeriServ objected to the proposed assumption and assignment

---

[1] The Sale Agreement was amended four times subsequent to Court-approval of the Sale Agreement and the filing of this Motion.  Each such amendment did not materially alter the terms of the Sale Agreement approved by this Court. The Second Amended Sale Agreement, Third Amended Sale Agreement, Fourth Amended Sale Agreement, and Fifth Amended Sale Agreement are attached hereto and incorporated herein as **Exhibits C**, **D**, **E**, and **F**, respectively.

of the Rite Aid Lease to Murray Avenue Market, asserting that Murray Avenue Market failed to provide requisite adequate assurance of its financial ability to fully perform all obligations under the Rite Aid Lease going forward.

23.    In response to the objection of the Receiver and AmeriServ, and by written directives of the Bankruptcy Court, Murray Avenue Market submitted, under penalty of perjury, (i) two declarations of its principal, Yitzchok Glassner, in support of its financial ability to perform under the Rite Aid Lease, (ii) a business market plan, (iii) a profit and loss statement for the currently-operating Murray Avenue Kosher, Inc. ("**Murray Avenue Kosher**"), and (iv) the 2022, 2023, and 2024 tax returns for Murray Avenue Kosher.

24.    On September 18, 2025, the Bankruptcy Court, in reliance on the declarations of Mr. Glassner, found that Murray Avenue Market provided sufficient adequate assurance of its financial ability to satisfy its obligations under the Rite Aid Lease, approved the assumption and assignment of the Rite Aid Lease to Murray Avenue Market.

## AMENDMENT OF SALE AGREEMENT

25.    In late October 2025, the Receiver and AmeriServ received information from a credible source that, in the process of providing financial information to the Bankruptcy Court, Murray Avenue Market utilized the tax returns, profit and loss statement, and other financial documents of Murray Avenue Kosher without Murray Avenue Kosher's permission.

26.    If such information proves to be accurate, the impermissible use of Murray Avenue Kosher's financial information, and presentation of the same to the Bankruptcy Court, would amount to, at a minimum, misrepresentations of material facts to that Court.

27.    Because of this misconduct with the Rite Aid Lease and the use of the Mortgaged Property, the Buyer is facing an actual and substantial likelihood of losing its financing to purchase

the Mortgaged Property.

28.     To enable Buyer to purchase the Mortgaged Property and carry out its obligations under the Agreement, the Sale Agreement parties have agreed to amend the Sale Agreement previously approved by this Court to reduce the Purchase Price from $5,100,000 to $4,675,000 (the "**Amended Purchase Price**").   A copy of the Sixth Amended Sale Agreement dated November 19, 2025 (the "**Amended Sale Agreement**") is attached hereto and incorporated herein as **Exhibit G**.

29.     All other terms of the original Sale Agreement approved by this Court remain in effect.

30.     The $425,000 reduction in the Purchase Price will enable the Buyer to fund any necessary litigation it may face in relation to the assignment of the Rite Aid Lease to Murray Avenue Market and to close the purchase of the Property as a cash deal if necessary.   In consideration of these concessions, Buyer has committed to close within five days of Court approval of the Amended Sale Agreement.

31.     For the foregoing reasons, Movants request that this Honorable Court grant this Motion, approve the Amended Sale Agreement, and enter an order authorizing the Receiver to sell the Mortgaged Property in a private sale to the Buyer for the Amended Purchase Price, upon the terms of the Amended Sale Agreement, and to execute a deed and all other necessary documents to convey title to the Mortgaged Property to the Buyer free and clear of all liens and encumbrances.

32.     Movants also request that this Court schedule an objection deadline and a hearing on this Motion to be held on or before December 15, 2025, by separate Court Order, and submit that time is of the essence, as closing of the sale on the Mortgaged Property must occur by December 31, 2025.

Docusign Envelope ID: 85773289-EE72-49C9-B2C0-526BF299B110

WHEREFORE, Movants, Michael Ella RES, LLC and AmeriServ Financial Bank, respectfully request that this Honorable Court enter an Order in substantially the form of the proposed order attached hereto which authorizes the Receiver to sell the Mortgaged Property, subject to the terms and conditions of the Amended Sale Agreement attached hereto as Exhibit G, and to execute a deed and all other necessary documents to convey title to the Mortgaged Property to the Buyer free and clear of all liens and encumbrances.

Respectfully submitted,

Dated: November 24, 2025

MICHAEL ELLA RES, LLC

*Martin Perry*
— 3DAC80DE85A7419
Martin Perry[2]

-and-

TUCKER ARENSBERG, P.C.

Michael A. Shiner, Esq. (PA ID No. 78088)
Maribeth Thomas, Esq. (PA ID No. 208376)
1500 One PPG Place
Pittsburgh, Pennsylvania 15222
(412) 566-1212
mshiner@tuckerlaw.com
mthomas@tuckerlaw.com

*Counsel for AmeriServ Financial Bank*

---

[2] For the avoidance of doubt, Tucker Arensberg, P.C. does not represent the Receiver in this action and only serves as counsel to Plaintiff AmeriServ Financial Bank.

**<u>VERIFICATION</u>**

The undersigned, Martin Perry, does hereby certify that he is the Principal of MICHAEL

ELLA RES, LLC, the within named Receiver, and makes this Verification pursuant to Pa.R.C.P.

1024.  I hereby verify that the facts set forth in the foregoing Joint Motion of Receiver and Plaintiff

for Order of Court Authorizing Receiver to Sell Property are true to the best of my information

and belief.

I understand that false statements therein are made subject to the penalties of 18 Pa. C. S.

§ 4904 relating to unsworn falsification to authorities.

Date:  _____11/24/2025 | 1:44 PM PST_____

Signed by:

_____
(Signature)

3DAC80DF65A7413...

Martin Perry_____
(Printed Name)

Principal, MICHAEL ELLA RES, LLC_____
(Title)

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:  Plaintiff

Signature:

Name:  Maribeth Thomas

Attorney No:  208376

**EXHIBIT A**

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

AMERISERV FINANCIAL BANK,  CIVIL DIVISION

       Plaintiff,  NO.:  GD-24-003188

vs.

1700 MURRAY AVENUE LLC,

       Defendant.

**ORDER APPOINTING RECEIVER**

AND NOW, this _20th_ day of _January_ 2025, upon consideration of the Motion for Appointment of Receiver (the "**Motion**") filed by Plaintiff AmeriServ Financial Bank ("**AmeriServ**" or "**Plaintiff**"), the consent of Defendant by way of contractual agreement, and it appearing that Plaintiff is entitled to the appointment of a receiver, *inter alia*, as a matter of law and equity, and after conducting a hearing or providing the parties with an opportunity for a hearing, and considering such other submissions as the Court deemed appropriate in the circumstances; the Court finding that due, proper and adequate notice has been given to, or been waived by, the Defendant; and good cause having been shown; it is hereby ORDERED, ADJUDGED and DECREED that the Motion is GRANTED in its entirety and it is FURTHER ORDERED as follows:

A.  **FINDINGS OF FACT**

1.      Defendant 1700 Murray Avenue LLC ("Defendant") is in default of the Loan, Notes, Modifications, Loan Agreement and Mortgage, which default is material and continuing.

2.      Defendant has contractually agreed to the appointment of a receiver for the Mortgaged Premises following a default under the Loan.

3.    The preservation and value of the Mortgaged Property is at risk of decline and deterioration.

4.    The appointment of a receiver for Defendant is necessary to preserve and maintain the value of the Mortgaged Property and to market the Mortgaged Property for lease or sale.

5.    The appointment of Michael Ella RES, through its principal Martin Perry, as the receiver (the "**Receiver**") for Mortgaged Property is appropriate to protect, preserve and market the Mortgaged Property for the protection and benefit of Defendant's creditors.

**B.    APPOINTMENT OF RECEIVER**

6.    Effective as of _10:00_ a.m. on _January 29 2025_, 2025 (the "**Effective Date**"), the Receiver is hereby appointed as the receiver for the Mortgaged Property for a period commencing on the Effective Date and ending upon termination of such appointment by further Order of Court.

7.    The Receiver is appointed for the purpose of managing, protecting, preserving, operating and liquidating the Mortgaged Property at 1700-1710 Murray Avenue, Pittsburgh, PA 15217 and 1712-1714 Murray Avenue, Pittsburgh, PA 15217, including Defendant's personal property located thereon, such as Defendant's equipment, fixtures, general intangibles, bills and accounts receivable, cash on hand and in banks (subject to any setoff rights in favor of Plaintiff), all leases, contracts, rights, insurance policies (including, but not limited to, property, liability, errors and omissions, directors and officers liability, crime, theft, and other policies of insurance, hereafter "Claim Policies"), claims, tort claims, causes of action (including, but not limited to, all claims, rights, and coverage available under any claim policies or other applicable insurance policy, indemnity agreement, insured contract, fidelity bond, or similar arrangement to pay,

reimburse, or defend any loss, direct loss, damages, punitive damages, defense costs, investigative costs, liability, or similar sums), escrow accounts, escrow arrangements or agreements, intangibles, licenses, permits, patents, trademarks and names, copyrights, corporate franchises, and its income and profits, books of accounts, records and other books, papers and accounts, deeds, muniments of title, and all interests, easements, privileges, rights and assets of every kind and whatever nature and wherever located (the Mortgaged Property and all personal property of the Defendant located thereon, collectively referred to as the "**Mortgaged Assets**") for the benefit and protection of Plaintiff and for the benefit of all creditors of Defendant, but without any duty to create equity or otherwise represent the interests of any equity holders.

8.      The Receiver is hereby granted and vested with all powers necessary to carry out such purposes. The Receiver's responsibilities include, but are not limited to, oversight of all aspects of the management, operation and, if deemed appropriate, orderly liquidation of Defendant's Mortgaged Assets. In carrying out its duties hereunder, the Receiver is authorized to provide management and operational services consistent with property management practices for properties of comparable type, class, age and condition in the greater Pittsburgh market without further court order.

**C.      DUTIES OF RECEIVER**

9.      Without limiting the generality of the foregoing, the Receiver is granted the power and duty to immediately take exclusive possession of all the Mortgaged Assets.

10.      The Receiver shall serve without bond, provided that the Receiver will well and truly perform its duties and shall abide by and perform all the things that it shall be required to do under this Order.

11.    The Receiver will be compensated in the form (i) a fixed monthly property management fee of $750.00, plus (ii) $175.00 per hour for receivership duties, including but not limited to reporting activities.  The Receiver shall be reimbursed for reasonable expenses incurred in the performance of the Receiver's duties, including reasonable attorneys' fees, travel, courier, bank & accounting fees, express mail and any extraordinary expenses associated with the property management and receivership duties.  The Receiver and any professionals, independent contractors or agents employed by the Receiver will furnish Plaintiff and Defendant with copies of their invoices for services rendered and costs incurred on a quarterly basis or such other time frames as Plaintiff and the Receiver may agree.  The Receiver shall be paid its compensation from the Rents (as defined herein) collected by Plaintiff under Plaintiff's Assignment of Rents, upon Receiver's request to Plaintiff for the payment of any such amounts. The Receiver's compensation shall not preclude the Receiver from receiving such additional compensation as may be approved by the Court, or agreed between the Receiver and Plaintiff in the event the Receiver or any affiliate of the Receiver is retained to perform and does perform additional services in connection with the Mortgaged Assets.

12.    In addition to the compensation set forth herein above, the Broker, as defined herein, shall be entitled to a brokerage fee on the sale of the Mortgaged Property equal to 3.5% of the gross purchase price, and a leasing fee upon the execution of any lease renewal equal to 2.0% of base rental, including any fixed escalations to the base annual rent, and equal to 4.0% of base rental, including any fixed escalations to the base annual rent, for new leases.  If a co-broker is involved in either a sale or lease, the aforementioned commissions shall be increased by 1.5%. If a commission is earned hereunder, any property management fees paid in connection with the

receivership paid by the rents received by Plaintiff, up to the amount of $10,000.00, shall be repaid to Plaintiff, prior to the commission being paid.

13.    The Receiver, following consultation and approval of the Plaintiff, is authorized to retain independent legal counsel to represent the Receiver generally in the Receivership including, without limitation, in dealing with the tenants, in reporting to and appearing before this Court, and as necessary in dealing with the parties to the action. Legal fees and costs reasonably incurred by the Receiver in performance of its duties shall be an expense of the Mortgaged Property.

14.    The Receiver is authorized to conduct investigations of, and analyses concerning, the operation of the Mortgaged Property and to assume responsibility for all leasing, management and operational functions at the Mortgaged Property including, but not limited to, the letting or re-letting of space and/or the making of disbursements as may be appropriate and in accordance with Plaintiff's Loan of any monies generated from the Mortgaged Property, with authority to undertake repairs and to hire and/or dismiss personnel as may be required in order to efficiently operate the Mortgaged Property and to maintain its value. Without limiting the generality of the foregoing, Receiver is granted the following specific authority, powers and responsibilities:

> a.  To take immediate and exclusive possession and control of the Mortgaged Property and Mortgaged Assets, including, but not limited to, all: real and personal property related to same; operating accounts and accounts receivable; records; furniture; appliances; keys; access keys and cards; building access cards; computer systems, with access information, if any, to operate the systems of the building (i.e. security system; communication systems; HVAC control systems, etc.); correspondence; cash; credit and charge card documents; leases; vending machines; common areas, restrooms, and lobbies; conference rooms; event spaces; audio/video equipment; utility rights and deposits; contract deposits; tenant security deposits; insurance policies; payment and performance bonds; licenses; permits; orders; books; inventory of parts; and such other property, real or personal, which may in any way

relate to the operation of the Mortgaged Property.  Defendant and its agents shall transfer possession of all such property and information to Receiver and is prohibited from removing any and all personal property from the Mortgaged Property.

b.  To continue to maintain and utilize Defendant's existing bank accounts and/or maintain one or more additional bank accounts in Defendant's name and using the Defendant's Tax Identification Numbers, as Receiver for the deposit of revenues and funds of the receivership estate and from which it may make disbursements for the costs and expenses of the receivership estate.

c.  To take immediate possession and control of all of Defendant's right, title and interest in and to all proceeds from any claims made or to be made under any property, casualty and other insurance policies that either Defendant maintains with respect to the Mortgaged Property ("Policies"), as well as the right to act on behalf of the named insured under the Policies, to settle and compromise any such claims made or to be made with respect thereto.

d.  To take immediate possession and control of all of Defendant's right, title and interest, if any, in and to any uncollected receivables pertaining to the Mortgaged Property, including, but not limited to, any and all recoveries, awards, and other payments in connection with any litigation with respect to the Mortgaged Property.

e.  To take immediate possession and control of any and all of Defendant's agreements with contractors, plans and specifications, cost estimates, reports, permits, licenses, certificates of occupancy, development rights, warranties, guaranties, telephone exchanges, trademarks, the name of the Mortgaged Property, and any intangible rights, relating to the Mortgaged Property, along with any other agreements with third parties relating to the Mortgaged Property.

f.  To review all the books and records of the Mortgaged Property.

g.  To operate, maintain, manage, protect, repair and otherwise control the Mortgaged Property and to perform ordinary and necessary repairs, maintenance and improvements to the Mortgaged Property.

h.  To staff the Mortgaged Property for operation, management, maintenance and security and to retain, hire and terminate facility management and other personnel or staff (with no obligation for pre-receivership payroll liabilities including but not limited to accrued vacation, sick time, etc.), or hire or terminate personnel on a contract basis, as necessary to operate, manage, maintain, repair and protect the Mortgaged Property.

i.  To obtain, maintain, make, perform, enforce, modify, cancel or terminate any contracts for services related to the operation, management, maintenance,

repair, lease, sale, and protection of the Mortgaged Property as the Receiver may reasonably deem necessary.

j.   Following consultation and approval of the Plaintiff, to hire any professionals necessary for the carrying out of Receiver's duties under this Order.

k.   To collect and hold in a separate account all tenant security deposits.

l.   To request that Plaintiff allow, in Plaintiff's sole discretion, access to and use of rental proceeds collected by Plaintiff pursuant to its Assignment of Rents, to pay necessary expenses and bills related to the operation of the Mortgaged Property, on a going forward basis including, but not limited to, property taxes and insurance, utilities, payroll and related taxes, and management fees; and, to use any pay any and all other outstanding obligations to vendors incurred in arm's length transactions who prior to the entry of this Order supplied services or materials for the benefit of the Mortgaged Property, but only to the extent the Receiver shall determine, in its sole judgment, that it is prudent to do so in order to maintain the business relationships with such suppliers for the benefit of the preservation of the Mortgaged Property, with all such funds so advanced by Plaintiff to be added to Defendant's indebtedness to Plaintiff and to be secured by the Plaintiff's Loan and Mortgage, with interest to accrue and be paid upon all such monies so advanced at the rate set forth in the Loan and all such monies so advanced, including interest thereon, shall be secured by the Mortgage.

m.   To market and lease the space at the Mortgaged Property, including through and with the services of a Broker.

n.   To enter into marketing, advertising, and similar agreements for the benefit of the Mortgaged Property.

o.   to negotiate and facilitate the sale or other disposition of the Mortgaged Assets and to do all acts and things necessary or advisable in connection with such sale or disposition, which sales shall be subject to Plaintiff's and the Court's approval.

p.   To endorse any and all checks that Receiver may receive that are payable to either Defendant and which represent payment of amounts due and owing in connection with the operation of the Mortgaged Property.

q.   To purchase inventory, operating supplies, equipment and personal property in connection with the operation of the Mortgaged Property.

r.   To enter into leases for equipment or personal property for use at the Mortgaged Property.

s.   To enforce contract and/or agreements already in existence which in any way relate to the Mortgaged Property.

t.  To maintain such licenses, certifications and permits currently in effect through the term of this receivership and/or to apply for, obtain and renew as necessary all licenses, certifications and permits required for the operation of the Mortgaged Property.

u.  With respect to any operation or activity that is now conducted on the Mortgaged Property, and that may lawfully be conducted only upon governmental license or permit, to continue such operation or activity under the licenses or permits issued to either Defendant or its agents subject to compliance with the terms thereof.

v.  To institute such legal actions as the Receiver deems necessary to preserve and protect the Mortgaged Property, the interests of the tenants of the Mortgaged Property, and the interests of the Plaintiff in the Mortgaged Property, including, but not limited to, collecting accounts and debts, and enforcing leases and other agreements relating to the Mortgaged Property, and to recover possession of the Mortgaged Property from persons who may now or in the future be wrongfully occupying or possessing the Mortgaged Property or any part thereof.

w.  To secure such monies as Plaintiff may be willing (but shall not be obligated) to advance for the preservation and maintenance of the Mortgaged Property, including current costs of repairs and general maintenance, security, utilities, insurance and other necessary services, with all such funds so advanced by Plaintiff to be added to Defendant's indebtedness to Plaintiff and to be secured by the Plaintiff's Loan and Mortgage, with interest to accrue and be paid upon all such monies so advanced at the rate set forth in the Loan and all such monies so advanced, including interest thereon, shall be secured by the Mortgage. All such monies advanced for the preservation and maintenance of the Mortgaged Property, together with interest thereon, shall be repaid, to the extent feasible, from the operating revenues or sale of the Mortgaged Property whether such operating revenues are generated before, during or after the receivership. In no event shall the Receiver be required to advance funds for any expense of the Mortgaged Property.

x.  To open new accounts with, or negotiate, compromise or otherwise settle Defendant's existing obligations to, utility companies or other service providers or suppliers of goods and services to the Mortgaged Property and to otherwise enter into such agreements, contracts or understandings with such utility companies or other service providers or suppliers as are necessary to maintain, preserve and protect the Mortgaged Property. The Receiver shall not be responsible for payment of any real property taxes, utility bills, unpaid payroll expenses or other unpaid invoices for services or utilities incurred by Defendant for the benefit of the Mortgaged Property prior to the receivership. however, the Receiver may pay any expenses if the Receiver deems such payment beneficial to the operation of the Mortgaged Property.

    y.  To take any other actions that are customary, necessary, and/or appropriate to be performed by a receiver appointed for similar commercial properties in Allegheny County, Pennsylvania.

    z.  To take any and all action to which Defendant would be entitled in connection with any tax assessment appeal relating to the Mortgaged Property ("Tax Appeal"), including without limitation, to communicate directly with counsel retained by Defendant in connection therewith any Tax Appeal, to direct strategy relating to any Tax Appeal, and to direct the settlement of any Tax Appeal.

  aa.  To apply to this Court for further directions and for such further powers as may be necessary to enable the Receiver to fulfill its duties.

15.    All rents, issues, profits, revenues, income or other payments which are now or hereafter become due (collectively, the "Rents") with respect to all or any portion of the Mortgaged Property whether pursuant to oral or written leases or any letting of possession or agreement for the use or occupancy of any part of the Mortgaged Property (collectively, the "Leases") shall continue to be remitted by the tenants or other entities occupying the Mortgaged Property directly to the Plaintiff pursuant to its Assignment of Rents.  However, pursuant to the terms of this Order, Plaintiff shall utilize the Rents to pay the Receiver's compensation and may make any such Rents available to the Receiver, as requested, in connection with the Receiver's performance of its duties hereunder.

16.    The Defendant and its agents, servants and employees, will immediately turn over to the Receiver all books, records, accounts, operating statements, reserve accounts and the like pertaining to the Defendant's operations with regard to the Mortgaged Assets from the date they acquired an ownership interest in the Mortgaged Assets to the date of this Order regardless of where the same may be located and any and all receipts, rents or profits from the Mortgaged Assets now or hereafter in the custody or control of the Defendant or its agents, servants or employees, including explicitly by way of example and not limitation: (a) bank accounts, (b) all

bank statements related to the Defendant and/or the Mortgaged Assets; and (c) financial and operating information for the Mortgaged Assets.

17.    Subject to the rights and interests and for the benefit of Plaintiff, the Receiver is authorized and directed to, including with the assistance of a Broker, solicit buyers and other interested parties for the Mortgaged Property and Mortgaged Assets as the Receiver and the Broker deem appropriate for the purposes of, subject to Court approval, selling and otherwise disposing of the Mortgaged Property and Mortgaged Assets in a commercially reasonable manner and to request that Plaintiff solicit such buyers and parties, and Plaintiff may rely on this Order as authorization to proceed with such solicitation if so requested by the Receiver.

18.    The Receiver is authorized to utilize Newmark or any other brokerage service as the exclusive leasing agent for the Mortgaged Property and to market the Mortgaged Property for lease or sale ("Broker") and complete a sale transaction, so long as any sale transaction is approved by Plaintiff on terms and conditions acceptable to Plaintiff, and provided such sale is approved by the Court.  In connection with the marketing and sale of the Mortgaged Property:

    a.    The Receiver is authorized and directed to cause the Mortgaged Property, in whole or in part, to be listed for sale at any price the Receiver determines, in the exercise of its business judgment, to be an appropriate list price.

    b.    The Receiver is authorized to assist in marketing the Mortgaged Property for sale.  The Receiver shall prepare marketing reports not less than quarterly which shall be provided to Plaintiff.

    c.    The Receiver is authorized and directed to negotiate proposed sale terms with a buyer(s) for the Mortgaged Property.

    d.    If the Receiver reaches an agreement with a buyer of the Mortgaged Property and Plaintiff consents to the terms and conditions of such sale, the Receiver shall file a motion with the Court for the approval of such sale.

    e.    Upon approval of a sale of the Mortgaged Property pursuant to the terms of this Order and/or any further order of Court, Defendant shall cooperate with Plaintiff and the Receiver to execute such documents to evidence the transfer as may be reasonably requested in order to convey clear insurable title of the

Mortgaged Property, including, without limitation, a deed of transfer for all real and personal property, as applicable.

19.    Subject to the rights and interests and for the benefit of Plaintiff, the Receiver is authorized and directed to remit any proceeds of the operation and/or from the sale of the Mortgaged Assets to Plaintiff and other creditors in accordance with their priority.

20.    Any and all monies paid or advanced by Plaintiff, in its sole discretion, pursuant to this Order, shall be deemed advances under and governed and secured by the Loan, the Security Agreement, the Mortgage, and this Order of Court, by which Plaintiff is and shall continue to be secured by a first priority lien on the Mortgaged Assets and all other collateral agreements, instruments or documents evidencing, securing or otherwise delivered in connection with the foregoing. Notwithstanding any provision in this Order, Plaintiff is and will continue to be secured by the Mortgaged Assets to the same extent, validity and priority it was prior to the Effective Date (as defined herein).  The Receiver is authorized to execute any documents or instruments that may be appropriate or necessary therefor.  This provision is in addition to, and not in lieu of, Plaintiff's rights to make protective advances as Plaintiff deems appropriate pursuant to the Loan, the Security Agreement, and the Mortgage.  Plaintiff shall have no obligation to make any advances, any loans or credit accommodations to the Receiver.  Any protective advances, or monies, or costs and expenses advanced by Plaintiff in connection herewith, including for the preservation and maintenance of the Property shall be obligations that are secured by the Mortgage.  The Receiver shall not, without Plaintiff's prior written consent, make any single expenditure for the repair, maintenance, remodeling or other improvement to the Mortgaged Property, exceeding $3,000.00.

21.    In order to exercise the authority conferred upon it by this Order, and subject to the limitations contained within this Order, the Receiver is hereby vested with the standing and

all power and authority of, but without the liability of or associated with, or obligation to act as the manager of Defendant as the Receiver deems necessary for the operation and management of the Mortgaged Assets, including, but not limited to, the power and authority to (i) settle claims that can be or have been asserted by or against the Defendant; (ii) execute documents, instruments and resolutions in connection with any authorized sale or finance transaction, and (iii) have and obtain access to Defendant's records, reports and communications and other work product related to the ordinary course of Defendant's business.

22.    The Receiver is authorized in its discretion to employ, fix and pay the compensation, salaries and wages of all managers, agents, employees, servants and contractors for Defendant as may be advisable or necessary in its judgment for the operation, management, conduct, control, leasing, sale or custody of the affairs of the Mortgaged Assets.

23.    The Receiver or its designee shall keep a true and accurate account of any and all receipts and expenditures and shall, within three (3) months after the Effective Date, and at such regular intervals of three (3) months thereafter until discharged, file reports of Receiver's receipts and expenditures and of Receiver's acts and transactions in Receiver's official capacity.

24.    All sale proceeds, rents, issues, profits, revenues, income or other payments that are now or hereafter become due (hereinafter, collectively, the "Accounts") with respect to all or any portion of the Mortgaged Assets, whether pursuant to oral or written agreements, shall be remitted by the tenants directly to the Plaintiff, with such proceeds being utilized to pay the Receiver its compensation and, in Plaintiff's discretion, made available to the Receiver for the payment of necessary expenses related to preservation and protection of the Mortgaged Assets, with all such amounts being added to the Loan and secured by the Mortgage and Mortgaged Assets.

25.    The Receiver may obtain liability insurance to protect itself in carrying out its duties hereunder with a policy limit acceptable to Plaintiff, and the premium therefor shall be paid from the Mortgaged Assets or rents collected by Plaintiff.

26.    The Receiver shall ensure that existing insurance coverage for the Mortgaged Assets remain in force until the expiration of the current paid up term under such policy or policies and that Plaintiff remains a loss payee and additional insured under such policy or policies. The Receiver shall notify the insurance carriers immediately of the appointment of the Receiver under this Order and request that the Receiver be added to the insurance policy or policies as an additional insured there under. Upon the expiration of the paid-up portion on such policy or policies, the Receiver shall have the responsibility for keeping the Mortgaged Assets insured and may as an option keep in force the existing insurance coverages or obtain new coverages for the Mortgaged Assets, each of which coverages shall name the Receiver as an additional insured there under and Plaintiff as an additional insured and loss payee.

27.    The Receiver is entitled to rely on all outstanding rules of law, court orders and any future court orders and shall not be liable to anyone for its own good faith compliance with any order, rule, law, judgment or decree. In no event shall the Receiver be personally liable for the debts or obligations of the Defendant or be liable to anyone for good faith compliance with its duties and responsibilities, nor shall the Receiver, its employees, agents or advisors be liable to anyone for any actions taken or omitted by the Receiver, except upon a finding by this Court that the Receiver or its designee acted or failed to act as a result of malfeasance, bad faith, gross negligence or reckless disregard of its duties.

28.    Defendant, its directors, managers, members, partners, officers, agents, employees or other representatives, as the case may be, under this Order are hereby directed to use their best

efforts to ensure a smooth transition of the operation of the Mortgaged Assets to the Receiver or

its designee, and Defendant shall cooperate with the Receiver or its designee in consummating

such transition.

29.    The Receiver shall not be bound or personally liable for any or all contracts,

agreements, understandings or other commitments Defendant had, or may have with third parties

with respect to Defendant's business operations or the Mortgaged Assets, whether oral or

written. The Receiver may, by an affirmative written ratification executed by the Receiver, agree

to become bound to any such contracts, agreements, understandings or other commitments or

may agree to enter into any new or amended contracts, agreements, understandings or other

commitments. Nothing in this Order constitutes or shall be construed to constitute an assumption

of any of the leases, contracts or agreements currently existing with respect to Defendant's

business operations of the Mortgaged Assets by the Receiver or a waiver by the Receiver of any

default under any such lease, contract or agreement.

30.    Except as otherwise stated herein, all affiliates, directors, managers, members,

equity owners, creditors, and all other persons and parties in interest, and all others acting on

behalf of any such person or party in interest, including any federal, state or local agency or

authority, sheriffs, marshals, other officers, deputies, servants, agents, employees and attorneys,

are enjoined from:

    a.    Commencing, prosecuting, continuing or enforcing any suit
or proceeding in law, equity, bankruptcy, or otherwise
against or affecting the Mortgaged Assets without first
obtaining leave of this Court, except that such actions may
be filed to toll any statutes of limitations;

    b.    Using self-help or executing or issuing or causing the
execution or issuance of any court attachment, subpoena,
warrant, replevin, execution, writ or other process for the
purpose of impounding or taking possession of or

interfering with or creating or enforcing a lien upon any portion of the Mortgaged Assets, wherever situated;

c.    Attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate the due date of any lease, loan, mortgage, indebtedness, security agreement or any document otherwise affecting the Property;

d.    Doing any act to interfere with the taking control, possession, or management, by the Receiver, of any portion of the Mortgaged Assets or to interfere in any manner with the exclusive jurisdiction of this Court over the Mortgaged Assets;

e.    Engaging in any act to create, perfect, or enforce any lien against the Mortgaged Assets, unless specifically authorized by order of this Court; and

f.    Engaging in any act to collect, assess, or recover a claim against the Mortgaged Assets that arose before the appointment of the Receiver.

31.    Notwithstanding anything to the contrary contained in this Order (a) Plaintiff is not enjoined from pursuing a sale of the Mortgaged Assets, and the Receiver is permitted, subject to accounting to the Court, to remit any and all Mortgaged Assets' proceeds to Plaintiff; and (b) nothing herein is intended to interfere with any pending or future criminal investigation or proceeding or other exercise of the police power by any federal, state or local agency or authority against the Defendant except for the protection and preservation of the Mortgaged Assets provided by this Order.

32.    Notwithstanding anything to the contrary contained in this Order, nothing herein shall alter, modify, subordinate, or impair any existing rights, interests, or remedies of Plaintiff, whether now or in the future available under any loan documents, at law or in equity, including, but not limited to, any right of offset with respect to any funds now or in the future on deposit or otherwise in the possession of Plaintiff or any of its affiliates.

33.    The Receiver shall within thirty (30) days of the date of this Order file a list of all creditors of the Defendant which are reasonably known to the Receiver, including any party which has recorded a lien or judgment against the Defendant, and shall provide notice to each such creditor by regular U.S. mail of the appointment of the Receiver with a copy of this Order. The Receiver shall also provide such notice to any additional creditors which later become known to the Receiver, as soon as is practicable following the existence of such creditor becoming known to the Receiver.

34.    Neither the Receiver nor Plaintiff shall have any personal liability for any environmental liabilities arising out of or relating to Defendant or Defendant's business or the Mortgaged Assets.

35.    Receiver will have no duty or obligation to prepare and/or file any tax returns or pay any taxes of the Defendant that are or may become due, including *inter alia*, income tax returns, sales tax returns and or payroll related returns. Receiver shall have no obligation to manage, fund, oversee or account for any retirement, pension, 401k, health insurance or other employee benefit plan, qualified or unqualified for any current or former employee, officer or agent of the Defendant.

36.    Defendant is hereby directed to use their best efforts to insure a smooth transition of the leasing, management and operation of the Mortgaged Property to the Receiver. In connection therewith, Defendant and its respective agents, employees or other representatives are hereby directed as follows:

    a.    To immediately vacate and surrender the Mortgaged Property to the Receiver;

    b.    To turn over copies of all leases to Receiver, tenant contact information and copies of communications concerning tenants and leases;

    c.    To turn over all Rents in their possession to Receiver;

    d.  To turn over all tenant security deposits to Receiver;

    e.  To turn over to Receiver all books, records, contracts, agreements, files, computers and access to all financial, services, utility, marketing, brokering, and other information relating to the Mortgaged Property, including information maintained electronically, software, and access codes, and any other property necessary for the Receiver to fulfill its duties hereunder;

    f.  To permit Receiver access to information necessary for Receiver to manage and operate the Mortgaged Property;

    g.  To execute and deliver the Receiver any documents reasonably requested by the Receiver, including, without limitation, a W-9 Form or FEIN number, necessary for the Receiver to administer bank accounts containing revenues from the Mortgaged Property;

    h.  To turn over all documents relating to any Tax Appeal; and

    i.  To cooperate with and assist the Receiver in carrying out his duties hereunder and to comply with reasonable requests of the Receiver's in furtherance of Receiver's duties hereunder.

37.    The Defendant and its agents, employees or other representatives are hereby enjoined from interfering in any manner with the Receiver's leasing, operation or management of the Mortgaged Property.

38.    No lien, claim, or other security interest in the Mortgaged Property shall be affected by this Order, nor shall the appointment of the Receiver or any provision of this Order impair the Plaintiff's rights and remedies under the Loan and related loan documents including, without limitation, Plaintiff's right to proceed with foreclosure of the Mortgaged Property or any sale of the subject Mortgage, Note and other loan documents.

39.    Nothing herein shall be deemed to preclude Plaintiff from inquiring in any discovery regarding Defendants, or their respective agents', employees' or other representatives', operation of the Mortgaged Property and the whereabouts of any and all accounts and documents including, but not limited to, leases, rent rolls, and books of account relating to the Mortgaged Property.

40.    The Receiver shall not be bound by all or any contracts, agreements, understandings or other commitments that Defendant had, has or may have with third parties, whether oral or written. The Receiver may, by an affirmative written ratification executed by the Receiver and Plaintiff's written approval, agree to become bound by any such contracts, agreements, understandings or other commitments or may agree to enter into any new or amended contracts, agreements, understandings or other commitments. Nothing in this Order constitutes, or shall be construed to constitute, an assumption by the Plaintiff or the Receiver of any of the leases or other contracts or agreements currently existing with respect to the Mortgaged Property or Mortgaged Assets or a waiver by the Plaintiff or the Receiver of any defaults under any such leases, contracts or agreements.

41.    Receiver is a receiver of the Mortgaged Property and Mortgaged Assets and shall take actions pursuant to this Order (and any other order of the Court) in his own name, as receiver for the Mortgaged Property and Mortgaged Assets, and not in the name of Plaintiff or Defendant.

42.    Without limiting any other rights or immunities the Receiver may have at law or in equity, the Receiver shall have no liability for acts or omissions made by or on behalf of it in its capacity as the Receiver of the Mortgaged Property and Mortgaged Assets, so long as such acts and omissions are made in good faith and without gross negligence. Receiver and its employees, agents and attorneys shall have no personal liability in connection with any liabilities, obligations, liens or amounts owed to any of Defendant's creditors because of its duties as Receiver. Nothing in this Order shall grant any rights to trade creditors or general unsecured creditors, whose rights shall be solely determined in accordance with applicable law.

43.     Receiver and its employees, agents and attorneys shall have no personal liability, and they shall have no claim asserted against them relating to Receiver's duties under this Order, except for claims due to their gross negligence, gross or willful misconduct, malicious acts and/or the failure to comply with this Court's orders. No person or entity shall file suit against the Receiver, or take other action against the Receiver, without an order of this Court permitting the suit or action.

44.     By making this request for the appointment of a receiver, the Plaintiff does not render itself responsible for advancing any funds to the Receiver to meet working capital or other financial needs of the Mortgaged Property. Plaintiff may, in its sole discretion and without further order of this Court, make available to the Receiver any of the funds currently in Plaintiff's possession, including any Rents received pursuant to its Assignment of Rents during the course of this receivership in any manner it determines is necessary, including for the payment of the Receiver's compensation and expenses (including its counsel's fees and expenses), all of which advances shall be added to the Loan and be secured by the Mortgage and Mortgaged Assets. If there are not sufficient Rents to pay the Receiver's compensation or any expenses, any funds advanced by Plaintiff for that purpose shall also be added to the indebtedness secured by the Mortgage and Mortgaged Assets.

45.     The appointment of the Receiver pursuant to this Order shall not constitute the existence of a lender in possession of the Mortgaged Property.

46.     Plaintiff may seek to terminate the receivership authorized and created hereby at any time by Motion seeking termination of the receivership. Within forty-five (45) days of termination of the receivership, the Receiver shall prepare and file a final report (the "Final Report"). Any objections to the Final Report must be filed with the Court and served on the

Receiver, its counsel, Plaintiff's counsel, and all other parties having entered their appearance in this proceeding within thirty (30) days of the filing of the Final Report.  Any objection to the Final Report not raised as set forth herein shall be deemed waived.  If no objections are received, the Final Report will be deemed accepted and approved by the Court.  After the Final Report is approved, the Receiver shall turn over any excess funds in its possession not used to pay final bills and expenses of the Receivership to the Plaintiff, unless otherwise directed by the Court.  In the event the indebtedness due to Plaintiff has been paid in full from funds remitted to Plaintiff, any excess funds shall be remitted by Plaintiff to Defendant.

47.    Nothing in this Order precludes the Receiver from requesting permission from this Court to terminate the Court's appointment as the Receiver in this case; provided, however, that Plaintiff shall have not less than 30 days' notice of the hearing on any such request.

48.    This Court retains jurisdiction to modify the terms of this Order and to expand or contract the rights, duties, and obligations of the Receiver. The Receiver may apply to this Court by motion and upon notice to all parties for further or other authority as may be necessary in its performance of its duties.

49.    Within thirty (30) days of the entry of this Order, Receiver shall cause a copy of this Order to be served upon all tenants and known creditors and shall keep records of such service that may be made available to this Court upon request.

50.    The Court shall retain jurisdiction and supervision of all matters concerning the Receiver, the receivership created hereby and the Mortgaged Assets.

51.    Plaintiff shall notify all creditors and any other interested persons or entities of this Order and shall serve this Order on the same.

BY THE COURT:

_____
J.

**EXHIBIT B**

## AGREEMENT OF SALE AND PURCHASE FOR COMMERCIAL REAL ESTATE

LISTING BROKER: **NEWMARK**                    SELLING BROKER:   **NEWMARK**

THIS IS A LEGALLY BINDING CONTRACT FOR THE SALE OF COMMERCIAL REAL ESTATE WHEN SIGNED BY BUYER AND SELLER.  **YOU SHOULD OBTAIN THE ADVICE OF A LAWYER BEFORE SIGNING THIS AGREEMENT**.

### I.  PURCHASE AND SALE

1.  **Agreement Date; Parties**.  The effective date of this Agreement (the "Agreement Date") shall be **March    , 2025**, unless delivery of the Agreement by the last party to sign occurs subsequent thereto, in which event the delivery date shall be the effective date.  The parties to this Agreement are:

        SELLER:   Name (s) **1700 Murray Avenue LLC**
                        Address: **c/o**
                        Telephone:
                        email:

        BUYER:    Name (s) **29 Katz Crew, LP**
                        Address: **c/o Brandywine Agency, Inc., 357 Lincoln Highway, North Versailles, PA  15137, Attn: John Katz**
                        Telephone:        **(412) 349-3997**
                        Facsimile:         **(412) 349-3965**
                        email: **jkatz@brandywineagency.com**

2. **Sale of Real Estate.**

   2.1 **Conveyance.**  Seller and Buyer, intending to be legally bound hereby, covenant and agree as follows:  Seller shall, on the date hereinafter specified, by deed of special warranty delivered in recordable form, grant and convey to Buyer, in fee simple, free and clear of all liens and encumbrances, subject only to the Permitted Exceptions in ¶ 2.2, good and marketable title (and such as will be insurable by a responsible title insurance company at regular rates) to the following real estate ("Real Estate"):

   (a) Description of Real Estate:  All that certain lot or parcel of land, located in the **City of Pittsburgh**, County of **Allegheny**, Commonwealth of Pennsylvania, more particularly described as follows: **that certain parcel known as 1700-1714 Murray Avenue, having erected thereon a three-story retail/office building and parking lot.**

   TOGETHER WITH all and singular the buildings, improvements, fixtures, easements, and all other appurtenances whatsoever thereunto appertaining, it being agreed that this sale and purchase includes: (i) all heating, ventilating, air-conditioning, plumbing, and electrical systems, and fixtures appurtenant thereto and forming a part thereof except as otherwise provided in ¶ 3 hereof; (ii) all built-in appliances, cabinets, elevators, loading docks and dock levelers, and other permanent fixtures; and (iii) all landscaping of the Real Estate.

   (b) Public record references:  Block and Lot **86-L-13 and 86-L-111.**

   2.2 **Permitted Exceptions**.  Buyer shall take title to the Real Estate subject only to the following Permitted Exceptions: (a) building and use restrictions of record; (b) vehicular or pedestrian easements of record affecting the Real Estate and being contiguous to the front, rear, or side lot lines; (c) water, sewer, gas, electric, cable television, and telephone lines or easements therefor of record or as currently installed; (d) prior grants, reservations, or leases of coal, oil, gas, or other minerals as shown by instruments of record; (e) easements apparent upon inspection of the Real Estate; and (f) any matters disclosed in writing by Seller to Buyer prior to or simultaneously with the execution of this

1

Agreement by Buyer and attached hereto and made a part hereof: provided that none of the foregoing matters shall interfere with the uses and/or occupancy of the Property for which it is zoned, including as a **three-story office/retail building with parking lot**, or would require the removal or alteration of the currently existing building(s) or appurtenant structures thereon.

3.  **Personal Property Included in Sale.**

   3.1 **Tangible Personal Property**.  This sale includes all tangible personal property owned by Seller and currently located at and used in the operation of the real estate, other than the following listed items, which are rented or otherwise not owned by Seller or are not included as part of this sale: NONE .  *(Examples of tangible personal property include: machinery and equipment; furniture, furnishings, and portable appliances; storm doors, screens, shades, blinds, awnings, drapery rods, and other window treatments; storage tanks, water and other storage towers, and silos; signs; antennas; fire-prevention/extinguishing devices; portable heating, refrigeration, air-cooling, and air-conditioning apparatus; security system; free-standing partitions and fencing; warehouse racking; supplies on hand; etc.)*

   3.2 **Books and Records.**

      (a)  Documentation included in sale. This sale includes all of the documentation in possession of Seller relating directly and exclusively to the Property, including, without limitation, those documents described on Schedule "1" (all of the foregoing collectively referred to herein as the "Documentation").  Where Seller may be required to retain certain documents, Seller will furnish true and correct copies thereof at Seller's expense.

      (b) Seller's duty to disclose.  Within **3** business days after the Agreement Date, Seller shall deliver copies of all Documentation to Buyer for inspection.

   3.3  **Delivery of Personal Property**.  All of the tangible personal property and the Documentation included in this sale (the "Personal Property") shall be delivered to Buyer at the time of delivery of possession of the Real Estate.

4. **Property**.  The Real Estate and Personal Property comprising this sale and purchase are collectively referred to herein as the "Property."

5.  **Purchase Price**.  Buyer shall purchase the Property and pay therefor the sum of **Four Million Nine Hundred Thousand Dollars ($4,900,000.00)** (the "Purchase Price") payable as follows:

| Hand money deposit payable to **Attorneys' Abstract Company, Inc.** ("Escrow Agent") within three (3) business days after the full execution of this Agreement | $**50,000.00** |
|---|---|
| Certified funds, bank-issued check or wire transfer at Closing | $**4,850,000.00** |
| TOTAL PURCHASE PRICE | $**4,900,000.00** |

The Purchase Price is allocated as follows: **$4,428,000** to Real Estate and **$472,000** to Personal Property.

6. **Closing.**

   6.1 **Closing Date.**  Unless otherwise agreed, the payment of the purchase price to Seller and delivery of the deed to Buyer ("Closing") shall be held **thirty (30) days after the end of the Inspection Period, defined in ¶ 9.1 below** (the "Closing Date").  By written notice to Seller no later than 3 business days prior to the closing date, Buyer may designate a definite time on such date and a definite place in **Allegheny** County, Pennsylvania, for Closing.

   6.2 **Modified Time of the Essence.**  If full performance of this Agreement is not completed by the Closing Date, either party shall have the right after that date to declare time to be of the essence of this Agreement by giving written notice to the other party.  Such notice shall contain a declaration that time is of the essence and shall fix the time, place, and date of Closing, which date shall not be sooner than 15 days nor later than 30 days following the effective date of the giving of such notice.

7. **Allocation of Certain Costs.**

7.1 **Real Estate Taxes.** Real estate taxes shall be prorated at Closing based upon the fiscal year of each taxing body.

7.2 **Other Charges.** Water and sewerage charges, municipal garbage and rubbish removal charges, rents, and interest shall be prorated as of the Closing.  The cost of real estate transfer taxes shall be divided equally between Seller and Buyer.  Seller shall be responsible for the cost of deed preparation and all matters of title clearance and a reasonable charge for making disbursements on behalf of Seller.

<h2 align="center">II. DUE DILIGENCE</h2>

8. **Contracts and Leases**.  Within **3** business days after the Agreement Date, Seller shall provide to Buyer a true and complete copy of (i) all contracts for services and supplies relating to the operation or maintenance of the Property and (ii) all tenant leases (the "Leases"); which are the only contract(s) and/or lease(s) which relate to use, management, occupancy, operation and/or maintenance of the Property.  Buyer may terminate this Agreement on or before the end of the Inspection Period after receipt of the aforesaid contracts and Leases, but in no event later than the date of Closing.  Seller agrees that after executing this Agreement, Seller will not enter into any new contracts and/or tenant lease or terminate, modify, extend, or renew any existing contract or lease relating to the occupancy, operation, or maintenance of the Property without the prior written approval of Buyer.  As of the Closing, Seller agrees to terminate all contracts for services and supplies relating to the operation or maintenance of the Property, other than the following:   **NONE** .

9. **Inspection of Property.**

9.1 **Right to Inspect**.  Within **sixty (60)** days after the Buyer receives the documents described in ¶ 3.2, 8 and 15.2 ("**Initial** Inspection Period"), Buyer or Buyer's authorized representatives may inspect and test the Property at Buyer's expense. **Such inspection period shall be extended for an additional thirty (30) days after the end of the Initial Inspection Period if Buyer gives notice of an extension on or before the end of the Initial Inspection Period and deposits with Escrow Agent, within three (3) business days after the end of the Initial Inspection Period, an additional hand money deposit of $10,000 (the Initial Inspection Period, including as the same may be so extended, called the "Inspection Period").** Seller hereby grants access to the Property to the persons designated by Buyer, upon reasonable notice to Seller, to perform inspections and tests.  Buyer or Buyer's authorized representatives may make any inspections and tests of the Property (the "Inspections") including, but not limited to, building structure and components, HVAC, plumbing and electrical systems (including service lines), machinery and equipment, pest infestation including wood-boring insects, and compliance with building codes, the Americans with Disabilities Act of 1990, 42 U.S.C. § § 12101 et seq., as amended, and other applicable statutes and ordinances.  Within the Inspection Period, Buyer shall also have the opportunity to review any and all financial and other information concerning the Property, including having had prepared on its behalf any and all surveys, title insurance commitments, insurance binders, studies, reviews and/or other due diligence materials concerning the Property (collectively hereinafter called the "Studies") as Buyer may deem as necessary or desirable in its sole discretion

9.2 **Notice to Seller**.  Within 2 business days after the end of the Inspection Period, Buyer shall deliver written notice to Seller and Broker that either:

(a)  Buyer waives any right that Buyer may have under this paragraph; or

(b)  The Inspection and/or Studies are unacceptable to Buyer and the Agreement is terminated as of the date of delivery of notice.

If Buyer does not deliver the written notice referred to in this ¶ 9.2 within 2 business days after the end of the Inspection Period, Buyer waives any right that Buyer may have under this provision.

9.3 **Buyer's Termination**.  If Buyer elects to terminate pursuant to ¶ 9.2(b) hereof, all hand money shall be returned to Buyer forthwith and without deduction and this Agreement shall be null and void and of no further force or effect.

9.4 **Time of the Essence**.  Time shall be of the essence as to the provisions of this ¶ 9.

10. **Pre-Closing Access**.  Buyer shall be permitted access on reasonable notice and at a reasonable times prior to Closing to review the Real Estate and all portions of the same and all of the Personal Property therein for the purpose of conducting the

inspections and Studies described in this Agreement, as well as determining whether the Property is in the same condition as when this Agreement was signed and remains in the Property.

11. **Condition of Property at Closing.** Possession of the Property shall be delivered to Buyer at Closing, broom-clean, free of debris, and with any lawn and shrubbery in trim and in substantially the same condition as it was on the date of Buyer's execution of the Agreement. Seller shall maintain and keep the Property in as good condition as it was on the date of Buyer's execution of the Agreement, except for ordinary wear and tear, normal use of consumables and risk of loss from fire or other casualty which is provided for in ¶ 12, until delivery of the Property to Buyer.

12. **Risk of Loss; Insurance**. Risk of loss of the Property shall remain upon Seller until Closing. Buyer has an insurable interest in the Property upon mutual execution and delivery of this Agreement. Seller agrees to maintain Seller's existing property insurance and to furnish Buyer, promptly upon Buyer's request, with a certificate of insurance or other satisfactory evidence of the amount of coverage and date of expiration. Except as otherwise provided herein, if there is a casualty damage to the Property between the date of Buyer's execution and delivery of this Agreement and Closing, Buyer shall have the option (a) to terminate this Agreement by giving Seller written notice of such termination within 10 business days after receiving notice of such damage or before Closing, whichever is earlier, whereupon all monies paid by Buyer on account of the purchase price shall be returned to Buyer with interest, if any, pursuant to ¶5, above and upon such return this Agreement shall be null and void, or (b) to proceed to Closing in accordance with this Agreement and pay the purchase price in full (less any applicable insurance deductible), in which event Seller shall assign to Buyer all insurance proceeds to which Seller may be entitled as a result of such casualty damage. If Buyer fails to give such notice, Buyer shall be conclusively deemed to have chosen option (a).

13. **Municipal or Other Governmental Improvement**. Seller shall pay for all work and improvements resulting in an assessment against the Real Estate where an ordinance or resolution authorizing such work or improvement is adopted or approved by a municipal or other public body or authority prior to Closing. Buyer shall pay for all work and improvements resulting in an assessment against the Real Estate where an ordinance or resolution authorizing such work or improvement is adopted or approved by a municipal or other public body or authority on or after Closing.

### III. REPRESENTATIONS, WARRANTIES, COVENANTS & ACKNOWLEDGEMENTS

14. **Representations, Warranties, Covenants and Acknowledgements regarding condition of Property.**

14.1 **Condition of Property.** Seller has no knowledge of any material defects in the Property, or of the violation of any code, ordinance, or regulation except as follows: **NONE**.

14.2 **Notice of Changes.** Seller shall promptly notify Buyer and Broker in writing of any material change affecting the Property that becomes known to Seller prior to Closing.

14.3 **Operation of Premises.** Seller shall continue to maintain and operate the Property in accordance with its normal business practice from the date hereof to the Closing Date.

14.4 **Documentation.** The Documentation, rent roll and other information previously delivered or furnished to Buyer was true and correct in as of date delivered, and any additional information to be delivered or furnished to Buyer shall be true and correct as of date delivered.

14.5 **Litigation.** To Seller's knowledge, there is no claim, action, suit, or proceeding is pending, or has been threatened, which affects or concerns title to any portion of the Property, any of the Leases, or impacts on the sale of the Property by Seller, in or before any court or before or by any federal, state, county or municipal department, commission, board, bureau, or agency or other governmental instrumentality.

14.5 **Notices of Violation.** No notice has been received by Seller from any federal, state or local governmental agency, any holder of any mortgage on the Property, any insurance company, or any board of fire underwriters (or other body exercising similar functions), or by any third party, any of which notices claim any defect or deficiency of or concerning the Property, or request the performance of any repairs, alterations or other work to the Property.

4

14.6 **Certificates of Occupancy**. Seller has valid certificates of occupancy for all current uses and occupancy at the Property and to Seller's knowledge, the tenants have obtained valid certificates of occupancy for their occupancy of the Property.

14.7 **Assessments**. Seller has received no notice that any portion of the Property is subject to or is affected by any special assessment or special taxing district whether or not there is presently a lien thereon.

14.8 **Obligations**. Seller has not made any commitments to any governmental or quasi-governmental authority, homeowners or property owners association, or to any other individual, entity, organization or group relating to the Property which would impose an obligation upon Buyer, or its successors or assigns.

14.9 **Disabilities Act Representations.** Seller has no knowledge that any legal action has been served or threatened, or that any federal, state or local governmental agency has given notice, regarding any alleged violation of the federal Americans with Disabilities Act of 1990, 42 USC 12101 et seq., as amended, or any similar state or local law, with respect to the Property.

14.10 **Authorized to Sell**. Seller has taken all necessary action (including internally and with any third party or governmental entity) to duly enter into this Agreement and to be able to sell the Property in accordance with the terms hereof. No person or entity, other than Buyer has, or as of the Closing will have, any right or option to acquire, lease, use or occupy the Property or any portion thereof or any interest therein, except for the rights of tenants to lease the space currently occupied by them under the Leases. The execution of this Agreement and consummation of the transactions contemplated hereby will not constitute a violation of any agreement to which Seller is a party or by which Seller is bound, or any law, order or regulation applicable to Seller.

14.11 **Employees**. Seller has no employees, including any Property-level employees.

14.12 **Financial Statements**. All financial statements related to the Property as previously or hereafter provided by Seller to Buyer were prepared in the ordinary course of business, and accurately reflect the operations of the Property.

## 15. **Environmental Matters**.

15.1 **Representations as to Seller's Knowledge.** Seller represents to Buyer that, to Seller's knowledge: (a) the Property does not contain any asbestos, polychlorinated biphenyls, petroleum or petroleum products [including gasoline, fuel oil, diesel oil, heating oil, motor oil, lubricating oil and similar substances, and used oil, waste oil or waste by-products of any of the foregoing, whether stored above ground or in underground storage tanks ("UST's")}, or any solid wastes, hazardous substances, toxic pollutants or toxic substances (collectively, "Hazardous Substances") which are defined in, determined, or identified as such in any federal, state, or local laws, rules, regulations, orders, or other governmental requirements pertaining to environmental matters (the "Legal Requirements") or any judicial or administrative interpretation thereof, except for cleaning solvents and other materials which may be Hazardous Substances in such quantities as may be customary in respect of property similar in construction, use, and class to the Property in the municipality in which the Property is located ("Permitted Substances"); (b) no use, generation, storage, treatment, disposal, release, or threatened release of Hazardous Substances has occurred on or about the Property (including but not limited to any prior use of UST's or any activity which may have used UST's), other than Permitted Substances which are used, generated, stored, treated, disposed of, and released in compliance with all applicable Legal Requirements and permits; and (c) there are no civil, criminal, or administrative actions, suits (including suits brought by or on behalf of a citizen or citizens' group), demands, claims, hearings, investigations, or proceedings pending or threatened, against Seller or in respect of the Property, nor has Seller received any notice of violation, demand, or other notice from any governmental authority or agency, citizen, or citizen's group relating to the use, generation, storage, treatment, disposal, release, or threatened release of Hazardous Substances on or about the Property.

15.2 **Inspection.**

(a) Environmental audit. Within the Inspection Period, Buyer shall, at Buyer's sole expense, be permitted to cause a comprehensive environmental site assessment and/or compliance audit to be made assessing the presence of Hazardous Substances on the Property and the applicability of government environmental standards, licenses, and permits (which shall include a Phase I and/or Phase II environmental site assessment, as determined by Buyer in its discretion). Seller hereby grants a license to Buyer's environmental consultant(s) to enter upon the Property, upon giving Seller reasonable notice, to conduct such environmental assessment and/or audit. Buyer shall immediately repair any damage and restore the Property to

5

its condition existing immediately prior to any such environmental assessment and/or audit.

(b) Notice of and access to documents. Within **3** days after Agreement Date, Seller shall notify Buyer of the  existence of any of the following documents and shall provide Buyer access to the same upon reasonable prior notice at reasonable times: (i) maps, surveys, building or other plans, or specifications related to the Real Estate, any prior underground storage tanks, and prior waste disposal areas; (ii) existing U.S. Environmental Protection Agency and Pennsylvania Department of Environmental Resources permits, permit applications, inspection reports, affidavits, submissions, environmental assessments, environmental impact statements, citations, cessation orders, consent orders, hazardous waste disposal manifests, annual permit fee invoices, and generator reports; and (iii) existing environmental assessments and audits, boring logs or other relevant engineering data, including, but not limited to, material safety data sheets on raw materials and products utilized on the Real Estate asbestos tests and electrical transformer-PCB tests.

(c) Buyer's right to terminate.  If any environmental assessment and/or audit is unsatisfactory to Buyer, in its sole discretion (including if it discloses that there are any Hazardous Substances present in, on, or under the Real Estate), Buyer shall have the right to terminate this Agreement by written notice to Seller within 1 business days after the end of the Inspection Period, in which event the hand-money, with interest, if any, shall be returned to Buyer, whereupon neither party shall have any further obligation to the other party under this Agreement. Time shall be of the essence as to this ¶ 15.2.

15.3 **Deed Disclosure**.  To the extent required by law, Seller shall include in the deed a disclosure of any hazardous waste disposal or hazardous substance disposal on the Property, in accordance with the provisions of the Solid Waste Management Act of 1980, 35 P.S.6018.405, the Hazardous Sites Cleanup Act, 35 P.S. 6020.512(b), as amended, and any other applicable statutes.

16.  **Compliance with Zoning and Other Ordinances; Occupancy and Other Permits.**  Seller represents and warrants that the Real Estate has the following Zoning Classification: **LNC**    and that the present use **x** is __, is not in compliance therewith and that there exists no notice of any uncorrected violations of housing, building, safety, or fire ordinances.  (If no block is checked, Seller will be deemed to have warranted that the present use is in compliance with the stated Zoning Classification in accordance with 21 P.S. 611.) [See ¶ 18.2(f)]

17.  **Sewage Facility**.  The Pennsylvania Sewage Facilities Act, 35 P.S. 750.1 et seq. as amended, requires that there be a statement regarding the availability of a community sewage system. *Seller must check the appropriate block:*

**x**  (a) The Real Estate is serviced by a community sewage system.

__  (b) Buyer is hereby advised that there is no currently existing community sewage system available to the Real Estate. There is a permit for the operation of an individual sewage system for the Real Estate, and said permit has been exhibited by Seller to Buyer;

__  (c) Buyer is hereby advised that there is no currently existing community sewage system available to the Real Estate and that a permit for an individual sewage system must be obtained from the appropriate local agency pursuant to Section 7 of the Pennsylvania Sewage Facilities Act.  Buyer should contact the appropriate local agency which administers the Sewage Facilities Act, before signing this Agreement to determine the procedures and requirements for obtaining a permit for an individual sewage system.

18. **Real Estate Broker.**

18.1 **Definition**.  Unless expressly stated otherwise herein, whenever the term "Broker" is used in this Agreement it shall mean, collectively, the real estate broker(s) or real estate brokerage firm(s) whose name(s) appear on the first page of this Agreement.  Broker is not responsible for the performance of the obligations of Buyer and Seller under this Agreement.

18.2 **Notices by Broker**.  Broker is required by the Pennsylvania Real Estate Licensing and Registration Act, 63 P.S. §§ 455.607 and 608, as amended, to provide the following notices and disclosures:

(a)Newmark is the agent of x☐ Buyer, [ ] Seller, both ☐ Buyer and Seller;

(b) O**mitted**

(c) IN THE EVENT A BROKER HAS INDICATED ABOVE THAT SUCH BROKER IS ACTING AS AN AGENT FOR BOTH BUYER AND SELLER, THEN BUYER AND SELLER, BY THEIR SIGNATURES AFFIXED TO THIS AGREEMENT, ACKNOWLEDGE AND CONSENT TO THIS DUAL AGENCY.

(d) THE RATE OR AMOUNT OF COMMISSION FOR THIS SALE IS NEGOTIABLE BETWEEN BROKER AND SELLER. THE CLOSING OFFICER IS HEREBY AUTHORIZED TO PAY THE SAME OUT OF THE PROCEEDS OF SALE. *(Note: If the commission is paid by more than one party, Broker is required to disclose all sources of payment. 63 P.S. § 455.608.)* There are no other agreements involving the payment of commissions by Buyer or Seller relating to this transaction except as follows: **None** . If the provisions of this Agreement are inconsistent with those of any listing contract or other agreement for the payment of commissions for this sale, the provisions of this Agreement as to payment shall prevail.

(e) A Real Estate Recovery Fund exists to reimburse any person who has obtained final civil judgment against a Pennsylvania real estate licensee owing to fraud, misrepresentation, or deceit in a real estate transaction and who has been unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-3658.

(f) The failure of Broker to disclose in this Agreement the zoning classification of the Real Estate (except for properties zoned solely or primarily to permit single-family dwellings) may, pursuant to the Pennsylvania Real Estate Licensing and Registration Act, 63 P.S. § 455.101 et seq., as amended, render this Agreement voidable at the option of Buyer; and, if voided, any deposits tendered by Buyer, and any interest accrued thereon, shall be returned to Buyer without any requirement for any court action. (Complete ¶ 16.)

(g) Obtaining access to a public road may require issuance of a highway occupancy permit from the Pennsylvania Department of Transportation.

19. **Certification of Non-Foreign Status of Seller**. Section 1445 of the U. S. Internal Revenue Code of 1986, 26 U.S.C. 1445, as amended (the Foreign Investment in Real Property Tax Act of 1980, 26 U.S.C. 861 et seq., as amended) provides that a buyer of property located in the United States must withhold tax if the seller is a foreign person. Seller hereby certifies that Seller is not a foreign person within the meaning of Section 1445 (b)(2) of the Internal Revenue Code. Seller understands that this certification may be disclosed to the Internal Revenue Service and that any false statement contained herein could be punished by fine, imprisonment, or both.

20. **Survival of Representations and Warranties**. All representations and warranties of Seller and Buyer in this Agreement shall survive delivery of the deed for the period provided under applicable statutes of limitation and, unless otherwise noted herein, are true, material, and relied upon by the other parties hereto in all respects, both as of the Agreement Date, and as of the date of Closing.

## IV. REMEDIES

21. **Default**. In the event of default:

21.1 **By Buyer**:

Seller may retain all monies paid on account of the purchase price as liquidated damages, in which event this Agreement shall become null and void and both parties shall be released of all further liability hereunder (it being agreed that, without resale, Seller's damages will be difficult to ascertain and that all monies paid on account of the purchase price constitute a reasonable liquidation thereof and not a penalty).

Further, in the event of default by Buyer, all monies paid on account by Buyer shall be paid to Seller by Escrow Agent

21.2 **By Seller**:

(a) Buyer may waive all claims of any nature at law or equity, in which event Seller hereby agrees to repay to Buyer all monies paid on account of the purchase price and, in addition, reimburse Buyer for all direct, out-of-pocket costs and expenses including, but not limited to, title examination; survey; pest, environmental, and other property inspections; and lawyers' fees; or

(b) In lieu thereof, Buyer may elect the following remedy: an action for specific performance.

7

21.3  **Enforcement Expenses**:  In any proceeding for damages or equitable relief under this Agreement, the prevailing party shall be entitled, at the discretion of the court, to reimbursement from the losing party of all reasonable lawyer's fees, costs, and expenses of litigation incurred in securing the relief granted by the court.

22.  **Eminent Domain**.  If the Real Estate or any part thereof is taken by eminent domain after the Agreement Date and prior to Closing, Buyer shall have the option to: (a) void this Agreement, whereupon all monies paid on account hereof shall forthwith be paid to Buyer and upon such payment all parties shall be relieved of liability hereunder, or (b) elect to proceed with this Agreement and pay the full consideration, in which event Seller shall assign to Buyer all damages to which Seller may be entitled and which may be assigned by Seller pursuant to the Pennsylvania Eminent Domain Code, 26 P.S. 1-101 et seq., as amended.  Within 5 days after notification of any such taking, but in no event later than the Closing, Seller shall notify Buyer thereof.

## V. ADDITIONAL PROVISIONS

23. **Buyer's Principals**.  **Buyer hereby states that some or all of the principals of Buyer are licensed Pennsylvania real estate salesperson(s)/broker(s).**

23A. **Transfer Tax.  Buyer shall, at its option, have the right to pay the Broker's commission due by Seller and Seller's side of the transfer tax for a corresponding reduction in the Purchase Price.**

23B. **Leases; Tenant Documents.  Seller represents and warrants that Schedule "2" attached hereto (the "Rent Roll") is (i) a complete listing of all leases or occupancy agreements affecting the Property as of such date and (ii) is a true, correct and complete listing of: (1) each tenant's name, (2) the premises leased by such tenant, (3) the amount of rent due monthly from such tenant and the amount of any pre-paid rents, (4) the amount of the security deposit, if any, being held by Seller on behalf of such tenant, (5) the expiration date of the term of such tenant's Lease, and all options to renew, (6) any defaults by tenant and/or any defaults asserted against the landlord, and (7) any concessions, abatements, improvements, allowances or other sums or consideration due to tenant.**

**On or before ten (10) days (although dated not earlier than fifteen (15) days) prior to the Closing Date, Seller will deliver to Buyer, from each tenant under the Leases: (i) an estoppel certificate from such tenant, in form and content as requested by Buyer and which shall be satisfactory to Buyer in all respects and (ii) if requested by Buyer's lender, a subordination non-disturbance and attornment agreements in the form as required by such lender.**

## VI. GENERAL PROVISIONS

24. **Good Faith and Reasonableness Implied**.  In all matters contained herein, both parties shall have an implied obligation of good faith and reasonableness.

25. **Waiver of Tender; Notices**.  Formal tender of deed and of purchase price are hereby waived.  All notices, requests, demands, directions, and other communications (collectively, "notices") under the provisions of this Agreement shall be in writing unless otherwise expressly permitted hereunder and shall be sent by U.S. Postal Service first-class certified mail-return receipt requested; U.S. Postal Service express mail or other overnight courier service; email; telecopy (fax); or personal delivery; in all cases with charges prepaid.  Any properly given notice shall be effective when received.  All notices shall be sent to the applicable party at the address stated in ¶ 1 or in accordance with the last unrevoked notice from such party to the other parties hereto.

26. **Entire Contract**.  This Agreement constitutes the entire contract between the parties hereto, and there are no other understandings, oral or written, relating to the subject matter hereof.  This Agreement may not be changed, modified, or amended, in whole or in part, except in writing signed by all parties affected thereby.

8

Whenever used in this Agreement, the singular shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders. Section and paragraph headings are inserted for convenience only and do not form part of the text of this Agreement.

27. **Binding Effect**. This Agreement and all of its terms and conditions shall extend to and be binding upon the parties hereto and upon their respective heirs, executors, administrators, successors, and assigns. **The Buyer reserves the right to substitute a nominee/new entity by which it will take title, and if Buyer so elects, at Buyer's request, Seller shall execute a new agreement with such nominee upon the same terms and conditions as are contained herein, and with all deadlines to remain unchanged, and this Agreement shall be terminated.**

28. **Contract Formation; Counterparts**. This Agreement is effective only upon execution and delivery by all parties hereto. This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed an original. This Agreement shall be legally binding upon the parties hereto if the parties transmit identical documents or identical counterpart documents to one another signed by the parties, including transmittal via telecopy (fax), email or other electronic means (including docu-sign and .pdf), showing on the signature page a signature which purports to be that of the transmitting party.

29. **Covenant Not to Record**. Buyer shall not record this Agreement and any such recording shall render this Agreement voidable at the option of Seller.

30. **Coal Notice**. NOTICE-THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHT TO SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND, THE INCLUSION OF THIS NOTICE DOES NOT ENLARGE, RESTRICT OR MODIFY ANY LEGAL RIGHTS OR ESTATES OTHERWISE CREATED, TRANSFERRED, EXCEPTED OR RESERVED BY THIS INSTRUMENT. (This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P.L. 984, as amended, and is not intended as notice of unrecorded instruments, if any.)

Unless the foregoing notice is stricken, the deed shall contain the notice as above set forth and shall also contain, and Buyer shall sign, the notice specified in the Pennsylvania Bituminous Mine Subsidence and Land Conservation Act, 52 P.S. 1406.1 et seq., as amended.

31. **Indemnification.** The Seller shall defend, indemnify and hold harmless the Buyer and Buyer's heirs, executors, personal representatives, successors and assigns (each a "Buyer Indemnitee"), from and against any and all claims (including, without limitation, any investigation, action or other proceeding, whether instituted by a third party against a Buyer Indemnitee or by a Buyer Indemnitee for the purpose of enforcing its rights hereunder), damages, losses, liabilities, costs and expenses (including, without limitation, attorneys' fees and court costs) that constitute, or arise out of or in connection with: (i) the inaccuracy or breach of any representation or warranty of the Seller given in or pursuant to this Agreement; (ii) any breach or default in the performance by the Seller of any of their covenants, obligations or agreements in or pursuant to this Agreement; (iii) any of the liabilities of the Seller; (iv) the ownership or conduct of the Property (and/or the business or the ownership or use of the Property and/or the business conducted thereon) at any time prior to the date of Closing, or any incident, occurrence, condition or claim arising or accruing prior to the date of Closing; (v) any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or alleged to have been made, by any person with Seller (or any person acting on their behalf) in connection with the contemplated transaction; (vi) any noncompliance with any fraudulent transfer law with respect to the contemplated transactions; and/or (vii) Seller's failure to comply with any law pertaining to the transfer of assets in bulk, including, but not limited to, 72 P.S. §§1403, 7240, 7321 and 69 P.S. §529, and their respective amendments.

32. **Business Day.** If any obligation required under this Agreement is to be performed on a day which is not a "business day" (i.e., a Saturday, Sunday or legal holiday), such performance shall be due on the next immediately following business day.

33. **Escrow Agent Provisions**.  The following provisions pertain to the Escrow Agent:

(a)    Escrow Agent shall pay to any person or entity, in accordance with joint written instructions from both Seller and Buyer, amounts from the hand money held hereunder (the "Escrow Fund").

(b)    Seller and Buyer jointly and severally agree to pay and hold the Escrow Agent harmless from and against all costs, charges, damages and attorneys' fees, which in good faith Escrow Agent may incur or suffer in connection with any action arising out of this Agreement unless such action is against Escrow Agent for its gross negligence and/or intentional misconduct.

(c)    The Escrow Agent shall have no duties other than those expressly imposed on it herein and shall not be liable for any act or omission which it may do or omit to do while acting in good faith and in exercise of its judgment.

(d)    In the event of any dispute between Buyer and Seller which the Escrow Agent cannot resolve by reference to the information contained herein, Escrow Agent is authorized to interplead the Escrow Fund and submit the same to binding and final arbitration in Pittsburgh, Pennsylvania, in accordance with the commercial rules of the American Arbitration Association before a panel of three arbitrators, with one arbitrator to be selected by each of the opposing parties and said arbitrators to select a third arbitrator. In such proceeding, Escrow Agent may obtain an order restraining the parties from any further action against said Escrow Agent in connection with the handling of the Escrow Fund.  The parties hereto agree that they will defend, pay and hold Escrow Agent harmless from and against all costs, damages and attorney's fees incurred or suffered in connection with said interpleader action, and will pay Escrow Agent a reasonable fee for its services rendered in connection with said interpleader action.

(e)    **It is agreed and acknowledged by the parties that Papernick & Gefsky, LLC ("P&G"), which is an affiliate of  Escrow Agent, is counsel to the Buyer in connection with this Agreement, the transaction contemplated thereby, and other ancillary matters and/or transactions.  Specifically, Seller, and its directors, shareholders, directors, affiliates and assigns, agrees that Escrow Agent's duties hereunder do not interfere with P&G's adversarial representation of Buyer, and Seller, and its shareholders, directors, affiliates and assigns, shall not raise any objection to P&G's continued representation of Buyer, and its officers, directors and/or affiliates, in connection with this Agreement, the transaction contemplated thereby, and other ancillary matters and/or transactions.**

[remainder of page left blank]

34. **Lawyer Review**.   **THIS IS A LEGALLY BINDING CONTRACT WHEN SIGNED BY BUYER AND SELLER. YOU SHOULD CONSULT YOUR ATTORNEY PRIOR TO SIGNING.**  If you do not have a lawyer, you may call the Lawyer Referral Service of the Allegheny County Bar Association at (412) 261-0518.

## VII.  BUYER'S SIGNATURE

WITNESS Buyer's execution of this Agreement this ___ day of **March, 2025**.

> **29 Katz Crew, LP a Pennsylvania limited partnership**
>
> **By:  NV Properties, LLC, its general partner**

_____     By:_____
Witness                                              **John Katz, President**


This Agreement shall become null and void and the hand money deposit returned to Buyer, at the option of Buyer, unless a copy hereof signed by Seller has been delivered to Buyer on or before **March 10th , 2025**.

## VIII.  SELLER'S SIGNATURE

WITNESS Seller's execution of this Agreement this _____ day of **March, 2025**.

> **1700 Murray Avenue LLC**

_____     By:_____
Witness                                              Name/Title: _____

11

Schedule "1"

All materials respecting the Property in Seller's possession or control (with respect to materials in the custody of third parties, only to the extent obtainable by the Seller at no cost), including: environmental reports, title reports, leases, service contracts, title policies, existing surveys, deeds, appraisals, governmental permits, licenses, certificates, approvals and authorizations (obtained or applied for), including without limitation certificates of occupancy  and/or zoning, documentation regarding compliance with all applicable government environmental laws and regulations, including copies of all permits, inspection reports, correspondence, notices of violations, orders, consent orders or consent agreements from or with any governmental authority, all environmental studies, audits, investigations and assessments performed, whether conducted internally or by third parties, and all drawings, studies, geotechnical reports and plans related to the Property

Schedule "2"

Rent Roll

13

## AMENDMENT TO AGREEMENT OF SALE AND PURCHASE OF COMMERCIAL REAL ESTATE

| | |
|---|---|
| SELLER: | **1700 Murray Avenue LLC** |
| BUYER: | **29 Katz Crew, LP** |
| DATE OF AGREEMENT: | **May 5, 2025** |
| PROPERTY ADDRESS: | **1700-1714 Murray Avenue, City of Pittsburgh, Allegheny County, PA** |

The above-referenced Agreement of Sale and Purchase of Commercial Real Estate (the "Agreement") is hereby modified and amended as follows:

> **The Purchase Price is corrected to be Five Million One Hundred Thousand Dollars ($5,100,000.00).**
>
> **7.2 Other Charges. Water and sewerage charges, municipal garbage and rubbish removal charges, rents, and interest shall be prorated as of the Closing. All real estate transfer taxes shall be paid by Buyer.  Seller shall be responsible for the cost of deed preparation and all matters of title clearance which Seller is required to make pursuant to this Agreement.**

Except as expressly amended by and in this Amendment, the Agreement shall remain in full force and effect.

BUYER:

**29 Katz Crew, LP a Pennsylvania limited partnership**

By:  NV Properties, LLC, its general partner

By: _____
    *JOHN KATZ*
    84FCF606CFCC49B
    John Katz, President

Date: _____
      5/13/2025


SELLER:

**1700 Murray Avenue LLC**

By: _____
    *Martin Perry*
    1D66D028794E4C4
    Martin Perry, authorized signatory

Date: _____
      5/12/2025

1

Docusign Envelope ID: 9B214C23-BB30-4EA3-B89B-B64F668296FC

**EXHIBIT C**

## SECOND AMENDMENT TO AGREEMENT OF SALE AND PURCHASE OF COMMERCIAL REAL ESTATE

| | |
|---|---|
| SELLER: | **1700 Murray Avenue LLC** |
| BUYER: | **29 Katz Crew, LP** |
| DATE OF AGREEMENT: | **May 5, 2025** |
| PROPERTY ADDRESS: | **1700-1714 Murray Avenue, City of Pittsburgh, Allegheny County, PA** |

The above-referenced Agreement of Sale and Purchase of Commercial Real Estate (the "Agreement") is hereby modified and amended as follows:

> **It is agreed and acknowledged that Buyer (and/or affiliate) intends to bid on, or otherwise attempt to acquire, the rights of tenant under the Rite Aid lease affecting the Property (the "Rite Aid Lease"). If Buyer (and/or affiliate) takes an assignment of, or otherwise succeeds to the rights of tenant under, the Rite Aid Lease, the parties agree that:**
>
> (i)     **Buyer (and/or affiliate) shall have no obligations under the Rite Aid Lease, including without limitation, any obligation to pay rent and/or additional rent, and/or any obligation to maintain the leased premises (except for the assignment obligation set forth in subsection (ii), below); and**
>
> (ii)     **If the Agreement is terminated, for whatever cause or reason other than a Seller default, Buyer (and/or affiliate) shall promptly assign its rights in the Rite Aid Lease to Seller or its designee; and**
>
> (iii)     **If the Agreement is terminated by Buyer as permitted under the terms of the Agreement (such as, for example, within the Inspection Period or a Seller default), then Seller shall promptly reimburse Buyer (and/or affiliate) for the costs of acquiring the Rite Aid Lease in an amount not to exceed $25,000.00.**

Except as expressly amended by and in this Amendment, the Agreement shall remain in full force and effect.

BUYER:
**29 Katz Crew, LP a Pennsylvania limited partnership**

By: NV Properties, LLC, its general partner

By: _JOHN KATZ_
84FCF606CFCC49B...
     John Katz, President

Date: 7/16/2025

SELLER:
**1700 Murray Avenue LLC**

By: _Martin Perry_
1D86D028794E4C4...
     Martin Perry, Receiver

Date: 7/16/2025

1

**EXHIBIT D**

### THIRD AMENDMENT TO AGREEMENT OF SALE AND PURCHASE OF COMMERCIAL REAL ESTATE

| | |
|---|---|
| SELLER: | **1700 Murray Avenue LLC** |
| BUYER: | **29 Katz Crew, LP** |
| DATE OF AGREEMENT: | **May 5, 2025** |
| PROPERTY ADDRESS: | **1700-1714 Murray Avenue, City of Pittsburgh, Allegheny County, PA** |

The above-referenced Agreement of Sale and Purchase of Commercial Real Estate (the "Agreement") is hereby modified and amended as follows:

      **The Purchase Price is amended to be Four Million Nine Hundred Thousand Dollars ($4,900,000.00).**

      **The Inspection Period is waived and satisfied.**

      **Closing will occur on or before October 31, 2025.  Time is of the essence.**

      **At Closing, real estate transfer taxes shall be paid as follows:  1% of the Purchase Price by Seller; and the remainder by Buyer.**

Except as expressly amended by and in this Amendment, the Agreement shall remain in full force and effect.

BUYER:
**29 Katz Crew, LP a Pennsylvania limited partnership**

By:  NV Properties, LLC, its general partner

By: _____JOHN KATZ_____
        84FCF606CFCC49B...
        John Katz, President
Date: _____9/24/2025_____

SELLER:
**1700 Murray Avenue LLC**

By: _____Martin Perry_____
        1D86D028794E4C4...
        Martin Perry, Receiver
Date: _____9/24/2025_____

**EXHIBIT E**

## FOURTH AMENDMENT TO AGREEMENT OF SALE AND PURCHASE OF COMMERCIAL REAL ESTATE

| | |
|---|---|
| SELLER: | **1700 Murray Avenue LLC** |
| BUYER: | **29 Katz Crew, LP** |
| DATE OF AGREEMENT: | **May 5, 2025** |
| PROPERTY ADDRESS: | **1700-1714 Murray Avenue, City of Pittsburgh, Allegheny County, PA** |

The above-referenced Agreement of Sale and Purchase of Commercial Real Estate (the "Agreement") is hereby modified and amended as follows:

**Closing will occur on or before November 14, 2025.  Time is of the essence.**

Except as expressly amended by and in this Amendment, the Agreement shall remain in full force and effect.

BUYER:
**29 Katz Crew, LP a Pennsylvania limited partnership**

By:  NV Properties, LLC, its general partner

By: _JOHN KATZ_
84FCF606CFCC49B...
John Katz, President

Date: 10/31/2025

SELLER:
**1700 Murray Avenue LLC**

By: _Martin Perry_
1D86D028794E4C4...
Martin Perry, Receiver

Date: 10/31/2025

**EXHIBIT F**

### FIFTH AMENDMENT TO AGREEMENT OF SALE AND PURCHASE OF COMMERCIAL REAL ESTATE

| | |
|---|---|
| SELLER: | **1700 Murray Avenue LLC** |
| BUYER: | **29 Katz Crew, LP** |
| DATE OF AGREEMENT: | **May 5, 2025** |
| PROPERTY ADDRESS: | **1700-1714 Murray Avenue, City of Pittsburgh, Allegheny County, PA** |

The above-referenced Agreement of Sale and Purchase of Commercial Real Estate (the "Agreement") is hereby modified and amended as follows:

### Closing will occur on or before December 2, 2025. Time is of the essence.

Except as expressly amended by and in this Amendment, the Agreement shall remain in full force and effect.

BUYER:

**29 Katz Crew, LP a Pennsylvania limited partnership**

By:  NV Properties, LLC, its general partner

By: _JOHN KATZ_____
      84FCF606CFCC49B...
      John Katz, President

Date: _11/13/2025_____

SELLER:

**1700 Murray Avenue LLC**

By: _Martin Perry_____
      1D86D028794E4G4...
      Martin Perry, Receiver

Date: _11/13/2025_____

1

**EXHIBIT G**

### SIXTH AMENDMENT TO AGREEMENT OF SALE AND PURCHASE OF COMMERCIAL REAL ESTATE

| | |
|---|---|
| SELLER: | **1700 Murray Avenue LLC** |
| BUYER: | **29 Katz Crew, LP** |
| DATE OF AGREEMENT: | **May 5, 2025** |
| PROPERTY ADDRESS: | **1700-1714 Murray Avenue, City of Pittsburgh, Allegheny County, PA** |

The above-referenced Agreement of Sale and Purchase of Commercial Real Estate (the "Agreement") is hereby modified and amended as follows:

**The Purchase Price is amended to be Four Million Six Hundred Seventy-Five Thousand Dollars ($4,675,000.00).**

**Seller shall promptly apply for a court order authorizing the sale of the Property pursuant to the reduced price set forth herein (an "Updated Sale Order"); and Closing will occur on or before five (5) business days after receipt of such Updated Sale Order. Time is of the essence.**

**Closing shall not be contingent on Buyer obtaining any loan; therefore, there shall be no requirement for Seller's delivery of any subordination non-disturbance and attornment agreements. As to estoppel certificates, Seller shall not be obligated to obtain any such estoppel from any tenant of the Rite Aid space.**

**At Closing, Seller shall assign to Buyer all of its right, title and interest in and to (i) the Cumberland Farms, Inc. indemnification agreement, (ii) all leases (including as to the putative assignee of the Rite Aid lease) and (ii) all claims regarding the assignment of (and assignee of) the Rite Aid lease, including in the Rite Aid bankruptcy (although Seller retaining claims as to past-due rent from Rite Aid). It is agreed that Seller has no objection to Buyer retaining the law firm of Tucker Arensberg as to claims regarding the assignment of (and assignee of) the Rite Aid lease.**

Except as expressly amended by and in this Amendment, the Agreement shall remain in full force and effect

This Amendment may be executed in separate counterparts, and signatures may be evidenced and effectuated by electronic transmission (including email, .pdf and/or docu-sign).
.

**[remainder of page left intentionally blank]**

1

[signatures to
**Fifth Amendment To Agreement Of Sale And Purchase Of Commercial Real Estate]**

BUYER:
**29 Katz Crew, LP a Pennsylvania limited partnership**

By:  NV Properties, LLC, its general partner

By: _____
         John Katz, President
Date: _____
            11/19/2025

SELLER:
**1700 Murray Avenue LLC**

By: _____
         Martin Perry, Receiver
Date: _____
            11/19/2025

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

AMERISERV FINANCIAL BANK,                    CIVIL DIVISION

       Plaintiff,                                  NO.:  GD-24-003188

   vs.

1700 MURRAY AVENUE LLC,

       Defendant.

## ORDER OF COURT APPROVING AMENDED SALE AGREEMENT

AND NOW, this _____ day of _____, 202___, upon consideration of the Joint

Motion of Receiver and Plaintiff for Order of Court Approving Amended Sale Agreement (the

"**Motion**"), the Court finds as follows:

1.      The Motion is GRANTED.

2.      The Amended Sale Agreement is APPROVED, and the Amended Purchase Price

of the Mortgaged Property shall be $4,675,000.

3.      All other terms of the Sale Order issued by this Court on June 25, 2025, shall remain

in full force and effect.

                           BY THE COURT:


                           _____

                           J.