**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jason R. Melzer, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com
jmelzer@coleschotz.com

*Counsel to the Liquidating Trustee and the Wind-Down Debtors*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| LAKEHURST AND BROADWAY CORPORATION, | Case No. 25-14831 (MBK) |
| Debtor.[1] | |
| ERIC KAUP, IN HIS CAPACITY AS LIQUIDATING TRUSTEE TO THE LIQUIDATING TRUST, | |
| Plaintiff, | Adv. Pro. No. |
| v. | |
| EXPRESS SCRIPTS, INC., | |
| Defendant. | |

---

[1]    On December 30, 2025, the Court entered the *Order Granting Debtors' Motion for Final Decree Closing Certain of the Chapter 11 Cases in New Rite Aid, LLC, et al.*, closing all cases listed therein except for the above captioned Debtor [Case No. 25-14861 (MBK), Docket No. 3695] (the "**Order on Final Decree**"). The Court has entered a text order on the affiliated dockets listed in the Order on Final Decree requiring that all remaining matters be filed under the above captioned case, Lakehurst and Broadway Corporation, Case No. 25-14831 (MBK). Except as otherwise provided herein, references to the "Docket" herein shall refer to the docket in the formerly jointly administered cases captioned *In re New Rite Aid, LLC*, Case No. 25-14861 (MBK).

70913/0001-52417754

## COMPLAINT

TO THE HONORABLE MICHAEL B. KAPLAN,
UNITED STATES BANKRUPTCY JUDGE:

Eric Kaup, in his capacity as liquidating trustee (the "**Liquidating Trustee**" or "**Plaintiff**"), and on behalf of the Liquidating Trust established pursuant to the *Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC and Its Debtor Affiliates (Technical Modifications)* [Docket No. 3445, Ex. A] (the "**Plan**"),[2] and the order confirming the same [Docket No. 3445] (the "**Confirmation Order**"), and on behalf of the above-captioned debtor and other Wind-Down Debtors (the "**Wind-Down Debtors**") brings this complaint ("**Complaint**") against Express Scripts, Inc. ("**ESI**"), and hereby alleges as follows:

## NATURE OF THE ACTION

1. This action arises from ESI's improper practice of classifying thousands of prescriptions as brand drugs at the point of sale—thereby setting the reimbursement terms—only to later reclassify those same prescriptions as generics during year-end reconciliation, reducing the reimbursement owed to Rite Aid Hdqtrs. ("**Rite Aid**") and depriving it of millions of dollars it was contractually entitled to receive.

2. ESI is one of the nation's largest pharmacy benefit managers ("**PBMs**"), acting as an intermediary in the prescription-drug supply chain between pharmacies, drug manufacturers, and prescription-drug plans.

3. In that role, ESI communicates coverage and pricing information to pharmacies at the point of sale, determines how prescriptions are classified under the applicable benefit plan, and ultimately controls the reimbursement amount paid to the pharmacy.

---

[2]   Capitalized terms used herein and not otherwise defined shall have the meaning assigned to them in the Plan.

70913/0001-52417754

4.       For thousands of prescriptions dispensed by Rite Aid in 2024, ESI initially adjudicated the claims as brand drugs at the point of sale, thereby establishing the applicable member cost-share and reimbursement terms.

5.       However, during the annual reconciliation process, ESI retroactively redesignated many of those same prescriptions as generic drugs solely for purposes of calculating final reimbursement, thereby reducing the amounts payable under the parties' agreements.

6.       This after-the-fact reclassification depressed Rite Aid's reimbursement rates and reduced its payments by at least $9,299,564 for the 2024 reconciliation year alone, diminishing the funds available to the estate and its creditors.

7.       The parties' Pharmacy Provider Agreement, dated September 24, 2009 (the "**Agreement**"), together with the incorporated Provider Manual[3], requires ESI to apply the contract's definitions and industry-standard drug classifications consistently.

8.       Rite Aid's review of ESI's Year-End Report identified 38,483 prescriptions in which ESI's reconciliation classification diverged from the classification communicated at the point of sale.

9.       Independent industry sources—including ESI's own InsideRx program and the nationally recognized Medi-Span drug database—classify the disputed drugs as brand drugs, confirming that ESI's retroactive redesignations improperly reduced Rite Aid's contractual reimbursements.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a core proceeding pursuant to 28

---

[3] Define, infra, at ¶ 48.

70913/0001-52417754

U.S.C. § 157(b)(2).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), the Plaintiff consents to entry of final orders or a final judgment by this

Court in this adversary proceeding.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1409.

12.     The statutory bases for the relief requested herein are sections 105(a) of the

Bankruptcy Code and Bankruptcy Rules 7001.  The Plaintiff has made no prior request for the

relief requested herein to this or any other court.

## THE PARTIES

13.     The Plaintiff is the Liquidating Trustee of the Liquidating Trust established

pursuant to the Plan and the Confirmation Order.

14.     ESI, Inc. is a Delaware corporation with headquarters located at 1 Express Way,

Saint Louis, Missouri 63121.

## Procedural Background

### I.     Overview of the Chapter 11 Cases

15.     On May 5, 2025, Rite Aid and its affiliated debtors each filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code before the Bankruptcy Court for the District of

New Jersey (the "**Court**").[4]  The Wind-Down Debtors' chapter 11 cases were formerly jointly

administered under the lead case *In re New Rite Aid, LLC*, Case No. 25-14861 (MBK). *See* Docket

No. 122.

16.     On November 26, 2025, the Court confirmed the Plan and entered the Confirmation

Order.  [Docket No. 3445].

---

[4]     A detailed description of the facts and circumstances of these Chapter 11 Cases is set forth in the *Declaration of
Marc Liebman, Chief Transformation Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and
First Day Motions* [Docket No. 24].

70913/0001-52417754

17.    On December 30, 2025, the Court entered the Order on Final Decree, closing all cases listed therein except for the Wind-Down Debtor, and ordered that all remaining matters be filed under the Wind-Down Debtor's case. [Docket No. 3695].

18.    On December 31, 2025, the *Notice of (I) Entry of Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of New Rite Aid, LLC (Technical Modifications) and its Debtor Affiliates and (II) Occurrence of Effective Date* was docketed, providing that the effective date of the Plan, December 31, 2025 (the "**Effective Date**"), had occurred [Docket No. 3699].

II.    **Material Provisions of the Plan and Confirmation Order**

19.    Article IV(C) of the Plan establishes the Liquidating Trust and provides that, as of the Effective Date, the "Liquidating Trustee shall be appointed as the sole manager, sole director, and sole officer of each Wind-Down Debtor, succeed to the powers of, and act for each Wind-Down Debtor in the same fiduciary capacity as, each of the Wind-Down Debtors' managers, directors, and officers . . . and have all the rights, powers, and duties necessary to carry out his . . . responsibilities under this Plan." [Docket No. 3445, Ex. A, p. 26].  In accordance with the Confirmation Order and Plan, upon the Effective Date the Liquidating Trustee was appointed.  *See* Docket No. 3694, Ex. A.

20.    Article IV(L) of the Plan provides that the Liquidating Trustee "shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action[5] allocated to them in the Schedule of Retained Causes of Action, whether arising before or after the Petition Date and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan."  [Docket No. 3445, Ex. A, p. 33].

---

[5]    "Causes of Action" is defined in the Plan to include, among other things, "any claim based on or relating to, or in any manner arising from, in whole or in part, … breach of contract …"  *See* Plan, Art. I.A.27.

70913/0001-52417754

21.     On November 11, 2025, the Debtors filed the *Notice of Filing of Plan Supplement*, including the Schedule of Retained Causes of Action, which states that "in accordance with section 1123(b) of the Bankruptcy Code, but subject to Article X of the Plan," all causes of action that a debtor or estate may hold as of the Effective Date, "whether or not specifically enumerated in the Schedule of Retained Causes of Action, shall vest in the Wind-Down Debtor." [Docket No. 3218, p. 48].

22.     Further, the Wind-Down Reserve is to be funded by, *inter alia*, Specified Receipts, which includes "funds received by the Debtors or a Debtor Employee Benefit Plan or, following the Effective Date, the Liquidating Trustee, **in respect of the prescription rebate program maintained by the Debtors**." [Docket No. 3445, Ex. A, p. 46 "Wind-Down Reserve", and p.13 ¶165 "Specified Receipts"] (emphasis added).

23.     Pursuant to Article XIII of the Plan, "on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction . . . over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan," including matters related to "the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom." [Docket No. 3445, Ex. A, p. 58-59].

## FACTUAL BACKGROUND

### I.     An Overview of ESI as a PBM

24.     Defendant ESI is a major PBM that administers prescription-drug benefits for commercial plans, employer plans, government programs, and other drug-benefit payors.

70913/0001-52417754

25.     In this role, PBMs exercise significant control over how prescription drugs are priced and reimbursed in the United States.[6]

26.     This issue is so pervasive that the Federal Trade Commission ("**FTC**") addressed it in a 2024 interim report describing how increasing vertical integration and concentration has enabled PBMs to "profit [] by inflating drug costs and squeezing Main Street pharmacies." *See* Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report* at 1 (July 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

27.     In response to these practices, the FTC filed an action against the three of the largest PBMs, including ESI, for engaging in anticompetitive and unfair rebating practices. *See* Federal Trade Commission, *FTC Sues Prescription Drug Middlemen for Artificially Inflating Insulin Drug Prices* (Sept. 20, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-sues-prescription-drug-middlemen-artificially-inflating-insulin-drug-prices.

28.     On or about February 4, 2026, ESI settled with the FTC, and the FTC announced that the settlement's required business-practice reforms are expected to generate up to $7 billion in patient savings over ten years.

29.     The pervasive nature of PBM industry practices has also prompted heightened scrutiny and mounting concern from Congress.

30.     Recognizing the competitive concerns posed by vertically integrated PBMs, Congress on December 11, 2024, introduced bipartisan legislation to prohibit PBMs and

---

[6]     *See* National Conference of State Legislatures ("According to the Kaiser Family Foundation, consumers filled over 3.7 billion retail prescriptions in 2019. The Centers for Medicare & Medicaid Services (CMS) reports that consumer purchases of prescription drugs totaled $378 billion in 2021. Approximately 90% of prescription drug claims are processed by a pharmacy benefit manager (PBM). Many states have sought to decrease prescription drug costs while increasing patient access through PBM reform.").

70913/0001-52417754

pharmacies from operating under common ownership. *See Rep. Harshbarger Introduces Legislation to Eliminate the PBM Monopoly on the Pharmaceutical Delivery Chain* (Dec. 11, 2024), https://harshbarger.house.gov/media/press-releases/rep-harshbarger-introduces-legislation-eliminate-pbm-monopoly-pharmaceutical.

31.     In addition to regulatory scrutiny, ESI's conduct has prompted a series of civil lawsuits brought by entities asserting related concerns about its pharmacy benefit practices.

32.     Similar to the concerns raised in this Complaint, in January 2026, a group of large retail pharmacy operators, including Albertsons, Safeway, and related entities, filed a consolidated complaint against ESI alleging that the PBM initially treated certain drugs as brand at the point of sale and later reclassifying those same drugs as generic during annual reconciliation, resulting in significant underpayments to the pharmacies. *Consolidated Complaint*, *Albertsons LLC v. Express Scripts, Inc.*, Consol. C.A. No. N25C-12-001-KMM (Del. Super. Ct. Jan. 7, 2026) (CCLD)

33.     In addition, a putative class action was filed on February 17, 2026, by Plumbers' Welfare Fund, Local 130 U.A., that alleges ESI, along with affiliated entities, manipulated formulary placement and routed compensation through an affiliate group, resulting in higher costs to plan sponsors and reduced transparency regarding manufacturer payments.

34.     Plaintiff's allegations, detailed below, align with a broader pattern of disputed practices attributed to ESI concerning transparency and the administration of pharmacy benefit functions.

**II.     PBM Reimbursements and Post Point-of-Sale Reconciliation**

35.     When a pharmacy dispenses a prescription, the claim is processed electronically at the point-of-sale through the PBM's system.

36.     At that point, the PBM determines whether the medication is covered and classifies it as either a brand or a generic drug, and it sets the reimbursement amount accordingly.

70913/0001-52417754

37. The PBM's classification of a medication as brand or generic directly affects the pharmacy's reimbursement, as brand drugs are generally reimbursed at a higher rate than generics.

38. At the point-of-sale, the customer provides the amount depending on the PBM's designation, including its designations of brand or generic drugs.

39. After the point-of-sale, the PBM conducts a periodic reconciliation in which it can retroactively adjust the pharmacy's reimbursements.

40. These reconciliations may include the application of fees, adjustments, or "clawbacks" that reduce the pharmacy's final payment for the same prescription weeks or months after it was dispensed.

41. As a result, the amount initially displayed at the point-of-sale often differs from the amount the pharmacy ultimately receives.

42. This structure leaves pharmacies unable to know, at the time a prescription is filled, what their final reimbursement will be and enables PBMs to maintain complete control over both the initial reimbursement and any subsequent adjustments under the contract.

### III. ESI and Rite Aid's 2024 Year End Report and Reconciliation

43. On or about September 24, 2009, ESI and Rite Aid, entered the Agreement.

44. Pursuant to the Agreement terms, the Agreement shall be construed and governed according to the laws of Missouri.

45. The reimbursement rates are set by agreements between ESI and Rite Aid, that are renegotiated every one to three years (the "**Exhibits**").

46. Under the Agreement, ESI agreed "[f]or services performed in accordance with the terms and conditions of this Agreement, ESI shall pay Provider [Rite Aid] the rates as set forth in the applicable **Exhibit A**. . ." Agreement at § 3.1.a.

9

47.     The Exhibit A applicable to this dispute, include, among others, the ES1000, agreed to in November 2023, and sets forth the parties' negotiated rates for dispensing Brand Drugs and Generic Drugs.

48.     In accordance with Section 11 of the 2023 Express Scripts Network Federal Network Provider Manual ("**Provider Manual**"), a brand drug is defined as "a prescription drug that is not a Generic Drug" ("**Brand Drug**").

49.     ESI defines a "Generic Drug" as a "prescription drug – whether identified by its chemical, proprietary or non-proprietary name – which is pharmaceutically equivalent and interchangeable with a drug containing an identical amount of the same active ingredient(s) and approved by the FDA."

50.     The definitions also state that ESI will utilize data elements provided by nationally recognized sources in the retail prescription drug industry.

51.     Pursuant to the Agreement and Exhibits, the reconciliation proceedings begin with ESI's delivery of the Year End Report. The Year End Report summarizes the reimbursement amounts ESI determined, the fees or adjustments it applied, and the final net amounts after all post-point-of-sale reconciliations.

52.     According to the Agreement and the Exhibits, the Year End Report is to be sent 45 days after the end of the calendar year for 2024, which would have been February 15, 2025.

53.     Despite Rite Aid's requests for the Year End Report, ESI did not provide the Year End Report until April 1, 2025.

54.     On April 25, 2025, Rite Aid outlined to ESI three items it disputed in the Year End Report.

10

55.    Among the disputed claims was ESI's improper classification of Brand Drugs as Generic Drugs.

56.    After a close review of the End of Year Report, Rite Aid identified 38,483 prescriptions that were misclassified as Generic Drugs.

57.    At the point-of-sale, these drugs were designated as Brand Drugs and reimbursed at a higher rate.

58.    In fact, InsideRx, a prescription savings program powered and owned by ESI, also identifies the disputed drugs as Brand Drugs, *not* Generic Drugs.

59.    Similarly, Medi-Span, a commercial drug information database used throughout the pharmacy and healthcare industry, also identifies the disputed drugs as Brand Drugs.

60.    Through this scheme to arbitrarily re-designate Brand Drugs as Generic Drugs, Defendants caused Rite Aid to incur damages in an amount no less than $9,299,564.

61.    Accordingly, after reviewing the Year End Report and disputing these designations, the parties had a 60-day window for a good faith negotiation.

62.    During that time, Rite Aid provided a detailed breakdown and analysis of the disputed drug designations.

63.    Nevertheless, the parties could not reconcile their disagreement prior to the expiration of the good faith negotiation period.

64.    Therefore, on June 24, 2025, within the contract designated 60-day window, Rite Aid reiterated its claims.

65.    Under the Agreement and its accompanying Exhibits, Rite Aid then has 30 days to invoke the dispute-resolution process.

11

70913/0001-52417754

66.     Accordingly, on July 24, 2025, Rite Aid invoked its right via email correspondence to ESI and on July 25, 2025, sent ESI a formal letter outlining its position.

67.     Despite clear evidence of the reimbursement owed to Rite Aid, ESI has arbitrarily, and without support of the Agreement and Exhibits, refused to reimburse Rite Aid for the amounts due.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

68.     The Plaintiff repeats and realleges all allegations contained in the preceding paragraphs of the Verified Complaint as if same were fully set forth at length herein.

69.     The Agreement and Exhibits are an express, unambiguous contract setting forth the terms, duties and obligations of both ESI and Rite Aid.

70.     Under the Agreement and the Exhibits, ESI agreed "[f]or services performed in accordance with the terms and conditions of this Agreement, ESI shall pay Provider [Rite Aid] the rates as set forth in the applicable **Exhibit A**. . ."

71.      Rite Aid has fully complied with and performed all its duties and obligations under the Agreement and the accompanying Exhibits, still ESI failed and refuses to perform its corresponding contractual obligations.

72.     ESI breached the Agreement and Exhibits by failing to reimburse Rite Aid for drugs designated as Brand Drugs at the point-of-sale.

73.     The definitions of Brand and Generic Drugs are defined in the Provider Manual and incorporated into the Agreement and Exhibits.

74.     Accordingly, ESI was required to treat Brand Drug and Generic Drug claims consistent with those definitions and in accordance with the Agreement and Exhibits.

12

75. Nevertheless, ESI breached the Agreement and Exhibits by retroactively designating Brand Drugs as Generic Drugs.

76. Multiple nationally recognized sources in the retail prescription drug industry designate these drugs as Brand Drugs, including ESI's own InsideRx and Medi-Span.

77. ESI thus breached the Agreement and Exhibits by classifying drugs as Brand Drugs at the point-of-sale, only to arbitrarily re-designate those same drugs to Generic Drugs during the reconciliation.

78. In failing to reimburse the disputed drugs at the reimbursement rate for Brand Drugs in accordance with the Agreement and Exhibits, ESI caused Rite Aid monetary damages in an amount no less than $9,299,564.

79. As a direct and proximate result of ESI's breach of contract, Rite Aid has suffered damages in an amount to be proven at trial, but no less than $9,299,564.

**COUNT II**
**(In the Alternative – Unjust Enrichment)**

80. The Plaintiff repeats and realleges all allegations contained in the preceding paragraphs of the Verified Complaint as if same were fully set forth at length herein.

81. By dispensing covered prescriptions and providing pharmacy services to members within ESI's network, Rite Aid directly conferred a concrete benefit upon ESI.

82. At the time Rite Aid dispensed the covered prescriptions and submitted the claims, it reasonably expected remuneration from ESI for those services and products.

83. ESI was responsible for reimbursing Rite Aid, and Rite Aid conferred the benefit with the clear expectation that ESI would pay the appropriate amounts.

70913/0001-52417754

84.    Nevertheless, ESI arbitrarily increased its profits to the detriment of Rite Aid by classifying prescriptions as Brand Drugs at the point-of-sale, only to misclassify those same drugs as Generic Drugs at the time of reimbursement/reconciliation.

85.    ESI's retention of the foregoing benefit and funds was at the expense of Rite Aid.

86.    If the Agreement and its Exhibits are found unenforceable, inapplicable, or not to cover the disputed reimbursements, Rite Aid lacks an adequate remedy at law and is entitled to restitution and equitable relief to prevent ESI's unjust enrichment.

87.    Accordingly, ESI has been unjustly enriched by failing to pay the $9,299,564 that is rightfully owed to Rite Aid as a result of an underpayment during the 2024 reconciliation.

### COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

88.    The Plaintiff repeats and realleges all allegations contained in the preceding paragraphs of the Verified Complaint as if same were fully set forth at length herein.

89.    The parties were subject to the Agreement and Exhibits which constitute a valid and enforceable contract between ESI and Rite Aid.

90.    Under the laws of Missouri and New Jersey, every contract contains an implied covenant of good faith and fair dealing that requires the parties to act honestly, fairly and in a manner that does not violate the rights of its counterparty.

91.    Under the implied covenant, the parties may not act in bad faith, dishonestly, with improper motive, or in a manner inconsistent with the reasonable expectations of the parties, nor may it unfairly exercise discretion granted under the contract.

92.    Rite Aid performed its duties and obligations under the Agreement and Exhibits, including dispensing the covered Brand Drugs and submitting claims for reimbursement consistent with its contractual requirements.

14

93. However, ESI breached the implied covenant of good faith and fair dealing by engaging in conduct that directly undermined the Agreement and Exhibits and thus deprived Rite Aid of the benefits of the Agreement and Exhibits.

94. To the extent ESI was permitted in its discretion to re-designate Brand Drugs as Generic Drugs, ESI was required to do so in good faith.

95. Instead, ESI designated certain drugs as Brand Drugs at the point-of-sale only to redesignate the same drugs as Generic Drugs at the post-sale reconciliation to artificially reduce Rite Aid's contractually due reimbursement.

96. This unfair and arbitrary discretionary designation was designed to decrease payments to Rite Aid and increase ESI's monetary benefit, contrary to the Agreement and Exhibits.

97. Thus, ESI failed to act honestly and fairly in the reimbursement of claims during the 2024 reconciliation.

98. Accordingly, ESI's actions were undertaken with the knowing, intentional, and/or otherwise improper motive inconsistent with the duty of good faith and fair dealing, in an effort to shift costs to Rite Aid while enabling ESI to retain financial benefits arising from the artificial reclassification of drugs.

99. As a direct and proximate result of ESI's breach of the implied covenant, Rite Aid has suffered damages in an amount no less than $9,299,564.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff requests that the Court render judgment against ESI and:

I. Damages in an amount to be determined at trial, but no less than $9,299,564, plus interest;

70913/0001-52417754

II.       All costs related to this action, including, but not limited to attorneys' fees, and

court costs permitted under the law and/or the Agreement; and

III.      Any other relief the Court deems just and proper.


Dated: March 18, 2026

/s/ *Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Jason R. Melzer, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com
           jmelzer@coleschotz.com

*Counsel to the Liquidating Trustee and the Wind-Down Debtors*

16

70913/0001-52417754