**TABLE OF CONTENTS**

Pages

1.      Demise of Premises: ................................................................................................ 1
2.      Term: ....................................................................................................................... 2
3.      Rent: ........................................................................................................................ 2
4.      Use of Premises: ...................................................................................................... 5
5.      Taxes, Utility Expenses and CAM: ......................................................................... 6
6.      Intentionally Deleted. .............................................................................................. 9
7.      Improvements, Repairs, Additions, Replacements: ................................................. 9
8.      Requirements of Public Authority: ........................................................................ 12
9.      Covenant Against Liens: ........................................................................................ 12
10.     Covenant of Quiet Enjoyment: .............................................................................. 12
11.     Lease Conditions: ................................................................................................... 13
12.     Assignment and Subletting: ................................................................................... 13
13.     Indemnity: .............................................................................................................. 14
14.     Insurance: ............................................................................................................... 14
15.     Waiver of Subrogation: .......................................................................................... 16
16.     Destruction: ............................................................................................................ 16
17.     Eminent Domain: .................................................................................................... 17
18.     Utility Easement & Highway Alignment; Cross Easements: ................................. 18
19.     Mortgages: .............................................................................................................. 18
20.     Representations: ..................................................................................................... 20
21.     Defaults: ................................................................................................................. 21
22.     Bankruptcy and Insolvency: .................................................................................. 23
23.     Waivers: .................................................................................................................. 23
24.     Force Majeure: ....................................................................................................... 24
25.     Notices: ................................................................................................................... 24
26.     Governing Law: ...................................................................................................... 25
27.     Partial Invalidity: ................................................................................................... 25
28.     Short Form Lease: .................................................................................................. 25
29.     Interpretation: ........................................................................................................ 26
30.     Entire Agreement: .................................................................................................. 26
31.     Parties: .................................................................................................................... 26
32.     Broker's Fee: .......................................................................................................... 26
33.     Dark Period. ........................................................................................................... 26
34.     Submission Not An Option: ................................................................................... 26
35.     Environmental Provisions: ..................................................................................... 27
36.     Holding Over: ......................................................................................................... 28
37.     Estoppel Certificate: ............................................................................................... 29
38.     Interest Rate: .......................................................................................................... 29
39.     Waiver of Landlord's Lien: .................................................................................... 29
40.     Exclusive: ............................................................................................................... 29
41.     Lease Contingency: ................................................................................................ 30
42.     Survival: ................................................................................................................. 31
43.     Automatic Extension: ............................................................................................. 31

LIST OF EXHIBITS:

A-1    LEGAL DESCRIPTION OF SHOPPING CENTER PARCEL
A-2    DEPICTION OF SHOPPING CENTER
A-3    LIENS AND TITLE EXCEPTIONS TO BE REMOVED BY LANDLORD
A-4    SURVEY
A-5    PREMISES SITE PLAN
A-6    LEGAL DESCRIPTION OF PREMISES PARCEL
B -    SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
C -    PERMITTED ENCUMBRANCES
D -    TENANT'S CERTIFICATE
E -    SHORT FORM LEASE
F -    EXCLUSIVES
G -    PLANS AND SPECIFICATIONS
H -    DECLARATION
I -    DELIVERY DATE CERTIFICATE

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") dated as of the 24th day of April, 2017 (the "Effective Date"), by and among **HVP 2 LLC**, a New York limited liability company ("Landlord"), having an address of 22 Jeffrey Place, Monsey, New York 10952, **TROY SRALP, LLC**, a New York limited liability company ("SC Owner"), having an address c/o Nigro Companies, 20 Corporate Woods Boulevard, Albany, New York 12211, and **ECKERD CORPORATION d/b/a RITE AID**, with offices at c/o Rite Aid Corporation, Post Office Box 3165, Harrisburg, Pennsylvania 17105 ("Tenant").

## R E C I T A L S

WHEREAS, SC Owner is the fee owner of a certain parcel of land located at 76 Vandenburgh Avenue, Troy, New York, more particularly described by metes and bounds on **Exhibit A-1** attached hereto (the "Shopping Center Parcel"), and the Shopping Center Parcel and the improvements thereon;

WHEREAS, Landlord is the fee owner of a certain parcel of land containing 0.60 acres (the "Premises") within the boundaries of the Shopping Center Parcel, but excluded from the legal description of the Shopping Center Parcel;

WHEREAS, the Shopping Center Parcel and the improvements thereon and the Premises are depicted on the drawing attached hereto and incorporated herein as **Exhibit A-2**; and together constitute Hudson Valley Plaza (the "Shopping Center");

WHEREAS, Tenant desires to lease the Premises as shown on the Site Plan (as hereinafter defined) and as more particularly described by metes and bound on **Exhibit A-6**, together with any and all appurtenances, rights, privileges and easements benefiting, belonging or pertaining thereto.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereto, represent, warrant, covenant and agree, as follows:

1.      Demise of Premises:

1.1.     Landlord hereby leases to Tenant and Tenant hereby takes from Landlord, upon and subject to the terms, conditions, covenants and provisions hereof, the Premises together with all improvements to be constructed thereon and all of Landlord's right, title and interest in any award made in condemnation, eminent domain or proceeding in lieu thereof with respect to the Premises. The Premises are shown on the survey attached hereto as **Exhibit A-4** and incorporated herein by this reference.

1.2.     Subject to Tenant obtaining any required approvals, Tenant may construct parking areas, buildings or any other improvements that it desires on the Premises (collectively, the "Improvements"), which Improvements shall be constructed in accordance with any applicable governmental requirements and may include, at Tenant's option, an approximately 14,578 square foot retail facility with double lane drive thru ("Building").

#39217812 v6

2.      Term:

2.1.    The obligations of the parties under this Lease shall be binding as of the Effective Date; provided, however, that Tenant's obligation to pay Minimum Rent shall commence upon the earlier to occur of:  (i) the date Tenant opens for business in all or any portion of the Premises; or (ii) nine (9) months following the Delivery Date (as defined in Section 7.1 below) (the "Rent Commencement Date").

2.2.    The parties hereto shall execute a written statement setting forth (i) the Rent Commencement Date and the date of expiration of this Lease promptly after the same shall have been ascertained, (ii) the dates for the increases in Minimum Rent (as defined in Section 3 hereof) in accordance with Section 3 hereof and (iii) the renewal terms (as described in Section 2.4 hereof) and the notice dates in accordance with Section 2.4 hereof, but the enforceability of this Lease shall not be affected should either party fail or refuse to execute such statement.

2.3.    The term of this Lease shall expire two hundred forty (240) full calendar months after the Rent Commencement Date, unless sooner terminated as herein provided (the "Term").  If the first day of the calendar month which is two hundred forty (240) months after the Rent Commencement Date occurs in October, November, December or January, the Lease shall end on January 31, following such date.

2.4.    Provided Tenant is not in default beyond applicable grace, notice and cure periods, Tenant is hereby granted the right to renew this Lease for five (5) successive five (5) year renewal terms and one (1), four (4) year renewal term, provided however, and notwithstanding anything herein to the contrary, the sixth renewal term, if exercised, shall end no later than one day prior to the 49th anniversary of the Rent Commencement Date.  To exercise each, Tenant shall be required to give to Landlord written notice ("Tenant's Renewal Notice") at least twelve (12) months prior to the expiration of the then current Term. It is the intention of the parties to avoid forfeiture of Tenant's rights to extend the Term of this Lease under any of the six (6) options set forth in this Section 2.4 through inadvertent failure to give notice of exercise thereof within the time limits prescribed.  Accordingly, if Tenant shall fail to give notice to Landlord of Tenant's election to extend the Term of this Lease for any of the aforesaid renewal terms, then Landlord may notify Tenant in writing thereof ("Landlord's Option Notice"). Tenant's right to extend for any of the renewal terms shall not expire unless (i) Tenant fails to give Landlord notice of the extension within thirty (30) days of receipt of Landlord's Option Notice, or (ii) Tenant advises Landlord in writing that Tenant has elected not to extend the Term of this Lease.  Minimum Rent for the renewals periods, if applicable, shall be payable in the amounts set forth in Section 3 below.

2.5.    Any New York State transfer tax payable because this Lease constitutes a conveyance of real property under the Tax Law of the State of New York and the regulations promulgated thereunder shall be paid by Tenant.

3.      Rent:

3.1.    Tenant shall pay as minimum rent ("Minimum Rent") the following amounts:

| **Years** | **Annual Rent** |
| --- | --- |
|  |  |
| Original Term |  |
| Years 1-10 | $378,000.00 |
| Years 11-20 | $415,800.00 |
| First Renewal Term |  |
| Years 21-25 | $467,775.00 |
| Second Renewal Term |  |
| Years 26-30 | $537,941.00 |
| Third Renewal Term |  |
| Years 31-35 | Fair Market Rent (but in no event less than 1.15 x Annual Rent for Second Renewal Term) |
| Fourth Renewal Term |  |
| Years 36-40 | Fair Market Rent (but in no event less than 1.15 x Annual Rent for Third Renewal Term) |
| Fifth Renewal Term |  |
| Years 41-45 | Fair Market Rent (but in no event less than 1.15 x Annual Rent for Fourth Renewal Term) |
| Sixth Renewal Term |  |
| Years 46-49 | Fair Market Rent (but in no event less than 1.15 x Annual Rent for Fifth Renewal Term) |

3.2.     If the Term shall commence on a day other than the first day of a month, then Minimum Rent shall be pro-rated for the balance of said month on a per diem basis. Minimum Rent shall be payable in advance, in equal monthly installments, on the first day of each and every calendar month from and after the Rent Commencement Date during the Term hereof, and shall be proportionately reduced for any partial month during the Term.

3.3.     The term "Fair Market Rent" means the annual minimum rent for the Premises based upon factors applicable to the Premises including, but not limited to:  (i) rental rates being charged for comparable premises in the same geographic location; (ii) the relative locations of comparable premises; (iii) improvements, or allowances provided for improvements, rental abatements, lease takeover/assumption fees, moving expenses and other forms of rental concessions; (iv) use or conditions; (v) services and utilities provided or to be provided; (vi) use limitations or restrictions; (vii) customary leasing commissions then being paid by landlords of comparable premises; and (viii) any other relevant lease terms or conditions.  The Fair Market Rent shall not reflect the value of improvements to the Premises which Tenant is entitled to remove at the end of the Term of this Lease.

3.4.     No later than thirty (30) days after the receipt of Tenant's Renewal Notice, Landlord shall provide Tenant with its written statement or opinion of Fair Market Rent for the applicable renewal period ("Landlord's Statement").  Within thirty (30) days of receipt thereof, Tenant shall select one of the following options:  (i) accept Landlord's opinion of Fair Market Rent by providing written notice thereof to Landlord within such 30 day period, (ii) reject Landlord's opinion of Fair Market Rent and give written notice ("Appraisal Notice") to Landlord

that Tenant desires to have the issue of Fair Market Rent determined by appraisal pursuant to the procedure set forth below, or (iii) provided Landlord's opinion of Fair Market Rent is more than 115% of the Minimum Rent for the then current renewal term cancel its exercise of the applicable renewal term by written notice to Landlord and this Lease and the Term shall terminate and come to an end as of the last day of the then current renewal term, unless Landlord agrees, within fifteen (15) days of receipt of the cancellation notice, to accept 115% of the Minimum Rent for the then current renewal term as the Fair Market Rent for the succeeding renewal term, in which event Tenant's cancellation notice shall be of no force and effect. If Tenant fails to respond to Landlord's Statement within said thirty (30) day period, it shall be deemed that Tenant has elected to have the Fair Market Rent determined pursuant to the appraisal procedure set forth below.

3.5. Within fifteen (15) days after (i) Landlord's receipt of the Appraisal Notice or (ii) Tenant's deemed election to have the Fair Market Rent determined by appraisal, each party, at its own cost and by giving written notice to the other party, shall appoint a real estate appraiser, with a membership in the American Institute of Real Estate Appraisers or the Society of Real Estate Appraisers and at least five (5) years' full-time commercial appraisal experience in the area where the Premises is located (and who has not been engaged by or affiliated with Landlord or Tenant for the preceding ten (10) year period), to appraise and determine the Fair Market Rent. If, in the time provided, only one (1) party shall have given written notice of the appointment of an appraiser, that single appraiser appointed shall determine the Fair Market Rent. If two (2) appraisers are appointed by the parties within the time prescribed, the two (2) appraisers shall independently, and without consultation with one another, prepare an appraisal of the Fair Market Rent within thirty (30) days after the appointment of the second appraiser and so notify the parties in writing. If only one (1) appraiser has completed his or her appraisal (and so notified the parties) within such thirty (30) day period, such appraiser shall determine the Fair Market Rent. If neither appraiser has completed his or her appraisal (and so notified the parties) within such thirty (30) day period and the parties have not otherwise agreed, the Fair Market Rent shall be 115% of the Minimum Rent for the immediately preceding renewal term until such time that one (1) of the two (2) appointed appraisers shall first complete his or her appraisal and so notify the parties in writing, which first appraisal shall determine the Fair Market Rent. If both appraisals are completed within the thirty (30) day time period, each appraiser shall seal his or her appraisal after completion and so notify the parties in writing. Each appraiser shall have the right to consult with experts and competent authorities in order to obtain factual information or evidence pertaining to a determination of Fair Market Rent. Each appraiser shall state in writing his or her determination of the Fair Market Rent supported by the reasons therefor with counterpart copies to each party. The appraisers shall arrange for a simultaneous exchange of their respective determination. If the value of the appraisals differ by no more than ten percent (10%) of the value of the higher appraisal, the Fair Market Rent shall be the average of the two (2) appraisals.

3.6. If the values of the appraisals differ by more than ten percent (10%) of the value of the higher appraisal, then within ten (10) days after the date the appraisals are compared, the two (2) appraisers selected by the parties shall appoint a third appraiser meeting the qualifications set forth above. If the two (2) appraisers fail to so select a third qualified appraiser within such ten (10) day period, a third appraiser shall be selected within fifteen (15) days after the appraisals are compared by the American Arbitration Association at the request of either

#39217812 v6                                          4

party or, if there is then no American Arbitration Association or it if refuses to perform this function, then at the request of either Landlord or Tenant, the third appraiser shall be appointed by the presiding judge of the Rensselaer County Court.   Within two (2) days after the appointment of the third appraiser, the two (2) appraisers shall each submit his or her independent appraisal in simple letter form to the third appraiser stating his or her determination of the Fair Market Rent (which determination may not be changed from that which was set forth in such appraiser's sealed appraisal).   The sole responsibility of the third appraiser shall be to determine which of the determinations made by the first two (2) appraisers is most accurate.   The third appraiser shall have no right to propose a middle ground or any modifications of either of the determinations made by the first two (2) appraisers.   The third appraiser's choice shall be submitted to Landlord and Tenant within fifteen (15) days after the third appraiser has received the written determination from each of the first two (2) appraisers.   The Fair Market Rent shall be determined from the selection made by the third appraiser from the determinations submitted by the first (2) appraisers.

3.7.    Each party shall pay the fees and expenses of their own appraiser and fifty percent (50%) of the fees and expenses of, and the cost of appointing, the third appraiser.   The appraisers shall have no power to modify the provisions of this Lease, and their sole function shall be to determine the Fair Market Rent in accordance with this Section 3.

3.8.    If any installment of Minimum Rent is not paid within five (5) business days after written notice from Landlord that such payment was not made when due, Tenant shall pay to Landlord together with such late payment of Minimum Rent, a late charge equal to five percent (5%) of each late payment of Minimum Rent; provided, however, that Landlord shall not be obligated to provide such written notice more than once in any calendar year to be entitled to collect a late charge with respect to any payment of Minimum Rent not received by Landlord within five (5) business days of the date such payment is due. The parties agree that such late charge represents a fair and reasonable estimate of the costs that the Landlord will incur by reason of such payment.

3.9.    Upon written request from Landlord made at least fifteen (15) days prior to the next date rent is due accompanied by all information reasonably necessary to process an ACH payment, including a signed W-9 from Landlord, Tenant shall pay future payments of Minimum Rent as and when due to Landlord via electronic transfer direct deposit into a bank account specified by Landlord; however, Tenant may elect to revert to payment of Minimum Rent by check by written notice to Landlord, in its sole discretion.

4.    Use of Premises: The Premises may be used for a drug store and pharmacy and any other lawful purpose, except a use for which another tenant in the Shopping Center has been granted an exclusive or is otherwise a prohibited use as of the Effective Date.   Landlord represents and warrants that neither it nor SC Owner has granted any exclusives within the Shopping Center or any adjacent or nearby property owned by Landlord or SC Owner or an affiliate thereof except as set forth on **Exhibit F**, that there are no prohibited uses restricting Tenant's use of the Premises except as set forth on **Exhibit F** and neither Landlord nor SC Owner has entered into, nor is the Premises subject to any restrictive use agreements, except for the Permitted Encumbrances listed on **Exhibit C** attached hereto.   In the event that Samaritan Hospital's lease terminates or Samaritan Hospital otherwise vacates their premises or if Samaritan Hospital's exclusive shall no longer apply to the Shopping Center, Tenant shall be

permitted to use and operate a medical clinic (a "Clinic") in the Premises to provide services, which shall include health services typically provided by nurse practitioners (any RN level nurse and beyond), physicians assistants or physicians, including, but not limited to the treatment of common medical conditions, administration of health screenings, examinations and procedures, vaccines, physicians and the provision of patient educational materials. Tenant may operate such Clinic under the tradename of "RediClinic" or such other tradename as Tenant is using for its Clinics in other locations. Nothing in this Article or otherwise in this Lease is intended to imply or create a covenant that Tenant will initially open for business or will operate its business in any particular manner, or at all. Tenant shall be permitted to conduct sidewalk sales.

5.      Taxes, Utility Expenses and CAM:

5.1.      Unless at any time the Premises constitutes a separate tax lot, in which event and at such time, Tenant shall pay Real Estate Taxes for the Premises directly to the appropriate taxing authority, Landlord shall pay, or shall cause SC Owner to pay, subject to reimbursement as set forth in this Lease, all Real Estate Taxes imposed on the Shopping Center. For the purpose of this Lease, the term "Real Estate Taxes" shall mean all real estate or equivalent taxes and assessments, regardless of how designated, including, but not limited to, any general or special assessments, imposed, levied and/or assessed upon the Shopping Center, of every kind and nature whatsoever, extraordinary as well as ordinary, foreseen and unforeseen, and each and every installment thereof. Real Estate Taxes shall include the reasonable costs and expenses (including attorney's fees) incurred by Landlord in contesting the amount of Real Estate Taxes.

5.2.      If the Premises is separately assessed, Landlord shall cause all Real Estate Tax bills and assessments regarding the Premises to be sent directly to Tenant, and with respect to time periods from and after the Rent Commencement Date until the end of the Term, Tenant shall pay all Real Estate Taxes on or prior to the date such Real Estate Taxes are due. The Real Estate Taxes for any tax year shall mean such amounts as shall be finally determined to be the Real Estate Taxes payable during such tax year less any abatements, refunds or rebates made thereof. Upon written request from Landlord, Tenant shall provide Landlord with evidence of payment for all Real Estate Taxes paid by Tenant.

5.3.      Real Estate Taxes shall not include the following: (i) income, intangible, franchise, capital stock, estate or inheritance taxes or taxes substituted for or in lieu of the foregoing exclusions; (ii) any rollback taxes or assessments for specified improvements relating to the Premises, not made by Tenant, including but not limited to the widening of exterior roads or the installation of or hook up to sewer lines (except for tap fees related to Tenant's improvements and sanitary and storm drainage systems and other utility lines and installations); (iii) taxes on rents, gross receipts or revenues of Landlord from the Premises; (iv) impact fees, including, but not limited to, loophole and proffer fees.

5.4.      If the Premises is not separately assessed, commencing on the Rent Commencement Date, Tenant shall pay to Landlord its proportionate share of all Real Estate Taxes within 30 days after Landlord informs Tenant in writing of its proportionate share of those Real Estate Taxes. Tenant's "proportionate share" of Real Estate Taxes for any tax year included in the portion of the Term of this Lease following the Rent Commencement Date shall be an amount equal to the Real Estate Taxes imposed, levied and/or assessed against the

#39217812 v6                                                          6

Shopping Center for such period multiplied by a fraction, the numerator of which is the land area of the Premises and the denominator of which is the land area of the Shopping Center (the "Real Estate Tax Sum").  Landlord shall submit to Tenant a copy of any applicable bill for Real Estate Taxes issued by the applicable taxing authority along with a computation of the Real Estate Tax Sum for the Real Estate Taxes covered by such bill.  Landlord shall promptly furnish evidence to Tenant that such Real Estate Taxes have been paid when due.  The Real Estate Taxes for any tax year shall mean such amounts as shall be finally determined to be the Real Estate Taxes payable during such tax year less any abatements, refunds or rebates made thereof, as applicable to the Premises.

5.5.     Tenant's proportionate share will be prorated for periods at the beginning and end of the Term which are not full fiscal tax years of the taxing authority.  Tenant will only be liable for payment of its proportionate share from and after the Rent Commencement Date. Land or improvements are assessed separately if a land or improvements assessment can be determined with reasonable accuracy from the assessor's work sheets, which Tenant may examine.  Tenant may at its own expense, without postponing payment thereof, contest any separate assessment of the Premises in its own name, provided that, prior thereto Tenant notifies Landlord in writing that Tenant intends to take such action.

5.6.     If the Term of this Lease shall terminate on any date other than the last day of a tax fiscal year, the amount payable by Tenant during the tax fiscal year in which such termination occurs shall be prorated on the basis which the number of days from the commencement of said tax fiscal year to and including said termination date bears to 365.  A similar proration shall be made for the tax fiscal year in which the Rent Commencement Date occurs.

5.7.     In the event for any reason that any real estate tax bills or assessments are not sent directly to Tenant, then Landlord shall furnish Tenant with copies of all such real estate tax bills and assessments on the Premises promptly upon receipt thereof and in sufficient time to allow Tenant to determine whether or not to contest any increase in Real Estate Taxes.  If Tenant desires to contest such tax increase, Tenant shall promptly notify Landlord and Tenant shall have the right to do so at its expense and Landlord shall fully cooperate with Tenant in any such proceeding.

5.8.     From and after the Delivery Date (as defined below), Tenant shall pay the applicable utility companies or governmental agencies directly for any and all utilities consumed on the Premises by Tenant.  Landlord shall not take or permit any person claiming under Landlord to take, any action which shall interrupt or interfere with any electric, gas, water, sewage, cable, internet, electronic, telephone, fiber optic or any other communication service to the Premises.

5.9.     Tenant shall pay, as and when due, all taxes which may be lawfully charged, assessed or imposed upon all trade fixtures, equipment and other personal property of every type in the Premises, and all license fees which may be lawfully imposed upon the business of Tenant conducted upon the Premises. If any such taxes for which Tenant is liable are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property and trade fixtures placed by Tenant in the Premises and Landlord elects to pay the taxes based on such

increase, Tenant shall pay to Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

5.10.    Commencing on the Rent Commencement Date, Tenant shall pay to Landlord its proportionate share of CAM (as hereinafter defined) within 30 days after Landlord informs Tenant in writing of its proportionate share of CAM.  Tenant's "proportionate share" of CAM for any calendar year included in the portion of the Term of this Lease following the Rent Commencement Date shall be an amount equal to the CAM for the Shopping Center for such period multiplied by a fraction, the numerator of which is the floor area of the improvements constructed on the Premises and the denominator of which is the floor area of the improvements constructed within the Shopping Center (the "CAM Sum").  Landlord shall submit to Tenant a copy of the applicable bills and invoices for CAM along with a computation of the CAM Sum for the CAM covered by such bills and invoices.  "CAM" shall mean reasonable costs and expenses incurred by Landlord (or charged to Landlord by SC Owner in accordance with the Declaration) in order to maintain and insure the paved areas of the Common Areas (as hereafter defined) of the Shopping Center and to maintain the landscaped areas of the Common Areas of the Shopping Center; provided, however, that CAM shall exclude the following:  (i) costs of a capital nature, including, without limitation, capital improvements, capital repairs, capital equipment and capital tools, (ii) management or administrative fees, (iii) amounts for which Landlord is or has the right to be reimbursed by any third party, (iv) Landlord's general corporate overhead and general and administrative expenses, (v) wages, salaries and benefits for employees, and (vi) costs to correct violations of law in existence on the Delivery Date. Tenant's proportionate share of CAM will be prorated for periods at the beginning and end of the Term which are not full calendar years.  Tenant will only be liable for payment of its proportionate share from and after the Rent Commencement Date.

5.11.    The term "Common Areas" means all areas, facilities and improvements operated or provided at or in connection with the Shopping Center from time to time for the non-exclusive common use of Landlord and the tenants and other occupants of the Shopping Center, and their respective employees, agents, licensees, customers and invitees. The term "Common Areas" includes the same as reduced, expanded or otherwise altered from time to time. The term "Common Areas" shall not include (a) any facilities dedicated exclusively to the use or occupancy of any individual tenant; (b) the building structure of any tenant building in the Shopping Center; or (c) any parcel or portion thereof leased by any individual tenant of the Shopping Center.

5.12.    Tenant shall have the right, at its sole cost and expense, to audit or have its appointed accountant, agents or employees audit, Landlord's records related to CAM and Real Estate Taxes.  Books and records shall be made available to Tenant, Tenant's employees, accountants or agents to conduct the audit in the geographic area of the Premises.  In the event Tenant's audit discloses any discrepancy in the amount of CAM or Real Estate Taxes billed to Tenant, the appropriate party shall, within thirty (30) days after the date of such determination, pay the other party the deficiency or overpayment, as applicable.  If Tenant's audit discloses that the Real Estate Taxes or CAM billed to Tenant were overstated by the Landlord by more than five percent (5%), the reasonable costs to Tenant of Tenant's audit (including legal and accounting costs) shall be reimbursed by Landlord to Tenant within thirty (30) days after Landlord's receipt of Tenant's invoice therefor.

6.    Intentionally Deleted.

7.    Improvements, Repairs, Additions, Replacements:

7.1.    Landlord shall deliver the Premises to Tenant on the date that the Delivery of Possession Requirements are complete, (the "Delivery Date"), provided, however, if the Delivery Date occurs between November 1 and January 31, Tenant shall have the option, exercised by notice to Landlord, to postpone the Delivery Date to the immediately following February 1st. The Delivery Date is expected to occur on May 1, 2017 ("Anticipated Delivery Date"). Landlord agrees to use diligent efforts to deliver possession of the Premises to Tenant, with the Delivery of Possession Requirements completed, on the Anticipated Delivery Date; and Landlord agrees to provide written notice to Tenant of any delays respecting completion on the Anticipated Delivery Date within five (5) days after becoming aware of the cause for delay. The Delivery Date shall not be deemed to have occurred, unless and until all of the following conditions have been satisfied or waived by Tenant in writing (the "Delivery of Possession Requirements"):

(i)    Exclusive physical possession of the Premises has been delivered to Tenant, including the satisfaction of the Lease contingencies (as set forth in Article 41);

(ii)    The Premises does not contain any Hazardous Substances as defined in Section 35.2;

(iii)    Landlord shall provide proof to Tenant that the liens and title exceptions set forth in **Exhibit A-3** have been paid, satisfied or otherwise released, without condition, as to the Premises; and

(iv)    Landlord shall have delivered to Tenant the Delivery Date Certificate in the form of **Exhibit I**, including all required attachments thereto, acknowledging and certifying that all of the requirements for the Delivery Date have been completed.

In no event shall the Delivery Date occur prior to the Anticipated Delivery Date.

7.2.    Upon delivery of the Premises to Tenant with the Delivery of Possession Requirements satisfied in accordance with above, Tenant may improve the Premises ("Tenant's Initial Work") substantially in accordance with the plans and specifications attached hereto as **Exhibit G** (the "Plans and Specifications"). In consideration of the same and provided that Tenant shall have furnished Landlord with a certificate of occupancy for the Premises from the City of Troy together with a certification ("Tenant's Certificate") from an authorized representative of Tenant stating the total costs incurred by Tenant in performing Tenant's Initial Work (including both hard and soft costs) (such sum is referred to as "Landlord's Contribution"), which certificate shall be in the form attached hereto as **Exhibit D**, and lien waivers from the general contractor and all subcontractors performing work at the Premises costing in excess of $50,000.00, Landlord shall pay to Tenant Landlord's Contribution. Landlord's Contribution is anticipated to equal $2,815,000. To the extent that the total actual cost of Tenant's Initial Work is less than $2,815,000 (such underage, the "TI Savings"), Minimum Rent shall be decreased to

exclude the amount of the TI Savings amortized on a straight line basis over the initial Term at a rate of nine and 57/100 percent (9.57%) annually. Likewise, to the extent that the total actual cost of Tenant's Initial Work exceeds $2,815,000 (such excess, the "Excess TI Costs"), Minimum Rent shall be increased to include the amount of the Excess TI Costs amortized on a straight line basis over the initial Term at a rate of nine and 57/100 percent (9.57%) annually. Notwithstanding the foregoing, in no event shall the total amount of Landlord's Contrubtion exceed $3,000,000.00. Landlord's Contribution shall be paid to Tenant no later than thirty (30) days following Landlord's receipt of Tenant's Certificate, the lien waivers and a certificate of occupancy for the Premises. If Landlord fails to pay the Landlord's Contribution to Tenant within thirty (30) days after presentation by Tenant of all information required under the terms of this Lease, then Tenant may offset the Rent payable pursuant to Article 3 above (together with interest accruing at the Interest Rate (as hereinafter defined)) until the entire Landlord's Contribution is paid in full (the "Recovery Period"). In the event this Lease is terminated before the end of the Recovery Period for any reason, then notwithstanding Tenant's election to recover Landlord's Contribution pursuant to the rent offset, Tenant shall be immediately entitled to reimbursement for the unpaid portion of Landlord's Contribution with interest thereon through the date of payment and no such termination attempted by Landlord shall be effective until the entire Landlord's Contribution has been received. Except for the Landlord's Contribution, Landlord shall not be responsible for any costs or expenses in connection with the construction of the Tenant's Initial Work, and Tenant shall bear the cost and expense of all hard and soft costs associated therewith.

7.3. Notwithstanding anything to the contrary in this Lease, in the event the Premises contains any hazardous materials including, without limitation, asbestos as of the Delivery Date, then and in that event Landlord shall be required to comply with all governmental rules, laws and regulations for the removal of same prior to the delivery of the Premises to Tenant. In the event Landlord fails to comply with all of such governmental rules, laws and regulations within one (1) year after the execution of this Lease, then and in that event Tenant shall have the option, at any time prior to delivery of Premises free and clear of hazardous materials upon not less than thirty (30) days' prior written notice to Landlord (unless Landlord completes such work within thirty (30) day notice period) to either (i) terminate this Lease, or (ii) comply with such governmental rules, laws and regulations at Landlord's sole cost and expense. All reasonable costs incurred by Tenant to do such work shall be billed to Landlord, together with interest accrued at the Interest Rate; and in the event Landlord fails to pay same, Tenant shall have the right to offset such costs against the Minimum Rent due under this Lease.

7.4. If the Delivery Date has not occurred by May 1, 2017 (the "Final Outside Delivery Date"), then, effective as of the Final Outside Delivery Date, the Tenant shall have the right to elect to terminate this Lease by providing written notice thereof to the Landlord, whereupon this Lease shall so terminate and, thereafter, the Landlord and the Tenant shall both be relieved of all further liability under this Lease.

7.5. Subject to Tenant obtaining any required approvals, Tenant shall have the right, at its own cost and expense, to construct on any part or all of the Premises, at any time and from time to time, such buildings and improvements as Tenant shall from time to time determine, including without limitation building signage and pylon and monument signs (subject to Tenant obtaining any approvals or variances necessary for any pylon and/or monument signs

10

and subject to the right of Price Chopper to have the top position on any additional pylon sign structure erected by Tenant in accordance with the terms of Section 8.6 of the Price Chopper lease), provided that such improvements and building signage shall be in compliance with all then applicable building codes and ordinances.  Tenant shall have the right to maintain its existing double-sided sign panel on the existing pylon sign structure for the Shopping Center. Landlord agrees that Tenant may supplement its building signage in connection with the operation of a Clinic, if permitted by applicable law; provided that such signage shall comply with all applicable governmental requirements and that Tenant shall be responsible for all cost and expense in connection with obtaining any required permits, installation, operation and maintenance of such sign.

7.6.    Tenant shall, at all times during the Term of this Lease and during each renewal term, and at its own cost and expense, keep and maintain or cause to be kept and maintained in repair and good condition (ordinary wear and tear excepted) the Premises, the building and improvements Tenant constructs on the Premises, and all doors, windows, signs and loading areas, sidewalks, landscaping within the curb-line (if any) and Tenant's drive-through facilities thereon as well as Tenant's trash enclosure, and Tenant shall use all reasonable precaution to prevent damage or injury thereon.  In addition, Tenant shall at all times during the Term of this Lease and each renewal term maintain, repair and replace any landscaping within the area shaded in gray on **Exhibit A-5** and designated as "Rite Aid Maintenance Area", including, without limitation, patching, sealing and repaving paved areas, landscape pruning, lawn cutting and maintenance, all to at least the standard that the balance of the Shopping Center is maintained.  Landlord shall, or Landlord shall cause SC Owner to, at all times during the Term of this Lease and during each renewal term, and at its own cost and expense subject to Tenant's obligations set forth in Section 5.10, keep and maintain or cause to be kept and maintained in repair and good condition the curbing and the parking and other paved and landscaped areas of the Common Areas of the Shopping Center, and shall use all reasonable precaution to prevent damage or injury thereon.

7.7.    Tenant may at its option and at its own cost and expense, at any time and from time to time, make such alterations, changes, replacements, improvements, and additions in and to the building and improvements Tenant constructs on the Premises as it may deem desirable.

7.8.    Until the expiration or sooner termination of the Term of this Lease, title to the building and improvements, Tenant's personal property and any alteration, change or addition thereto, shall remain solely in Tenant; and Tenant alone shall be entitled to deduct all depreciation on Tenant's income tax returns for all of same.

7.9.    On the expiration or sooner termination of the Term of this Lease, Tenant shall quit and surrender the Premises, and the building and improvements thereon, broom clean and in the condition Tenant is required to maintain hereunder (ordinary wear and tear and damage by casualty, eminent domain, obsolescence and the elements excepted), except that Tenant may remove its personal property and trade fixtures; however, Tenant shall not remove the HVAC system or integral components of the electrical, plumbing or sprinkler systems of the building. On the expiration or sooner termination of the Term of this Lease legal title to all

buildings and improvements affixed to the Premises shall be deemed to revert and be vested in Landlord.

8.     <u>Requirements of Public Authority</u>: During the Term of this Lease, Tenant shall, at its own cost and expense, promptly observe and comply (unless Tenant contests same and protects Landlord, at no cost to Landlord) with all present and future laws, ordinances, requirements, orders, directives, rules and regulations of any governmental body (collectively, "Governmental Requirements") dealing with Tenant's use and occupancy of the Premises. During the Term of this Lease, Landlord shall, or Landlord shall cause SC Owner to, at its own cost and expense, promptly observe and comply (unless Landlord contests same and protects Tenant, at no cost to Tenant) with all Governmental Requirements applicable to the Shopping Center or Shopping Center Parcel other than with respect to Tenant's use and occupancy of the Premises.

9.     <u>Covenant Against Liens</u>: If, because of any act or omission of Tenant, any mechanic's lien or other lien, charge or order for the payment of money shall be filed against Landlord or any portion of the Premises, that is not otherwise permitted by this Lease, Tenant shall remove, bond, discharge or satisfy same, at its own cost and thirty (30) days after written notice to Tenant of the filing thereof; and Tenant shall indemnify and save harmless Landlord against and from all costs, liabilities, suits, penalties, claims and demands, including reasonable counsel fees, resulting therefrom.  In connection therewith, Tenant hereby indemnifies Landlord, and holds Landlord harmless from and against all such mechanic's liens or other lien, charge or order for the payment of money filed against the Landlord or any portion of the Premises. Landlord shall not be liable for any labor or materials furnished or to be furnished to the Tenant and no mechanic's or other lien for any such labor or materials shall attach to or affect the remainder or other estate or interest of the Landlord in and to the Premises.  Tenant covenants that in the event any mechanic's lien shall be filed against the Premises based upon any act or interest of Tenant or of anyone claiming through Tenant affecting any improvements, materials, machinery, furnishings or fixtures used in the construction, repair or operation thereof, or annexed thereto by Tenant, or its successors in interest, Tenant shall forthwith take such action by bonding, deposit or payment as will remove or satisfy the said mechanic's lien within thirty (30) days after notice to Tenant.  In the event Tenant fails to do so, Landlord may discharge the same by deposit, the amount so paid or deposited, with interest thereon, being deemed additional rent reserved under this Lease; however, Tenant retains the right to dispute the validity of any such mechanics lien subject to the bonding requirements above and Landlord shall not have the right to pay such mechanics lien while such dispute is the subject of pending litigation.

10.     <u>Covenant of Quiet Enjoyment</u>: Landlord covenants and warrants that Landlord is the true and lawful owner of the Premises, subject only to those matters set forth in **<u>Exhibit C</u>**, attached hereto and by this reference made a part hereof (the "Permitted Encumbrances") and has good right and full power to let and lease the same.  Landlord agrees that Tenant shall quietly and peaceably hold, possess and enjoy the Premises for the full Term of this Lease, or any extension thereof, without any hindrance or molestation by the agents or employees of Landlord, and further, Landlord shall defend the title to the Premises and the use and occupancy of the same by Tenant against the lawful claims of all persons whomsoever, except those claiming by or through the Tenant.  Without limiting the generality of the foregoing, Landlord acknowledges that a material inducement to Tenant in entering into this Lease, is an assurance that Tenant's

customers, employees and visitors shall have continuous access to the Premises from entries to the Premises as shown on the Site Plan and to the extent that such access is interrupted other than by reason of temporary closure, a force majeure event and/or causes beyond the control of the Landlord and SC Owner, the correction of which must be diligently pursued, and Landlord shall cause SC Owner to diligently pursue same, such interruption shall constitute a breach of Landlord's covenant and warranty to Tenant of quiet enjoyment and in such event, Tenant shall have all rights and remedies available to it at law or in equity, including the right to terminate this Lease effective upon thirty (30) days' written notice to Landlord, in which case thereafter neither party shall be liable to the other except as to rights otherwise specifically set forth in this Lease.  Landlord hereby represents and warrants that Landlord and its successors or assigns, shall not enter into, or agree to modify, amend, revise or change any documents, including but not limited to declarations, easements, restrictions, or other similar instruments ("Declarations"), that are or are to be recorded against the Premises, or otherwise affect the Premises, and affect the rights and/or obligations of Tenant, without first obtaining the prior written consent of Tenant, which consent will not  be unreasonably withheld, delayed or conditioned by Tenant; however, it shall be deemed reasonable for Tenant to withhold its consent if any such modification adversely impacts Tenant's operations at the Premises, increases Tenant's cost of occupying the Premises or diminishes any rights granted to Tenant hereunder or under any Declaration.

11.    Lease Conditions:

11.1.    Tenant's obligation hereunder to complete the transactions contemplated in this Agreement shall be conditioned on the satisfaction (or Tenant's written waiver) of each of the following conditions (each of which shall be for the benefit of Tenant alone):

11.1.1. Each of Landlord's representations under this Lease shall be true and accurate.

11.1.2. Landlord shall have performed all of its obligations under this Lease.

11.1.3. Intentionally Deleted.

11.1.4. Landlord provides satisfactory evidence to Tenant that the Premises is free of all tenancies and encumbrances of every kind, except those specifically permitted elsewhere in this Lease.

12.    Assignment and Subletting:

12.1.    Tenant shall have the right to assign or encumber this Lease or sublease all or any portion of the Premises (each, a "Transfer") without Landlord's consent.  If Tenant does effect any such Transfer it shall remain liable to Landlord for the full performance of Tenant's obligations under this Lease.

12.2.    If Tenant shall effect a Transfer for rent or other consideration in excess of the rent payable hereunder, Tenant shall retain all such net excess rent or other consideration.

13.    Indemnity:

13.1.    Tenant shall indemnify, defend and save harmless Landlord from and against any and all liability, damage, penalties or judgments (including without limitation, reasonable legal fees, expenses and court costs) arising from injury to person or property sustained by anyone in and about the Premises resulting from any act or acts or omission of Tenant, or Tenant's agents, servants, employees or contractors.  Tenant shall, at its own cost and expense, defend any and all suits or actions which may be brought against Landlord or in which Landlord may be impleaded with others upon any such above-mentioned matter, claim or claims, except as may result from the acts set forth in Section 13.2.This obligation to indemnify Landlord shall survive the expiration or earlier termination of this Lease.

13.2.    Except for the willful acts or negligence of Landlord, its officers, agents, servants, employees or contractors, Landlord shall not be responsible or liable for any damage or injury to Tenant's Improvements, or personal property of Tenant or to any person or persons, at any time on the Premises, including any damage or injury to Tenant or to any of Tenant's agents, servants, employees or contractors.

13.3.    The obligation of Tenant to indemnify Landlord, as hereinabove set forth, shall not extend to any matter against which Landlord shall be protected by insurance, provided however, that if any such liability shall exceed the amount of the collectable insurance in question, the liability of Tenant shall apply to such excess.

13.4.    Landlord shall reimburse, defend, indemnify and hold harmless Tenant, its successors, assigns and other parties claiming any interest in the Premises by, through or under Tenant, from and against any and all liability, damage, penalties or judgments (including without limitation, reasonable legal fees, expenses and court costs) arising from injury to person or property sustained by anyone in and about the Premises resulting from any act or acts or omission of Landlord, or Landlord's agents, servants, employees or contractors.  This obligation to indemnify Tenant shall survive the expiration or earlier termination of this Lease.

14.    Insurance:

14.1.    From and after the Delivery Date, Tenant shall, at no expense to Landlord, provide and keep in force general liability insurance in a good and solvent insurance company or companies licensed to do business in the state wherein the Premises is located in the amount of at least Four Million Dollars ($4,000,000.00) combined single limit.  All of said insurance shall be maintained for the protection of Landlord, Landlord's lender (if any) and Tenant, and each shall be named an additional named insured as their interests may appear in all policies of insurance. Tenant agrees to deliver certificates of such insurance to Landlord on an annual basis.  Such insurance shall be non-cancelable (except for the non-payment of premium) without at least ten (10) days' written notice to Landlord, to the extent such coverage requirements are generally available in the insurance market with no additional premium.

14.2.    Following the completion of a building or other insurable structure on the Premises, Tenant shall keep the Premises insured against damage or destruction by fire, and such other perils as are, from time to time, included in standard fire insurance policy with extended

coverage endorsements, for the full insurable value thereof.  For the purposes hereof, full insurable value, shall mean the actual replacement cost without deduction for depreciation, but shall not include "uninsurables" (i.e., footings, parking lot, underground piping, etc.).  All of said insurance shall be maintained for the protection of both Landlord and Tenant, and each shall be named as insureds in all policies of insurance.  The proceeds of such insurance in case of loss or damage shall be made available to Tenant to repair and/or rebuild the Premises, subject to the provisions of Section 16.2 below.

14.3.    Any insurance required to be provided by Tenant pursuant to this Lease may contain a deductible provision, and may be provided by blanket insurance covering the Premises and other locations in which Tenant has an interest. Tenant may carry all or any part of such insurance:  (A)  a self-insured retention of up to $500,000 for the property and casualty and $4,000,000 for general liability (subject to customary and reasonable adjustments); (B) under any plan of self-insurance which Tenant may from time to time have in force and effect; or (C) under a blanket policy or policies, covering other liabilities of Tenant and its subsidiaries, controlling or affiliated corporation; or (D) partly under such a plan of self insurance and partly under such blanket policies; provided, that any blanket policy shall specifically provide that the coverage requirements under this Lease are not affected by losses at other locations covered by such blanket policy.

14.4.    Except with respect to the insurance required by Section 14 hereof, neither Landlord nor Tenant shall take out separate insurance concurrent in form or contributing in the event of loss with that required in this Section 14 to be furnished by, or which may reasonably be required to be furnished by Tenant unless Landlord and Tenant are included therein as the insured, with loss payable as in this Lease provided.  Each party shall immediately notify the other of the placing of any such separate insurance and shall cause the same to be delivered as is required.

14.5.    Tenant's Work.  Prior to commencement of the Improvements and until completion thereof, Tenant shall effect and maintain or cause to be maintained Builder's Risk Insurance covering Landlord, Tenant, Tenant's contractors and Tenant's subcontractors, as their interests may appear, against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a so-called "special cause of loss form" or so-called "all-risk" coverage on the Improvements, and all materials, equipment, supplies and temporary structures of all kinds incidental to the construction of the Improvements and equipment, all while forming a part of or contained in such Improvements or temporary structures, or while on the Premises all to the full insurable value thereof at all times on a completed value basis.

14.5.1. From and after the Delivery Date, Tenant shall maintain Worker's Compensation coverage as required by statute, covering all employees, lease workers, temporary workers and volunteer labor of Tenant, Tenant's contractors and Tenant's subcontractors, including Employer's Liability coverage with statutorily mandated limits; provided that in monopolistic states Stop Gap Coverage be maintained by endorsement to the Commercial General Liability Insurance, in lieu of Employer's Liability coverage.

14.5.2. General Provisions.  All insurance carried or required to be carried by Tenant shall be with insurers qualified to do business in the state where the Premises is

#39217812 v6                                              15

located and which have an AM Best rating of "A-\VII" or better, or the equivalent thereof.  The coverage under Tenant's insurance shall be primary, and any other insurance available to or carried by Landlord shall be non-contributory or excess.   Any errors, omissions or misrepresentations by Tenant that may invalidate coverage to Tenant shall not prejudice Landlord's rights under the aforementioned insurance required of Tenant.  Tenant shall provide Landlord with certificates of the policies, evidencing that such insurance required of Tenant is in full force and effect and stating the terms thereof.

15.     Waiver of Subrogation: All insurance policies carried by either party covering the Premises, including but not limited to contents, fire and casualty insurance, shall expressly waive any right on the part of the insurer against the other party.  The parties hereto agree that their policies will include such waiver clause or endorsement so long as the same shall be obtainable without extra cost, or if extra cost shall be charged therefor, so long as the other party pays such extra cost.  If extra cost shall be chargeable therefor, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its elections, may pay the same, but shall not be obligated to do so.  Neither party, nor its agents, employees or guests, shall be liable to the other for loss or damage caused by any risk covered by such insurance, provided such policies shall be obtainable.  This release shall extend to the benefit of any subtenant and the agents, employees and guests of any such subtenant.

16.     Destruction:

16.1.   If at any time during the Term of this Lease, Tenant's building upon the Premises or the Improvements shall be destroyed or damaged in whole or in part by fire or other cause within the extended coverage of the fire insurance policies carried by Tenant in accordance with this Lease, then, Tenant, at its option and at its own cost and expense, shall cause the same to be repaired, replaced or rebuilt within a period of time which, under all prevailing circumstances, shall be reasonable.  Tenant shall advise Landlord of its plans for reconstruction on the Premises within ninety (90) days after the date of such destruction.  If Tenant does not elect to repair, replace or rebuild the Premises following a casualty event (1) Tenant shall pay over to Landlord all such insurance proceeds as Tenant shall have received from Tenant's insurance carrier or the amount of insurance proceeds which would have been payable if Tenant did not elect to self-insure, provided that Landlord shall be responsible for the payment of any deductible and (2) provided that Section 16.2 below does not apply and Tenant does not have the right to terminate this Lease, Tenant shall continue to pay Minimum Rent and shall continue to be bound by the terms of this Lease for the remainder of the Term.

16.2.   Notwithstanding Section 16.1 hereof, if (a) the building or Improvements constructed by Tenant on the Premises have been damaged or destroyed so that the cost of repair or replacement thereto shall exceed the proceeds to be received by Tenant from applicable insurance policies or (b) such damage or destruction shall occur during the last three (3) years of the Term hereof or during any renewal term, then Tenant shall have the right, but not the obligation, to elect not to repair, replace or rebuild and to terminate this Lease by giving written notice of termination to Landlord on or prior to the date ninety (90) days after the occurrence of such damage or destruction, and upon the giving of such notice of termination: (1) the Term of this Lease shall expire and come to an end on the last day of the calendar month in which such notice shall be given, with the same force and effect as if said day had been originally fixed

herein as the expiration date of the Term of this Lease; (2) Tenant shall pay over to Landlord all such insurance proceeds as Tenant shall have received from Tenant's insurance carrier or the amount of insurance proceeds which would have been payable if Tenant did not elect to self-insure, together with the amount of any deductible; and (3) neither party shall have any further rights or liabilities hereunder.

17.    Eminent Domain:

17.1.    If the whole of the Premises shall be taken for any public or quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof (a "Taking"), then this Lease shall automatically terminate as of the date of the vesting of title.  In the event of a partial Taking of the Premises pursuant to which Tenant's business is adversely affected, then Tenant shall have the right to terminate this Lease by giving written notice of such termination to Landlord on or prior to the date one hundred twenty (120) days after the date of such Taking and upon the giving of such notice of termination the Term of this Lease shall expire and come to an end on the last day of the calendar month in which such notice shall be given, with the same force and effect as if said day had been originally fixed herein as the expiration date of the Term of this Lease.  If this Lease shall terminate or shall be terminated, the rent shall, if and when necessary, be adjusted to the day of the Taking and neither party shall have any further rights or liabilities hereunder.

17.2.    Intentionally Deleted.

17.3.    If, after the execution of this Lease and prior to the expiration of the Term of this Lease, any Taking shall result in:

17.3.1.    a reduction of any portion of the Building or ten percent (10%) or more of the square footage of the Premises;

17.3.2.    the closing of any entrance or exit to the Shopping Center or the Premises that has a materially adverse impact on the Tenant's business; or

17.3.3.    a Taking of any portion of the access roads to the Shopping Center, or any portion of the Shopping Center, which taking in Tenant's sole but reasonable discretion, materially and adversely impedes or materially and adversely interferes with access to the Shopping Center or the Premises, or materially and adversely affects the conduct of Tenant's business as theretofore conducted at the Premises;

then in any such event Tenant may, at its election, terminate this Lease by giving Landlord notice of the exercise of Tenant's election within thirty (30) days after Tenant shall receive written notice of such Taking.  In the event of termination by Tenant under the provisions of this Section, this Lease and the Term hereof shall cease and terminate as of the date of such Taking subject to the right of Tenant, at its election, to continue to occupy the Premises, subject to the terms and provisions of this Lease, for all or such part as Tenant may determine of the period between the date of such Taking and the date when possession of the Premises shall be taken by the appropriating authority, and any unearned rent or other charges, if any, paid in advance, shall be refunded to Tenant.

17.4.    In the event of a Taking in respect of which Tenant shall not have the right to elect to terminate this Lease or, having such right, shall not elect to terminate this Lease, this Lease and the Term thereof shall continue in full force and effect and Tenant, at Tenant's sole cost and expense, but subject to receipt of available condemnation proceeds pursuant to Section 17.5 below, shall promptly and diligently proceed to restore the remaining portions of the Premises, including any and all improvements made theretofore, together with the remaining portions of the parking areas, to an architectural whole in substantially the same condition that the same were in prior to such Taking.  An equitable proportion of the Rent reserved hereunder and any other charges payable by Tenant hereunder, according to the nature and extent of the injury to the Premises and to Tenant's business, shall be suspended or abated until the completion of such restoration and thereafter the Rent and any other charges shall be reduced to equitably reflect the effect of such taking on Tenant's business.

17.5.    Except as otherwise provided in this Section 17.4 or this Section 17.5, all damages awarded or other forms of awards paid on account of any condemnation or taking under the power of eminent domain of the Premises, or any portion or portions of the Premises, shall belong to and shall be the sole property of Landlord, whether such damages or other sums are awarded as compensation for loss or diminution in value of the leasehold estate, severance damages or for the fee of the Premises, or otherwise, and Tenant assigns to Landlord any interest which Tenant might otherwise have in any such award. Tenant shall only be entitled to receive as a separate award from any award to Landlord an award which is attributable to: (i) the unamortized cost of any improvements or alterations made to the Premises and paid for solely by Tenant (net of reimbursements or contributions or payments by Landlord) in accordance with this Lease; (ii) the value of Tenant's trade fixtures, but not in excess of an amount of the original cost; (iii) Tenant's moving or relocation expenses as allowed by the governmental authority having jurisdiction over the Premises; and (iv) Tenant's loss of goodwill to extent proven by Tenant.

17.6.    In the event of any termination of this Lease as the result of the provisions of this Article 17, the parties, effective as of such termination, shall be released, each to the other, from all liability and obligations thereafter arising under this Lease and this Lease shall become null and void and of no further force or effect, subject to Tenant's right to receive Tenant's Damages as provided above.

18.    <u>Utility Easement & Highway Alignment; Cross Easements:</u> Tenant shall have the right to enter into reasonable agreements with utility companies creating easements in favor of such companies as are required in order to service Tenant, Tenant's Building or the Improvements, and Landlord covenants and agrees to consent thereto and to execute, and Landlord shall cause SC Owner to consent thereto and to execute, any and all documents, agreements and instruments, and to take all other actions, in order to effectuate the same, all at no cost or expense to Landlord.  In the event of an easement being taken by a utility company that is not "insubstantial" (e.g. the award or compensation is greater than $2500) then any and all of such payment, net of Tenant's or Landlord's reasonable attorneys' fees and expenses incurred in obtaining such payment, shall be given to the Landlord.

19.    <u>Mortgages:</u>

#39217812 v6                                                18

19.1.   Upon written request from Landlord, Tenant agrees to subordinate this Lease to any mortgage now or hereafter placed upon the Premises by Landlord and to all advances made or hereafter to be made upon the security thereto, provided that the holder of any such mortgage shall execute and deliver a Subordination, Non-Disturbance and Attornment Agreement in form and substance reasonably satisfactory to Tenant.  The word "mortgage" as used herein includes mortgages, deeds of trust or similar instruments both in effect as of the Delivery Date or thereafter.  As a condition to this Lease, Landlord shall obtain within ninety (90) days after the execution of this Lease a subordination, non-disturbance and attornment agreement in conformance with **Exhibit B**, from the holders of any and all of the above mortgages (each, an "SNDA"), provided, however, Landlord represents and warrants that, as of the Effective Date, except as shown on **Exhibit C**, there are no mortgages on the Premises, which representation shall be true and correct as of the Rent Commencement Date, subject to Landlord's rights under this Section 19.1; however, subject to the obligation of Landlord to obtain a subordination, non-disturbance and attornment agreement pursuant to this paragraph, Landlord shall not be deemed to be prohibited from mortgaging its interest in the Premises, subject to Tenant's rights under this Lease.

19.2.   Tenant and every successor and assign of Tenant is hereby given the right (exercisable at any time and from time to time) by Landlord, without Landlord's prior consent, to mortgage their interests in this Lease, under one or more leasehold mortgage(s), and to assign this Lease, and all sublease(s), as collateral security for such leasehold mortgage(s), upon the condition that all rights acquired under such leasehold mortgage(s) shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease, and to all rights and interests of Landlord in this Lease, none of which covenants, conditions or restrictions is or shall be waived by Landlord by reason of the right given to Tenant to mortgage Tenant's interest in this Lease, except as expressly provided in this Article 19.  If Tenant and/or Tenant's successors and assigns shall mortgage this leasehold and if the holder of any such leasehold mortgage shall send to Landlord notice specifying the name and address of such holder and the pertinent recording data with respect to its leasehold mortgage, then Landlord agrees that the following provisions shall apply to each leasehold mortgage with respect to which such conditions are met (each being herein called a "Leasehold Mortgage"), so long as such Leasehold Mortgage shall remain unsatisfied of record or until notice of satisfaction of such Leasehold Mortgage is given by the holder to Landlord:

19.2.1. There shall be no cancellation, surrender or modification of this Lease by joint action of Landlord and Tenant without the prior consent in writing of the holder of the Leasehold Mortgage, and no merger shall result from the acquisition by, or devolution upon, any one entity of the fee and leasehold estates in the Premises.

19.2.2. Landlord shall, upon serving Tenant with any notice of default or other notice with respect to this Lease, simultaneously serve a copy of such notice upon the holder of the Leasehold Mortgage; and no such notice to Tenant shall be effective unless a copy of such notice is also served on the holder of the Leasehold Mortgage.  The holder of the Leasehold Mortgage shall thereupon have the same period, after service of such notice upon it, to remedy or cause to be remedied the defaults complained of, and Landlord shall accept such performance by or at the instigation of the holder of the Leasehold Mortgage as if the same had been done by Tenant.

19.2.3. No holder of a Leasehold Mortgage shall have any liability for performance of Tenant's obligations under this Lease unless and until such holder acquires title to Tenant's leasehold estate or assumes possession of the Premises. Notwithstanding anything to the contrary in the Lease, while any party who is a holder of a Leasehold Mortgage, or at any time was the holder of a leasehold mortgage or is a designee or nominee of any existing or former holder of a Leasehold Mortgage, holds title to the Lease or possession of the Premises through a receiver or otherwise, or is proceeding to foreclosure on a lien held by it against Tenant's leasehold estate created by the Lease or to obtain title to Tenant's leasehold estate created by the Lease by a deed in lieu of foreclosure, no provision in the Lease requiring reconstruction or rehabilitation of any buildings, improvements or other property following a condemnation, fire or other casualty, if any, shall be applicable to or enforceable against such party to an extent in excess of the condemnation award or the net insurance proceeds actually received by reason of such fire or other casualty.

19.3. The provisions of this Article 19 shall survive any termination of this Lease with respect to any wrongful termination of this Lease by Landlord in violation of Landlord's covenants in this Article 19 or of any other provision of this Lease.

20. Representations:

20.1. Landlord Representations.

20.1.1. Landlord represents and warrants to Tenant that (i) it has good and marketable fee simple title to the Premises, (ii) it has the power and authority to execute and deliver this Lease and to carry out and perform all covenants to be performed by it hereunder, and (iii) upon execution by both Landlord and Tenant, this Lease shall be binding upon Landlord.

20.1.2. Landlord further represents and warrants to Tenant that:

20.1.2.1    The Premises are free from all encumbrances, liens, defects in title, violations of law, leases, tenancies, easements, restrictions and agreements, except the Permitted Encumbrances.

20.1.2.2    Prior to the Final Outside Delivery Date, or such earlier date as may be mutually acceptable to the parties, sole and undisturbed physical possession of the entire Premises will be delivered to Tenant subject only to the Permitted Encumbrances.

20.1.2.3    At all times Tenant shall have unobstructed and adequate means of ingress and egress to the Premises from all abutting streets, roads and highways.

20.1.2.4    To Landlord's actual knowledge, there is no litigation or proceeding currently pending or threatened, which, if successful, would prevent Landlord from complying with any of its obligations under this Lease.

#39217812 v6                                20

20.1.2.5    Landlord has not been adjudicated insolvent or bankrupt; nor has Landlord commenced any proceeding relative to the reorganization, dissolution or liquidation of Landlord pursuant to the Federal Bankruptcy Act or similar law or statute.

20.2.    Tenant's Representations.

Tenant represents and warrants to Landlord that the following are true and correct:

20.2.1.    Tenant has the requisite authority to enter into this Lease and that upon execution by Landlord, SC Owner and Tenant, this Lease shall be binding upon Tenant, subject to Tenant's right to terminate this Lease as set forth elsewhere in this Lease.

20.2.2.    To Tenant's actual knowledge, there is no litigation or proceeding currently pending or threatened, which, if successful, would prevent Tenant from complying with any of its obligations under this Lease.

20.2.3.    Tenant has not been adjudicated insolvent or bankrupt; nor has Tenant commenced any proceeding relative to the reorganization, dissolution or liquidation of Tenant pursuant to the Federal Bankruptcy Act or similar law or statute.

20.3.    If Landlord shall be in default under this Section 20, Tenant, in addition to any and all remedies it may have in law and/or equity, may terminate this Lease upon written notice to Landlord in which event any prepaid amounts shall be returned to Tenant.

21.    Defaults:

21.1.    In the event Tenant shall at any time be in default in the payment of rent or other charges herein required to be paid by Tenant or in the observance or performance of any of the other covenants and agreements required to be performed and observed by Tenant hereunder and any such default shall continue for a period of seven (7) business days after written notice to Tenant for monetary obligations and thirty (30) days after written notice to Tenant for all other obligations (or if such non-monetary default is incapable of being cured in a reasonable manner within thirty (30) days, if Tenant has not commenced to cure the same within said thirty (30) day period and thereafter diligently prosecutes the same to completion, provided, however, that if the default by Tenant relates to any covenant other than one respecting the payment of money which cannot reasonably be cured within thirty (30) days, then Tenant shall have an additional reasonable period of time to cure) and Tenant shall not thereafter cure such default, then Landlord shall be entitled at its election, to exercise concurrently or successively any one or more of the following rights, in addition to all remedies otherwise provided in this Lease and otherwise available at law or in equity under the laws of the United States or the State in which the Premises is located (provided, however, Landlord shall not be entitled to accelerate rent, nor shall it be entitled to consequential or punitive damages):

21.1.1.    to bring suit for the collection of any amounts for which Tenant may then be or thereafter become in default, or for the performance of any other covenant or agreement devolving upon Tenant, without terminating this Lease; and/or

21.1.2.    terminate this Lease upon thirty (30) days' written notice to Tenant without waiving Landlord's rights to damages for Tenant's failure to perform its obligations hereunder.  In the event Landlord shall elect to terminate this Lease, as aforesaid, all rights and obligations of Landlord, and of any permitted successors or assigns, shall cease and terminate, except that Landlord shall have and retain full right to sue for and collect all amounts for the payment of which Tenant shall then be in default and all damages to Landlord by reason of any such breach.

21.2.    In the event that Landlord shall at any time be in default in the observance or performance of any of the covenants and agreements required to be performed and observed by Landlord hereunder and any such default shall continue for a period of thirty (30) days after written notice to Landlord (or if such default is incapable of being cured in a reasonable manner within thirty (30) days, if Landlord has not commenced to cure the same within said thirty (30) day period and thereafter diligently prosecuted the same to completion provided, however, that if the default by Landlord relates to any covenant other than one respecting the payment of money which cannot reasonably be cured within thirty (30) days, then Landlord shall have an additional reasonable period of time to cure) and Landlord shall not thereafter cure such default, Tenant shall be entitled at its election, to exercise concurrently or successively any one or more of the following rights, in addition to all remedies otherwise provided in this Lease and otherwise available at law or in equity under the laws of the United States or the State in which the Premises is located:

21.2.1.    to bring suit for the collection of any amounts for which Landlord may be in default, or for the performance of any other covenant or agreement devolving upon Landlord, without terminating this Lease; and/or

21.2.2.    terminate this Lease upon thirty (30) days' written notice to Landlord without waiving Tenant's rights to damages for Landlord's failure to perform its obligations hereunder.  In the event Tenant shall elect to terminate this Lease, as aforesaid, all rights and obligations of Tenant, and of any permitted successors or assigns, shall cease and terminate, except that Tenant shall have and retain full right to sue for and collect all amounts for the payment of which Landlord shall then be in default and all damages to Tenant by reason of any such breach.

21.3.    In the event that either Landlord or Tenant seeks enforcement of its rights and commences any suit for the collection of any amounts for which the other may be in default or for the performance of any other covenant or agreement hereunder, the prevailing party shall be entitled to be reimbursed by the other party for reasonable attorneys' fees and expenses incurred in enforcing such obligations and/or collecting such amounts.

21.4.    All remedies of Landlord or Tenant herein created or remedies otherwise existing at law or in equity are cumulative and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to the exercise of any other; provided that in no event shall either Landlord or Tenant have the right to receive consequential, punitive or exemplary damages for the other party's default; and in no event shall Landlord have the right to accelerate rental reserved hereunder.  Except as limited hereinabove, all rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord or Tenant shall deem necessary.

21.5.    In no event shall Tenant be entitled to any excess rental received by Landlord over and above that which Tenant is obligated to pay hereunder; however, such amounts, net of brokerage commissions, attorney's fees and disbursements and all reasonable, actual, out-of-pocket costs reasonably expended in connection with re-leasing the Premises or any portion thereof to a third party, shall be credited against all obligations of Tenant under this Lease.  Should the net rentals received by Landlord from such reletting during any month be less than the fixed rental payable hereunder during that month by Tenant, Tenant shall pay such deficiency and any remaining or additional amount due for damages and costs to Landlord pursuant to the terms of this Lease upon demand, and such deficiency shall be calculated and paid monthly.

22.    <u>Bankruptcy and Insolvency</u>:

22.1.    If, after the commencement of the Term of this Lease;

22.1.1.    Tenant shall be adjudicated a bankrupt or adjudged to be insolvent;

22.1.2.    a receiver or trustee shall be appointed for the aforesaid Tenant's property and affairs;

22.1.3.    Tenant shall make an assignment for the benefit of creditors or shall file a petition in bankruptcy or insolvency or for reorganization or shall make application for the appointment of a receiver; or

22.1.4.    any execution or attachment shall be issued against the aforesaid Tenant or any of the aforesaid Tenant's property, whereby the Premises or any building and improvements shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant, except as may herein be permitted; and such adjudication, appointment, assignment, petition, execution or attachment shall not be set aside, vacated, discharged or bonded within forty five (45) days after the issuance of the same, then a default hereunder shall be deemed to have occurred so that the provisions of Section 21 hereof shall have occurred and Landlord shall have the rights and remedies provided for therein.  Notwithstanding anything to the contrary hereinabove contained, upon the occurrence of a default pursuant to this Section 22, if the rent due and payable hereunder shall continue to be paid and the covenants, conditions and agreements of this Lease on Tenant's part to be kept and performed shall continue to be kept and performed, no event of default shall have been deemed to have occurred and the provisions of Section 22 hereof shall not become effective.

23.    <u>Waivers:</u> Failure of Landlord or Tenant to complain of any act or omission on the part of the other party no matter how long the same may continue shall not be deemed to be a waiver by said party of any of its rights hereunder.  No waiver by Landlord or Tenant at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver or a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.  No acceptance by Landlord of any partial payment shall constitute an accord or satisfaction but shall only be deemed a part payment on account.

24. <u>Force Majeure</u>: If Landlord or Tenant shall be delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or other reason beyond their control, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The terms of this provision shall not be deemed to extend the time periods for which Tenant is obligated to pay rent.

25. <u>Notices</u>: Every notice, approval, consent or other communication authorized or required by this Lease shall not be effective unless same shall be in writing and sent postage prepaid by United States registered or certified mail, return receipt requested, or by a reputable commercial overnight carrier, directed to the other party at its address set forth below, or such other address as either party may designate by notice given from time to time in accordance with this Section 25. The rent payable by Tenant hereunder shall be paid to Landlord at the same place where a notice to Landlord is herein required to be directed.

Landlord's Address:

HVP 2 LLC

c/o Nigro Companies
20 Corporate Woods Boulevard
Albany, New York 12211
ATTENTION: John J. Nigro

with a copy to:
John L. Allen, Esq.
Whiteman Osterman & Hanna LLP
One Commerce Plaza, 19th Floor
Albany, New York 12260

SC Owner's Address:

Troy SRALP, LLC
c/o Nigro Companies
20 Corporate Woods Boulevard
Albany, New York 12211
ATTENTION: John J. Nigro

Tenant's Address:

if sent via United States mail:

c/o Rite Aid Corporation
P.O. Box 3165
Harrisburg, Pennsylvania 17105

#39217812 v6

24

Attn:  Secretary

if sent via overnight courier:

c/o Rite Aid Corporation
30 Hunter Lane
Camp Hill, Pennsylvania 17011
Attn:  Secretary

with a copy to:

if sent via United States mail:

Eckerd Corporation
c/o Rite Aid Corporation
P.O. Box 3165
Harrisburg, Pennsylvania 17105
Attn:  Joseph J. Notarianni, Jr.

if sent via overnight courier:

Eckerd Corporation
c/o Rite Aid Corporation
30 Hunter Lane
Camp Hill, Pennsylvania 17011
Attn:  Joseph J. Notarianni, Jr.

and a copy to:

Matthew J. Swett
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103-2799

26.     Governing Law: This Lease and the performance thereof shall be governed, interpreted, construed and regulated by the laws of the state wherein the Premises is located.

27.     Partial Invalidity: If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, at any time or to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

28.     Short Form Lease: Landlord shall at the request of Tenant promptly execute duplicate originals of an instrument in the form attached hereto as **Exhibit E** (the "Short Form

#39217812 v6

25

Lease"), which will constitute a short form of lease, which Tenant may cause to be recorded at its expense among the land records of the county where the Premises is located.

29.    Interpretation: Wherever herein the singular number issued, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  The captions or headings used herein are for reference and convenience only, and shall not enter into the interpretation hereof.  This Lease may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

30.    Entire Agreement: No oral statement or prior written matter shall have any force or effect.  Tenant agrees that it is not relying on any representations or agreements other than those contained in this Lease.  This agreement shall not be amended, modified or canceled except by writing subscribed by all parties.  Time shall be of the essence with respect to all of the obligations under this Lease.

31.    Parties: Except as herein otherwise expressly provided, the covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, successors, administrators and assigns.

32.    Broker's Fee: Landlord and Tenant mutually warrant, one to another, that there are no real estate brokers entitled to a commission as a result of producing this Lease and that neither employed or engaged a real estate broker or agent to effectuate this Lease Agreement. Landlord and Tenant shall hold each other harmless from any claims made by any real estate broker against the indemnifying party for a commission as a result of allegedly effectuating this Lease.

33.    Dark Period.  If at any time during the Term of the Lease, Tenant shall cease operating its business in the Premises for greater than 150 days for reasons other than casualty, condemnation or remodeling (and shall be extended day-for-day due to force majeure), the Tenant shall have deemed to go "Dark" (the "Dark Period"), Landlord may elect to terminate this Lease and thereby recapture the Premises ("Landlord's Recapture Right") by providing written notice to Tenant ("Recapture and Termination Notice"), at which point the Lease shall terminate upon the earlier of: (1) the date Tenant returns the Premises to Landlord; or (2) thirty (30) days following the date Tenant receives the Recapture and Termination Notice; provided, however, that if, at any time during the Dark Period, Tenant shall provide Landlord written notice (a "Reopening Notice") that the Premises will no longer be Dark (either through Tenant reinstating operations in the Premises or through an assignment or sublease made in accordance with this Lease) and provided that the Premises is actually re-opened for business within ninety (90) days after delivery of the Reopening Notice and remains open for a minimum of 180 days thereafter, Landlord shall forfeit Landlord's Recapture Right. If following the Dark Period, the Premises are no longer Dark, but then become Dark again, Landlord shall once again have the rights set forth herein.

34.    Submission Not An Option: The submission of this document for examination does not constitute an option or offer to lease the Premises.  This document shall have no binding

effect on the parties unless executed by Landlord, SC Owner and Tenant and a fully executed copy is delivered to both Landlord and Tenant.

35.    Environmental Provisions:

35.1.    Landlord shall deliver the Premises to Tenant, on or before the Delivery Date, in compliance with all Environmental Requirements (as hereinafter defined), so as to allow the construction and operation of the Project without impairment, interruption, interference, liability or additional cost or expense to Tenant with respect to any Hazardous Substances (as hereinafter defined).    Tenant may obtain, at Tenant's expense, such reports, audits and other documentation (collectively, "Reports") as Tenant shall reasonably require, to determine whether the Premises are in compliance with all Environmental Requirements and upon Landlord's request shall provide a copy of all such Reports to Landlord.    Landlord shall perform any and all investigation, remediation or other response necessary to address any environmental conditions caused by the presence of with respect to any Hazardous Substances (collectively, the "Remedial Activities").    In connection with the foregoing, Landlord agrees to perform, or cause to be performed, prior to the Delivery Date all Remedial Activities necessary to the full satisfaction of applicable Environmental Requirements and in a manner which results in a government "clean closure" or "no further action" determination or other governmental acknowledgement that no further action is necessary in connection with the Remedial Activities.

35.2.    "Hazardous Substances" for purposes of this Lease shall be interpreted broadly to include, but not be limited to, any material or substance that is defined or classified under federal, state, or local laws as:  (a) a "hazardous substance" pursuant to section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601(14), section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1321, as now or hereafter amended; (b) a "hazardous waste" pursuant to section 1004 or section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. §§6903, 6921, as now or hereafter amended; (c) a toxic pollutant under section 307(a)(1) of the Federal Water Pollution Control Act, 33 U.S.C. §1317(a)(1); (d) a "hazardous air pollutant" under section 112 of the Clean Air Act, 42 U.S.C. §7412, as now or hereafter amended; (e) a "hazardous material" under the Hazardous Materials Transportation Uniform Safety Act of 1990, 49 U.S.C. App. §1802(4), as now or hereafter amended; (f) toxic or hazardous pursuant to regulations promulgated now or hereafter under the aforementioned laws; or (g) presenting a risk to human health or the environment under other applicable federal, state or local laws, ordinances, or regulations, as now or as may be passed or promulgated in the future (all of the foregoing laws, ordinances, regulations and other governmental strictures and guidelines pertaining to the environment, health and safety being herein sometimes referred to as the "Environmental Requirements"). "Hazardous Substances" specifically include, but are not limited to, asbestos, polychlorinated biphenyls ("PCBs"), radioactive substances, petroleum and petroleum based derivatives, hydrocarbons and urea formaldehyde.

35.3.    Neither Tenant nor any employee, agent, contractor or subcontractor of Tenant (collectively, the "Tenant Parties") shall cause or permit the storage, use, escape, disposal or release of Hazardous Substances in, on or under the Premises in any manner not in compliance with the Environmental Requirements; provided, however, that nothing herein shall prevent Hazardous Substances to be brought onto the Premises in the ordinary course of Tenant's business, as long as such presence is in compliance with the Environmental Requirements.

Tenant shall indemnify and hold harmless Landlord against and from any liability, claim of liability, claims, suits, costs, expenses, causes of action, personal liability and property damage (including without limitation Landlord's reasonable attorneys' fees) arising out of a breach by Tenant of its covenant in the preceding sentence.  The foregoing covenants and indemnities shall survive the expiration or earlier termination of this Lease; provided, however, that Tenant shall not be required to indemnify Landlord from any matter arising from Hazardous Substances present at the Premises prior to the Delivery Date which were not brought onto the Premises by Tenant or any other Tenant Party, Landlord's gross negligence or willful misconduct or a breach of Landlord's covenant contained in Section 35.4 below.

35.4.    Neither Landlord nor any employee, agent, contractor or subcontractor of Landlord (collectively, the "Landlord Parties") shall cause or permit the storage, use, escape, disposal or release of Hazardous Substances in, on or with respect to the Premises in any manner not in compliance with the Environmental Requirements.  Landlord shall indemnify and hold Tenant harmless against and from any liability, claim of liability, claims, suits, costs, expenses, causes of action, personal liability and property damage (including without limitation reasonable attorney's fees) arising out of a breach by Landlord of its covenant in the preceding sentence.  Further, Landlord shall indemnify and hold Tenant harmless against and from any liability, claim of liability, claims, suits, costs, expenses, causes of action, personal liability and property damage (including without limitation reasonable attorneys' fees) arising out of any Hazardous Substances which are (a) present at the Premises prior to the Delivery Date and (b) present thereafter as a result of the acts of Landlord or any other Landlord Party or SC Owner or any employee, agent, contractor or subcontractor of SC Owner.  The foregoing covenants and indemnities in this Section 35.4 shall survive the expiration or earlier termination of this Lease; provided, however, that Landlord shall not be required to indemnify Tenant from any matter arising from Tenant's gross negligence or willful misconduct or a breach of Tenant's covenant contained in Section 35.3 above.

35.5.    If either party defaults in the performance of any obligation imposed on it by this Lease and does not cure such default within thirty (30) days after receipt of written notice from the other party specifying the default (or does not within said period commence and thereafter diligently proceed to cure such default), the other party, without waiver of or prejudice to any other right or remedy it may have, shall have the right (provided, in Tenant's case, Tenant shall have given similar prior written notice and time to cure to the holder of any mortgage secured upon the Premises or any part thereof of which Tenant has been provided prior written notice), at any time thereafter, to cure such default for the account of the defaulting party, and the defaulting party shall reimburse the other party upon invoice for any amount paid and any expense or contractual liability so incurred together with interest thereon at the Interest Rate.  In the event of emergencies, or where necessary to prevent injury to persons or damage to property, either party may cure a default by the other before the expiration of the waiting period, but after giving such written or oral notice to the other party as is practical under all of the circumstances.

36.    <u>Holding Over</u>: In the event of Tenant's continued occupancy of the Premises after the expiration of the Term of this Lease or any renewal or extension thereof, or any earlier termination provided or permitted by this Lease, with or without the consent of Landlord, such tenancy shall be from month-to-month terminable on thirty (30) days written notice from either

party to the other and such holding over shall be a tenancy at sufferance at one hundred twenty-five percent (125%) of the Minimum Rent herein specified (pro-rated on a monthly basis).

37.   Estoppel Certificate: Either party agrees within thirty (30) days after request therefor by the other party to execute and deliver to the requesting party a statement, certifying to its actual knowledge (a) whether or not this Lease is in full force and effect, (b) the date of commencement and termination of the Term of this Lease, (c) the date to which rental and all other charges hereunder are paid currently without any offset or defense thereto (or stating any such offset or defense), (d) the amount of rental and all other charges hereunder, if any, paid in advance, (e) whether or not this Lease has been modified and, if so, identifying the modifications, (f) that there are no uncured defaults by the other party or describing the claimed defaults and (g) such other matters of a factual nature as the requesting party shall reasonably request.  Nothing in any such estoppel statement shall be deemed to modify or amend this Lease. Tenant shall be required to give no more than two (2) such certificates in any calendar year.

38.   Interest Rate: "Interest Rate" as used herein means an annual rate of interest equal to the lesser of (i) the maximum rate of interest permitted in the State of New York, or (ii) the prime rate from time to time as set forth in the Money Rates Section (or successor section) in the Wall Street Journal (or, if the Wall Street Journal is no longer being published, then another similar financial publication) plus three hundred fifty (350) basis points. Interest shall payable to a party owing and shall be calculated on the basis of a 365-day year, actual days elapsed, from the thirtieth date after any cost or expense is due and payable until the amount owing is fully paid.

39.   Waiver of Landlord's Lien: For so long as Tenant, its parent or any of its subsidiaries or affiliates is the tenant under this Lease, Landlord hereby waives in favor of Tenant its landlord's lien for rent against any and all of the property of Tenant, its parent, subsidiaries or affiliates to the extent provided in the applicable laws, regulations or ordinances where the Premises are located.

40.   Exclusive:

40.1.   Subject to the rights of existing tenants in the Shopping Center as of the date of this Lease, each of Landlord and SC Owner agrees not to permit any property owned or otherwise controlled by it (or any entity in which it has a controlling interest) within two (2) miles of the Shopping Center (the "Exclusive Area") to be used for the conduct of any store, business, trade or profession (i) which requires or has a license or permit to conduct a pharmacy or which employs or is required to employ a registered or licensed pharmacist, or (ii) for the conduct of any store, business, trade or profession which is called, labeled, named or commonly known or referred to as a drug store, pharmacy or apothecary (collectively, "Drug Store Restriction") or (iii) for the sale of health aids (including, without limitation, over the counter medications, vitamin supplements, mineral supplements and medical equipment) (the "Health Aid Restriction"), (iv) for the sale of beauty aids (including, without limitation, hair care products and cosmetics) (collectively, the "Beauty Aid Restriction"), (v) for use as a health care services clinic or any clinic of that nature whatsoever, including but not limited to so-called "Convenient Care Clinics", walk-in urgent care clinics, Retail-based Clinics, and the like, or (vi) for use as a clinic or other facility in which injections are administered, including but not limited

to immunizations, flu shots and the like.  Retail-based Clinics or Convenient Care Clinics shall mean: any retail space used, in any manner, for the provision of health care services that are typically provided by nurse practitioners (any RN level nurse and beyond), physician assistants or physicians.  The aforementioned health care services may include, but in no way or limited to, the following: the treatment of common medical conditions, administration of health screenings, vaccinations/immunizations, and other such procedures.

40.2.    Neither the Health Aid Restriction nor the Beauty Aid Restriction shall be deemed to prohibit the incidental sale of health and/or beauty aids by Landlord's or SC Owner's other tenants operating within the Exclusive Area primarily as a barber or hair salon provided that such sales do not exceed five percent (5%) of the gross sales of such tenant or occupant.  If Landlord or SC Owner shall violate any of the provisions of this Article 40 and Landlord shall not cure, or cause SC Owner to cure, such violation within seventy five (75) days after receipt of Tenant's notice thereof, Tenant, at any time thereafter, upon ten (10) days prior written notice to Landlord may (in addition to, and not as a substitute to, any and all other legal or equitable rights or remedies it may have): (i) terminate this Lease; or (ii) pay to Landlord rent reduced to a level equal to 50% of the rent due immediately prior to such violation.  The provisions of this Article 40 shall remain in full force and effect regardless of whether Tenant is operating in the Premises.

40.3.    The Drug Store Restriction, the Health Aid Restriction and the Beauty Aid Restriction shall not apply to the premises currently occupied by Price Chopper in the Shopping Center, nor shall all other exclusives and restrictions as set forth in Section 40.1 above (including, but not limited to the Clinic restriction) apply to the premises occupied by Price Chopper, so long as all or substantially all of the premises occupied by Price Chopper as of the Effective Date continues to be occupied by Price Chopper or another single tenant.

40.4.    If any restriction benefitting the Premises (and/or burdening the Shopping Center Parcel) described in this Lease is deemed to expire or terminate at any time during the Term due to any statute or other legal requirement, Landlord and Tenant shall cooperate to cause such restriction to be extended or renewed (and any such extension or renewal to be recorded in the chain of title for the Shopping Center Parcel and the Premises) in accordance with applicable laws prior to such expiration or termination.

41.    Lease Contingency: Tenant's obligations under this Lease are expressly contingent upon the satisfaction of the following condition on or before the Final Outside Delivery Date:

41.1.    Intentionally Deleted.

41.2.    Intentionally Deleted.

41.3.    Intentionally Deleted.

41.4.    The execution, delivery and recordation of that certain Declaration of Reciprocal Easements and Restrictions in the form attached hereto as **Exhibit H** (the "Declaration"), with respect to the Premises and the Shopping Center Parcel to establish easements for utilities, access, parking and signage in connection with Tenant's use of the

Premises, which Declaration shall be recorded by Landlord in the land records of the county where the Premises is located.

If the foregoing condition is not satisfied on or before the Final Outside Delivery Date, Tenant shall have the right, in its sole discretion, to elect to: (i) terminate this Lease by ten (10) days' written notice to Landlord in which event, neither party shall have any further rights or obligations, unless the Declaration is executed, delivered and recorded within such ten (10) day period as provided in Section 41.4 above; (ii) extend the time period for satisfying the condition; or (iii) waive the condition in which case this Lease shall continue in accordance with its terms.

42.    Survival: All rights and obligations which by their nature are to be or may be performed after the termination or expiration of the Lease shall survive such expiration or termination.

43.    Automatic Extension: In the event that the date for performance of any duty or obligation, exercise of any right or option or giving of any notice shall occur upon a Saturday, Sunday or federal legal holiday, the due date for such performance, exercise or giving of notice shall be automatically extended to the next succeeding business day.

IN WITNESS WHEREOF, the parties hereto have hereunto executed this Lease the day and year first above written.

WITNESS:

**LANDLORD**:
**HVP 2 LLC**

By: _____
Name:  Marcia Klein
Title:  Member

WITNESS:

**SC OWNER**:
**TROY SRALP, LLC**

By:  Troy Management, LLC, managing member

By: _____
Name:  Joel Aronson
Title:  Member

WITNESS:

**TENANT**:
**ECKERD CORPORATION**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have hereunto executed this Lease the day and year first above written.

WITNESS:

        **LANDLORD:**
        **HVP 2 LLC**

_____

        By:_____
        Name:  Marcia Klein
        Title:  Member

WITNESS:

        **SC OWNER:**
        **TROY SRALP, LLC**

        By:  Troy Management, LLC, managing member

_____

        By:_____
        Name:  Joel Aronson
        Title:  Member

WITNESS:

        **TENANT:**
        **ECKERD CORPORATION**

M.L. Baajkari

        By:_____
        Name:
        Title:
        **Joseph J. Notarianni**
        *Vice President, Real Estate - Law*

STATE OF NEW YORK )

) ss

COUNTY OF ROCKLAND )

On the _20th_ day of _April_ , in the year 2017, before me, the undersigned, a Notary Public in and for said state, personally appeared Marcia Klein, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

SHANDEL I STRASBERG
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ST6100044
Qualified in Rockland County
Commission Expires Oct. 14, 2019

STATE OF NEW YORK )

) ss

COUNTY OF ROCKLAND )

On the _20th_ day of _April_ , in the year 2017, before me, the undersigned, a Notary Public in and for said state, personally appeared Joel Aronson, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

SHANDEL I STRASBERG
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ST6100044
Qualified in Rockland County
Commission Expires Oct. 14, 2019

COMMONWEALTH OF PENNSYLVANIA          )
                                                          :
COUNTY OF CUMBERLAND                   )

On the 13TH day of ____April____ A.D. 2017, before me, the undersigned officer, personally appeared Joseph J. Notarianni, who acknowledged himself to be the Vice President of ECKERD CORPORATION, a corporation, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Vice President.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.

My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LINDA L BROWN, NOTARY PUBLIC
CAMP HILL, PA CUMBERLAND CO.
MY COMMISSION EXPIRES ON JUNE 18, 2020

## EXHIBIT A-1

### LEGAL DESCRIPTION OF SHOPPING CENTER PARCEL

ALL that certain plot, piece or parcel of land, together with the buildings and improvements thereon erected, situate lying and being in the City of Troy, County of Rensselaer, State of New York, being more particularly bounded and described as follows.

BEGINNING at a point on the westerly boundary of Vandenburg Avenue, otherwise known as US Route 4, said highway boundary being more fully shown on Map No 26 as Parcel No. 29, dated August 2, 2000, for the reconstruction of a portion of the City of Troy: Vandenburg Avenue, on file in the Office of the State Department of Transportation, as it is intersected by the division line between the City of Troy on the north and the Town of North Greenbush on the south,

Thence:  S 84°29'30"W along said division line 1,053.47 feet to a point, being S 33°09'10"W, 0.36 feet from a capped iron rod found on the northerly line of lands of National Grid, formerly Niagara Mohawk,

Thence: N 67°33'40" W along the lands of National Grid 61.24 feet to a point, being S66"18'35"W, 0.57 feet from a capped iron rod found,

Thence: N 16°36'50" W continuing along said lands 31.90 feet to a point, being S 71°08"15"W, 0.35 feet from a capped iron rod found,

Thence: S 84°29'30" W still along said lands 52.87 feet to a point, being N 30°22'45" W, 0.19 feet from a capped iron rod found,

Thence: N 67°33'40" W still along said lands 75.40 feet to a point, being S 89°38'10" E, 0.78 feet from a capped iron rod found,

Thence: N 02°13'50" E in part along said lands of National Grid and the lands of Hudson Valley Dorms, Inc. on the west, 100.00 feet to a point,

Thence: N 02°13'50" E along a prolongation of said line 36.00 feet more or less to the centerline of a creek,

Thence running in a general northwesterly and westerly direction along the centerline of said creek, as it winds and turns, 680.00 feet more or less, to a point on the division line between the lands of Hudson Valley Dorm, Inc. on the west and herein described parcel on the east,

Thence: N 19°32'00" E along said division line 15.00 feet to an iron rod found, said point being distant S 81°48'30" E 562.66 feet from the aforesaid point, lying 36.00 feet southerly of the centerline of the creek,

Thence: N 19°32'00" E continuing along said division line 411.90 feet to a capped iron rod found, for a total distance of 427.00 feet more or less,

Thence: N 73°32'00" E in part along the southerly line of lands of Hudson Valley Dorms, Inc., the southerly line of Crestwood Development as shown on a plan filed in the Rennselaer County Clerk's Office in Drawer 46 as Map 34, the southerly line of lands of Brentwood Avenue & Hayden Lane also showing lot layout, as shown on a Survey & Map by King & Danskin on file in the Rennselaer County Clerk's Office in Drawer 58 as Map 2 and a portion of the lands of Kathleen L Sousa, 1,254.00 feet to an iron rod found on the westerly line of lands of SEFCU,

Thence: S 19°49'20" E continuing along the lands of SEFCU 90.00 feet to a point, being S 56°18'20"W, 0.44 feet from a square iron found,

Thence:  N 72°42'10" E still along said lands 197.20 feet to a point on the westerly margin of Vandenburg Avenue,

Thence:  S 16° 48' 34" E along Vandenburg Avenue 157.92 feet to the northerly corner of aforesaid Parcel No 29 being a capped iron rod found,

Thence the following seven courses and distances along the westerly lines of the reconstructed Vandenburg Avenue:

1.      S 15°07'49" E 292.11 feet to an iron found,
2.      S 23°06'34° W 45.84 feet to a point,
3.      S 16°19'28" E 159.45 feet to a capped iron found,
4       S 34°53'35" E 74.02 feet to an iron found,
5       S 14°38'15" E 88.60 feet to an iron found,
6.      S 11°26'22" W 21.42 feet to a capped iron found,
7.      S 15°13'03" E 81.27 feet to the point or place of beginning.

For Information Only:
Premises being known as 79 Vandenburg Avenue, Troy NY 12180
Section 123.21 Block: 1 Lot 2

Said parcel of land containing about 26.9 acres of land more or less

This description is in accordance with a survey made by RDM Surveying Consultants dated April 15, 2013 as Project No. "City South Block 1 2013-2871"

Exempting and reserving from the above described premises the following parcel:

ALL THAT PIECE OR PARCEL OF LAND SITUATE IN THE CITY OF TROY, COUNTY OF RENSSELAER AND THE STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT LOCATED WITHIN THE LANDS NOW OR FORMERLY OF TROY SRALP, LLC, SAID POINT BEING LOCATED NORTH 52°40'00" WEST, 131.77 FEET FROM A POINT LOCATED ALONG THE WESTERLY BOUNDARY OF VANDENBURGH AVENUE, (ROUTE 4) SAID HIGHWAY BOUNDARY BEING MORE

FULLY SHOWN ON MAP NO. 26 AS PARCEL 29, DATED AUGUST 2, 2000 FOR THE RECONSTRUCTION OF A PORTION OF THE CITY OF TROY, VANDENBURGH AVENUE, ON FILE IN THE OFFICE OF THE STATE DEPARTMENT OF TRANSPORTATION, AS IT IS INTERSECTED BY THE DIVISION LINE BETWEEN THE CITY OF TROY ON THE NORTH AND THE TOWN OF NORTH GREENBUSH ON THE SOUTH; THENCE THROUGH THE AFORESAID LANDS OF TROY SRALP, LLC, THE FOLLOWING FOUR COURSES: 1) SOUTH 72°46'25" WEST, 135.00 FEET TO A POINT; 2) NORTH 17°13'35" WEST, 195.00 FEET TO A POINT; 3) NORTH 72°46'25" EAST, 135.00 FEET TO A POINT AND 4) SOUTH 17°13'35" EAST, 195.00 FEET TO THE POINT OR PLACE OF BEGINNING.

ALL AS SHOWN ON A MAP ENTITLED "SUBDIVISION AND SITE PLAN OF TROY SRALP, LLC, PREPARED BY RDM SURVEYING CONSULTANTS, DATED NOVEMBER 19, 2013, LAST REVISED NOVEMBER 19, 2013 AND FILED IN THE RENSSELAER COUNTY CLERKS OFFICE AS MAP NO. 2013-168.

CONTAINING IN ALL 26,325 SQUARE FEET OF LAND BEING MORE OR LESS

# EXHIBIT A-2

## DEPICTION OF SHOPPING CENTER



## <u>EXHIBIT A-3</u>

## LIENS AND TITLE EXCEPTIONS TO BE REMOVED BY LANDLORD

**None.**

## EXHIBIT A-4

## SURVEY



A-4-1

## EXHIBIT A-5

## PREMISES SITE PLAN



A-5-1

## EXHIBIT A-6

### LEGAL DESCRIPTION OF PREMISES PARCEL

ALL THAT PIECE OR PARCEL OF LAND SITUATE IN THE CITY OF TROY, COUNTY OF RENSSELAER AND THE STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT LOCATED WITHIN THE LANDS NOW OR FORMERLY OF TROY SRALP, LLC, SAID POINT BEING LOCATED NORTH 52°40'00" WEST, 131.77 FEET FROM A POINT LOCATED ALONG THE WESTERLY BOUNDARY OF VANDENBURGH AVENUE, (ROUTE 4) SAID HIGHWAY BOUNDARY BEING MORE FULLY SHOWN ON MAP NO. 26 AS PARCEL 29, DATED AUGUST 2, 2000 FOR THE RECONSTRUCTION OF A PORTION OF THE CITY OF TROY, VANDENBURGH AVENUE, ON FILE IN THE OFFICE OF THE STATE DEPARTMENT OF TRANSPORTATION, AS IT IS INTERSECTED BY THE DIVISION LINE BETWEEN THE CITY OF TROY ON THE NORTH AND THE TOWN OF NORTH GREENBUSH ON THE SOUTH; THENCE THROUGH THE AFORESAID LANDS OF TROY SRALP, LLC, THE FOLLOWING FOUR COURSES: 1) SOUTH 72°46'25" WEST, 135.00 FEET TO A POINT; 2) NORTH 17°13'35" WEST, 195.00 FEET TO A POINT; 3) NORTH 72°46'25" EAST, 135.00 FEET TO A POINT AND 4) SOUTH 17°13'35" EAST, 195.00 FEET TO THE POINT OR PLACE OF BEGINNING.

ALL AS SHOWN ON A MAP ENTITLED "SUBDIVISION AND SITE PLAN OF TROY SRALP, LLC, PREPARED BY RDM SURVEYING CONSULTANTS, DATED NOVEMBER 19, 2013, LAST REVISED NOVEMBER 19, 2013 AND FILED IN THE RENSSELAER COUNTY CLERKS OFFICE AS MAP NO. 2013-168.

CONTAINING IN ALL 26,325 SQUARE FEET OF LAND BEING MORE OR LESS

TOGETHER WITH A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS BETWEEN THE ABOVE-DESCRIBED PARCEL AND VANDENBURG AVENUE A/K/A US ROUTE 4, OVER THE DRIVEWAYS PRESENTLY EXISTING AND HEREAFTER CONSTRUCTED ON THE REMAINING LANDS OF TROY SRALP, LLC.

## EXHIBIT B

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement ("Agreement") is made as of the _____ day of _____, 2017, between **ECKERD CORPORATION**, c/o Rite Aid Corporation, P.O. Box 3165, Harrisburg, PA 17105, Attn: Secretary ("Tenant") and _____ ("Lender").

**WHEREAS**, Tenant and HVP 2 LLC ("Landlord") have entered into a lease dated _____ (the "Lease") covering all of certain premises situate at 76 Vandenburgh Avenue, Troy, New York, as set forth in the Lease (the "Premises"); and

**WHEREAS**, Lender has made or is about to make a loan to Landlord secured by a mortgage covering the Premises demised under the Lease (the "Mortgage") and intended to be recorded in the public records; and

**WHEREAS**, Tenant has agreed that its rights in and pursuant to the Lease are and shall be subordinate to the Mortgage, provided Lender executes and delivers to Tenant a Non-Disturbance Agreement, which Lender is willing to provide on condition that Tenant agrees to attorn to Lender;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, it is agreed:

1.    Subordination. The Lease is and shall be subject and subordinate to the Mortgage insofar as it affects the Demised Premises, and to all renewals, modifications, consolidations, replacements and extensions thereof, and to all future advances made thereunder.

2.    Non-Disturbance Agreement.  As long as Tenant is not in default beyond any applicable grace period in the payment of rent, additional rent or other charges or in the performance of any of the other terms or conditions of the Lease, Tenant's rights under the Lease and its possession of the Premises will not be interfered with or disturbed by Lender during the term of the Lease (including any renewal or extension term) following acquisition of title to the Property (a) by Lender or the purchaser at a foreclosure sale pursuant to any action or proceeding to foreclose the Mortgage, or (b) by Lender pursuant to acceptance of a deed in lieu of foreclosure (in either case, a "Transfer of Ownership").

3.    Attornment Agreement.  If a Transfer of Ownership occurs, Lender and Tenant will be bound to each other, as landlord and tenant, respectively, under all of the terms and conditions of the Lease for the balance of the term thereof (including any renewal or extension term), and Tenant hereby attorns to Lender as its landlord, such attornment to be effective and self-operative, without the execution of any other instruments on the part of either party hereto, immediately upon a Transfer of Ownership. As used in this Article and in the

B-1

subsequent provisions hereof, whenever the context allows, the term "Lender" will also include a purchaser of the Property at a foreclosure sale.

4.      Lender's Liability.  Notwithstanding any other provision of this Agreement,  Lender or any subsequent owner purchasing the Property at a foreclosure sale will not be: (a) liable for acts or omissions of any prior landlord (including Landlord) unless otherwise provided by law or to the extent continuing; (b) subject to offsets or defenses that Tenant might have had against any prior landlord (including Landlord) unless otherwise provided by law; (c) bound by rent, additional rent or other charges that Tenant might have paid for more than 30 days in advance to any prior landlord (including Landlord); (d) bound by any amendment or modification of the Lease hereafter made without Lender's prior written consent, which consent will not be unreasonably withheld (except to the extent that the Lease may specifically contemplate any amendment or modification thereof); or (e) responsible for money or other security delivered to Landlord pursuant to the Lease but not subsequently received by Lender.

5.      Lender's Right to Cure Default.  Notwithstanding any provision of the Lease, no notice by Tenant to Landlord of any breach or default by Landlord under the Lease will be effective unless and until (a) a copy of the notice is received by Lender at Lender's notice address set forth in Paragraph 6, and (b) the time period specified in the Lease or a reasonable period of time, if no time period is specified in the Lease, has elapsed following Lender's receipt of such copy, during which period Lender will have the right, but will not be obligated, to cure the breach or default.

6.      Notices.  To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postpaid by United States certified mail with return receipt requested or by a nationally recognized overnight courier service at the addresses set forth on the first page hereof, or at such other address as the parties may provide in writing. Any such notice or other communication shall be effective upon receipt or rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication.

The agreements contained herein shall bind and inure to the benefit of the successors and assigns in interest of the parties hereto, and, without limitation of the foregoing generality, the agreements of Lender herein shall specifically be binding upon any purchaser or successor of said property at a sale foreclosing said Mortgage or in lieu of such foreclosure.

B-2

IN WITNESS WHEREOF, the parties hereof have caused the execution hereof as of the date first above written.

WITNESS OR ATTEST:

TENANT:
ECKERD CORPORATION

By:

Name:

Title:

LENDER:

By:

Name:

Title:

B-3

Case 25-14831-MBK   Doc 388-28   Filed 05/04/26   Entered 05/04/26 18:30:32   Desc
Exhibit X - Build Lease   Page 49 of 109

COMMONWEALTH OF PENNSYLVANIA)

                        )

COUNTY OF CUMBERLAND         )

On the _____ day of _____, 20___, before me, the undersigned officer, personally appeared _____, who acknowledged him/herself to be the _____ of ECKERD CORPORATION, a corporation, and that (s)he as such ____ _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by him/herself as _____ _____.

      **IN WITNESS WHEREOF**, I have hereunto set my hand and Notarial Seal.

                            My Commission Expires:

_____OF _____)

                        )

COUNTY OF _____      )

On the ___ day of_____, A.D. 20__, before me, the undersigned officer, personally appeared _____, who acknowledged him/herself to be the _____ of _____, a _____, and that (s)he as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the _____ by him/herself as _____.

      **IN WITNESS WHEREOF**, I have hereunto set my hand and Notarial Seal.

                            My Commission Expires:

## EXHIBIT C

**PERMITTED ENCUMBRANCES**

**None.**

## EXHIBIT D

### TENANT'S CERTIFICATE

HVP 2 LLC
c/o Nigro Companies
20 Corporate Woods Boulevard
Albany, New York 12211
Attention:  John J. Nigro

                    , 2017

Dear Landlord:

Reference is hereby made to that certain Lease between HVP 2 LLC and the undersigned dated _____, 2017 (the "Lease").  All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Lease.

The undersigned hereby acknowledges and certifies as follows:

1.      A copy of the certificate of occupancy for the Premises from the City of Troy is attached hereto as Schedule 1.

2.      The total costs incurred by Tenant in performing Tenant's Initial Work (including both hard and soft costs) is $_____.

3.      Lien waivers from the general contractor and all subcontractors performing work at the Premises costing in excess of $50,000 are attached hereto as Schedule 2.

Landlord shall pay Landlord's Contribution to Tenant no later than thirty (30) days following the date of this Tenant's Certificate in accordance with Section 7.2 of the Lease.

Sincerely,

                    

By: _____
Name: _____
Title: _____

[Schedules to be attached]

D-1

## EXHIBIT E

### SHORT FORM LEASE

RITE AID #10687

After recording, mail to:
Eckerd Corporation
c/o Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA
Attention:  Joseph J. Notarianni, Jr.

### MEMORANDUM OF LEASE

**THIS MEMORANDUM LEASE** (this "Memorandum of Lease") dated as of the ____ day of _____, 201__ (the "Effective Date"), by and between HVP 2 LLC, having an address of 22 Jeffrey Place, Monsey, New York 10952 ("Landlord"), TROY SRALP, LLC, having an address of c/o Nigro Companies, 20 Corporate Woods Boulevard, Albany, New York 12211 ("SC Owner"), and ECKERD CORPORATION D/B/A RITE AID, with offices at c/o Rite Aid Corporation, 30 Hunter Lane, Camp Hill, Pennsylvania 17011 ("Tenant").

W I T N E S S E T H:

Landlord and Tenant have entered into a lease (the "Lease") of even date herewith, whereby Landlord has leased to Tenant real property (the "Property"), located in Troy, New York, the legal description of which Property is set forth on **Exhibit A** attached hereto. The Property leased to Tenant by Landlord shall hereinafter be referred to as the "Premises."  SC Owner is the fee owner of a certain parcel of land described on **Exhibit B** attached hereto (the Shopping Center").  The Lease contains provisions and rights appurtenant to the Property and the Shopping Center, some of which are as follows:

1.      The term of the Lease (the "Term") is for a period of twenty (20) years, commencing on the Rent Commencement Date (as defined in the Lease). Thereafter, Tenant has the right under the Lease to renew and extend the Term of the Lease for five (5) successive periods of five (5) years each and one (1), four (4) year renewal term, provided however, and notwithstanding anything in the Lease to the contrary, the sixth renewal term, if exercised, shall end no later than one day prior to the 49th anniversary of the Rent Commencement Date.

2.      Subject to the rights of existing tenants in the Shopping Center as of the date of the Lease, each of Landlord and SC Owner agrees not to permit any property owned or otherwise controlled by it (or any entity in which it has a controlling interest) within two (2) miles of the Shopping Center (the "Exclusive Area") to be used for the conduct of any store, business, trade or profession (i) which requires or has a license or permit to conduct a pharmacy or which employs or is required to employ a registered or licensed pharmacist, or (ii) for the conduct

#39217812 v6                    E-1

of any store, business, trade or profession which is called, labeled, named or commonly known or referred to as a drug store, pharmacy or apothecary (collectively, "Drug Store Restriction") or (iii) for the sale of health aids (including, without limitation, over the counter medications, vitamin supplements, mineral supplements and medical equipment) (the "Health Aid Restriction"), (iv) for the sale of beauty aids (including, without limitation, hair care products and cosmetics) (collectively, the "Beauty Aid Restriction"), (v) for use as a health care services clinic or any clinic of that nature whatsoever, including but not limited to so-called "Convenient Care Clinics", walk-in urgent care clinics, Retail-based Clinics, and the like, or (vi) for use as a clinic or other facility in which injections are administered, including but not limited to immunizations, flu shots and the like.  Retail-based Clinics or Convenient Care Clinics shall mean: any retail space used, in any manner, for the provision of health care services that are typically provided by nurse practitioners (any RN level nurse and beyond), physician assistants or physicians.  The aforementioned health care services may include, but in no way or limited to, the following: the treatment of common medical conditions, administration of health screenings, vaccinations/immunizations, and other such procedures.

3.      Neither the Health Aid Restriction nor the Beauty Aid Restriction shall be deemed to prohibit the incidental sale of health and/or beauty aids by Landlord's or SC Owner's other tenants operating within the Exclusive Area primarily as a barber or hair salon provided that such sales do not exceed five percent (5%) of the gross sales of such tenant or occupant.  If Landlord or SC Owner shall violate any of the provisions of Article 40 of the Lease and shall not cure, or cause SC Owner to cure, such violation within seventy five (75) days after receipt of Tenant's notice thereof, Tenant, at any time thereafter, upon ten (10) days prior written notice to Landlord may (in addition to, and not as a substitute to, any and all other legal or equitable rights or remedies it may have): (i) terminate the Lease; or (ii) pay to Landlord rent reduced to a level equal to 50% of the rent due immediately prior to such violation.  The provisions of Article 40 of the Lease shall remain in full force and effect regardless of whether Tenant is operating in the Premises.

4.      The Drug Store Restriction, the Health Aid Restriction and the Beauty Aid Restriction shall not apply to the premises currently occupied by Price Chopper in the Shopping Center, nor shall all other exclusives and restrictions as set forth in Section 40.1 of the Lease (including, but not limited to the Clinic restriction) apply to the premises occupied by Price Chopper, so long as all or substantially all of the premises occupied by Price Chopper as of the Effective Date of the Lease continues to be occupied by Price Chopper or another single tenant.

5.      If any restriction benefitting the Premises (and/or burdening the Shopping Center Parcel) described in the Lease is deemed to expire or terminate at any time during the Term due to any statute or other legal requirement, Landlord and Tenant shall cooperate to cause such restriction to be extended or

E-2

renewed (and any such extension or renewal to be recorded in the chain of title for the Shopping Center Parcel and the Premises) in accordance with applicable laws prior to such expiration or termination.

6.      All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

7.      Unless otherwise indicated herein, all capitalized terms used herein shall have the meaning set forth in the Lease. This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter, modify, expand, diminish or supplement the provisions of the Lease.  In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

*[Signature page to follow]*

IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

WITNESS:                                     **LANDLORD**:
                                             **HVP 2 LLC**

_____                    By:_____
                                             Name:  Marcia Klein
                                             Title:  Member


WITNESS:                                     **SC OWNER**:
                                             **TROY SRALP, LLC**

                                             By:  Troy Management, LLC, managing member

_____                    By:_____
                                             Name:  Joel Aronson
                                             Title:  Member


WITNESS:                                     **TENANT**:
                                             **ECKERD CORPORATION**

_____                    By:_____
                                             Name:
                                             Title:


#39217812 v6                    E-4

STATE OF NEW YORK       )
                       ) ss

COUNTY OF ROCKLAND     )

On the _____ day of _____, in the year 2017, before me, the undersigned, a Notary Public in and for said state, personally appeared Marcia Klein, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

STATE OF NEW YORK       )
                       ) ss

COUNTY OF ROCKLAND     )

On the _____ day of _____, in the year 2017, before me, the undersigned, a Notary Public in and for said state, personally appeared Joel Aronson, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

#39217812 v6                               E-5

COMMONWEALTH OF PENNSYLVANIA　　　　)
　　　　　　　　　　　　　　　　　　　　　:
COUNTY OF CUMBERLAND　　　　　　　　　)

On the _____ day of _____A.D. 2017, before me, the undersigned officer, personally appeared Joseph J. Notarianni, who acknowledged himself to be the Vice President of ECKERD CORPORATION, a corporation, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by himself as Vice President.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal.

_____

My Commission Expires:

## EXHIBIT F

## HUDSON VALLEY PLAZA – EXCLUSIVE USES

*Nino & Michaels Unisex Hair Salon (Date of Lease – Nov. 12, 1996)*:

None

*China Wok (Date of Lease – Mar. 10, 1992)*:

None

*First Niagara (Date of Lease – Mar. 22, 1983)*:

None

*Nail Salon (Date of Lease – Jun. 20, 1997)*:

None

*Hudson Valley Community College (Dec. 31, 2010)*:

None

*Price Chopper (Date of Lease – Oct. 19, 2001)*

ARTICLE 11. Lessor's Use Restrictions.

11.1. During the term of this Lease or extension or renewal thereof, Lessor agrees that, for so long as no less than thirty-five thousand (35,000) square feet of ground floor area in the Demised Premises is being used as a supermarket, Lessor will not lease, use, operate or permit to be used any part of the Shopping Center, or any other property adjacent to the Shopping Center now owned or subsequently owned, leased or acquired by Lessor or by any party controlled by Lessor (directly or indirectly) for the operation of a supermarket or convenience store or for the sale of fresh meat and seafood, fresh poultry or fresh vegetables. Provided, further, nothing contained herein shall prevent or prohibit the operation within the Shopping Center of an ice cream store, "Dunkin' Donuts" or similar store, gourmet coffee shop; restaurant, candy store, liquor store, pizza shop or any similar shop if the incidental sale for off-premises consumption of grocery products is not in excess of fifty (50%) of the sales derived from the primary use of the premises.

*Samaritan Hospital (Date of Lease – Jun. 22, 2011)*

5.04. Competition.

(b)     Landlord covenants and warrants that it shall not or hereafter use, lease or sublet any space within the building in which the Demised Premises are located or Shopping Center to any

entity that competes with Tenant including but not limited to, primary care, physician practice, ambulatory care, urgent care, outpatient services, diagnostic services, emergency care or to any entity that competes with the products and services which Tenant will now or shall provide at the Demised Premises that would reasonably be construed as being in direct competition with Tenant.

*Subway (Date of Lease – Sept. 27, 2010)*

5.01. Use.

(a)     Throughout the Term, Tenant shall open and use and occupy the Demised Premises solely for the conduct and operation of a retail store selling submarine sandwiches and other items typically sold by a Subway fast food restaurant (hereinafter referred to as "Permitted Use").  Tenant shall not use or permit, or suffer the use of the Demised Premises, or any part thereof, for any other business or purpose.

23. Representations and Warranties

(vi)     Landlord shall not lease any other premises of the Shopping Center to a tenant whose principal use is Tenant's Permitted Use as defined in subparagraph 5.01(a) herein, as long as Tenant is open and operating in accordance with subparagraph 5.01(a) herein and so long as Tenant is not in default of this Lease in any way, unless said use is allowed pursuant to another tenant's lease in effect at the time this Lease is executed. This exclusive shall be personal to Tenant and not transferable to a subtenant or assignee. This Lease has been entered into by Tenant in reliance upon the foregoing representations and warranties of Landlord.

*HVP Dental (Date of Lease – May 1, 2012)*

5.01. Use

(a)     Throughout the Term, Tenant shall open and use and occupy the Demised Premises solely for the conduct and operation of a full service dental office (hereinafter referred to as "Permitted Use").  Tenant shall not use or permit, or suffer the use of the Demised Premises, or any part thereof, for any other business or purpose.

23. Representations and Warranties

(v)     Landlord shall not lease any other premises of the Shopping Center to a dental office or permit any other premises to be so used, as long as Tenant is open and operating in accordance with subparagraph 5.01(a) herein and so long as Tenant is not in default of this Lease in any way, unless said use is allowed pursuant to another tenant's lease in effect at the time this Lease is executed (Landlord represents that the only tenant leases in effect at the time this Lease is executed that allow said use are the Price Chopper lease and TJ Maxx lease).  This exclusive shall be personal to Tenant and not transferable to a subtenant or assignee (except to an assignee or subtenant permitted by the terms of this Lease).

*TJ Maxx (Aug. 27, 2002)*

SCHEDULE B

4(B)   Landlord agrees that, during the term of this lease (while Tenant is operating in the Demised Premises for such use and for two years thereafter, except if such closure is due to a cause or event of the type described in Articles X or XI or Section 18.3 hereof, in which event the two (2) year time limit shall not toll), no other premises in the Shopping Center (except for Price Chopper and its assignees and sublessees under the Price Chopper lease, or Kohl's in excess of sixty thousand (60,000) square feet or any space which may be occupied by a tenant leasing more than seventy five thousand (75,000) square feet of floor area) shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of apparel, including in the computation of such floor area one-half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of apparel. Upon the expiration or earlier termination of this lease, this exclusive shall be deemed terminated.

*Wendy's* (Date of Lease – Jul. 23, 2002)

16(F).  Warranty of Title By Lessor: Use Restriction

As a material inducement for Lessee to enter into this Lease, Lessor warrants.; covenants and agrees that Lessor will not sell, lease or develop, nor permit the sale, lease or development of any part of Lessor's Larger Tract as set forth on Exhibit B (excepting the Leased Premises) for a restaurant use the primary business of which is the advertising, preparation and/or sale of hamburgers, hamburger products, or chicken sandwiches (or any combination thereof). For purposes of this restriction a restaurant has as its primary business the advertising, preparation and/or sale of hamburgers, hamburger products, or chicken sandwiches (or any combination thereof) if fifteen percent (15%) or more of its gross sales exclusive of tax, beverage and dairy product sales, consist of sales of hamburgers, hamburger products, or chicken sandwiches (or any combination thereof). Notwithstanding, this use restriction does not apply to leases already existing relating to a portion of Lessor's Larger Tract as of the Effective Date of this Lease that allow or permit such competing uses, which leases may be extended or renewed, and which have been disclosed in writing to Lessee prior to the Effective Date; however, Lessor shall not consent, agree or approve of any amendment or modification of such existing leases to permit or allow any such competing uses.

For purposes of this Section, Lessor shall include, but shall not be limited to, any other person, corporation, partnership, or legal entity in which Lessor has, or subsequently acquires, an interest.

Lessor covenants and agrees that all deeds, leases or other legal documents which shall be given or made by Lessor for Lessor's Larger Tract shall contain appropriate restrictions prohibiting the use of said lands or buildings located thereon for the purposes set forth above.

This restriction shall attach and run with Lessor's Larger Land Tract for a period commensurate with the original term and any renewal terms of this Lease and shall be binding upon Lessor's heirs, personal representatives, tenants, successors and assigns.  However, if the use of the Leased Premises changes from a quick service or fast food restaurant specializing in hamburgers to another use for ninety (90) consecutive days or more, the use restrictions shall terminate.  This

restriction shall not apply to uses on Lessor's Larger Tract in existence on the Effective Date which have been disclosed to Lessee in writing prior to the Effective Date.

**HUDSON VALLEY PLAZA – PROHIBITED USES**

*Price Chopper*

ARTICLE 6. Use; Assignment and Subletting.

6.1     Use of the Demised Premises.  The Demised Premises may be used and occupied for the operation of a supermarket and any uses incidental thereto as operated by Lessee from time to time, including, without limitation, an in-store bank, which are not in conflict with the exclusive / prohibited use clauses described on Exhibit 6 attached hereto.  In addition to the foregoing, Lessee shall have the right to use the Demised Premises for any other lawful retail use, provided and on the condition that (i) if applicable, Lessee shall first comply with the provisions of Article 6.3 below, and Lessor shall have failed to exercise its rights set forth in Article 6.3; (ii) Lessee shall give Lessor a detailed description of the new use at least forty-five (45) days prior to its implementation; (iii) the new use or manner of such use does not contain a use described in Article 6.4 below, and (iv) if the new use will be conducted by a sublessee or assignee of Lessee, such new use does not compete with the primary use of, or any exclusive use granted to, any tenant leasing 10,000 square feet or more of ground floor area in the Shopping Center.

EXHIBIT 6

1.     So long as that certain Lease Agreement dated as of May 6, 1983 by and between Lessor and Fay's Drug Company, Inc. (now Eckerd) shall be in effect, (a) so long as the premises demised under said Lease (the "Eckerd Premises") is used principally as a drug store with a pharmacy, the Demised Premises shall not be used as a complete modern drug store nor a store in which items requiring the presence or service of a registered pharmacist are filled or sold, and (b) so long as the Eckard Premises are used as a super modern drug store employing a registered pharmacist, neither the Demised Premises nor any part thereof shall be used for a pharmacy, or principally as a health and beauty discount operation.

2.     So long as that certain Lease dated as of March 5, 1999 by and between Lessor and Wendy's Old Fashioned Hamburgers of New York, Inc. shall be in effect, the Demised Premises shall not be used for a restaurant the primary business of which is the advertising, preparation and/or sale of hamburgers, hamburger products, or chicken sandwiches (or any combination thereof). For purposes of this restriction, a restaurant has as its primary business the advertising, preparation and/or sale of hamburgers, hamburger products, or chicken sandwiches (or any combination thereof) if fifteen percent (15%) or more of its gross sales exclusive of tax, beverage and dairy product sales, consists of sales of hamburgers, hamburger products, or chicken sandwiches (or any combination thereof).

6.4     Prohibited Uses.     No part of or premises in the Shopping Center, including the Demised Premises, shall be used for any one or more of the following uses described in this Article 6.4:

(a)     for any industrial or warehousing purposes; or

(b)     for the conduct of a business operation which as its principal purpose sells merchandise of the types or qualities now commonly known as "odd lot", "distressed", "bankruptcy", "fire sale" or "damaged", it being agreed that a use such as those operated under the trade names "Dollar Store," "Ocean State Job Lot" "Consolidated Stores" or similar operation is permitted; or

F-5

(c)      for any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors (normal restaurant odors shall not be considered to be offensive so as to violate the foregoing); or

(d)      for the operation of a motel, or for similar operations catering to tourists; or

(e)      for any bowling alleys, casinos, betting parlors, night clubs, live entertainment or massage parlors, or the sale or renting of pornographic literature or articles (the foregoing shall not prohibit the sale of adult material incidental to the operation of a video store) it being agreed that (i) a use such as those operated under the trade name "Discovery Zone" or "Chuck E. Cheese", or similar operation is permitted provided that the entrance to such operation shall be at least one hundred fifty (150) feet from the Demised Premises, (ii) a health spa or gymnasium is permitted provided that the entrance to such operation shall be at least one hundred fifty (150) feet from the Demised Premises, and (iii) and a theatre is permitted provided that the entrance to such operation shall be at least two hundred fifty (250) feet from the Demised Premises; or

(f)      for any automobile or truck sales, storage, service, fueling, washing, or repair operations, with the exception of limited repair operations such as a "Monroe Muffler" or "Jiffy Lube" type operations; or

(g)      for boat sales yards and the like; or

(h)      for any office or storage use except (x) office and storage operations which are incidental or part of the conduct of a retail business, or (y) incidental office operations typically found in shopping centers such as insurance agencies, real estate agencies, tax services, beauty salon/barber shop; legal, accounting, optometrist or optician's offices; travel agency; tax preparation office; a pack and mail operation; copy center; finance company, real estate brokerage or insurance office; or

(i)      for (i) gasoline sales, (ii) an on-site dry cleaning processing operation or any other use which would permit on-site dry cleaning processing, but not dry cleaning drop-off, and (iii) any use which, in Lessor's reasonable judgment, is environmentally sensitive and which potentially would impair the value of the Shopping Center.

*TJ Maxx*

SCHEDULE B

4. (A)  Landlord agrees that as long as any retail sales activity shall be conducted in the Demised Premises the Shopping Center shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices and medical, dental and service uses for all of the foregoing limited to ten thousand (10,000) square feet in the aggregate, not being deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema (except in the Price Chopper space), bar, nightclub, discotheque, amusement gallery, poolroom, health club (at least one hundred fifty (150) feet from the Demised Premises and the square footage of the health club shall be counted towards the ten thousand (10,000) square feet referenced above), massage parlor, sporting event, sports or game facility, off-track betting club, or (c) for any establishment which sells or displays pornographic materials, except as may be incidental to a book, record, or video store, provided such sale or display of pornographic materials is not the primary purpose of such store and such materials are

displayed in accordance with first class business practice, or (d) for any establishment which sells or displays used merchandise or second hand goods except in accordance with a first class business practice, such as Game Stop, Strawberries and Play It Again Sports (but not thrift stores or consignment stores of any kind).  No restaurants or establishments selling food prepared on premises for consumption on or off premises shall be located in the Shopping Center except where shown on the Lease Plan as Wendy's and elsewhere in the Shopping Center (provided that additional restaurants in the Shopping Center shall be counted towards the ten thousand (10,000) square feet referenced above).  Provided Landlord is not in default of this Section 4(A), Tenant shall not use the Demised Premises for any of the uses prohibited by this Section 4(A).

5.      The Demised Premises shall not be used in violation of any provision of any other lease existing on the date hereof of space in the Shopping Center which shall give the tenant thereunder an "exclusive" or prohibited use without the consent of such tenant, provided the use prohibited by such "exclusive" is then being conducted under such lease and is enforceable for that use, and provided such exclusive and prohibited use is fully set forth in Schedule F attached hereto.  Landlord warrants and represents that except for the exclusives and prohibited uses set forth on Schedule F, there are no other exclusives or use restrictions which would in any manner be applicable to the Demised Premises.  Landlord will indemnify and hold Tenant harmless from and against any losses, costs, liabilities, damages, fees or expenses of claims suffered or claimed to be suffered as a result of any breach of or any inaccuracies in the representation and warranties set forth in the preceding sentence.

*See also exclusives for Price Chopper, Wendy's and Eckerd/Rite Aid.*

*Hudson Valley Community College; Subway; HVP Dental*

5.01. Use.

(b) . . . Tenant agrees that it will not use the Demised Premises or any part thereof . . .  (x) for the principal activity or exclusive use of another tenant in the Shopping Center or any use prohibited by another tenant's lease in the Shopping Center.

23. Representations and Warranties.

…however, in no event shall any part of the Shopping Center be used for off-track betting, New York State unemployment offices or regional insurance offices;

*Samaritan Hospital*

5.01. Use.

(b)      . . . Tenant agrees that it will not use the Demised Premises or any part thereof . . . (x) for the principal activity or exclusive use of another tenant in the Shopping Center or any use prohibited by another tenant's lease in the Shopping Center.

# EXHIBIT G

## PLANS AND SPECIFICATIONS

3/15/2014, CUB dated 10/30/15 and November 2015 Criteria Bulletin



G-1



Case 25-14831-MBK    Doc 388-28    Filed 05/04/26    Entered 05/04/26 18:30:32    Desc





G-4



G-5

**Sign Code Allows:**

| Sign # | Sign Type | Description | Notes |
|---|---|---|---|
| 1 | Channel letters | 36" letterset  w/ 45" shield logo | Allowed aggregrate of 100SF-proposed 87SF |
|  |  |  |  |
| 9a | Wall plaque | 8" non-illum Clearance DT sign | Permit required-not counted toward aggregrate |
|  |  |  |  |
|  |  |  |  |
| 9d | Wall plaque | 8" non-illum Exit Only DT sign | Permit required-not counted toward aggregrate |
| 9e | Regulatory | 18" non-illum Exit Only traffic signal sign | Permit required-not counted toward aggregrate |
| 11 | Directional | 16" x 36" d/f non-illum directional | Permit required-not counted toward aggregrate |
| 12 | Directional | 16" x 36" d/f non-illum directional | Permit required-not counted toward aggregrate |
|  |  |  |  |
|  |  |  |  |

**Requires Application for Variance:**

| Sign # | Sign Type | Description | Notes |
|---|---|---|---|
| 2 | Channel letters | 36" letterset  w/ 45" shield logo | Exceeds 100SF aggregrate allowed per business |
| 3 | Channel letters | 20" Pharmacy Reverse Channel letters | Exceeds 100SF aggregrate allowed per business |
| 5 | Cabinet | 24" Drive Thru cabinet | Exceeds 100SF aggregrate allowed per business |
| 6 | Cabinet | 24" Drive Thru cabinet | Exceeds 100SF aggregrate allowed per business |
| 7 | Channel letters | 13" Drive Thru Pharmacy w/arrow | Exceeds 100SF aggregrate allowed per business |
| 8 | Channel letters | 13" Drive Thru Pharmacy w/arrow | Exceeds 100SF aggregrate allowed per business |
| 9 | Channel letters | 13" Drive Thru Pharmacy | Exceeds 100SF aggregrate allowed per business |
| 10 | Freestanding | Existing Shopping Center | Exceeds 100SF aggregrate allowed per business |
| 14 | Cabinet | 24"  GNC Live Well | Exceeds 100SF aggregrate allowed per business |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |



SignResource
IDENTITY GROUP

6135 District Blvd • Maywood, CA 90270
800.423.4283 • Fax 323.560.7143
Website: www.signresource.com

RA #10687 TROY, NY  REVISION B  05/02/16

G-6



| 1 | 36" letterset  w/ 45" shield logo |
| 2 | 36" letterset  w/ 45" shield logo |
| 3 | 20" Pharmacy Reverse Channel letters |
| | |
| 5 | 24" Drive Thru cabinet |
| 6 | 24" Drive Thru cabinet |
| 7 | 13" Drive Thru Pharmacy w/arrow |
| 8 | 13" Drive Thru Pharmacy w/arrow |
| 9 | 13" Drive Thru Pharmacy |
| 9a | 8" non-illum Clearance DT sign |
| | |
| | |
| 9d | 8" non-illum Exit Only DT sign |
| 9e | 18" non-illum Exit Only traffic signal sign |
| 10 | Existing Shopping Center |
| 11 | 16" x 36" d/f non-illum directional |
| 12 | 16" x 36" d/f non-illum directional |
| | |
| 14 | 24" GNC Live Well Cabinet |

G-7

RA #10687 TROY, NY_REVISION B_05/02/16



ENTRY ELEVATION
Scale: 1/16" = 1'-0"

LEFT SIDE ELEVATION
Scale: 1/16" = 1'-0"

RIGHT SIDE ELEVATION
Scale: 1/16" = 1'-0"

FRONT SIDE ELEVATION
Scale: 1/16" = 1'-0"

REAR ELEVATION
Scale: 1/16" = 1'-0"

SignResource
IDENTITY GROUP

6135 District Blvd • Maywood, CA 90270
800.423.4283 • Fax 323.560.7143
Website: www.signresource.com

RA #10687 TROY, NY  REVISION B  05/02/16

G-8





**LED ILLUMINATION**

REQUIRED INFO: METHOD OF SERVICE IS REMOVAL OF FACE , 120V, & ELECTRICAL RUN LOCATION IS THROUGH THE BACK

ILLUMINATION VIEW

SIDE VIEW

① 2" x .063 aluminum letter coil painted to Match DRIFT WOOD MICA COOL 20 FACES letter locked to aluminum letter backs
② DRIFT WOOD MICA COOL 20 FACES
③ White LED's siliconed to Face backs
④ Low voltage wiring from power supply
⑤ 4" x 4" Handy Box with switch
⑥ 1/4" Weep holes at low points of letters - Weep hole covers to prevent light leakage
⑦ 1/8" Clear Polycarbonate Letter Backers
⑧ Anchors as required
⑨ Low voltage LED power supplies (120 volt circuit required)
⑩ 1/2" aluminum electrical coupling
⑪ 1/2" chase nipple
⑫ Building facade, CMU-brick, Typ.

161 11/16" (13'-5 11/16")

20" (1'-8")

DRIFT WOOD MICA COOL 20 FACES

FRONT VIEW

PART #: RA0214CVR

**TEMPORARY WHITE BANNER COVERS    QTY: 2**

170"

26"

COVERS PHARMACY LETTERS ONLY
COVERS MUST BE OPAQUE.

SCALE 1:17
22.46 SF

APPROVAL SIGNATURE          DATE
By signing, you are validating the dimensions and graphic provided to SignResource and/or you are handling your own installation.

Please Note: Weights and Measures requirements vary by State, County and Municipality. It is the responsibility of the customer to confirm that these graphics are compliant with all local Regulations, Statues and Ordinances. Compliancy must be confirmed by the party obtaining the permit. SignResource is not liable for misinterpretation of local Weights and Measures requirements or any rule changes that may occur after the order has been placed. If permitting and installation is provided by SignResource, we will make every effort to confirm the signage provided is compliant at the time of installation.

**Sign Resource**
IDENTITY GROUP
6135 District Blvd • Maywood, CA 90270
800.429.4283 • Fax 323.560.7143
Website: www.signresource.com

**REVISION HISTORY:**

| REV | DATE | RECEIVED BY | UPDATED BY |
|---|---|---|---|
| A | 08/11/15 | AH | BS |
| REVISION DESCRIPTION: INITIAL DRAWING |
| B | 10/05/15 | TL | BS |
| REVISION DESCRIPTION: ADDED LED LAYOUT PAGE 2 |

**PARTS LIST:**

| ITEM | DESCRIPTION | |
|---|---|---|
| A | PAINT TO MATCH DRIFTWOOD MICA... | |
| B | DRIFTWOOD MICA COOL 20 PANEL | |
| C | | |
| D | | |
| E | | |
| F | | |

**MATERIAL LIST**

| 1 | 2" ALUMINUM RETURNS |
| 2 | 1/8" CLEAR PLASTIC |
| 3 | LED ILLUMINATION |
| 4 | |
| 5 | |

THIS SIGN IS INTENDED TO BE INSTALLED IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 600 OF THE NATIONAL ELECTRIC CODE AND/OR OTHER APPLICABLE LOCAL CODES. THIS INCLUDES PROPER GROUNDING AND BONDING OF THE SIGN

**GENERAL NOTES**

1. TOLERANCE ( UNLESS NOTED)
• GRAPHICS +/- 1/8" • FACE SIZE +1/16" WC
• CAB INT +/- 1/8" • VINYL OVERLAP = 1/8"+/-1/16"
• ALL COPY LEVEL UNLESS NOTED OTHERWISE
2. V EWING DISTANCE 25' TO 50' UNLESS NOTED OTHERWISE
3. PMS COLOR CALLOUT INDICATES USE OF SPRAYLAT MIX SYSTEM
4. NO DEVIATION OR MATERIAL SUBSTITUTION WITHOUT PEN.
5. ALL ELECTRICAL SIGNS TO COMPLY WITH UL-48

DESCRIPTION:
**RITEAID
2' X 13' SF LED
HALO LIT CHANNEL LETTERS**

| VOLTAGE: | CIRCUIT: | CURRENT: | DESIGN LOAD: |
|---|---|---|---|

| DRAWN BY: BRIAN S. | CHECKED BY: |
| CLIENT: RITEAID |
| LOCATION: |
| QUOTE: | DATE: 08/11/15 |

| DRAWING/PART #: RA20CLHL01-LED | REV. B | SHEET #: 1 OF 2 |

G-10









5"

5.6 SQ. FT.

136" (11'-4")

24" (2'-0")

Scale 3/8" = 1'

1  1"x 1"x .125 Aluminum tube frame
2  Hinged Face: ACM by Reynobond - Scottish Oakwood Grain
3  Pop rivet attachment
4  .080 aluminum backs
5  Sides: ACM by Reynobond - Scottish Oakwood Grain
6  Masonry fasteners used in top section of cabinets
7  Lagbolts used in bottom section of cabinets

WALL

**Detail of Sign Cabinet**
N.T.S.

SCALE: 3/4" = 1'-0"

REVISION HISTORY:

PARTS LIST:

GENERAL NOTES

RITEAID
2' X 11' NL SF
ANCILLARY SIGN CABINET BLANK

RITEAID

MULTIPLE

| QUOTE | DATE |
|---|---|
| 216587 | 04/09/2015 |

RA0211ANC07    A    1 OF 1

G-14

| INFORMATION BAR: | KIT PART NUMBER | PART NUMBER | PAGE NUMBER |
|---|---|---|---|
| **THIS IS A KIT PART ORDER** | **RAACMB10687-KP** | **RA0211ANC07** | **4 OF 6** |





# LED ILLUMINATION

DRIVE THRU PHARMACY →

ILLUMINATION VIEW

DRIVE THRU PHARMACY →

FRONT VIEW

SIDE VIEW

| LETTERS | MATERIAL LIST |
|---|---|
| 1 | 3" X .040 aluminum letter coil painted P-4 letter locked to aluminum letter backs |
| 2 | 1" Trim cap painted P-4 |
| 3 | .125 #2447 White plex faces |
| 4 | White LEDs siliconed to letter backs |
| 5 | Low voltage wiring from power supply |
| 6 | Pre-drilled electrical hole w/ plastic grommet. |
| 7 | 1" x 2" x 1/8" Aluminum Raceway |
| 8 | Masonry fasteners (Min. 3 per raceway) |
| 9 | .063 pre-finished black/white aluminum backs (white to inside) |
| 10 | 1/4" Weep holes or low points of letters |
| 11 | Sheathing by others |
| 12 | Building facade. CMU - Brick (Typ.) |
| 13 | 4" x 4" Honey Box with switch |
| 14 | #12 THHN primary wire |
| 15 | Low voltage LED power supplies (120 volt circuit required) |
| 16 | High voltage rated flexible wire sleeve |

Access to rear of facade to be by others.
Note: All penetrations to be sealed with
BIOSTOP 500 + Intumescent Firestop
Sealant to meet NEC #300.21, ASTM
#E814, UL #1479 and UL #2079 standards.

PART #: RA0210CVR

**TEMPORARY WHITE BANNER COVERS   QTY: 2**

120"

24"

COVERS PHARMACY LETTERS ONLY
COVERS MUST BE WHITE

**APPROVAL SIGNATURE**          **DATE**

By signing, you are validating the dimensions and graphic provided to SignResource and/or you are handling your own installation.

Please Note: Weights and Measures requirements vary by State, County and Municipality. It is the responsibility of the customer to confirm that these graphics are compliant with all local Regulations, Statues and Ordinances. Compliancy must be confirmed by the party obtaining the permit. SignResource is not liable for misinterpretation of local Weights and Measures requirements or any rule changes that may occur after the order has been placed. If permitting and installation is provided by SignResource, we will make every effort to confirm the signage provided is compliant at the time of installation.

**SignResource**
IDENTITY GROUP
6135 District Blvd • Maywood, CA 90270
800.423.4283 • Fax 323.560.7143
Website: www.signresource.com

**REVISION HISTORY:**

| REV | DATE | REQUESTED BY | DRAWN BY |
|---|---|---|---|
| B | 10/05/15 | TI | BS |
| | ADDED LED LAYOUT ON PAGE 3 | | |
| C | 10/16/15 | DS | BS |
| | UPDATED ARTWORK ON PAGE 2 | | |
| D | 11/24/15 | JM | DJ/BS |
| | UPDATED RACEWAY DETAIL ON PAGE 2 | | |

**PARTS LIST:**

| ITEM | DECORATION |
|---|---|
| A | VINYL 3M-3630-59 DARK BROWN |
| B | P-4 5w6076 TURKISH COFFEE |
| C | WHITE |
| D | |
| E | |
| F | |

| | MATERIAL LIST |
|---|---|
| 1 | 3" ALUMINUM RETURNS |
| 2 | 1/8" WHITE PLASTIC FACE |
| 3 | |
| 4 | |
| 5 | |

FIRST SURFACE DECORATION

THIS SIGN IS INTENDED TO BE INSTALLED IN
ACCORDANCE WITH THE REQUIREMENTS OF
ARTICLE 600 OF THE NATIONAL ELECTRIC CODE
AND/OR OTHER APPLICABLE LOCAL CODES.
THIS INCLUDES PROPER GROUNDING AND
BONDING OF THE SIGN

**GENERAL NOTES**

1. TOLERANCE (UNLESS NOTED)
• GRAPHICS +/-1/8" • FACE SIZE +/- 1/16" ½"
• CABINET +/- 1/8" • VINYL OVERLAP + 1/8" +/-1/16"
• ALL COPY LEVEL UNLESS NOTED OTHERWISE
2. VIEWING DISTANCE 25' TO 50' UNLESS NOTED OTHERWISE
3. PMS COLOR CALLOUT INDICATES USE OF SPRAYLAT INKS SYSTEM
4. NO DEVIATION OR MATERIAL SUBSTITUTION WITHOUT ECN.
5. ALL ELECTRICAL SIGNS TO COMPLY WITH UL 48.

DESCRIPTION:
**RITEAID**
APPROX. 1' X 16' SF LED IL
CHANNEL LETTERS WITH ARROW

| VOLTAGE: | CIRCUITS: | CURRENT: | CONNECTED LOAD: |
|---|---|---|---|

DRAWN BY: BRIAN S.          CHECKED BY:

CLIENT: RITE-AID

LOCATION: MULTIPLE

QUOTE:          DATE: 08/06/15

| DRAWING/FILE # | REV | SHEET # |
|---|---|---|
| RA10CLDTPA-LED | D | 1 OF 3 |

G-16



**LED ILLUMINATION**

DRIVE THRU PHARMACY

ILLUMINATION VIEW

9a

# RA0854APC10

4'-6"

6"

**CLEARANCE 10'-0"**

3 SQ FT

**Panel**
.125 Flat Aluminum, paint
GripGuard Brown to match
SW6076 Turkish Coffee
Semi gloss finish  P-1

**Copy**
White Reflective vinyl copy
3M-480-10  V-3

**Facade**
Aluminum Panels (Typ.)

**Mounting**
(1) 8x3 Flat Head
Color Matched Galvanized
Deck Screws to be used
in conjunctions w/ silicone

9e

# RA1818SPEO

18"

**EXIT ONLY**

2⅜"

8¼"

18"

2¾"

3F Traffic Control Sign

2.25 SQ FT

**Rigid**
.125 Alum. paint GripGuard Brown
to match SW6076 Turkish Coffee
(front & back) Semi gloss finish  P-4

**Copy**
White Reflective vinyl copy
3M-480-10  V-5

**Symbol**
Red Reflective vinyl 3M 480-82
w/ White Reflective vinyl detail
3M-480-10  V-5 & V-6

**Facade**
CMU - Brick (Typ.)

9d

# RA0827APEO

2'-3"

6"

**EXIT ONLY**

1.5 SQ FT

**Panel**
.125 Flat Aluminum, paint
GripGuard Brown to match
SW6076 Turkish Coffee
Semi gloss finish  P-4

**Copy**
White Reflective vinyl copy
3M-480-10  V-5

**Facade**
Aluminum Panels (Typ.)

**Mounting**
(4) 8x3 Flat Head
Color Matched Galvanized
Deck Screws to be used
in conjunctions w/ silicone

**COLOR/FINISHES**

| | |
|---|---|
| P-1 | MP 42-202 WHITE |
| P-2 | RUSTOLEUM 9109 WHITE PRIMER |
| P-3 | REYNOBOND OYSTER WHITE |
| P-4 | SW6076 TURKISH COFFEE |
| M-1 | ACM BY REYNOBOND - SCOTTISH OAKWOOD GRAIN |
| V-1 | ARLON 2500-2870 BLUE |
| V-2 | ARLON 2500-2263 RED |
| V-3 | CALON 102 WHITE LOW TAC OPAQUE |
| V-4 | VINYL 3M-3630-59 DARK BROWN |
| V-5 | VINYL 3M-480-10 SCOTCHLITE REFLECTIVE WHITE |
| V-6 | VINYL 3M-480-82 SCOTCHLITE REFLECTIVE RED |
| V-7 | VINYL TO MATCH BM 0C-41 FRENCH CANVAS |

17'-1"

**CANOPIES VARY IN WIDTH
IF DRIVE THRU CANOPY IS LESS THAN 17'-1" FROM THE WALL,
PLEASE CONTACT SIGN VENDOR**

EQ  13'-11"  EQ

**DRIVE THRU PHARMACY**

**CLEARANCE 10'-0"**

3" from
bottom of canopy

Mounted on Exit
side of column (TYP.)

4'-6"

LARGE CANOPY ELEVATION



17'-1"

**EXIT ONLY**

5" from
bottom of canopy

Mounted on Exit
side of column (TYP.)

4'-6"

LARGE CANOPY ELEVATION

17'-1"

EQ  13'-11"  EQ

**DRIVE THRU PHARMACY**

**CLEARANCE 10'-0"**

3" from
bottom of canopy

SMALL CANOPY ELEVATION



**D/F DIRECTIONAL SIGN**
NON-ILLUMINATED                    4 SQ FT

**11**

DRIVE THRU PHARMACY

THANK YOU FOR SHOPPING **RITE AID**

BACK VIEW
SCALE: 1"=1'

**Panels**
.080 flat aluminum panels
PAINTED Sw6076 TURKISH COFFEE

**Copy**
White Reflective vinyl copy
WHITE REFLECTIVE VINYL 3M480-10

**Posts**
PAINTED Sw6076 TURKISH COFFEE

SIDE VIEW
SCALE: 1"=1'

FRONT VIEW

**SignResource**
IDENTITY GROUP

6135 District Blvd • Maywood, CA 90270
800.423.4283 • Fax 323.589.7143
Website: www.signresource.com

**REVISION HISTORY:**

| REV | DATE | REQUESTED BY | DEPARTMENT BY |
|---|---|---|---|
| A | 08/11/15 | AH | BS |

REVISION DESCRIPTION: INITIAL DRAWING

**PARTS LIST:**

| ITEM | DECORATION | |
|---|---|---|
| A | VINYL (TO MATCH SW6076 TURKISH COFFEE) | |
| B | WHITE REFLECTIVE VINYL 3M480-10 | |
| C | | |
| D | | |
| E | | |
| F | | |

**MATERIAL LIST**

| 1 | .080" ALUMINUM PANEL |
|---|---|
| 2 | LOW TAC OPAQUE VINYL |
| 3 | |
| 4 | |
| 5 | |

THIS SIGN IS INTENDED TO BE INSTALLED IN
ACCORDANCE WITH THE REQUIREMENTS OF
ARTICLE 600 OF THE NATIONAL ELECTRIC CODE
AND/OR OTHER APPLICABLE LOCAL CODES.
THIS INCLUDES PROPER GROUNDING AND
BONDING OF THE SIGN

**GENERAL NOTES**

1. TOLERANCE (UNLESS NOTED)
   • GRAPHICS +/- 1/8" • FACE SIZE +/- 1/16" 1/8"
   • CABINET +/- 1/8" • VINYL OVERLAP - 1/8"+/1/16"
   • ALL COPY LEVEL UNLESS NOTED OTHERWISE
2. VIEWING DISTANCE 25' TO 50' UNLESS NOTED OTHERWISE
3. PMS COLOR CALLOUT INDICATES USE OF SPRAYFLAT INKS SYSTEM
4. NO DEVIATION OR MATERIAL SUBSTITUTION WITHOUT ECN.
5. ALL ELECTRICAL SIGNS TO COMPLY WITH UL 48

DESCRIPTION:
**RITEAID**
16" x 36" DF NL
DIRECTIONAL SIGNS

| VOLTAGE: | CIRCUIT: | CURRENT: | DESIGN LOAD: |
|---|---|---|---|

| DRAWING BY: | CHECKED BY: |
|---|---|
| BRIAN S. | |

CLIENT: RITEAID

LOCATION:

SCALE 1:12
4 SF

QUOTE #:                    DATE: 08/11/15

| DRAWING # | REV | SHEET # |
|---|---|---|
| RA0103DIR10 | A | 1 OF 1 |

This document which contains and confidential business information and may not be used, reproduced, published, or otherwise disclosed to any person without the prior express written consent of SignResource. All rights reserved. SignResource holds ownership of copyright.

**APPROVAL SIGNATURE**                    **DATE**

By signing, you are validating the dimensions and graphic provided to SignResource and/or you are handling your own installation.

Please Note: Weights and Measures requirements vary by State, County and Municipality. It is the responsibility of the customer to confirm that these graphics are compliant with all local Regulations, Statues and Ordinances. Compliancy must be confirmed by the party obtaining the permit. SignResource is not liable for misinterpretation of local Weights and Measures requirements or any rule changes that may occur after the order has been placed. If permitting and installation is provided by SignResource, we will make every effort to confirm the signage provided is compliant at the time of installation.

G-19





## WILL OBTAIN FACE MEASUREMENTS BEFORE WE MANUFACTURE







G-22

## **EXHIBIT H**

## **DECLARATION**

H-1

**DECLARATION OF RECIPROCAL EASEMENTS AND RESTRICTIONS**

**THIS DECLARATION OF RECIPROCAL EASEMENTS AND RESTRICTIONS** (this "Declaration") is dated April 24, 2017 between **TROY SRALP, LLC**, a New York limited liability company having an address c/o Nigro Companies, 20 Corporate Woods Boulevard, Albany, New York 12211 ("Troy SRALP"), as owner of Parcel A (hereinafter described), and **HVP 2 LLC**, a New York limited liability company having an address of 22 Jeffrey Place, Monsey, New York 10952 ("HVP") as owner of Parcel B (hereinafter described) (each of Troy SRALP and HVP, an "Owner" and each of Parcel A and Parcel B, a "Parcel").

**R E C I T A L S**

**WHEREAS**, Troy SRALP is the owner of certain real property located in the City of Troy, Rensselaer County, New York constituting all but 0.60 acres of the commercial development known as Hudson Valley Plaza (the "Shopping Center") and more particularly shown as Parcel A on Exhibit A attached hereto (the "Troy SRALP Property") and described on Schedule 1; and

**WHEREAS**, HVP is the owner of real property containing 0.60± acres within the property known as Hudson Valley Plaza and more particularly shown as Parcel B on Exhibit B an described on Schedule 2; and

**WHEREAS**, HVP has determined to develop Parcel B by the construction of a new commercial building containing approximately 14,578 square feet and related site improvements for use by Rite Aid (as hereinafter defined); and

**WHEREAS**, Troy SRALP and HVP desire to provide non-exclusive easements on, over, across and through Parcel A for the benefit of Parcel B and non-exclusive easements on, over, across and through Parcel B for the benefit of Parcel A, subject to the terms and conditions hereinafter set forth, and to impose certain restrictions on Parcel A and Parcel B,

**NOW, THEREFORE**, in consideration of One and 00/100 ($1.00) Dollar and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Troy SRALP and HVP declare as follows:

1.      Definitions.

A.      The term "Driveway" shall mean the driveways shown on the Site Plan attached hereto as Exhibit C and related driveway improvements, paving, curbing, entrances and exits, in the locations on the Parcels as shown on the Site Plan.

B.      The term "Owner" or "Owners" shall mean Troy SRALP and HVP and any and all successors or assigns of such persons as the owner or owners of fee simple title to all or any portion of the Shopping Center, whether by sale, assignment, inheritance, operation of law, trustee's sale, foreclosure, or otherwise, but not including the holder of any lien or encumbrance on such real property.

#33651503 v4

C.      The term "Permittees" shall mean the tenant(s) or occupant(s) of a Parcel (including without limitation Tenants), and the respective employees, agents, contractors, customers, invitees and licensees of the Owner and/or the tenant(s) or occupant(s) of such Parcel.

D.      The term "Rite Aid" shall mean Eckerd Corporation d/b/a Rite Aid (or any of its affiliates, subsidiaries, successors or assigns) or Rite Aid Corporation (or any of its affiliates, subsidiaries, successors or assigns).  Rite Aid shall be deemed a third party beneficiary to this Declaration for so long as the Rite Aid Lease is in effect; provided, however, that nothing contained herein shall be construed as imposing greater liabilities or obligations on Rite Aid than imposed on Rite Aid under the Rite Aid Lease, and in the event of any conflict, the Rite Aid Lease shall control.

E.      The term "Rite Aid Lease" shall mean that Lease of Parcel B from HVP as landlord to Rite Aid as tenant, and any amendments, extensions or replacements thereof.

F.      The term "Tenants" shall mean Rite Aid for so long as the Rite Aid Lease is in effect (and its successors and assigns) and tenants of Parcel A, and "Tenant" shall mean any one of them.  The term "Tenants" shall also include any occupant for a Parcel under a license agreement or other form of occupancy agreement.  The rights of Rite Aid under this Declaration shall be deemed automatically extinguished upon the expiration or sooner termination of the Rite Aid Lease, as though this Declaration had never referred to Rite Aid, except for any rights accruing prior thereto.

2.      Easements.  Subject to any express conditions, limitations or reservations contained herein, Declarant hereby declares that the Parcels, and all Owners and Permittees of the Parcels, shall be benefited and burdened by the following nonexclusive, perpetual and reciprocal easements which are hereby imposed upon the Parcels and all present and future Owners and Permittees of the Parcels:

A.      An easement for reasonable access, ingress and egress over all paved driveways, roadways and walkways as presently or hereafter constructed including, without limitation, the Driveway, so as to provide for the passage of motor vehicles and pedestrians between all portions of the Shopping Center intended for such purposes, and to and from all abutting streets or rights of way furnishing access to such Parcels, as they may exist from time to time.  The Driveway shall be kept open at all times, except for temporary closing for emergencies, maintenance, repair and replacement work or as may be necessary to avoid public dedication thereof, provided the party closing same shall ensure that (unless unable to do so in the event of emergency) at least one other Access Opening (as hereinafter defined) to the Shopping Center remains open and shall provide reasonable advance written notice to all Owners and Tenants and any such actions shall be undertaken only in such a manner so as to minimize any interference with the business of any other Owners and Permittees, including without limitation, minimizing any obstruction to the free flow of traffic and delivery facilities.

B.      An easement over Parcel A (and benefitting Parcel B) so as to enable the construction of the improvements in connection with the development of Parcel B.

2

#33651503 v4

C.    An easement under and across those parts of the Parcels that are not within, under or adjacent to any building areas, for the installation, maintenance, repair and replacement of water mains, storm drains, sewers, water sprinkler system lines, telephone or electrical conduits or systems, cable, gas mains and other utility facilities necessary for the orderly development and operation of the Parcels and each building from time to time located on the Parcels; provided that (i) the rights granted pursuant to such easements shall at all times be exercised in such a manner as not to unreasonably interfere with the normal operation of a Parcel and the businesses conducted therein, (ii) the exact location of any utilities shall be subject to the approval, in the sole but reasonable discretion, of the Owner(s) of the burdened Parcel(s) (and, as to Parcel B, Rite Aid) (all parties hereby approve the location of those utility facilities that are to be installed as part of HVP's initial site work and Rite Aid's work at the Shopping Center pursuant to the terms of the Rite Aid Lease [the "Parcel B Work"], which locations are depicted on the plan(s) attached hereto as Exhibit C, subject, however, to any reasonable modifications thereof that may be required by applicable permitting authorities [the "Parcel B Utility Layout"]), and (iii) except in an emergency, the right of any Owner to enter upon the Parcel of another Owner for the exercise of any right pursuant to such easements shall be conditioned upon providing reasonable prior advance written notice to the other Owner (and, as to any entry upon Parcel B, Rite Aid) as to the time and manner of entry.  All such systems, structures, mains, sewers, conduits, lines and other public utilities shall be installed and maintained below the ground level or surface of the Parcel (except to the extent, as regards the Parcel B Work, that any above ground components of the utility facilities, such as transformers or control panels, are part of the Parcel B Utility Layout).  To be clear, pursuant to subpart (ii) above, other than the Parcel B Utility Layout no additional utility easements affecting either Parcel shall be installed without the consent of the Owner (and, as to Parcel B, Rite Aid) of the burdened Parcel, in such Owner's (and if applicable Rite Aid's) sole but reasonable discretion.

D.    The rights granted by Paragraphs A through C above shall extend to the tenants, occupants, licensees, and invitees, and their respective contractors, employees, agents, successors and assigns of the benefited Parcel.  The exercise of such rights shall not interfere with the use and occupancy of the existing buildings on Parcel A or with construction, and once constructed, the use and occupancy, of the building on Parcel B or the rights of any holders of any easements affecting a Parcel as of the date hereof.

E.    Subject to the waiver of subrogation set forth herein, each Owner having rights with respect to an easement granted hereunder shall indemnify and hold the Owner whose Parcel is subject to the easement harmless from and against all claims, liabilities and expenses (including reasonable attorneys' fees) relating to accidents, injuries, loss, or damage of or to any person or property arising from the negligent, intentional or willful acts or omissions of such indemnifying Owner, its tenants, contractors, employees, agents, or others acting on behalf of such Owner, as applicable, in connection with the use of such easement.

F.    The opening(s) and access point(s) contemplated for use of the Driveway for access to Route 4 (Vandenburgh Avenue) are shown on the Site Plan (such opening(s) and access point(s) are hereinafter called the "Access Openings").  Except as otherwise expressly provided herein, the Driveway and Access Openings shall in no event be blocked, closed, altered, changed or removed, and shall at all times remain in place as shown on the Site Plan. There shall be maintained between the Access Openings a smooth and level grade transition to

3

#33651503 v4

allow the use of the Driveway for pedestrian and vehicular ingress and egress as set forth in Section 2(A) of this Declaration.  Except with respect to the Access Openings, provided there is no materially adverse effect upon the visibility of or access to either of the Parcels and the improvements located thereon, each Owner shall be permitted to maintain curbing, landscaping or other improvements along the boundary line of its Parcel.

G.    Reasonable Use of Easements.

i.    The easements herein above granted shall be used and enjoyed by each Owner and Permittee in such a manner so as not to unreasonably interfere with, obstruct or delay the conduct and operations of the business of any other Owner or Permittee at any time conducted on its Parcel, including, without limitation, public access to and from said business, and the receipt or delivery of merchandise, equipment and fixtures in connection therewith.

ii.    Once commenced, any construction undertaken upon an easement granted herein shall be diligently prosecuted to completion, so as to minimize any interference with the business of any other Owner and Permittee.  In such case, no affirmative monetary obligation shall be imposed upon the other Owner and/or its Tenant and the Owner undertaking such work shall with due diligence repair at its sole cost and expense any and all damage caused by such work and restore the affected portion of the Parcel upon which such work is performed to a condition which is equal to or better than the condition which existed prior to the commencement of such work.  In addition, the Owner undertaking such work shall pay all costs and expenses associated therewith, and shall indemnify and hold harmless the other Owner and its Permittees from all damages, losses, liens or claims attributable to the performance of such work.

3.    No Rights in Public; No Implied Easements.  Nothing contained in this Declaration shall be deemed to be a gift or dedication of any portion of either Parcel to the general public for any public use or purpose whatsoever, it being the intent of the parties that this Declaration is to the exclusive benefit of the parties hereto and their respective tenants, occupants, licensees, invitees, contractors, employees, agents, successors and assigns.

4.    Maintenance

A.    The Owner of each Parcel shall maintain the access drives, drive aisles, parking areas and landscaped areas on its Parcel in good condition and repair, shall remove snow and ice from the paved areas on its Parcel and shall comply with all applicable laws, ordinances, rules and regulations pertaining to the maintenance or condition of its Parcel and shall pay all costs and expenses associated with the foregoing.  Each party shall have the right to close off any portion of its Parcel burdened by the aforesaid easements for such period of time as may be necessary to repair and maintain such areas, but such closure shall not completely close off either Parcel's access to Route 4 (Vandenburgh Avenue).

B.    Each Owner covenants to keep and maintain, at its sole cost and expense, the building(s) located from time to time on its respective Parcel in good order, condition and repair.  Once constructed, in the event of any damage to or destruction of a building on any Parcel, the Owner of such Parcel shall, at its sole cost and expense, with due diligence, either (a)

4

#33651503 v4

repair, restore, rebuild or replace such building to its condition prior to such damage or destruction (or with such changes as shall not conflict with this Declaration), or (b) demolish and remove all damaged or destroyed portions of such building then remaining, including the debris resulting therefrom, and otherwise fill, grade, pave or landscape the area affected by such casualty in a safe and sightly manner.  Nothing contained in Section 4 shall be deemed to allow an Owner (or Tenant, as the case may be) to avoid a more stringent obligation for repair, restoration and rebuilding contained in a Lease or other written agreement between an Owner and such Owner's Permittee.  The Owners acknowledge and agree that a portion of the parking spaces serving Parcel B are located on Parcel A and therefore the Owners shall be jointly responsible for compliance with applicable governmental parking ratio requirements for the Shopping Center taking into account both the vehicular parking requirements for Parcel A and Parcel B.

C.    Each Owner of a Parcel covenants at all times during the term hereof to operate and maintain or cause to be operated and maintained at its expense all areas of its Parcel in good order, condition and repair.  Following the construction of improvements thereon, maintenance of such Parcel shall include, without limitation, maintaining and repairing all sidewalks and the surface of the parking and roadway areas, removing all papers, debris, other refuse, snow and ice from and periodically sweeping all parking and road areas to the extent necessary to maintain the same in a clean, safe and orderly condition, maintaining appropriate lighting fixtures for the parking areas and roadways, maintaining markings, directional signs, lines and striping as reasonably needed, maintaining landscaping, maintaining signage in good condition and repair, and performing any and all such other duties as are reasonably necessary to maintain such Parcel in a clean, safe and orderly condition.  In connection with the requirement to remove snow and ice for its respective Parcel, the Owner of such parcel shall have the right for snow storage on Parcel A, subject to the terms hereof, including but not limited to the requirement that Driveways and Access Openings and ingress and egress thereto, and to and from the Parcels and adjacent streets and roads shall not be unreasonably obstructed.  Each Owner reserves the right to alter, modify, reconfigure, relocate and/or remove the building areas on its Parcel (each, an "Alteration") subject to the conditions below.  Each Alteration shall be subject to the following conditions: (i) the Driveways and Access Openings and ingress and egress thereto, and to and from the Parcels and adjacent streets and roads, shall not be altered, modified, permanently relocated, permanently blocked and/or permanently removed without the express written consent of all Owners and Tenants (such consent to be given or withheld in each such party's sole discretion); (ii) the same shall not violate any of the provisions and easements granted in this Declaration; and (iii) the requirements of this Declaration shall be complied with.

D.    Each Owner shall at all times during the term hereof construct, operate and maintain or cause to be constructed, operated and maintained, in good order, condition and repair, at its sole expense, any utility or other installations serving the Parcel of such Owner and from time to time existing on the Parcel of another Owner pursuant to an easement described herein or otherwise.

5.    <u>Construction of Improvements</u>.  Every building and any other improvements now or in the future constructed on the Shopping Center, shall be constructed, operated and maintained so that the same is in compliance with all applicable governmental requirements and the requirements of this Declaration.

5

6.     Restrictions.

A.     Each Parcel shall be used for lawful purposes in conformance with all restrictions imposed by all applicable governmental laws, ordinances, codes, and regulations, and no use or operation shall be made, conducted or permitted on or with respect to all or any portion of a Parcel which is illegal.

B.     For as long as Price Chopper Operating Co., Inc., its successors or assigns (collectively, "Price Chopper") operate a supermarket in at least thirty five thousand (35,000) square feet of the building located on Parcel A constituting the Price Chopper store (as defined in the Lease Agreement between Troy Commercial Associates Limited Partnership and Price Chopper), the following restrictions shall apply:

i.   No portion of any store or building in the Shopping Center shall be leased, occupied or used for (i) the operation of a supermarket or convenience store or (ii) for the sale of fresh meat and seafood, fresh poultry or fresh vegetables.  Notwithstanding the foregoing, nothing contained herein shall prevent or prohibit the operation within the Shopping Center of an ice cream store, "Dunkin' Donuts" or similar store, gourmet coffee shop, restaurant, candy store, liquor store, pizza shop or similar shop if the incidental sale for off-premises consumption of grocery products is not in excess of fifty (50%) percent of the sales derived from the primary use of the premises.

ii.  No part of any premises in the Shopping Center, including the Price Chopper store, shall be used for any one or more of the following uses described in this Article 6.B:

1.  for any industrial or warehousing purposes; or

2.  for the conduct of a business operation which as its principal purpose sells merchandise of the types or qualities now commonly known as "odd lot," "distressed," "bankruptcy," "fire sale" or "damaged," it being agreed that a use such as those operated under the trade names "Dollar Store," "Ocean State Job Lot," "Consolidated Stores" or similar operation is permitted; or

3.  for any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors (normal restaurant odors shall not be considered to be offensive so as to violate the foregoing); or

4.  for the operation of a motel, or for similar operations catering to tourists; or

5.  for any bowling alleys, casinos, betting parlors, night clubs, live entertainment or massage parlors, or the sale or renting of

6

#33651503 v4

pornographic literature or articles (the foregoing shall not prohibit the sale of adult material incidental to the operation of a video store) it being agreed that (a) a use such as those operated under the trade name "Discovery Zone" or "Chuck E. Cheese," or similar operation is permitted provided that the entrance to such operation shall be at least one hundred fifty (150) feet from the Price Chopper store, (b) a health spa or gymnasium is permitted provided that the entrance to such operation shall be at least one hundred fifty (150) feet from the Price Chopper store, and (c) a theatre is permitted provided that the entrance to such operation shall be at least two hundred fifty (250) feet from the Price Chopper store; or

6. for any automobile or truck sales, storage, service, fueling, washing, or repair operations, with the exception of limited repair operations such as a "Monroe Muffler" or "Jiffy Lube" type operation; or

7. for boat sales or yards and the like; or

8. for any office or storage use except (x) office and storage operations which are incidental or part of the conduct of a retail business, or (y) incidental office operations typically found in shopping centers such as insurance agencies, real estate agencies, tax services, beauty salon/barber shop; legal, accounting, optometrist or optician's offices; travel agency; tax preparation office; a pack and mail operation; copy center; finance company, real estate brokerage or insurance office; or

9. for (a) gasoline sales, (b) an on-site dry cleaning processing operation or any other use which would permit on-site dry cleaning processing, but not dry cleaning drop-off, and (c) any use which, in Price Chopper's reasonable judgment, is environmentally sensitive and which potentially would impair the value of the Shopping Center.

iii. Except as permitted under the Lease Agreement with Price Chopper, no portion of any store or building on Parcel A shall be leased, occupied or used as a drug store with a pharmacy department or principally as a health and beauty discount operation.

C.      For as long as Samaritan Hospital, it successors and assigns (collectively, "Samaritan") use and occupy premises leased to Samaritan pursuant to a Lease with Troy SRALP dated June 22, 2011 for primary care, physician practice, ambulatory care, urgent care, outpatient services, diagnostic services, emergency care or as an extension clinic of an Article 28 facility pursuant to the New York State Public Health Law, no other space in the Shopping Center shall be used for any such purpose or substantially similar purpose.

7

D.      Throughout the term of the Rite Aid Lease it is expressly agreed that, subject to the rights of existing tenants in the Shopping Center as of the date of the Rite Aid Lease, no portion of Parcel A shall be used for the conduct of any store, business, trade or profession (i) which requires or has a license or permit to conduct a pharmacy or which employs or is required to employ a registered or licensed pharmacist, or (ii) for the conduct of any store, business, trade or profession which is called, labeled, named or commonly known or referred to as a drug store, pharmacy or apothecary (collectively, "Drug Store Restriction") or (iii) for the sale of health aids (including, without limitation, over the counter medications, vitamin supplements, mineral supplements and medical equipment) (the "Health Aid Restriction"), (iv) for the sale of beauty aids (including, without limitation, hair care products and cosmetics) (collectively, the "Beauty Aid Restriction"), (v) for use as a health care services clinic or any clinic of that nature whatsoever, including but not limited to so-called "Convenient Care Clinics", walk-in urgent care clinics, Retail-based Clinics, and the like, or (vi) for use as a clinic or other facility in which injections are administered, including but not limited to immunizations, flu shots and the like.  Retail-based Clinics or Convenient Care Clinics shall mean: any retail space used, in any manner, for the provision of health care services that are typically provided by nurse practitioners (any RN level nurse and beyond), physician assistants or physicians.  The aforementioned health care services may include, but in no way or limited to, the following: the treatment of common medical conditions, administration of health screenings, vaccinations/immunizations, and other such procedures.  Neither the Health Aid Restriction nor the Beauty Aid Restriction shall be deemed to prohibit the incidental sale of health and/or beauty aids by either Owner's other Tenants operating within the Shopping Center primarily as a barber or hair salon provided that such sales do not exceed five percent (5%) of the gross sales of such tenant or occupant.  The provisions of this Section 6(D) shall remain in full force and effect regardless of whether Rite Aid is operating on Parcel B.  Notwithstanding the foregoing, the Drug Store Restriction, the Health Aid Restriction and the Beauty Aid Restriction shall not apply to the premises currently occupied by Price Chopper in the Shopping Center, nor shall all other exclusives and restrictions as set forth in this Section 6(D) (including, but not limited to the Clinic restriction) apply to the premises occupied by Price Chopper, so long as all or substantially all of the premises occupied by Price Chopper as of the Effective Date of the Rite Aid Lease continues to be occupied by Price Chopper or another single tenant.

7.      Taxes and Assessments; Insurance.  Each Owner shall pay all taxes, assessments, or charges of any type levied or made by any governmental body or agency with respect to its Parcel.  Each Owner shall procure and maintain general and/or comprehensive public liability and property damage insurance against claims for personal injury (including contractual liability arising under the indemnities contained in this Declaration), death, or property damage occurring upon such Owner's Parcel, with single limit coverage of not less than an aggregate of Three Million Dollars ($3,000,000) including umbrella coverage, if any, and naming each other Owner and Rite Aid (during the continuance of the Rite Aid Lease) as additional insureds; all such insurance policies shall include a waiver of subrogation clause or endorsement denying the insurer any rights of subrogation against any other Owner or Permittee for all claims, losses, damages and the like covered by such policy.  Notwithstanding anything in the foregoing to the contrary, such insurance shall not be required to cover any building, including any interior space within a building.

8

8.      Remedies and Enforcement.

A.      In the event of a breach or threatened breach by any Owner or its Permittees of any of the terms, covenants, restrictions or conditions hereof, the other Owner (and with respect to Parcel B, Rite Aid) shall be entitled forthwith to full and adequate relief by injunction and/or all such other available legal and equitable remedies from the consequences of such breach, including payment of any amounts due and specific performance.  Notwithstanding anything in this Declaration to the contrary, no Owner or Permittee shall be liable hereunder for any consequential damages.  In the event of a violation or threat thereof with respect to any of the provisions of Sections 2 and/or 4 and/or 6 of this Declaration, each Owner agrees that such violation or threat thereof may cause the nondefaulting Owner and/or its Permittees to suffer irreparable harm and such nondefaulting Owner and its Permittees may have no adequate remedy at law.  As a result, in the event of a violation or threat thereof of any of the provisions of Sections 2 and/or 4 and/or 6 of this Declaration, the nondefaulting Owner and its Permittee, in addition to all remedies available at law or otherwise under this Declaration, shall be entitled to seek injunctive or other equitable relief to enjoin a violation or threat thereof of Sections 2 and/or 4 and/or 6 of this Declaration.

B.      If a Parcel Owner defaults in the performance of any of its obligations under this Declaration and fails to cure such default within thirty (30) days following the date it is notified in writing of such default, Rite Aid or the other Parcel Owner will have the right, but not the obligation, without waiving or releasing any other right or remedy in connection with such default, to cure such default for the account of the defaulting Owner.  In such event, the defaulting Owner shall, upon demand, reimburse the non-defaulting Owner or Rite Aid for all costs and expenses incurred by the non-defaulting Owner or Rite Aid in curing such default together with interest at the rate of ten percent (10%) per annum (but in no event to exceed the maximum rate of interest allowed by law).  Notwithstanding the foregoing, in the event of (i) an emergency, and/or (ii) blockage or material impairment of any easement right, the affected Owner or Rite Aid may immediately cure the same and be reimbursed by the defaulting Owner upon demand for the reasonable cost thereof together with interest at the rate of ten percent (10%) per annum, as described above.

C.      Any claim for reimbursement, including interest as aforesaid, and all costs and expenses including reasonable attorneys' fees awarded by a court of competent jurisdiction to any Owner or Rite Aid in enforcing any payment in any suit or proceeding under this Declaration shall be assessed against the defaulting Owner in favor of the prevailing party and shall constitute a lien (the "Assessment Lien") against the Parcel of the defaulting Owner until paid, effective upon the recording of the Assessment Lien in the Office of the Recorder of Rensselaer County, New York (to be clear, an Assessment Lien does not exist unless and until it is recorded as just described); provided, however, that any such Assessment Lien shall be automatically subject and subordinate to (i) liens for taxes and other public charges which by applicable law are made superior, (ii) all mortgages (including any future advances under said mortgages and any future amendments or modifications of such mortgage) given in good faith and for value to a bona fide third party mortgagee, recorded before the recording of the Assessment Lien; (iii) any other types of liens recorded in the Office of the Recorder of Rensselaer County, New York, prior to the date of recordation of said notice of lien, and (iv) all leases (including assignments thereof, and subleases thereof, and any amendments or

9

modifications of such leases) entered into, whether or not recorded, before the recording of such Assessment Lien.  All liens recorded subsequent to the recordation of the notice of lien described herein shall be junior and subordinate to the Assessment Lien.  Upon the timely curing by the defaulting Owner of any default for which a notice of lien was recorded, the party recording same shall record an appropriate release of such notice of lien and Assessment Lien.

9.    Covenants to Run with Land.  This Declaration and all of the rights and obligations set forth herein are intended to be appurtenant to the land, to run with the land, and to bind, benefit and burden as the case may be the parties and their respective successors and assigns, including without limitation, their tenants.

10.    Grantee's Acceptance.  The grantee of any Parcel or any portion thereof, by acceptance of a deed conveying title thereto, whether from a party hereto or from a subsequent Owner of such Parcel, shall accept such deed or contract upon and subject to each and all of the easements, covenants, conditions, restrictions and obligations contained herein.  By such acceptance, any such grantee shall for itself and its successors, assigns, heirs, and personal representatives, covenant, consent, and agree to and with the other party, to keep, observe, comply with, and perform the obligations and agreements set forth herein with respect to the property so acquired by such grantee.  Notwithstanding the foregoing, the obligations under this Declaration are only personal to and enforceable against the Owner of Parcel A and Parcel B, as the case may be, with respect to obligations, liabilities of claims arising or occurring during the period in which such Owner owns Parcel A or Parcel B, as the case may be.

11.    Survival of Declaration.  In the event that Parcel A and Parcel B are held in common ownership now or any time in the future, this Declaration and the rights and obligations provided for herein shall not be extinguished by operation of law unless, and subject to Section 13 below, the common Owner of Parcel A and Parcel B causes a document to be recorded in the Rensselaer County Clerk's Office terminating this Declaration.

12.    Notices.  All notices, requests, demands and other communications which are required or may be given under this Declaration must be in writing and sent to the intended recipient at the address set forth above (or with respect to Rite Aid, as set forth below) or at such other address within the United States as the intended recipient previously designated by written notice to the other Owner.  Notices will be deemed to have been duly given (1) when received, personally delivered, (2) the day after being sent, if sent for next day delivery by nationally recognized overnight delivery service  (e.g., FedEx, UPS) and (3) the third day after being sent, sent by certified registered mail, return receipt requested.

|  |  |
|---|---|
| Rite Aid: | Eckerd Corporation d/b/a Rite Aid<br>c/o Rite Aid Corporation<br>P.O. Box 3165<br>Harrisburg, Pennsylvania 17105<br>Attn:  Joseph J. Notarianni, Jr. |
| With copies to: | Eckerd Corporation d/b/a Rite Aid<br>c/o Rite Aid Corporation<br>30 Hunter Lane<br>Camp Hill, Pennsylvania 17011<br>Attn:  Joseph J. Notarianni, Jr. |

10

#33651503 v4

Pepper Hamilton LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103
Attn:  Matthew J. Swett, Esquire

13.     Amendments.  This Declaration may be amended only by a written agreement signed and acknowledged by the then Owners of Parcel A and Parcel B and recorded in the office land records of Rensselaer County, New York.  Notwithstanding the foregoing, during the term of the Rite Aid Lease, no termination of this Declaration, and no modification or amendment of this Declaration shall be made nor shall the same be effective unless the same has been expressly consented to in writing by Rite Aid.

14.     Attorneys' Fees.  If the Owner of either Parcel brings an action to enforce or interpret this Declaration, the non-prevailing party shall, upon demand of the prevailing party, pay the reasonable attorney's fees (in such amounts as may be determined reasonable by the court) and court costs of the prevailing party.

15.     Severability.  If any provision of this Declaration is declared by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Declaration will remain in full force and effect.

16.     Entire Agreement.  This Declaration sets forth the entire agreement of Troy SRALP and HVP with respect to the subject matter of this Declaration and supersedes all prior understandings and agreements between said Owners.

17.     Governing Law.  This Declaration is governed by the laws of the State of New York without giving effect to principles of conflict of laws.

18.     No Termination for Breach.  Notwithstanding anything to the contrary in this Declaration, no breach hereunder shall entitle any Owner to cancel, rescind, or otherwise terminate this Declaration.  No breach hereunder shall defeat or render invalid the lien of any mortgage or deed of trust upon any Parcel made in good faith for value, but the easements, covenants, conditions and restrictions hereof shall be binding upon and effective against any Owner of such Parcel covered hereby whose title thereto is acquired by foreclosure, trustee's sale, or otherwise.

19.     Term.  The easements, covenants, conditions and restrictions contained in this Declaration shall be effective commencing on the date of recordation of this Declaration in the Rensselaer County, New York official land records, and shall remain in full force and effect thereafter in perpetuity (except where this Declaration may expressly provide that a certain restriction or restrictions do not survive in perpetuity), unless this Declaration is modified, amended, canceled or terminated in accordance with Section 13 hereof.  If any of the restrictions described in this Declaration is deemed to expire or terminate at any time during the term hereof due to any statute or other legal requirement, each Owner (and the applicable Tenants, if required) shall cooperate to cause such restriction to be extended or renewed (and any such

11

#33651503 v4

extension or renewal to be recorded in the chain of title for each of the Parcels) in accordance with applicable laws prior to such expiration or termination.

20.    Estoppel Certificates.  Each Owner and Rite Aid, within thirty (30) days following its receipt of a written request from the other Owner(s) or Rite Aid, shall from time to time provide the requesting Owner or Rite Aid, a certificate binding upon such Owner or Rite Aid stating:  (a) to such party's knowledge, whether any party to this Declaration is in default or violation of this Declaration and if so identifying such default or violation; and (b) to such party's knowledge, whether this Declaration is in full force and effect; and (c) such other reasonable information concerning this Declaration as the requesting Owner (or Rite Aid) may reasonably require.

21.    Bankruptcy.  In the event of any bankruptcy affecting any Owner or Permittee, the parties agree that this Declaration shall, to the maximum extent permitted by law, be considered an agreement that runs with the land and that is not rejectable, in whole or in part, by the bankrupt person or entity.

[Remainder of Page Intentionally Left Blank – Signature Page Follows]

12

#33651503 v4

**IN WITNESS WHEREOF,** the parties have executed this Declaration as of the day and year first written above.

**TROY SRALP, LLC**

By: Troy Management, LLC, Managing Member

By: _____

Name: Joel Aronson

Title: _____

**HVP 2 LLC**

By: _____

Marcia Klein, Member

STATE OF NEW YORK              )
                              ) ss
COUNTY OF _____Rockland_____   )

On the 10th day of April , in the year 2017, before me, the undersigned, a Notary Public in and for said state, personally appeared Joel Aronson, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

SHANDEL I STRASBERG
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ST6100044
Qualified in Rockland County
Commission Expires Oct. 14, 20__

STATE OF NEW YORK              )
                              ) ss
COUNTY OF _____Rockland_____   )

On the 10th day of April , in the year 2017, before me, the undersigned, a Notary Public in and for said state, personally appeared Marcia Klein, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

SHANDEL I STRASBERG
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ST6100044
Qualified in Rockland County
Commission Expires Oct. 14, 20__

Declaration of Reciprocal Easements and Restrictions

# EXHIBIT A

## Parcel A

(Excluding the cross-hatched area)



## EXHIBIT B

### Parcel B



## EXHIBIT C

Site Plan





## SCHEDULE 1

<u>Parcel A Description</u>

## LEGAL DESCRIPTION OF SHOPPING CENTER PARCEL

ALL that certain plot, piece or parcel of land, together with the buildings and improvements thereon erected, situate lying and being in the City of Troy, County of Rensselaer, State of New York, being more particularly bounded and described as follows.

BEGINNING at a point on the westerly boundary of Vandenburg Avenue, otherwise known as US Route 4, said highway boundary being more fully shown on Map No 26 as Parcel No. 29, dated August 2, 2000, for the reconstruction of a portion of the City of Troy: Vandenburg Avenue, on file in the Office of the State Department of Transportation, as it is intersected by the division line between the City of Troy on the north and the Town of North Greenbush on the south,

Thence:  S 84°29'30"W along said division line 1,053.47 feet to a point, being S 33°09'10"W, 0.36 feet from a capped iron rod found on the northerly line of lands of National Grid, formerly Niagara Mohawk,

Thence: N 67°33'40" W along the lands of National Grid 61.24 feet to a point, being S66"18'35"W, 0.57 feet from a capped iron rod found,

Thence: N 16°36'50" W continuing along said lands 31.90 feet to a point, being S 71°08"15"W, 0.35 feet from a capped iron rod found,

Thence: S 84°29'30" W still along said lands 52.87 feet to a point, being N 30°22'45" W, 0.19 feet from a capped iron rod found,

Thence: N 67°33'40" W still along said lands 75.40 feet to a point, being S 89°38'10" E, 0.78 feet from a capped iron rod found,

Thence: N 02°13'50" E in part along said lands of National Grid and the lands of Hudson Valley Dorms, Inc. on the west, 100.00 feet to a point,

Thence: N 02°13'50" E along a prolongation of said line 36.00 feet more or less to the centerline of a creek,

Thence running in a general northwesterly and westerly direction along the centerline of said creek, as it winds and turns, 680.00 feet more or less, to a point on the division line between the lands of Hudson Valley Dorm, Inc. on the west and herein described parcel on the east,

Thence: N 19°32'00" E along said division line 15.00 feet to an iron rod found, said point being distant S 81°48'30" E 562.66 feet from the aforesaid point, lying 36.00 feet southerly of the centerline of the creek,

A-1-1

Thence: N 19°32'00" E continuing along said division line 411.90 feet to a capped iron rod found, for a total distance of 427.00 feet more or less,

Thence: N 73°32'00" E in part along the southerly line of lands of Hudson Valley Dorms, Inc., the southerly line of Crestwood Development as shown on a plan filed in the Rennselaer County Clerk's Office in Drawer 46 as Map 34, the southerly line of lands of Brentwood Avenue & Hayden Lane also showing lot layout, as shown on a Survey & Map by King & Danskin on file in the Rennselaer County Clerk's Office in Drawer 58 as Map 2 and a portion of the lands of Kathleen L Sousa, 1,254.00 feet to an iron rod found on the westerly line of lands of SEFCU,

Thence: S 19°49'20" E continuing along the lands of SEFCU 90.00 feet to a point, being S 56°18'20"W, 0.44 feet from a square iron found,

Thence: N 72°42'10" E still along said lands 197.20 feet to a point on the westerly margin of Vandenburg Avenue,

Thence: S 16° 48' 34" E along Vandenburg Avenue 157.92 feet to the northerly corner of aforesaid Parcel No 29 being a capped iron rod found,

Thence the following seven courses and distances along the westerly lines of the reconstructed Vandenburg Avenue:

1. S 15°07'49" E 292.11 feet to an iron found,
2. S 23°06'34° W 45.84 feet to a point,
3. S 16°19'28" E 159.45 feet to a capped iron found,
4. S 34°53'35" E 74.02 feet to an iron found,
5. S 14°38'15" E 88.60 feet to an iron found,
6. S 11°26'22" W 21.42 feet to a capped iron found,
7. S 15°13'03" E 81.27 feet to the point or place of beginning.

For Information Only:
Premises being known as 79 Vandenburg Avenue, Troy NY 12180
Section 123.21 Block: 1 Lot 2

Said parcel of land containing about 26.9 acres of land more or less

This description is in accordance with a survey made by RDM Surveying Consultants dated April 15, 2013 as Project No. "City South Block 1 2013-2871"

Exempting and reserving from the above described premises the following parcel:

ALL THAT PIECE OR PARCEL OF LAND SITUATE IN THE CITY OF TROY, COUNTY OF RENSSELAER AND THE STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT LOCATED WITHIN THE LANDS NOW OR FORMERLY OF TROY SRALP, LLC, SAID POINT BEING LOCATED NORTH 52°40'00" WEST, 131.77 FEET FROM A POINT LOCATED ALONG THE WESTERLY BOUNDARY OF

VANDENBURGH AVENUE, (ROUTE 4) SAID HIGHWAY BOUNDARY BEING MORE FULLY SHOWN ON MAP NO. 26 AS PARCEL 29, DATED AUGUST 2, 2000 FOR THE RECONSTRUCTION OF A PORTION OF THE CITY OF TROY, VANDENBURGH AVENUE, ON FILE IN THE OFFICE OF THE STATE DEPARTMENT OF TRANSPORTATION, AS IT IS INTERSECTED BY THE DIVISION LINE BETWEEN THE CITY OF TROY ON THE NORTH AND THE TOWN OF NORTH GREENBUSH ON THE SOUTH; THENCE THROUGH THE AFORESAID LANDS OF TROY SRALP, LLC, THE FOLLOWING FOUR COURSES: 1) SOUTH 72°46'25" WEST, 135.00 FEET TO A POINT; 2) NORTH 17°13'35" WEST, 195.00 FEET TO A POINT; 3) NORTH 72°46'25" EAST, 135.00 FEET TO A POINT AND 4) SOUTH 17°13'35" EAST, 195.00 FEET TO THE POINT OR PLACE OF BEGINNING.

ALL AS SHOWN ON A MAP ENTITLED "SUBDIVISION AND SITE PLAN OF TROY SRALP, LLC, PREPARED BY RDM SURVEYING CONSULTANTS, DATED NOVEMBER 19, 2013, LAST REVISED NOVEMBER 19, 2013 AND FILED IN THE RENSSELAER COUNTY CLERKS OFFICE AS MAP NO. 2013-168.

CONTAINING IN ALL 26,325 SQUARE FEET OF LAND BEING MORE OR LESS

## SCHEDULE 2

Parcel B Description
**LEGAL DESCRIPTION OF PREMISES PARCEL**

ALL THAT PIECE OR PARCEL OF LAND SITUATE IN THE CITY OF TROY, COUNTY OF RENSSELAER AND THE STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT LOCATED WITHIN THE LANDS NOW OR FORMERLY OF TROY SRALP, LLC, SAID POINT BEING LOCATED NORTH 52°40'00" WEST, 131.77 FEET FROM A POINT LOCATED ALONG THE WESTERLY BOUNDARY OF VANDENBURGH AVENUE, (ROUTE 4) SAID HIGHWAY BOUNDARY BEING MORE FULLY SHOWN ON MAP NO. 26 AS PARCEL 29, DATED AUGUST 2, 2000 FOR THE RECONSTRUCTION OF A PORTION OF THE CITY OF TROY, VANDENBURGH AVENUE, ON FILE IN THE OFFICE OF THE STATE DEPARTMENT OF TRANSPORTATION, AS IT IS INTERSECTED BY THE DIVISION LINE BETWEEN THE CITY OF TROY ON THE NORTH AND THE TOWN OF NORTH GREENBUSH ON THE SOUTH; THENCE THROUGH THE AFORESAID LANDS OF TROY SRALP, LLC, THE FOLLOWING FOUR COURSES: 1) SOUTH 72°46'25" WEST, 135.00 FEET TO A POINT; 2) NORTH 17°13'35" WEST, 195.00 FEET TO A POINT; 3) NORTH 72°46'25" EAST, 135.00 FEET TO A POINT AND 4) SOUTH 17°13'35" EAST, 195.00 FEET TO THE POINT OR PLACE OF BEGINNING.

ALL AS SHOWN ON A MAP ENTITLED "SUBDIVISION AND SITE PLAN OF TROY SRALP, LLC, PREPARED BY RDM SURVEYING CONSULTANTS, DATED NOVEMBER 19, 2013, LAST REVISED NOVEMBER 19, 2013 AND FILED IN THE RENSSELAER COUNTY CLERKS OFFICE AS MAP NO. 2013-168.

CONTAINING IN ALL 26,325 SQUARE FEET OF LAND BEING MORE OR LESS

TOGETHER WITH A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS BETWEEN THE ABOVE-DESCRIBED PARCEL AND VANDENBURG AVENUE A/K/A US ROUTE 4, OVER THE DRIVEWAYS PRESENTLY EXISTING AND HEREAFTER CONSTRUCTED ON THE REMAINING LANDS OF TROY SRALP, LLC.

## EXHIBIT I

### DELIVERY DATE CERTIFICATE

Eckerd Corporation d/b/a Rite Aid
c/o Rite Aid Corporation
P.O. Box 3165
Harrisburg, PA 17105
Attn:   Joseph Notarianni
Vice President - Real Estate Law

_____, 2017

Dear Tenant:

Reference is hereby made to that certain Lease between ECKERD CORPORATION d/b/a RITE AID and the undersigned dated _____, 2017 (the "Lease").  All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Lease.

The undersigned hereby acknowledges and certifies that as of the date hereof the requirements for the Delivery Date have been completed as follows:

1.      Exclusive physical possession of the Premises (in accordance with Article 7 of the Lease) has been delivered to Tenant, including the satisfaction of the Lease contingencies (as set forth in Article 41 of the Lease).

2.      The Premises does not contain any Hazardous Substances (as defined in the Lease).

3.      The undersigned has delivered proof to Tenant that the liens and title exceptions set forth on **Exhibit A-3** of the Lease have been paid, satisfied, or otherwise released, without condition, as to the Premises, copies of such proof are attached hereto as Schedule 1; and the Premises are free from all encumbrances, liens, defects in title, violations of law, leases, tenancies, easements, restrictions and agreements, except the Permitted Encumbrances.

Sincerely,

_____

By: _____
Name: _____
Title: _____

[Schedules to be attached]

I-1