**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

ANSELL GRIMM & AARON, P.C.
Anthony D'Artiglio, Esq.
Nicole A. Benis, Esq.
Ansell Grimm & Aaron, P.C.
1500 Lawrence Avenue
Ocean, New Jersey 07712
Tel:  (732) 922-1000
E-mail:  adartiglio@ansell.law
         nbenis@ansell.law

*Attorneys for Creditor Aztec Inn L.P.*

Chapter 11

Case No. 25-14831 (MBK)

**Hearing Date and Time:**
**June 30, 2026, at 11:30 a.m. (ET)**

Honorable Michael B. Kaplan, U.S.B.J.

In re:

LAKEHURST AND BROADWAY
CORPORATION,

Debtor.[1]

**CREDITOR AZTEC INN L.P.'S OBJECTION TO DEBTOR'S FIRST NOTICE OF**
**SATISFACTION OF CLAIMS AT DOCKET ENTRY 413**

1. Creditor, Aztec Inn, L.P. ("Aztec Inn") submits this objection to Debtor Lakehurst and Broadway Corporation's First Notice of Satisfaction of Claims, Docket Entry ("D.E.") 413 by and through the undersigned counsel.

2. On Ocotber 15, 2025, Aztec Inn filed a proof of claim ("POC") in the amount of $664,034.35 with $29,055.82 of the POC as an administrative priority under 11 U.S.C. § 503(b)(9) for a total sum of $693,090.17. Aztec Inn's POC is listed as claim number 2148. Annexed hereto as **Exhibit A** is a true and correct copy of the Ocotber 15, 2025 POC.

3.      Aztec Inn's POC was filed in the *In re New Rite Aid, LLC* matter, bearing docket number 25-14861.  *See* **Exhibit A**.

4.      To date, Aztec Inn's administrative expense claim in the amount of $29,055.82 has yet to be satisfied by the Debtor.

5.      As such, Aztec Inn objects to Debtor's request for the POC to be expunged.

6.      Further, Aztec Inn hereby requests information regarding when the administrative expense claim will be paid by the Debtor.

**WHEREFORE,** for the foregoing reasons, Aztec Inn's POC cannot be expunged.

Respectfully submitted,

ANSELL GRIMM & AARON, P.C.

By:     */s/ Nicole A. Benis*
        Nicole A. Benis, Esq.
        Anthony J. D'Artiglio, Esq.
        *Attorneys for Creditor Aztec Inn, L.P.*

Dated:  June 23, 2026

# EXHIBIT A

United States Bankruptcy Court for the District of New Jersey

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|

**Debtor:** New Rite Aid, LLC

**Case Number:** 25-14861

Modified Official Form 410

# Proof of Claim

4/25

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. | **Who is the current creditor?** | Aztec Inn LP |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor |

| 2. | **Has this claim been acquired from someone else?** | ☑ No |
|---|---|---|
| | | ☐ Yes. From whom? |

| 3. | **Where should notices and payments to the creditor be sent?** | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Address1: c/o Anthony J. D'Artiglio, Esq. | Address1: |
| | | Address2: Ansell Grimm & Aaron, P.C. | Address2: |
| | | Address3: 365 Rifle Camp Road | Address3: |
| | | Address4: | Address4: |
| | | City: Woodland Park | City: |
| | | State: NJ | State: |
| | | Postal Code: 07424 | Postal Code: |
| | | Country: | Country: |
| | | Contact phone 9732479000 | Contact phone |
| | | Contact email adartiglio@ansell.law | Contact email |
| | | **Uniform Claim Identifier (if you use one)** | |

| 4. | **Does this claim amend one already filed?** | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ MM / DD / YYYY | |

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

**Claim Number: 2148**                    **Proof of Claim**                    page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$ 664034.35 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Unpaid rent, CAM, taxes, etc.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☐ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☐ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | | **Amount entitled to priority** |
|---|---|---|
| | ☐ No | |
| | ☐ Yes. *Check one:* | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☐ No<br><br>☑ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $ 29055.82 |
|---|---|---|

---

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Anthony J. D'Artiglio, Esq.*        10/15/2025

_____        _____
Electronic Signature                Date

**Name of the person who is completing and signing this claim**

Name                Anthony J. D'Artiglio, Esq.

_____
First name          Middle name          Last name

Title/Company       Attorney/Ansell Grimm & Aaron, P.C.

Identify the corporate servicer as the company if the authorized agent is a servicer.

365 Rifle Camp Road

Address

_____
Number       Street

Woodland Park          NJ          07424

City                State          ZIP Code     Country

Contact phone       9732479000          Email   adartiglio@ansell.law

**Proof of Claim**                                                  page 3

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:

Address2:

Address3:

Address4:

City:
State:
Postal Code:
Country:


Contact Phone:
Contact Email:

---

**Additional Address 2**
Name:
Address1:
Address2:

Address3:

Address4:
City:
State:
 Postal Code:

 Country:


Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes

☐ No

--------------------------------------------------------------------------------------------------

 Attachment Filename:

Attachments to Proof of Claim.pdf

KROLL

**<u>Calculation for Outstanding Balance Under Lease For Rite Aid—Aztec Inn LP</u>**

**General Rent Calculations**

-One year of rent from petition date (earlier date than rejection of the lease): $186,604.80 (¶ 2 of First Amendment to Lease)

-Monthly rent due on 1st of every month: $15,550.40 (¶ 2 of First Amendment to Lease)

- One day of rent ($186,604.80/365 days) = $511.25

**Unsecured Claim Calculation**

- May rent pre-petition (May 1st to May 4th): $2,044.98

-May rent post-petition (May 5th to May 31st) accounts for $13,505.42

- CAM (Landscaping): $1,500

-Maintenance/ Damage to Roof: $10,000

-Utilities (Water & Electric): $384.35

- Late payment fee of 3% of basic rent amount, if rent is not paid within 5 days of written late notice (¶ 6 (c) of Lease) for May & June rents: $933.00 (breakdown below)

May rent: 15,550.40 x 3%=466.51

June rent: 15,550.40 x 3%=466.51

Total 3% late fees for May and June 2025: $933.02


- 9.25% prime rate on unpaid rent until payment date →(¶ 19(a) (iv) of Lease).

15,550 x 9.25%=1438.41 (increased interest for May)

Increased interest for June because didn't pay June

Increased prime rate for May and June= 1438.41+1438.41=2876.82 (increased prime rent for May and June)


**<u>1-Year Rent Analysis</u>**

5/1/25: 15,550.40

6/1/25: 15,550.40

7/1/25: 15,550.40

8/1/25: 15,550.40

1

9/1/25: 15,550.40

10/1/25: 15,550.40

11/1/25: 15,550.40

12/1/25: 15,550.40

1/1/26: 15,550.40

2/1/26: 15,550.40

3/1/26: 15,550.40

4/1/26: 15,550.40

**Total: 186,604.80**

**3-year analysis:**

**Year 1**

5/1/25: 15,550.40

6/1/25: 15,550.40

7/1/25: 15,550.40

8/1/25: 15,550.40

9/1/25: 15,550.40

10/1/25: 15,550.40

11/1/25: 15,550.40

12/1/25: 15,550.40

1/1/26: 15,550.40

2/1/26: 15,550.40

3/1/26: 15,550.40

4/1/26: 15,550.40

**Total: 186,604.80**

**Year 2**

5/1/26: 15,550.40

6/1/26: 15,550.40

7/1/26: 15,550.40

8/1/26: 15,550.40

9/1/26: 15,550.40

10/1/26: 17,105.44

11/1/26: 17,105.44

12/1/26:17,105.44

1/1/27: 17,105.44

2/1/27: 17,105.44

3/1/27: 17,105.44

4/1/27: 17,105.44

**Year 2 total: 197,490.08**

**Year 3**

5/1/27: 17,105.44

6/1/27: 17,105.44

7/1/27: 17,105.44

8/1/27: 17,105.44

9/1/27: 17,105.44

10/1/27: 17,105.44

11/1/27: 17,105.44

12/1/27: 17,105.44

1/1/28: 17,105.44

2/1/28: 17,105.44

2/1/28: 17,105.44

3/1/28: 17,105.44

4/1/28: 17,105.44

**Year 3 total: 205,265.28**

**3 year cap total: $589,360.16 for rejection damages**

3

**<u>Proof of Claim Total (Rejection damages, interest, taxes, repairs etc.)</u>**

$589,360.16

$933.02

$1,500.00

$10,000.00

$384.35

$58,980.42

$2876.82

**<u>POC Total: $664,034.35</u>**

**<u>Administrative Expense Claim</u>**

- June Rent (post-petition): $15,550.40

-May rent post-petition (May 5th to May 31st): $13,505.42

**<u>Total: $29,055.82</u>**

# LEASE

Between

## CP RAD BRICK, LLC,

as Landlord,

and

## RITE AID OF NEW JERSEY, INC.,

as Tenant.

Brick, New Jersey

Store #3974

Store No. _3974_

## TABLE OF CONTENTS

|     |                                                                                   | Page |
| --- | --------------------------------------------------------------------------------- | ---- |
| 1.  | Demise of Premises                                                                | 1    |
| 2.  | Certain Definitions                                                               | 1    |
| 3.  | Title and Condition                                                               | 4    |
| 4.  | Use of Leased Premises; Quiet Enjoyment                                           | 6    |
| 5.  | Term                                                                              | 7    |
| 6.  | Rent                                                                              | 7    |
| 7.  | Net Lease; Non-Terminability                                                      | 8    |
| 8.  | Payment of Impositions; Compliance with Legal Requirements and Insurance Requirements. | 9    |
| 9.  | Liens; Recording and Title                                                        | 11   |
| 10. | Indemnification                                                                   | 11   |
| 11. | Maintenance and Repair                                                            | 12   |
| 12. | Alterations                                                                       | 13   |
| 13. | Condemnation                                                                      | 14   |
| 14. | Insurance; Damage or Destruction                                                 | 15   |
| 15. | Restoration                                                                       | 18   |
| 16. | Subordination to Financing                                                        | 20   |
| 17. | Assignment, Subleasing                                                            | 22   |
| 18. | Permitted Contests                                                                | 24   |
| 19. | Conditional Limitations; Default Provisions                                       | 24   |
| 20. | Additional Rights of Landlord and Tenant                                         | 27   |
| 21. | Notices                                                                           | 28   |
| 22. | Estoppel Certificates                                                             | 29   |

i

23. Surrender and Holding Over.................................................................................30

24. No Merger of Title.............................................................................................30

25. Definition of Landlord.......................................................................................31

26. Hazardous Substances........................................................................................31

27. Entry by Landlord..............................................................................................36

28. Statements.........................................................................................................37

29. No Usury............................................................................................................37

30. Separability.......................................................................................................37

31. Miscellaneous....................................................................................................37

32. Additional Rent.................................................................................................38

33. Right of First Refusal.........................................................................................38

34. Substitution of Leased Premises.........................................................................40

35. Disclaimer.........................................................................................................44

36. State or City Specific Provisions........................................................................44

ii

DSC:1018882.5

Store No. 3974

THIS LEASE AGREEMENT made as of the 1st day of _October_, 2004, by and between **CP RAD BRICK, LLC**, a New Jersey limited liability company, having an office at 545 S. Figueroa Street, Suite 614, Los Angeles, CA 90071 ("Landlord"), and **RITE AID OF NEW JERSEY, INC.**, a New Jersey corporation, having its principal office at 30 Hunter Lane, Camp Hill, PA  17011 ("Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant, intending to be legally bound, hereby covenant and agree as follows:

1.     <u>Demise of Premises</u>.  Landlord hereby demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the term and upon the provisions hereinafter specified the following described property ("Leased Premises"):  (i) the lot or parcel of land described in Exhibit "A" attached hereto and made a part hereof, together with the easements, rights and appurtenances thereunto belonging or appertaining ("Land"); (ii) the buildings, structures and other improvements on the Land (collectively, the "Improvements"); and (iii) the machinery and equipment which is attached to the Improvements in such a manner as to become fixtures under applicable law, together with all additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease (collectively, the "Equipment"), excepting therefrom the Trade Fixtures.

2.     <u>Certain Definitions</u>.

"Additional Rent" shall mean Additional Rent as defined in Paragraph 32.

"Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining the Leased Premises.

"Alteration" or "Alterations" shall mean any or all changes, additions (whether or not adjacent to or abutting any then existing buildings), expansions (whether or not adjacent to or abutting any then existing buildings), improvements, reconstructions, removals or replacements of any of the Improvements or Equipment, both interior or exterior, and ordinary and extraordinary.

"Basic Rent" shall mean Basic Rent as defined in Paragraph 6.

"Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 6.

"Commencement Date" shall mean _October  1, 2004_.

"Condemnation" shall mean a Taking and/or a Requisition.

"Default Rate"  shall mean the Default Rate as defined in

Paragraph 19(b)(iv).

"Environmental Laws" shall mean Environmental Laws as defined in

Paragraph 26.

"Equipment" shall mean the Equipment as defined in Paragraph 1.

"Event of Default" shall mean an Event of Default as defined in

Paragraph 19(a).

"Guarantor" shall mean Rite Aid Corporation, a Delaware corporation.

"Guaranty" shall mean the Corporate Guaranty of even date herewith in which Guarantor guarantees the obligations of Tenant hereunder.

"Impositions" shall mean the Impositions as defined in Paragraph 8.

"Improvements" shall mean the Improvements as defined in Paragraph 1.

"Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy, and whenever Tenant shall be engaged in making any Alteration or Alterations, repairs or construction work of any kind (collectively, "Work"), the term "Insurance Requirement" or "Insurance Requirements" shall be deemed to include a requirement that Tenant obtain or cause its contractor to obtain completed value builder's risk insurance when the estimated cost of the Work in any one instance exceeds the sum of Five Hundred Thousand ($500,000.00) Dollars and that Tenant or its contractor shall obtain worker's compensation insurance or other adequate insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or bodily injury claims could be asserted against Landlord.

"Land" shall mean the Land as defined in Paragraph 1.

"Law" shall mean any constitution, statute or rule of law.

"Lease Year" shall mean the twelve calendar month period beginning on the Lease Year Commencement Date and on each anniversary thereof throughout the Term.

"Lease Year Commencement Date" shall mean the Commencement Date, if such date shall be on the first day of a calendar month, or, if the Commencement Date does not fall on the first day of a calendar month, then, "Lease Year Commencement Date" shall mean the first day of the first calendar month following that month in which the Commencement Date falls.

"Leased Premises" shall mean the Leased Premises as defined in

2

Paragraph 1.

"Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of all present and future Laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those which by their terms are not applicable to and do not impose any obligation on Tenant, Landlord or the Leased Premises) and all covenants, restrictions and conditions now of record, or of record in the future if created or filed by or with the consent of Tenant, which may be applicable to Tenant, Landlord (with respect to the Leased Premises) or to all or any part of or interest in the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the "Americans with Disabilities Act") or results in interference with the use or enjoyment of the Leased Premises or (ii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

"Lender" shall mean an entity identified as such in writing to Tenant which makes a Loan to Landlord, secured by a Mortgage and evidenced by a Note or which is the holder of the Mortgage and Note as a result of an assignment thereof.

"Loan" shall mean a loan made by a Lender to Landlord secured by a Mortgage and evidenced by a Note.

"Mortgage" shall mean a first priority mortgage or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender.

"Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any reasonable expenses incurred by Landlord in collecting such award.

"Net Proceeds" shall mean the entire proceeds of any insurance required under clauses (i) or (iv) of Paragraph 14 (a), less any actual and reasonable expenses incurred by Landlord in collecting such proceeds.

"Note" or "Notes" shall mean a Promissory Note or Notes hereafter executed from Landlord to Lender, which Note or Notes will be secured by a Mortgage and an assignment of leases and rents.

"Original Landlord" shall mean the entity identified in the first paragraph hereof as Landlord.

"Permitted Encumbrances" shall mean those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of the date of Landlord's acquisition thereof, excepting, however, any such matters arising from the acts of Landlord (such as liens arising as a result of judgments against Landlord).

"Regulated Activity" shall mean Regulated Activity as defined in Paragraph 26.

3

DSC:1018882.5

"Replaced Equipment" or "Replacement Equipment" shall mean the Replaced Equipment and Replacement Equipment, respectively, as defined in Paragraph 11(d).

"Requisition" shall mean any temporary condemnation or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"Restoration" shall mean the Restoration as defined in Paragraph 13(c)(i).

"State" shall mean the State or Commonwealth in which the Leased Premises is situated.

"Substitution Lease" shall mean a lease of the Substitute Premises on the same terms and conditions as this Lease with respect to the Withdrawn Premises, including, without limitation, the same rental terms with respect to the Withdrawn Premises, for the remaining term of the Lease (including all remaining Renewal Terms hereunder).

"Substitute Premises" shall mean the premises that are substituted under this Lease for the Withdrawn Premises pursuant to Paragraph 34.

"Substitution" shall mean the substitution under this Lease of the Substitute Premises for the Withdrawn Premises pursuant to Paragraph 34.

"Taking" shall mean any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation.

"Term" shall mean the Term as defined in Paragraph 5.

"Termination Date" shall mean the Termination Date as defined in Paragraph 13(b)(i)(A).

"Trade Fixtures" shall mean all fixtures, equipment and other items of personal property (whether or not attached to the Improvements) which are owned by Tenant and used in the operation of the business conducted on the Leased Premises.

"Withdrawn Premises" shall mean the Leased Premises withdrawn from the Lease in accordance with the terms and conditions of Paragraph 34.

3.    Title and Condition.

(a)    The Leased Premises are demised and let subject to (i) the Permitted Encumbrances, (ii) all Legal Requirements and Insurance Requirements, including any existing violation of any thereof, and (iii) the condition of the Leased Premises as of the commencement of the Term; without representation or warranty by Landlord; it being understood and agreed,

4

however, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any thereof which for any reason may have expired.

(b)     LANDLORD HAS NOT MADE AND WILL NOT MAKE ANY INSPECTION OF ANY OF THE LEASED PREMISES, AND LANDLORD LEASES AND WILL LEASE AND TENANT TAKES AND WILL TAKE THE LEASED PREMISES "AS IS", AND TENANT ACKNOWLEDGES THAT LANDLORD (WHETHER ACTING AS LANDLORD HEREUNDER OR IN ANY OTHER CAPACITY) HAS NOT MADE AND WILL NOT MAKE, NOR SHALL LANDLORD BE DEEMED TO HAVE MADE, ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE LEASED PREMISES, INCLUDING ANY WARRANTY OR REPRESENTATION AS TO ITS FITNESS FOR USE OR PURPOSE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE, AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, AS TO LANDLORD'S TITLE THERETO, OR AS TO VALUE, COMPLIANCE WITH SPECIFICATIONS, LOCATION, USE, CONDITION, MERCHANTABILITY, QUALITY, DESCRIPTION, DURABILITY OR OPERATION, IT BEING AGREED THAT ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY TENANT. Tenant acknowledges that the Leased Premises are of its selection and to its specifications, and that the Leased Premises have been inspected by Tenant and are satisfactory to it.  In the event of any defect or deficiency in any of the Leased Premises of any nature, whether patent or latent, Landlord shall not have any responsibility or liability with respect thereto or for any incidental or consequential damages (including strict liability in tort). The provisions of this Paragraph 3 (b) have been negotiated, and the foregoing provisions are intended to be a complete exclusion and negation of any warranties by Landlord, express or implied, with respect to any of the Leased Premises, arising pursuant to the uniform commercial code or any other Law now or hereafter in effect or otherwise.

(c)     Tenant acknowledges and agrees that Tenant has examined the title to the Leased Premises prior to the execution and delivery of this Lease and has found such title to be satisfactory for the purposes contemplated by this Lease.

(d)     Landlord hereby assigns, without recourse or warranty whatsoever, to Tenant, all warranties, guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of any of the Leased Premises, including, but not limited to, any rights and remedies existing under contract or pursuant to the uniform commercial code (collectively, the "guaranties").  Such assignment shall remain in effect until the termination of this Lease. Landlord shall also retain the right to enforce any guaranties assigned in the name of Tenant upon the occurrence of an Event of Default.  Landlord hereby agrees to execute and deliver at Tenant's expense such further documents, including powers of attorney, as Tenant may reasonably request in order that Tenant may have the full benefit of the assignment effected or intended to be effected by this Paragraph 3 (d).  Upon the termination of this Lease, the guaranties shall automatically revert to Landlord. The foregoing provision of reversion shall be self-operative and no further instrument of reassignment shall be required.  In confirmation of such reassignment Tenant shall execute and deliver promptly any certificate or other instrument which Landlord may request.  Any monies collected by Tenant under any of the guaranties after the occurrence of and during the

5

continuation of an Event of Default shall be held in trust by Tenant and promptly paid over to Landlord.

(e)     Landlord agrees to enter into, at Tenant's expense, such easements, covenants, waivers, approvals or restrictions for utilities, parking or other matters as desirable for operation of the Leased Premises or properties adjacent thereto (collectively, "Easements") as reasonably requested by Tenant, subject to Lender's and Landlord's approval of the form thereof, not to be unreasonably withheld, conditioned or delayed; provided, however, that no such Easement shall result in any diminution in the value or utility of the Leased Premises for use as a retail site and further provided that no such Easement shall render the use of the Leased Premises dependent upon any other property or condition the use of the Leased Premises upon the use of any other property, each of which Tenant shall certify to Landlord and Lender in writing delivered with Tenant's request with respect to such Easement. Tenant's request shall also include Tenant's written undertaking acknowledging that Tenant shall remain liable hereunder as principal and not merely as a surety or guarantor notwithstanding the establishment of any Easement. Tenant shall pay Landlord's reasonable attorney's fees, and the reasonable fees of Lender, incurred in connection with any such request. If either Landlord or Lender shall fail to approve or disapprove the form of any such Easements, within a period of thirty (30) days from their respective receipt of same, then either Landlord or Lender, as the case may be, shall be deemed to have approved the form of any such Easement.

(f)     Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises under and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any reciprocal easement agreement or any other agreement or document of record now, or of record in the future if created or filed by or with the consent of Tenant, affecting the Leased Premises, herein referred to collectively as the "REA", and that Tenant shall comply with all of the terms and conditions of the REA during the Term of this Lease. Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Lender against any claim, loss or damage suffered by Landlord or Lender by reason of Tenant's failure to perform any obligations or pay any expenses as required under any REA or comply with the terms and conditions of any REA as herein above provided during the Term of this Lease.

4.     Use of Leased Premises; Quiet Enjoyment.

(a)     Tenant may use the Leased Premises as a retail store or for any other lawful purpose so long as such other lawful purpose would not (i) have a material adverse effect on the value of the Leased Premises, (ii) materially increase (when compared to use as a retail store) the likelihood that Tenant, Landlord or Lender would incur liability under any Environmental Laws, or (iii) result in or give rise to any material environmental deterioration or degradation of the Leased Premises. In no event shall the Leased Premises be used for any purpose which shall violate any of the provisions of any Permitted Encumbrance or any covenants, restrictions or agreements hereafter created by or consented to by Tenant applicable to the Leased Premises. Tenant agrees that with respect to the Permitted Encumbrances and any covenants, restrictions or agreements hereafter created by or consented to by Tenant, Tenant shall observe, perform and comply with and carry out the provisions thereof required therein to be observed and performed by Landlord.

6

DSC:1018882.5

(b)      Subject to Tenant's rights under Paragraph 18 hereof, Tenant shall not permit any unlawful occupation, business or trade to be conducted on the Leased Premises or any use to be made thereof contrary to applicable Legal Requirements or Insurance Requirements. Subject to Tenant's rights under Paragraph 18, Tenant shall not use, occupy or permit any of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any of the Leased Premises, in a manner which would (i) make void or voidable any insurance which Tenant is required hereunder to maintain then in force with respect to any of the Leased Premises, (ii) affect the ability of Tenant to obtain any insurance which Tenant is required to furnish hereunder, or (iii) cause any injury or damage to any of the Improvements unless pursuant to Alterations permitted under Paragraph 12 hereof.

(c)      Subject to all of the provisions of this Lease, so long as no Event of Default exists hereunder, Landlord covenants to do no act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant.

5.      Term.

(a)      Subject to the provisions hereof Tenant shall have and hold the Leased Premises for an initial term commencing on the Commencement Date and ending at midnight on the date immediately prior to the twentieth (20th) anniversary of the Lease Year Commencement Date (the "Expiration Date") (such initial term, together with any Renewal Term, hereinafter defined, which comes into effect as hereinafter provided, is herein called the "Term").

(b)      Provided this Lease shall not have been terminated pursuant to the provisions of Paragraphs 13 (b) or 19, this Lease and the Term shall be automatically extended for eight (8) consecutive renewal terms, each for a period of five (5) years (each, "Renewal Term"), upon condition that Tenant may cancel any Renewal Term by giving notice ("Renewal Term Cancellation Notice") to Landlord in writing at least six (6) months prior to the expiration of the then current Term. If Tenant does not timely give to Landlord a Renewal Term Cancellation Notice, the date by which Tenant may give such Renewal Term Cancellation Notice to Landlord shall be extended to the date occurring ten (10) days after the date on which Landlord shall have given to Tenant a written notice reciting the provisions of this Paragraph 5(b). Upon the giving of a Renewal Term Cancellation Notice this Lease and the Term shall terminate and come to an end as of the later of (i) the one hundred eightieth (180th) day following the giving of the Renewal Term Cancellation Notice, or (ii) the last day of the then current Term (and if the effect of this sentence is to extend the Term it shall be so extended on the terms and conditions and for the Rent specified herein for the Renewal Term so cancelled). Any Renewal Term shall be subject to all of the provisions of this Lease, and all such provisions shall continue in full force and effect, except that the Basic Rent for each Renewal Term shall be the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof. If Tenant shall timely give a Renewal Term Cancellation Notice, then all options with regard to subsequent Renewal Terms shall expire and be null and void.

6.      Rent.

(a)      Tenant shall pay to Landlord (or to Lender, if directed by Landlord), as minimum rent for the Leased Premises during the Term, the amounts set forth in Exhibit "B"

7

DSC:1018882.5

attached hereto ("Basic Rent"), commencing on the Commencement Date and continuing on the first day of the second full calendar month of the Term and the first day of each calendar month thereafter during the Term, in advance (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America and if required by Lender by wire transfer in immediately available federal funds to such account in such bank as Lender shall designate, from time to time. Basic Rent shall be adjusted on the anniversary of the Lease Year Commencement Date in Lease Years 11, 21, 31, 41 and 51, as the case may apply. If the Commencement Date shall occur on a date other than the first day of a calendar month, then, Basic Rent for the period from and including the Commencement Date through and including the last day of the month in which the Commencement Date occurs shall be paid, in advance, on the Commencement Date, together with the first full calendar month's payment, in advance, as required above, in an amount prorated by (i) dividing the monthly installment of Basic Rent due for the month in which the Commencement Date occurs by the number of days in such month, and (ii) multiplying such sum by the numbers of days remaining in such month from and including the Commencement Date.

(b)     Tenant shall pay and discharge before the imposition of any fine, lien, interest or penalty may be added thereto for late payment thereof, as Additional Rent, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added by the party to whom such payment is due for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by Law or otherwise, in the event of nonpayment of Basic Rent.

(c)     If any installment of Basic Rent is not paid within five (5) days after written notice is given by Landlord or Lender (or Lender's servicer or other designee of Lender) to Tenant that the same is overdue, Tenant shall pay to Landlord or Lender, as the case may be, on demand, as Additional Rent, a late charge equal to three percent (3%) (the "Late Charge") on such overdue installment of Basic Rent.

(d)     Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement. Each party shall reflect the transactions represented by this Lease in all applicable books, records and reports (including, without limitation, income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

7.   Net Lease; Non-Terminability.

(a)     This is a net lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid, except as otherwise expressly set forth in this Lease, without notice, demand, setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.

(b)     Except as otherwise expressly provided in this Lease, this Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term. Except as otherwise expressly provided in this Lease, Tenant shall not be entitled to any setoff,

8

counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease; and except as otherwise expressly provided in this Lease, the obligations of Tenant under this Lease shall not be affected by any interference with Tenant's use of any of the Leased Premises for any reason, including but not limited to the following: (i) any damage to or destruction of any of the Leased Premises by any cause whatsoever, (ii) any Condemnation, (iii) the prohibition, limitation or restriction of Tenant's use of any of the Leased Premises, (iv) any eviction by paramount title or otherwise, (v) Tenant's acquisition of ownership of any of the Leased Premises other than pursuant to an express provision of this Lease, (vi) any default on the part of Landlord under this Lease or under any other agreement, (vii) any latent or other defect in, or any theft or loss of any of the Leased Premises, (viii) the breach of any warranty of any seller or manufacturer of any of the Equipment, (ix) any violation of Paragraph 4 (c) by Landlord, or (x) any other cause, whether similar or dissimilar to the foregoing, any present or future Law to the contrary notwithstanding. It is the intention of the parties hereto that the obligations of Tenant under this Lease shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events (or, in lieu thereof, Tenant shall pay amounts equal thereto), and that the obligations of Tenant under this Lease shall continue unaffected, unless this Lease shall have been terminated pursuant to an express provision of this Lease.

(c)    Tenant agrees that it shall remain obligated under this Lease in accordance with its provisions and that, except as otherwise expressly provided herein, it shall not take any action to terminate, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, or (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise.

(d)    This Lease is the absolute and unconditional obligation of Tenant. Tenant waives all rights which are not expressly stated in this Lease but which may now or hereafter otherwise be conferred by Law (i) to quit, terminate or surrender this Lease or any of the Leased Premises, (ii) to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided in this Lease, and (iii) for any statutory lien or offset right against Landlord or its property.

8.    Payment of Impositions; Compliance with Legal Requirements and Insurance Requirements.

(a)    (i)    Subject to the provisions of Paragraph 18 hereof relating to contests, Tenant shall, before interest or penalties are due thereon, pay and discharge (all of the following being herein collectively called the "Impositions"): all taxes of every kind and nature (including real, *ad valorem,* personal property, gross income, franchise, withholding, profits and gross receipts taxes) on or with respect to the Leased Premises; all charges and/or taxes for any easement or agreement maintained for the benefit of the Leased Premises; all general and special assessments, levies, permits, inspection and license fees on or with respect to the Leased

9

Premises; all water and sewer rents and other utility charges on or with respect to the Leased Premises; all ground rents on or with respect to the Leased Premises; and all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed or assessed upon or with respect to the Leased Premises, prior to or during the Term, against Landlord, Tenant or any of the Leased Premises as a result of or arising in respect of the occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Leased Premises, or the Basic Rent or Additional Rent, including without limitation, any gross income tax, sales tax, occupancy tax or excise tax levied by any governmental body on or with respect to such Basic Rent or Additional Rent.  If received by Landlord, Landlord shall promptly deliver to Tenant any bill or invoice with respect to any Imposition; provided, that the Landlord's failure to deliver any such bill or invoice shall not limit Tenant's obligation to pay such tax.  Landlord agrees to cooperate with Tenant to enable Tenant to receive tax bills directly from the respective taxing authorities.  Notwithstanding anything to the contrary set forth in this Lease, if the Leased Premises are located in the state of Michigan, Tenant shall pay or reimburse any Michigan Single Business Tax levied or assessed on or with respect to, or payable by Landlord, to the extent arising from or in connection with or related to the ownership, leasing or operation of the Leased Premises; provided, however, that: (A) Landlord agrees to use reasonable efforts to identify and claim applicable credits and deductions available to reduce such tax liability (however, the Landlord's failure to identify and claim applicable credits and deductions shall not limit Tenant's obligation to pay any such Michigan Single Business Tax) (B) Tenant shall not be liable for any interest, penalty, addition to tax or other sum payable solely by reason of the failure to have timely paid such tax except such interest, penalty, addition to tax or other sum which accrues beginning on the 31st day after Tenant shall have been given written notice of the amount of such tax due and shall have failed to pay such amount within 30 days; and (C) Tenant shall not be liable for any such tax if Tenant shall not have been given written notice of the amount owing with respect to such tax within one year following the date that such tax was due and payable to the State of Michigan.

(ii)    Nothing herein shall obligate Tenant to pay, and the term "Impositions" shall exclude, federal, state or local (A) transfer taxes as the result of a conveyance by (or suffered by) Landlord, (B) franchise, capital stock or similar taxes if any, of Landlord, (C) income, excess profits or other taxes, if any, of Landlord, determined on the basis of or measured by its net income, or (D) any estate, inheritance, succession, gift, capital levy or similar taxes, unless the taxes referred to in clauses (B) and (C) above are in lieu of or a substitute for any other tax or assessment upon or with respect to any of the Leased Premises which, if such other tax or assessment were in effect at the commencement of the Term, would be payable by Tenant.  In the event that any assessment against any of the Leased Premises may be paid in installments, Tenant shall have the option to pay such assessment in installments; and in such event, Tenant shall be liable only for those installments which become due and payable during the Term.  Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Impositions.  Tenant shall deliver to Landlord and to Lender, within twenty (20) days after Landlord's written request therefor, copies of all settlements and notices pertaining to the Impositions which may be issued by any governmental authority and receipts for payments of all Impositions made during each calendar year of the Term, within thirty (30) days after payment.

(b)    Subject to the provisions of Paragraph 18 hereof, Tenant shall promptly comply with and conform to all of the Legal Requirements and Insurance Requirements.

10

9.    Liens; Recording and Title.

(a)    Subject to the provisions of Paragraph 18 hereof, Tenant shall not, directly or indirectly, create or permit to be created or to remain, and shall promptly discharge, any lien on the Leased Premises, on the Basic Rent, Additional Rent or on any other sums payable by Tenant under this Lease, other than the Mortgage, the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting from any act or omission by Landlord or those claiming by, through or under Landlord (except Tenant). Landlord shall not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding any of the Leased Premises through or under Tenant, and no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to any of the Leased Premises.

(b)    Except if the Leased Premises is located in the State of Maryland, each of Landlord and Tenant shall execute, acknowledge and deliver to the other a written Memorandum of this Lease to be recorded in the appropriate land records of the jurisdiction in which the Leased Premises is located, in order to give public notice and protect the validity of this Lease. If the Leased Premises is located in the State of Maryland each party will, if requested by the other, execute, acknowledge and deliver such a Memorandum, which the requesting party may record provided the requesting party shall pay the entire cost of such recording including, without limitation, all recording taxes. In the event of any discrepancy between the provisions of said recorded Memorandum of this Lease and the provisions of this Lease, the provisions of this Lease shall prevail.

(c)    Nothing in this Lease and no action or inaction by Landlord shall be deemed or construed to mean that Landlord has granted to Tenant any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest or lien in or upon the estate of Landlord in any of the Leased Premises.

10.    Indemnification.

(a)    Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender, and their officers, directors, shareholders, partners, attorneys, beneficial owners, trustees, members, managers and employees, from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from the Leased Premises or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of the Leased Premises, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon, whether or not such indemnified party has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said injury, death, loss, damage or other claim; except to the extent that any such liability, loss, damage, penalty, cost, expense, cause of action, suit, claim, demand or judgment is the result of the gross negligence of such indemnified party or the intentional or wrongful act of such indemnified party. In case any action or proceeding is brought against any indemnified party by reason of any such claim against which Tenant has agreed to defend, pay, protect, indemnify, save and hold harmless pursuant to the preceding sentence, Tenant covenants

11

DSC:1018882.5

upon notice from such indemnified party to resist or defend such indemnified party in such action, with the expenses of such defense paid by Tenant, and such indemnified party will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.

(b) The obligations of Tenant under this Paragraph 10 shall survive any termination of this Lease.

11. Maintenance and Repair.

(a) Except for any Alterations that Tenant is permitted to make pursuant to this Lease, Tenant shall at all times, including any Requisition period, put, keep and maintain the Leased Premises (including, without limitation, the roof, landscaping, walls, footings, foundations and structural components of the Leased Premises) and the Equipment in the same condition and order of repair as exists as of the date of this Lease, except for ordinary wear and tear, and shall promptly make all repairs and replacements of every kind and nature, whether foreseen or unforseen, which may be required to be made upon or in connection with the Leased Premises in order to keep and maintain the Leased Premises in the order and condition required by this Paragraph 11(a). Tenant shall do or cause others to do all shoring of the Leased Premises or of foundations and walls of the Improvements and every other act necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon any of the Leased Premises, whether or not Landlord shall, by reason of any Legal Requirements or Insurance Requirements, be required to take such action or be liable for failure to do so. Landlord shall not be required to make any repair, whether foreseen or unforeseen, or to maintain any of the Leased Premises or Adjoining Property in any way, and Tenant hereby expressly waives the right to make repairs at the expense of the Landlord, which right may be provided for in any Law now or hereafter in effect. Nothing in the preceding sentence shall be deemed to preclude Tenant from being entitled to insurance proceeds or condemnation awards for Restoration pursuant to Paragraphs 13 (c) and 14 (g) of this Lease. Tenant shall, in all events, make all repairs for which it is responsible hereunder promptly, and all repairs shall be in a good, proper and workmanlike manner.

(b) In the event that any Improvement shall violate any Legal Requirements or Insurance Requirements or shall encroach upon the property of another person or entity and as a result of such violation or encroachment, enforcement action (including civil or criminal action by a public or private party) is threatened or commenced against Tenant or Landlord or Lender or with respect to the Leased Premises, then Tenant, at the request of Landlord, shall either (i) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such violation or encroachment, whether the same shall affect Landlord, Lender, Tenant or all of them, or (ii) take such action as shall be necessary to remove such violation or encroachment, including, if necessary, any Alteration. Any such repair or Alteration shall be made in conformity with the provisions of Paragraph 12.

(c) If Tenant shall be in default under any of the provisions of this Paragraph 11 or Paragraph 26, Landlord may after thirty (30) business days written notice given to Tenant and failure of Tenant to commence to cure during said period, but without notice in the event of an emergency, do whatever is necessary to cure such default as may be appropriate under the

12

DSC:1018882.6

circumstances for the account of and at the expense of Tenant. In the event of an emergency Landlord shall notify Tenant of the situation by phone or other available communication. All reasonable sums so paid by Landlord and all reasonable costs and expenses (including, without limitation, attorneys' fees and expenses) so incurred, together with interest thereon at the Default Rate from the date of payment or incurring the expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand.

(d)     If the Leased Premises are located in the State of California, there is attached hereto Exhibit "D" entitled "California Provisions" which includes Paragraph 11(d) and which is incorporated herein and made a part hereof.

12.   Alterations.

(a)     Tenant shall not make any Alterations which would (after the completion thereof) impair the structural integrity of the Leased Premises, without Landlord's written consent, which consent Landlord agrees not to unreasonably withhold, condition or delay. Tenant may make any other Alterations without the prior written consent of the Landlord provided such Alterations comply with all of the provisions of the following sentence.

(b)     In the event that Landlord gives its prior written consent to any Alterations, or if such consent is not required, Tenant agrees that in connection with any Alteration:  (i) the fair market value of the Leased Premises shall not be lessened in any material respect after the completion of any such Alteration, or its structural integrity impaired; (ii) the Alteration and any Alteration theretofore made or thereafter to be made shall not in the aggregate reduce the gross floor area of the Improvements by more than ten percent (10%); (iii) all such Alterations shall be performed in a good and workmanlike manner, and shall be expeditiously completed in compliance with all Legal Requirements; (iv) all work done in connection with any such Alteration shall comply with all Insurance Requirements; (v) Tenant shall promptly pay all costs and expenses of any such Alteration, and shall (subject to the provisions of Paragraph 18 hereof) discharge all liens filed against any of the Leased Premises arising out of the same; (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration; (vii) all such Alterations shall be the property of Landlord and shall be subject to this Lease; and (viii) all Alterations shall be made in the case of any Alteration the estimated cost of which in any one instance exceeds Five Hundred Thousand Dollars ($500,000) under the supervision of an architect or engineer and, in accordance with plans and specifications which shall be submitted to Landlord (for informational purposes only) prior to the commencement of the Alterations (ix) Tenant shall give Landlord notice of such Alteration before commencing work and (x) if the estimated cost of any Alterations exceeds Seven Hundred Fifty Thousand Dollars ($750,000) and if neither Tenant nor Guarantor has a Standard & Poor's rating of BBB- (and not on credit watch) or better, then Tenant shall deliver, or cause the general contractor to deliver, to Landlord, payment and performance bonds issued by a company rated "A" or better by Standard & Poor's (and in a form reasonably acceptable to Landlord) covering such Alterations.

(c)     Whenever Tenant is authorized to make Alterations under this Lease, Tenant may make all applications for permits and other governmental approvals for such

13

Alterations in its own name or, if required by the applicable authority, in the name of Landlord and may sign the name of Landlord for such purpose.

    13.    Condemnation.

    (a)    Tenant, promptly after obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Landlord thereof and Landlord shall be entitled to participate in any Condemnation proceeding. Landlord, promptly after obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Tenant thereof and Tenant shall have the right to participate in such proceedings. Subject to the provisions of this Paragraph 13 and Paragraph 15, Tenant hereby irrevocably assigns to Lender or to Landlord, in that order, any award or payment in respect of any Condemnation of Landlord's interest in the Leased Premises, except that (except as hereinafter provided) nothing in this Lease shall be deemed to assign to Landlord or Lender any award relating to the value of the leasehold interest created by this Lease or any award or payment on account of the Trade Fixtures, moving expenses and out-of-pocket expenses incidental to the move, if available, to the extent Tenant shall have a right to make a separate claim therefor against the condemnor, it being agreed, however, that Tenant shall in no event be entitled to any payment that reduces the award to which Landlord is or would be entitled for the condemnation of Landlord's interest in the Leased Premises. Notwithstanding the foregoing, Tenant shall not be entitled to any award or payment on account of Tenant's leasehold interest under this Lease except in the event of a Condemnation described in Paragraph 13(b) and then only to the extent that when such award, added to all other awards to which Tenant is entitled hereunder, is subtracted from the entire award in respect to all interests in the Leased Premises, the remainder exceeds the sum of (i) the purchase price paid by the current Landlord for the acquisition of its interest in the Leased Premises plus closing costs and (ii) any prepayment penalties or defeasance costs arising out of any Loan prepayment arising from such Condemnation. As used in this paragraph, "closing costs" shall mean the amounts commonly called closing costs and paid by the then current Landlord in connection with its acquisition of its interest in the Leased Premises including, without limitation, transfer taxes, attorney's fees, title insurance premiums, broker's fees, loan fees and loan assumption fees.

    (b)    If (i) the entire Leased Premises or (ii) at least ten percent (10%) of the applicable Land or the building constructed on the Land or any means of ingress, egress or access to the Leased Premises, the loss of which even after Restoration would, in Tenant's reasonable business judgment, be substantially and materially adverse to the business operations of Tenant at the Leased Premises, shall be subject of a Taking by a duly constituted authority or agency having jurisdiction, then Tenant shall, not later than ninety (90) days after a Taking has occurred, serve notice ("Tenant's Termination Notice") upon Landlord of Tenant's intention to terminate this Lease on any Basic Rent Payment Date specified in such Tenant's Termination Notice, which date (the "Termination Date") shall be no sooner than the first Basic Rent Payment Date occurring at least thirty (30) days after the date of such Tenant's Termination Notice.

    (c)    (i)    In the event of a Condemnation of any part of the Leased Premises which does not result in a Termination of this Lease, subject to the requirements of Paragraph 15, the Net Award of such Condemnation shall be held initially by Landlord for the benefit of Tenant to fund the Restoration of the Premises; and promptly after such Condemnation, Tenant shall commence and diligently continue to restore the Leased Premises as nearly as possible to

14

its value, condition and character immediately prior to such Condemnation, in accordance with the provisions of this Lease, including but not limited to the provisions of Paragraphs 11(a), 12 and 15 (such restoration following a Condemnation and restoration following a casualty is, as the context shall require, herein called a "Restoration").

(ii)     Upon the payment to Landlord of the Net Award of a Taking which falls within the provisions of this Paragraph 13(c), Landlord and Lender shall, to the extent received, make that portion of the Net Award equal to the cost of Restoration (the "Restoration Award") available to Tenant for Restoration, in accordance with the provisions of Paragraph 15, and promptly after completion of the Restoration (or if no Restoration is required), the first $20,000 of the balance of the Net Award shall be paid to Tenant and the remainder (if any) shall be paid to Tenant and Landlord in proportion to the values of their respective interests in the Leased Premises; and all Basic Rent, Additional Rent and other sums payable hereunder shall continue unabated and unreduced.

(iii)     In the event of a Requisition of the Leased Premises, Landlord shall apply the Net Award of such Requisition, to the extent available, to the installments of Basic Rent, Additional Rent or other sums payable by Tenant hereunder thereafter payable and Tenant shall pay any balance remaining thereafter. Upon the expiration of the Term, any portion of such Net Award which shall not have been previously credited to Tenant on account of the Basic Rent and Additional Rent shall be retained by Landlord.

(d)     Except with respect to an award or payment to which Tenant is entitled pursuant to the provisions of Paragraph 13 (a), 13 (b) and 13 (c), no agreement with any condemnor in settlement of or under threat of any Condemnation shall be made by either Landlord or Tenant without the written consent of the other, and of Lender, if the Leased Premises is then subject to a Mortgage, which consent of Landlord and Tenant shall not be unreasonably withheld, conditioned or delayed.

(e)     If the Leased Premises are located in the State of California, there is attached hereto Exhibit "D" entitled "California Provisions" which includes Paragraph 13(e) and which is incorporated herein and made a part hereof.

14.     Insurance; Damage or Destruction.

(a)     Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i)     Insurance against loss or damage to the Improvements and Equipment under a fire and broad form of all risk extended coverage insurance policy (which shall include flood insurance if the Leased Premises is located within a flood hazard area and which shall include earthquake insurance if the Leased Premises is located in an area where earthquake insurance is customarily maintained for similar commercial properties, including, without limitation, the State of California and the cities of Orem, Utah and Memphis, Tennessee). Such insurance shall be in amounts sufficient to prevent Landlord or Tenant from becoming a co-insurer under the applicable policies, and in any event in amounts not less than the actual replacement cost of the Improvements and Equipment (excluding footings and

15

DSC:1018882.5

foundations and other parts of the Improvements which are not insurable) as determined from time to time at Lender's request but not more frequently than once in any 12-month period, by agreement of Landlord, Lender and Tenant, or if not so agreed, at Tenant's expense, by the insurer or insurers or by an appraiser approved by Landlord.  Such insurance policies may contain reasonable self-insured retention, exclusions and deductible amounts, but in no event greater than $100,000.

(ii)     Contractual and commercial general liability insurance against claims for bodily injury, death or property damage occurring on, in or about the Leased Premises, which insurance shall be written on a so-called "Occurrence Basis," and shall provide minimum protection with a combined single limit in an amount not less than the greater of (x) Five Million ($5,000,000) Dollars (or in such increased limits from time to time to reflect declines in the purchasing power of the dollar as Landlord may reasonably request) or (y) the aggregate amount of such insurance carried by Tenant, for bodily injury, death and property damage in any one occurrence.  Such policy may contain a self-insurance retention or deductible not to exceed $250,000.

(iii)     Worker's compensation insurance covering all persons employed by Tenant on the Leased Premises in connection with any work done on or about any of the Leased Premises for which claims for death or bodily injury could be asserted against Landlord, Tenant or the Leased Premises.

(iv)     Insurance against loss or damage from explosion of any steam or pressure boilers or similar apparatus located in or about the Improvements in an amount not less than the actual replacement cost of the Improvements and Equipment (excluding footings and foundations and other parts of the Improvements which are not insurable).

(b)     During such time as (i) no Event of Default is outstanding hereunder (ii) the tangible net worth of Tenant (or of Guarantor) shall be not less than One Hundred Million Dollars ($100,000,000.00)  as determined in accordance with generally accepted accounting principles consistently applied (iii) Tenant is  paying Basic Rent and Additional Rent pursuant to this Lease and (iv) Tenant or Guarantor has a credit rating of "BB" or better (and not on credit watch) by Standard & Poor's,  Tenant may self-insure all or any portion of the coverage referred to in Paragraph 14 (a) (i), (ii), (iii) and (iv) , provided that the self insurance program of this section (b) does not violate any Laws.  Tenant shall provide Landlord with annual certificates indicating its decision to self-insure.

(c)     Except as otherwise provided in Paragraph 14(b), the insurance required by Paragraph 14(a) shall be written by companies having a claims paying ability rating by Standard & Poors of not less than A-, and all such companies shall be authorized to do an insurance business in the State, or otherwise agreed to by Landlord and Lender.  Sums due from Tenant in lieu of insurance proceeds because of such self-insurance programs shall be treated as insurance proceeds for all purposes under this Lease.  The insurance policies (i) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (ii) shall (except for the worker's compensation insurance referred to in Paragraph 14 (a) (iii) hereof) name Landlord, Tenant and any Lender as additional insured parties and/or loss payees, as appropriate, as their respective interests may appear.  If said insurance or any part thereof shall

16

expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void or unsafe by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and Lender.

(d)      Each insurance policy referred to in clauses (i) and (iv) of Paragraph 14 (a), shall contain standard non-contributory mortgagee clauses in favor of any Lender which holds a Mortgage on the Leased Premises. Each policy shall provide that it may not be canceled except after 30 days prior notice to Landlord and any Lender. Each policy shall also provide that any losses otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, or (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy.

(e)      Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 14, shall renew or replace each policy, and shall deliver to Landlord and Lender a certificate or other evidence (reasonably satisfactory to Lender and Landlord) of the existing policy and such renewal or replacement policy at least thirty days prior to the Policy Expiration Date (as hereinafter defined) of each policy. Each such policy shall provide that it shall not expire until the Landlord and Lender shall receive a notice from the insurer to the effect that a policy will expire on a date (the "Policy Expiration Date") which shall be thirty (30) days following the date of the receipt by Landlord and Lender of such notice. In the event of Tenant's failure to comply with any of the foregoing requirements of this Paragraph 14 within five (5) business days of the giving of written notice by Landlord to Tenant, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(f)      Anything in this Paragraph 14 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 14(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 14. In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender evidence of the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 14.

(g)      Except as provided in Paragraph 14(i), in the event of any damage to or destruction of the Premises by fire, the elements or other casualty, the Term shall continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sum payable by Tenant hereunder. In the event of any casualty loss exceeding $350,000, Tenant shall give Landlord immediate notice thereof. Tenant shall adjust, collect and compromise any and all claims, with the consent of Lender and Landlord, not to be unreasonably withheld, conditioned or delayed, and Landlord and Lender shall have the right to join with Tenant therein. If the estimated cost of Restoration or repair shall be Three Hundred Fifty Thousand ($350,000.00) Dollars or less, all proceeds of any insurance required under clauses (i) and (iv) of Paragraph 14(a) shall be payable to Tenant, provided that Tenant or Guarantor at such time shall have a

17

DSC:1018882.5

tangible net worth of not less than Fifty Million Dollars ($50,000,000.00) as determined in accordance with generally accepted accounting principles, consistently applied, and in all other events to a Trustee which shall be a federally insured bank or other financial institution, selected by Landlord and Tenant and reasonably satisfactory to Lender (the "Trustee"). If the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee. Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant and Landlord each hereby appoints such Trustee as its attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease. The Net Proceeds of such insurance payment shall be retained by the Trustee and, promptly after such casualty, Tenant, as required in Paragraphs 11 (a) and 12, shall commence and diligently continue to perform the Restoration to the Leased Premises. Upon payment to the Trustee of such Net Proceeds, the Trustee shall, to the extent available, make the Net Proceeds available to Tenant for Restoration, in accordance with the provisions of Paragraph 15. Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace the Improvements and Equipment in accordance with the provisions of Paragraph 11(a) and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof. In the event that any damage or destruction shall occur at such time as Tenant shall not have maintained third-party insurance in accordance with Paragraph 14(a)(i) and (iv), Tenant shall pay to the Trustee the amount of the proceeds that would have been payable had such insurance program been in effect (the "Tenant Insurance Payment").

(h)  If the Leased Premises are located in the State of California, there is attached hereto Exhibit "D" entitled "California Provisions" which includes Paragraph 14(h) and which is incorporated herein and made a part hereof. If the Leased Premises are located in the State of New Jersey, the parties hereby expressly agree that the provisions of Section 14(g) control over any Law to the contrary including, without limitation, N.J.S.A. §46:8-6 and §46:8-7.

(i)  If in the last three (3) years of any Term of this Lease the Leased Premises is damaged such that the cost of Restoration is in excess of twenty-five percent (25%) of its then fair market value, then, Tenant may terminate this Lease.

(j)  Notwithstanding anything in this Lease to the contrary, Landlord and Tenant each waive any rights of action for negligence against the other party, which may arise during the Term for damage to the Leased Premises or to the property therein resulting from any fire or casualty, but only to the extent covered by insurance or to the extent the same would have been covered by insurance had Tenant maintained the insurance to be maintained under this Lease.

15.  Restoration. Net Proceeds, Restoration Award and Tenant Insurance Payment (the aggregate of which being herein defined as the "Restoration Fund") shall be disbursed by the Trustee in accordance with the following conditions:

(a)  If the cost of Restoration will exceed $500,000, prior to commencement of the Restoration the architects, general contractor(s), and plans and specifications for the Restoration shall be approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed; and which approval shall be granted to the extent that the plans and specifications depict a Restoration which is substantially similar to the Improvements and

18

Equipment which existed prior to the occurrence of the casualty or Taking, whichever is applicable.

(b)     At the time of any disbursement, no Event of Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged or unbonded.

(c)     Disbursements shall be made from time to time in an amount not exceeding the hard and soft cost of the work and costs incurred since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (2) partial releases of liens, and (3) other reasonable evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed in place or delivered to the site and free and clear of mechanics' lien claims.

(d)     Each request for disbursement shall be accompanied by a certificate of Tenant describing the work, materials or other costs or expenses, for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work or expense and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been substantially completed and complies with the applicable requirements of this Lease.

(e)     The Trustee may retain ten percent (10%) of the Restoration Fund until the Restoration is at least fifty percent (50%) complete, and thereafter five percent (5%) until the Restoration is substantially complete.

(f)     The Restoration Fund shall be kept in a separate interest-bearing federally insured account by the Trustee or by Lender.

(g)     At all times the undisbursed balance of the Restoration Fund held by Trustee plus any funds contributed thereto by Tenant, at its option, shall be not less than the cost of completing the Restoration, free and clear of all liens.

(h)     In addition, prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord, exceeds the amount of the Net Proceeds, the Restoration Award and Tenant Insurance Payment available for such Restoration, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund or Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration.  Any sum in the Restoration Fund which remains in the Restoration Fund upon the completion of Restoration of damages from a casualty loss shall be paid to Tenant and any such sum remaining from a Condemnation shall be disbursed as provided in Paragraph 13(c).  For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or the Restoration Award shall be deemed to be disbursed prior to any amount added by Tenant.

19

16.   Subordination to Financing.

(a)   (i)   Subject to the provisions of Paragraph 16 (a)(ii), Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be reasonably required to further effectuate or confirm such subordination.

(ii)   Except as expressly provided in this Lease by reason of the occurrence of an Event of Default, Tenant's tenancy and Tenant's rights under this Lease shall not be disturbed, terminated or otherwise adversely affected, nor shall this Lease be affected, by any default under any Mortgage, and in the event of a foreclosure or other enforcement of any Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the Term of this Lease and any Renewal Term, the rights of Tenant under this Lease shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default has occurred and is continuing. Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by Law. Any Mortgage to which this Lease is now or hereafter subordinate shall provide, in effect, that during the time this Lease is in force insurance proceeds and Restoration Award shall be permitted to be used for Restoration in accordance with the provisions of this Lease. Notwithstanding an Event of Default, but provided no event of default has occurred under the Qualified Sublease, the provisions of this Paragraph 16 (a) shall continue to apply for the benefit of any Qualified Subtenant referred to in Paragraph 17 herein.

(b)   Notwithstanding the provisions of Paragraph 16(a), the holder of any Mortgage to which this Lease is subject and subordinate shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to this Lease by recording a unilateral declaration to such effect, provided that such holder shall have agreed that during the time this Lease is in force insurance proceeds and Restoration Award shall be permitted to be used for restoration in accordance with the provisions of this Lease.

(c)   At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of a Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16 (a) above, to attorn, from time to time, to any such owner or Lender, upon the terms and conditions of this Lease, for the remainder of the Term. The provisions of this Paragraph 16(c) shall inure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

(d)   Each of Tenant, any owner and Lender, however, upon demand of the other, hereby agrees to execute, from time to time, instruments in confirmation of the foregoing provisions of Paragraphs 16(a) and 16(c), reasonably satisfactory to the requesting party acknowledging such subordination, non-disturbance and attornment as are provided in such subsections and setting forth the terms and conditions of its tenancy.

(e)   Each of Tenant and Landlord agrees that, if requested by the other, each shall, without charge, enter into a Subordination, Non-Disturbance and Attornment Agreement

20

DSC:1018882.5

reasonably requested by Lender, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of subparagraph (a) and Tenant hereby agrees for the benefit of Lender that Tenant will not, (i) without in each case the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed, amend or modify the Lease (provided, however, Lender, in Lender's sole discretion may withhold or condition its consent to any amendment or modification which would or could (A) alter in any way the amount or time for payment of any Basic Rent, Additional Rent or other sum payable hereunder, (B) alter in any way the absolute and unconditional nature of Tenant's obligations hereunder or materially diminish any such obligations, (C) result in any termination hereof prior to the end of the initial term, or (D) otherwise, in Lender's reasonable judgment, affect the rights or obligations of Landlord or Tenant hereunder), or enter into any agreement with Landlord so to do, (ii) without the prior written consent of Lender which may be withheld in Lender's sole discretion, cancel or surrender or seek to cancel or surrender the Term hereof, or enter into any agreement with Landlord to do so, or (iii) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease. Such subordination, non-disturbance and attornment agreement shall also provide that in the event Lender succeeds to the interest of Landlord under the Lease, Lender shall not be:

liable for any act or omission of any prior Landlord (including, without limitation, the then defaulting Landlord), or

subject to any defense or offsets which Tenant may have against any prior Landlord (including, without limitation, the then defaulting Landlord), or

bound by any payment of "Basic Rent" or "Additional Rent" (as such terms are defined in the Lease) which Tenant might have paid for more than one month in advance of the due date under the Lease to any prior Landlord, (including, without limitation, the then defaulting Landlord), except to the extent such monies are actually received by Lender, or

bound by any obligation of any prior Landlord to make any payment to Tenant which was required to be made prior to the time Lender succeeded to any such prior Landlord's interest, or

accountable for any monies deposited with any prior Landlord (including security deposits), except to the extent such monies are actually received by Lender, or

bound by any amendment or modification of the Lease or by any waiver or forbearance on the part of any prior Landlord (including, without limitation, the then defaulting Landlord), in either case to the extent the same is made or given without the prior written consent of Lender; or

liable with respect to warranties or indemnities of any nature whatsoever made by any prior Landlord (including, without limitation, the then defaulting Landlord). In the event that Lender shall acquire Landlord's estate in and to the Leased Premises, Lender shall have no obligation, nor incur any liability, beyond Lender's then equity interest, if any, in the Leased Premises, and Tenant shall look exclusively to such equity interest of Lender, if any, in the Leased Premises for the payment and discharge of any obligations or liability imposed upon

21

DSC:1018882.5

Lender hereunder, under the Lease or under any new lease of the Leased Premises, except with respect to the misappropriation of insurance or condemnation proceeds which have been received by Lender.

(f)     Tenant hereby consents to any assignment of this Lease by Landlord to or for the benefit of any Lender.

17.    <u>Assignment, Subleasing.</u>

(a)     Tenant may assign its interest in this Lease and may sublet the Leased Premises in whole or in part, from time to time, without the consent of Landlord, provided that (i) the assignee or sublessee does not intend to use the Leased Premises as a gun shop, adult book store or adult movie theater, dry cleaners with dry cleaning on premises or for any other use that would violate any provisions of this Lease and (ii) such assignment or sublease would not cause any part of the Leased Premises to become "tax exempt use property" within the meaning of Section 168(h) of the Internal Revenue Code of 1986, as amended.

(b)     (i)     Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease. No assignment or sublease shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made. Notwithstanding any assignment or subletting Tenant shall continue to remain liable and responsible for the payment of the Basic Rent and Additional Rent and the performance of all its other obligations under this Lease; provided, however, if (A) the assignee of all of Tenant's interest in the Leased Premises has a rating by Standard & Poors of not less than BBB- (and not on credit watch) (but in no event less than the Standard & Poors rating of Tenant at the time) (B) such assignee's intended use of the Leased Premises is not in violation of Paragraph 17(a) above or any other provisions of this Lease (C) Tenant has delivered to Landlord the instrument of assumption described in Paragraph 17(b)(ii) below (D) no Event of Default exists under this Lease and (E) either (I) Lender consents in writing to such assignment and Tenant's release which consent may not be unreasonably withheld or (II) assignee has a rating by Standard & Poor's of not less than BBB+ (and not on credit watch), then, Tenant and any guarantor of Tenant's obligations hereunder shall be released from all liability and obligation under this Lease from and after the date of assignment. No assignment or sublease shall impose any obligations on Landlord under this Lease except as otherwise provided in this Lease.

(ii)     Tenant agrees that in the case of an assignment of the Lease, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Landlord (i) a duplicate original of such assignment in recordable form and (ii) an agreement executed and acknowledged by the assignee in recordable form wherein the assignee shall agree to assume and agree to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such assignment. In the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord a duplicate original of such sublease.

(c)     Upon the occurrence of an Event of Default under this Lease, Landlord shall have the right to collect and enjoy all rents and other sums of money payable under any

22

sublease of any of the Leased Premises, and Tenant hereby irrevocably and unconditionally assigns such rents and money to Landlord, which assignment may be exercised upon and after (but not before) the occurrence of an Event of Default.

(d)  (i)  Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into a nondisturbance and attornment agreement with any Qualified Subtenant, as defined below, upon the terms described below, pursuant to which Landlord shall agree, for so long as such Qualified Subtenant is not in default beyond all applicable periods of notice and cure under its Qualified Sublease, as defined below, that the Qualified Sublease shall not be terminated as a result of any termination of this Lease and such Qualified Subtenant's use and occupancy of the Leased Premises shall not be disturbed by Landlord, and pursuant to which such Qualified Subtenant shall agree to attorn to Landlord or its successor as landlord under the Qualified Sublease upon any termination of this Lease.  Said agreement shall further provide that nothing therein contained shall impose any obligation on the Landlord or the Lender to (A) return or apply any security deposit under such Qualified Sublease, unless such security deposit shall be transferred and turned over to the Landlord or Lender or their or either of their successors, (B) expend any sums to make any installations or alterations provided to be made by the Landlord under said Qualified Sublease or reimburse the Tenant under said Qualified Sublease for any installations or alterations made by it, (C) be liable for any act or omission of Tenant as sublandlord (or any successor to Tenant as sublandlord) or be subject to any offsets or defense which such Qualified Subtenant might have against Tenant as sublandlord (or any successor to Tenant as sublandlord), (D) be bound by any rent or additional rent which such Qualified Subtenant might have paid for more than the current month to any prior landlord, or (E) be bound by any amendment or modification of the Qualified Sublease made without the prior written consent of Landlord, the terms of which amendment or modification if included in the original sublease would have prevented such sublease from meeting the criteria for a Qualified Sublease.

(ii)  Any subtenant under a Qualified Sublease, as defined below, is a "Qualified Subtenant." A "Qualified Sublease" shall be any sublease of all of the Leased Premises, pursuant to which the subtenant thereunder had, at the time such sublease was entered into, a Standard & Poor's investment grade rating of BBB-, or higher or a Moody's investment grade rating of Baa3, or higher (or equivalent rating of any other nationally recognized statistical rating organization) and was not on credit watch, such sublease to be on the terms and conditions of this Lease (except the Basic Rent or Additional Rent (or both) may be higher), and for a term not to exceed the Term of this Lease, (and if any such Qualified Sublease shall include all or part of any Renewal Term or Renewal Terms, then Tenant shall be conclusively deemed to have irrevocably waived the right to issue a Renewal Term Cancellation Notice as to such Renewal Term or Renewal Terms, which waiver Tenant will confirm in writing to Landlord if requested to do so, except that if thereafter such Qualified Sublease shall terminate prior to its original term and on or before the last day as of which Tenant would otherwise be entitled to issue a Renewal Term Cancellation Notice as to any Renewal Term originally included within the term of such Qualified Sublease, then Tenant's right to issue a Renewal Term Cancellation Notice as to such Renewal Term and all subsequent Renewal Terms originally falling within the term of such Qualified Sublease shall be reinstated in accordance with the terms of this Lease) .

23

(e)  (i)  Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into an agreement with any Qualified Assignee, as defined below, pursuant to which Landlord shall agree, for so long as such Qualified Assignee is not in default of its obligations under this Lease, that no defaults or Event of Default shall be deemed to have occurred under this Lease by reason of the occurrence of one or more of the events designated in Paragraphs 19(a)(iii), (iv), (v) or (vi) with respect to any party who was a Tenant under this Lease prior to the date of the assignment of this Lease to the Qualified Assignee.

(ii)  A "Qualified Assignee" shall be any assignee of the Tenant's rights, title and interest under this Lease which, at the time of the assignment to it, had a Standard & Poor's investment grade rating of BBB, or higher, or a Moody's investment grade rating of Baa3, or higher, (or equivalent rating of any other nationally recognized statistical rating organization) and was not on credit watch.

18.  Permitted Contests.

(a)  After prior written notice to Landlord, Tenant shall not be required to (i) pay any Imposition, (ii) comply with any Legal Requirement, (iii) discharge or remove any lien referred to in Paragraphs 9 or 12, or (iv) take any action with respect to any violation referred to in Paragraph 11(b) so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (A) the collection of, or other realization upon, the Imposition or lien so contested, (B) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of any such Legal Requirement or by any such violation, (C) any interference with the use or occupancy of any of the Leased Premises, (D) any interference with the payment of any Basic Rent or any Additional Rent, and (E) the cancellation of any fire or other insurance policy.

(b)  In no event shall Tenant pursue any contest with respect to any Imposition, Legal Requirement, lien, or violation, referred to above in such manner that exposes Landlord or Lender to (i) criminal liability, penalty or sanction, (ii) any civil liability, penalty or sanction for which Tenant has not made provisions reasonably acceptable to Landlord and Lender or (iii) defeasance of its interest in the Leased Premises.

(c)  Tenant agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall have the right to attempt to settle or compromise such contest through negotiations. Tenant shall pay and save Lender and Landlord harmless against any and all losses, judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.

19.  Conditional Limitations; Default Provisions.

24

(a)      The occurrence of any one or more of the following events (any such event being specified herein as a "failure" or "default") shall constitute an Event of Default under this Lease: (i) a failure by Tenant to make (regardless of the pendency of any bankruptcy, reorganization, receivership, insolvency or other proceedings, in law, in equity or before any administrative tribunal which had or might have the effect of preventing Tenant from complying with the provisions of this Lease):  (x) any payment of Basic Rent which continues unremedied for a period of three (3) business days after written notice ("Nonpayment Notice") thereof given to Tenant by Landlord or Lender or Lender's designee, or (y) any payment of Additional Rent or other sum herein required to be paid by Tenant which continues unremedied for a period of fifteen (15) business days after a Nonpayment Notice is given to Tenant by Landlord or Lender or Lender's designee; (ii) failure by Tenant to perform and observe, or a violation or breach of, any other provision in this Lease and such default shall continue for a period of thirty days after written notice thereof is given by Landlord or Lender or Lender's designee to Tenant or if such default is of such a nature that it cannot reasonably be cured within such 30 day period, such period shall be extended for such longer time as is reasonably necessary (but not to exceed 180 days) provided that Tenant has commenced to cure such default within said 30 day period and is actively, diligently and in good faith proceeding with continuity to remedy such default; (iii) Tenant or any guarantor of Tenant's obligations hereunder shall (A) voluntarily be adjudicated a bankrupt or insolvent, (B) or voluntarily consent to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (C) voluntarily file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (D) voluntarily file a general assignment for the benefit of creditors; (iv) a court shall enter an order, judgment or decree appointing, with the voluntary consent of Tenant or any guarantor of Tenant's obligations hereunder, a receiver or trustee for Tenant or any guarantor of Tenant's obligations hereunder or for the Leased Premises or approving a petition filed against Tenant which seeks relief under the bankruptcy or other similar laws of the United States or any State, and such order, judgment or decree shall remain in force, undischarged or unstayed, sixty days after it is entered; (v) Tenant or any guarantor of Tenant's obligations hereunder shall in any insolvency proceedings be liquidated or dissolved or shall voluntarily commence proceedings towards its liquidation or dissolution; or (vi) the estate or interest of Tenant in the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within sixty days after such levy or attachment.

(b)      If any Event of Default shall have occurred, Landlord shall have the right at its option, then or at any time thereafter, to do any one or more of the following without demand upon or notice to Tenant:

(i)      Landlord may give Tenant notice  of Landlord's termination of this Lease. Upon the giving of such notice, the Term and the estate hereby granted and all rights of Tenant hereunder shall expire and terminate as if such date were the date herein fixed for the expiration of the Term, but Tenant shall remain liable  as hereinafter provided.

(ii)      Landlord may, whether or not the Term of this Lease shall have been terminated pursuant to clause (i) above re-enter and repossess the Leased Premises and remove any persons or property therefrom. Landlord shall be under no liability for or by reason of any such entry, repossession or removal. No such entry or repossession shall be construed as

25

an election by Landlord to terminate this Lease unless Landlord gives a written notice of such intention to Tenant pursuant to clause (i) above.

(iii)   After repossession of any of the Leased Premises pursuant to clause (ii) above, whether or not this Lease shall have been terminated pursuant to clause (i) above, Landlord may relet the Leased Premises or any part thereof to such tenant or tenants for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term) for such rent, on such conditions (which may include concessions or free rent) and for such uses as Landlord, in its reasonable discretion, may determine; and Landlord shall collect and receive any rents payable by reason of such reletting. The rents received on such reletting shall be applied (A) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Leased Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (B) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Leased Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Leased Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth above. Landlord may make such Alterations as Landlord in its reasonable discretion may deem advisable. Tenant agrees to pay Landlord, as Additional Rent, immediately upon demand, all reasonable expenses incurred by Landlord in obtaining possession, in performing Alterations and in reletting any of the Leased Premises, including fees and commissions of attorneys, architects, agents and brokers.

(iv)   If Tenant shall fail to make payment of any installment of Basic Rent or any Additional Rent on or before the date when each such payment is due, Tenant shall pay to Landlord, a sum equal to the amount unpaid multiplied by the greater of (A) two (2%) percent per annum above the then current Prime Rate, as hereinafter defined, or (B) 8.25%, but not more than the highest rate permitted to be contracted for under applicable Law (the "Default Rate") computed from the date such payment of Basic Rent or Additional Rent was due to and including the date of payment. The term "Prime Rate" shall mean the prime rate of interest published in the Wall Street Journal or its successor, from time to time. Notwithstanding the foregoing, if the Leased Premises are located in the State of Tennessee, the Default Rate shall be the lowest of (i) the "Applicable Formula Rate" as defined in Tennessee Code Annotated 47-14-102 (if then applicable), (ii) the rate provided in the first sentence of this subparagraph or (iii) the highest rate permitted to be contracted for under applicable Law.

(v)   Landlord may exercise any other right or remedy now or hereafter existing by law or in equity. If the Leased Premises are located in the State of California, there is attached hereto Exhibit "D" entitled "California Provisions" which includes an addition to Paragraph 19(b)(v) and which is incorporated herein and made a part hereof.

(c)   In the event of any expiration or termination of this Lease or repossession of any of the Leased Premises by reason of the occurrence of an Event of Default, Tenant shall

26

DSC:1018882.5

pay to Landlord Basic Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination or repossession and, thereafter, Tenant shall, until the end of what would have been the Term in the absence of such expiration, termination or repossession, and whether or not any of the Leased Premises shall have been relet, be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages: (i) Basic Rent, Additional Rent and all other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less (ii) the net proceeds, if any, of any reletting pursuant to paragraph 19(b) (iii), after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including all reasonable repossession costs, brokerage commissions, legal expenses, attorneys' fees, employees' expenses, costs of Alteration and expenses of preparation for reletting).  Tenant hereby agrees to be and remain liable for all sums aforesaid and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages.  Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by limitation had there been no such Event of Default.

(d)     At any time after such expiration or sooner termination of this Lease pursuant to Paragraph 19 or pursuant to Law or if Landlord shall have reentered the Leased Premises, as the case may be, whether or not Landlord shall have recovered any amounts under Paragraph 19(b)(iii) or 19(c), Landlord shall be entitled to recover from Tenant and Tenant shall pay to Landlord, on demand, as and for liquidated and agreed final damages for Tenant's default, the amount by which the Basic Rent, and all Additional Rent reserved hereunder for the unexpired portion of the Term demised herein as if the Lease had not expired or been terminated exceeds the then fair and reasonable rental value of the Leased Premises for the same period, discounted to present worth at the annual rate of 8.25%, minus any such monthly deficiencies previously recovered from Tenant under Paragraph 19(b)(iii) if applicable to such period.

(e)     If any Law governing a proceeding in which such liquidated final damages provided for in Paragraph 19(d) are to be proved shall validly limit the amount thereof to an amount less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such Law.

20.     <u>Additional Rights of Landlord and Tenant.</u>

(a)     No right or remedy conferred upon or reserved to Landlord in this Lease is intended to be exclusive of any other right or remedy; and each and every right and remedy shall be cumulative and in addition to any other right or remedy contained in this Lease.  No delay or failure by Landlord or Tenant to enforce its rights under this Lease shall be construed as a waiver, modification or relinquishment thereof.  In addition to the other remedies provided in this Lease, Landlord and Tenant shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation or attempted or threatened violation of any of the provisions of this Lease, or to specific performance of any of the provisions of this Lease.

(b)     Tenant hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, any right and privilege which it or any of them may have under any present or future Law to redeem any of the Leased Premises or to have a

27

continuance of this Lease after termination of this Lease or of Tenant's right of occupancy or possession pursuant to any court order or any provision hereof.

(c)    Landlord hereby waives any right to distrain or levy upon Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is created or otherwise. Landlord agrees at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant.

(d)    Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that the Trade Fixtures are Tenant's property and not part of the Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

(e)    Each of Tenant and Landlord (herein called "Paying Party") agrees to pay to the other party (herein called "Demanding Party") any and all reasonable costs and expenses incurred by the Demanding Party in connection with any litigation or other action instituted by the Demanding Party to enforce the obligations of the Paying Party under this Lease, to the extent that the Demanding Party has prevailed in any such litigation or other action. Any amount payable by Tenant to Landlord pursuant to this Paragraph 20(e) shall be due and payable by Tenant to Landlord as Additional Rent. No sum payable by Landlord to Tenant under this subparagraph will be payable or recoverable from any sums pledged or assigned (or intended to have been pledged or assigned) by Landlord to Lender, Tenant's right to recover such sums from Landlord being subordinate to the rights of Lender, such sums only being recoverable after payment to Lender in full of the Loan as constituted on the date hereof. As used in this Paragraph, "costs and expenses" shall include, without limitation, reasonable attorneys' fees at trial, on appeal and on any petition for review, and in any proceeding in bankruptcy, in addition to all other sums provided by Law.

21.    Notices. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes (i) three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below or (ii) one (1) day after having been sent by Federal Express, United Parcel or other nationally recognized air courier service,

To the Addresses stated below:

If to Landlord:

545 S. Figueroa Street, Suite 614
Los Angeles, CA 90071
Attn: Howard Sands
Telephone: (213) 488-9330

28

DSC:1018882.5

With a copy to:

> Gorman & Miller
> 201 Santa Monica Blvd., Suite 300
> Santa Monica, CA 90401
> Attn: Ken Miller, Esq.
> Telephone: (310) 394-4747

If to Tenant:

> c/o Rite Aid Corporation
> 30 Hunter Lane
> Camp Hill, PA  17011
> Attn:  Secretary
> Telephone: (717) 761-2633

And to:

> I. Lawrence Gelman, Esquire
> Rite Aid Corporation
> 30 Hunter Lane
> Camp Hill, PA  17011
> Telephone: (717) 975-5717

With a copy to:

> Thomas P. Witt, Esquire
> Wolf, Block, Schorr and Solis-Cohen LLP
> 1650 Arch Street
> 22nd Floor
> Philadelphia, PA 19103-2097
> Telephone: (215) 977-2164

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and states in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall send a copy of such Notice to Lender in the manner aforesaid. For the purposes of this Paragraph 21, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above.  Any Notice may be given on behalf of any party by its counsel.

22.    Estoppel Certificates.  Landlord and Tenant shall at any time and from time to time, upon not less than fifteen days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the current amount of Basic Rent and the dates to which Basic Rent, payable hereunder has been paid, and the fact (if true) that Tenant has no current offset or credits against Basic Rent due or to become due under the Lease and no security deposit (iii) that to the knowledge of the signer of such certificate no default by either Landlord or

29

DSC:1018882.5

Tenant exists hereunder or specifying each such default of which the signer may have knowledge, (iv) the remaining Term hereof, (v) with respect to a certificate signed on behalf of Tenant, that to the knowledge of the signer of such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said signer's knowledge, specifying and describing the same, (vi) that the Lease has not been assigned or sublet (or if it has, identifying any such sublease or assignment), (vii) that Tenant does not have any options to purchase the Leased Premises and (if true) that it has elected not to exercise its right of first refusal with respect to the proposed sale and (viii) such other matters as may reasonably be requested by the party requesting the certificate. It is intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective purchaser, assignee or subtenant of the Leased Premises.

23.    Surrender and Holding Over.

(a)    Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord. Tenant shall remove from the Leased Premises on or prior to such expiration or earlier termination the Trade Fixtures and personal property which is owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier Termination, repair any damage caused by such removal. Trade Fixtures and personal property not so removed at the end of the Term or within thirty days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. The cost of removing and disposing of such property and repairing any damage to any of the Leased Premises caused by such removal shall be borne by Tenant. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.

(b)    Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the Term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as tenancy from month to month only, at one hundred ten percent (110%) of the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred ten percent (110%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 19 (b).

24.    No Merger of Title. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (a) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (b) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (i) this

30

DSC:1018882.5

Lease or the leasehold estate created by this Lease and (ii) the fee estate in or ownership of the Leased Premises or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

25.  Definition of Landlord.

(a)  Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in the Leased Premises and shall not be enforced against the Landlord individually or personally.

(b)  The term "Landlord" as used in this Lease so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Leased Premises or holder of the Mortgage in possession at the time in question of the Leased Premises and in the event of any transfer or transfers of the title of the Leased Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all personal liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed.

26.  Hazardous Substances.

(a)  For the purposes hereof, the term "Hazardous Materials" shall include, without limitation, any material, waste or substance which is (i) included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "hazardous wastes" in or pursuant to any Laws, or subject to regulation under any Law; (ii) listed in the United States Department of Transportation Optional Hazardous Materials Table, 49 C.F.R. Section 172.101, as enacted as of the date hereof or as hereafter amended, or in the United States Environmental Protection Agency List of Hazardous Substances and Reportable Quantities, 40 C.F.R. Part 302, as enacted as of the date hereof or as hereafter amended; or (iii) explosive, radioactive, asbestos, a polychlorinated biphenyl, petroleum or a petroleum product or waste oil.  The term "Environmental Laws" shall include all Laws pertaining to health, industrial hygiene, Hazardous Materials or the environment, including, but not limited to each of the following, as enacted as of the date hereof or as hereafter amended: the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 *et seq.*; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901 *et seq.*; the Toxic Substance Control Act, 15 U.S.C. §2601 *et seq.*; the Water Pollution Control Act (also known as the Clean Water Act), 33 U.S.C. §1251 *et seq.*; the Clean Air Act, 42 U.S.C. §7401 *et seq.*; and the Hazardous Materials Transportation Act, 49 U.S.C. §5101 *et seq.*

(b)  Tenant represents and warrants to Landlord and Lender that, except as disclosed in the environmental reports listed on Exhibit C hereto, (i) neither the Leased Premises, nor any portion thereof, has been used by Tenant or, to the best of Tenant's knowledge, by any prior owner for the generation, manufacture, storage, handling, transfer, treatment, recycling, transportation, processing, production, refinement or disposal (each, a "Regulated Activity") of any Hazardous Materials; and (ii) to the best of Tenant's knowledge, there are no Hazardous

31

Materials present on, in or under the Leased Premises or any portion thereof except to the extent expressly permitted by the terms of this Section 26. Tenant covenants it (i) will comply, and will cause the Leased Premises to comply, with all Environmental Laws applicable to the Leased Premises, (ii) will not use, and shall prohibit the use of the Leased Premises for Regulated Activities or for the storage, handling or disposal of Hazardous Materials (other than in connection with the operation and maintenance of the Leased Premises and in commercially reasonable quantities as a consumer thereof, subject to compliance with applicable Laws), (iii) (A) will not install or permit the installation on the Leased Premises of any asbestos or asbestos-containing materials (except in compliance with all applicable Environmental Laws), underground storage tanks or surface impoundments and shall not permit there to exist any petroleum contamination in violation of applicable Environmental Laws originating on the Leased Premises, and (B) with respect to any petroleum contamination on the Leased Premises which originates from a source off the Leased Premises, Tenant shall notify all responsible third parties and appropriate government agencies (collectively, "Third Parties") and shall prosecute the cleanup of the Leased Premises by such Third Parties, including, without limitation, undertaking legal action, if necessary, to enforce the cleanup obligations of such Third Parties and, to the extent not done so by such Third Parties and to the extent technically feasible and commercially practicable, Tenant shall remediate such petroleum contamination, and (iv) shall cause any alterations of the Leased Premises to be done in a way which complies with applicable Laws relating to exposure of persons working on or visiting the Leased Premises to Hazardous Materials and, in connection with any such alterations, shall remove any Hazardous Materials present upon the Leased Premises which are not in compliance with applicable Environmental Laws or which present a danger to persons working on or visiting the Leased Premises.

Notwithstanding any provision of this Lease to the contrary, Landlord agrees that Tenant may sell household and automotive cleaners and other chemicals and products (including motor oil) in standard retail containers as are commonly sold by supermarkets, discount stores, and/or drugstores. Storage of such chemicals in commercially reasonable quantities for sale by Tenant is also permitted. Additionally, Landlord agrees that Tenant may use household and commercial cleaners and chemicals to maintain the Leased Premises, and additional chemicals necessary to perform on site photoprocessing activities, provided that such use and photoprocessing activities are in compliance with all Environmental Laws. Landlord and Tenant acknowledge that any or all of the cleaners and chemicals described in this paragraph may constitute Hazardous Materials. However, Tenant may sell, use, store and dispose of same as herein set forth, provided, that in doing so Tenant complies with all Laws. For the purposes of subdivisions (c) and (d) of this Article, the term "Hazardous Materials" shall exclude the Hazardous Materials used as permitted in this paragraph.

(c)     If, at any time during the Term, Hazardous Materials shall be found in, on or under the Leased Premises, then Tenant shall (at Tenant's sole expense), or shall cause such responsible Third Parties to, promptly commence and diligently prosecute to completion all investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (collectively, "Remedial Work") to the extent required by Environmental Laws, and in compliance with Environmental Laws, and at Tenant's sole cost; provided, that except as otherwise expressly provided in this subparagraph (c), Landlord shall not be required to accept any institutional control (such as a deed restriction) arising subsequent to Original Landlord's acquisition of its interest in the Leased Premises that restricts the permitted use of the

32

Leased Premises or any real property as a condition to any remedial plan approved by any governmental agency in connection with such Remedial Work. The Remedial Work required of Tenant under this Lease shall be limited to achieving clean-up standards applicable to commercial use of the Leased Premises as provided herein ("Commercial Closure"), if allowed under applicable Environmental Laws and if approved by the applicable governmental authority with jurisdiction over the Leased Premises, Hazardous Materials and Remedial Work; provided, that the Hazardous Materials left in place would not reasonably be expected to cause or threaten to cause current or future migration of such Hazardous Materials from the environmental media in which such Hazardous Materials are present to other environmental media or to other properties in excess of applicable regulatory standards permitted under applicable Legal Requirements; and provided, further, that nothing contained in this Section 26(c) shall be deemed to limit the obligations of the Tenant under any other provision of this Section 26 including, without limitation, the indemnification obligations of the Tenant under Section 26(e). In the event an institutional control (such as a deed restriction, environmental land use restriction, or activity and use limitation) that restricts the permitted use of or activities on the Leased Premises (hereinafter a "Restriction") is required in order to achieve Commercial Closure, prior to submitting any proposed plan for Remedial Work to a governmental authority which proposes such a Restriction or performing or implementing such Remedial Work or actually recording any Restriction in the relevant real property records, Tenant shall submit such Restriction to Landlord for review and approval. Landlord shall not unreasonably withhold or delay its approval of any such Restrictions (i) so long as the condition set forth in subpart (iii) of this sentence is satisfied, which require that the Leased Premises not be used for residential purposes, for a day care facility, or for agricultural purposes, (ii) so long as the condition set forth in subpart (iii) of this sentence is satisfied and the Leased Premises are adequately served by a municipal water supply, which prohibit the use of the ground water underlying the Leased Premises, or (iii) so long as such Restrictions would not reasonably be likely to result in a material decrease in the fair market value of the Leased Premises based upon the use of the Leased Premises as commercial property, would not reasonably be likely to materially affect the marketability of the Leased Premises or the ability to obtain financing secured by the Leased Premises based upon the use of the Leased Premises as commercial property, and would not reasonably be likely to create ongoing monitoring or reporting obligations with respect to the Leased Premises.

(d)     To the extent that Tenant has knowledge thereof, Tenant shall promptly provide notice to Landlord and Lender of any of the following matters which are not specified in the Environmental Reports described on Exhibit C hereto:

(i)     any proceeding or investigation commenced or threatened by any governmental authority with respect to the presence of any Hazardous Material affecting the Leased Premises;

(ii)     any proceeding or investigation commenced or threatened by any governmental authority, against Tenant or Landlord, with respect to the presence, suspected presence, release or threatened release of Hazardous Materials from the Leased Premises;

(iii)     all written notices of any pending or threatened investigation or claims made or any lawsuit or other legal action or proceeding brought by any person against

33

(A) Tenant or Landlord or the Leased Premises, or (B) any other party occupying the Leased Premises or any portion thereof, in any such case relating to any loss or injury allegedly resulting from any Hazardous Material or relating to any violation or alleged violation of Environmental Laws;

(iv)    the discovery of any occurrence or condition on the Leased Premises, of which Tenant becomes aware and which is not corrected within ten (10) days, or written notice received by Tenant of an occurrence or condition on any real property adjoining or in the vicinity of the Leased Premises, which reasonably could be expected to lead to the Leased Premises or any portion thereof being in violation of any Environmental Laws or subject to any restriction on ownership, occupancy, transferability or use under any Environmental Laws or which might subject Landlord or Lender to any Environmental Claim.  "Environmental Claim" means any claim, action, investigation or written notice by any person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resource damages, property damages, personal injuries or penalties) arising out of, based on or resulting from (A) the presence, or release into the environment, of any Hazardous Materials at or from the Leased Premises, or (B) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; and

(v)    the commencement and completion of any Remedial Work.

(e)    TENANT SHALL BE SOLELY RESPONSIBLE FOR AND SHALL DEFEND, REIMBURSE, INDEMNIFY AND HOLD EACH LANDLORD AND LENDER, AND THEIR OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, ATTORNEYS, BENEFICIAL OWNERS, TRUSTEES, MEMBERS, MANAGERS AND EMPLOYEES (AS USED IN THIS SUBPARAGRAPH, EACH AN "INDEMNIFIED PARTY") HARMLESS FROM AND AGAINST ALL DEMANDS, CLAIMS, ACTIONS, CAUSES OF ACTION, ASSESSMENTS, LOSSES, DAMAGES, LIABILITIES (INCLUDING, WITHOUT LIMITATION, STRICT LIABILITIES), INVESTIGATIONS, WRITTEN NOTICES, COSTS AND EXPENSES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, DIMINUTION IN PROPERTY VALUE AND REASONABLE EXPENSES OF INVESTIGATION BY ENGINEERS, ENVIRONMENTAL CONSULTANTS AND SIMILAR TECHNICAL PERSONNEL AND REASONABLE FEES AND DISBURSEMENTS OF COUNSEL), ARISING OUT OF, IN RESPECT OF OR IN CONNECTION WITH (I) TENANT'S BREACH OF ITS REPRESENTATIONS, WARRANTIES, COVENANTS OR OBLIGATIONS IN THIS LEASE, (II) THE OCCURRENCE OF ANY REGULATED ACTIVITY AT, ON OR UNDER THE LEASED PREMISES AT ANY TIME DURING OR PRIOR TO THE TERM OF THIS LEASE, (III) ANY ENVIRONMENTAL CLAIM WITH RESPECT TO THE LEASED PREMISES AGAINST ANY INDEMNIFIED PARTY OR ANY PERSON WHOSE LIABILITY FOR SUCH ENVIRONMENTAL CLAIM LANDLORD OR TENANT HAS OR MAY HAVE ASSUMED OR RETAINED EITHER CONTRACTUALLY OR BY OPERATION OF LAW (PROVIDED, THAT, EXCEPT FOR LIABILITIES OF LANDLORD ASSUMED OR RETAINED BY OPERATION OF LAW, WITHOUT THE CONSENT OF TENANT NO ENVIRONMENTAL LIABILITY CONTRACTUALLY ASSUMED OR CONTRACTUALLY RETAINED BY LANDLORD SHALL INCREASE THE LIABILITY OF TENANT UNDER THIS SECTION 26(e) IN EXCESS OF THAT LIABILITY OF TENANT OTHERWISE EXPRESSLY PROVIDED HEREUNDER), (IV) THE RELEASE,

34

THREATENED RELEASE OR PRESENCE OF ANY HAZARDOUS MATERIALS AT, ON, UNDER OR FROM THE LEASED PREMISES, REGARDLESS OF HOW DISCOVERED BY TENANT, LANDLORD OR ANY THIRD-PARTY, EXCEPT TO THE EXTENT THAT TENANT CAN DEMONSTRATE THAT SUCH RELEASE, THREATENED RELEASE OR PRESENCE OCCURRED SOLELY SUBSEQUENT TO THE TERM OF THIS LEASE (PROVIDED, THAT, IF AT THE END OF THE TERM OF THIS LEASE, TENANT SHALL PROVIDE TO LANDLORD AN ENVIRONMENTAL ASSESSMENT OF THE LEASED PREMISES DATED NOT EARLIER THAN THE LAST DAY OF THE TERM OF THIS LEASE AND PREPARED BY A CONSULTANT REASONABLY ACCEPTABLE TO LANDLORD AND LENDER WHICH CONCLUDES THAT NO RECOGNIZED ENVIRONMENTAL CONDITIONS EXIST ON THE LEASED PREMISES AND, WITH RESPECT TO ANY PREVIOUSLY IDENTIFIED RECOGNIZED ENVIRONMENTAL CONDITIONS, WHICH EVIDENCES APPROPRIATE INVESTIGATION AND, IF NECESSARY, REMEDIATION OF ALL SUCH ENVIRONMENTAL CONDITIONS, THEN THIS SUBPART (IV) SHALL BE DEEMED TO READ AS FOLLOWS: "THE RELEASE, THREATENED RELEASE OR PRESENCE OF ANY HAZARDOUS MATERIALS AT, ON, UNDER OR FROM THE LEASED PREMISES AT ANY TIME DURING OR PRIOR TO THE TERM OF THIS LEASE REGARDLESS OF HOW DISCOVERED BY TENANT, LANDLORD OR ANY THIRD-PARTY"), (V) ANY REMEDIAL WORK REQUIRED TO BE PERFORMED PURSUANT TO ANY ENVIRONMENTAL LAW OR THE TERMS HEREOF WITH RESPECT TO MATTERS ARISING OR OCCURRING PRIOR TO OR DURING THE TERM, OR (VI) ANY MATTERS ARISING UNDER OR RELATING TO ANY ENVIRONMENTAL LAW AND RELATING TO THE TENANT OR THE LEASED PREMISES.

(f)     Upon Landlord's request, at any time after the occurrence and during the continuation of an Event of Default hereunder or at such other time as Landlord has reasonable grounds to believe that Hazardous Materials (except to the extent those substances are permitted to be used by Tenant under Section 26(b) in the ordinary course of its business and in compliance with all Environmental Laws) are or have been released, stored or disposed of on or around the Leased Premises or that the Leased Premises may be in violation of the Environmental Laws, Tenant shall provide, at Tenant's sole cost and expense, an inspection or audit of the Leased Premises prepared by a hydrogeologist or environmental engineer or other appropriate consultant approved by Landlord and Lender indicating the presence or absence of the reasonably suspected Hazardous Materials on the Leased Premises or an inspection or audit of the Leased Premises prepared by an engineering or consulting firm approved by Landlord and Lender indicating the presence or absence of friable asbestos or substances containing asbestos on the Leased Premises.  If Tenant fails to provide such inspection or audit within thirty (30) days after such request, Landlord may order the same, and Tenant hereby grants to Landlord and Lender and their respective employees, contractors and agents access to the Leased Premises upon reasonable notice and a license to undertake such inspection or audit.  The cost of such inspection or audit, together with interest thereon at the Lease Default Rate from the date Tenant is provided with written confirmation of costs incurred by Landlord until actually paid by Tenant, shall be immediately paid by Tenant on demand.

(g)     Without limiting the foregoing, where recommended by the Environmental Reports listed on Exhibit C hereto and/or any other "Phase I" or "Phase II"

35

DSC:1018882.5

assessment provided to Tenant and where the particular conditions on the Leased Premises which formed the basis for such recommendation still exist, Tenant shall establish and comply with an operations and maintenance program relative to the Leased Premises, in form and substance acceptable to Landlord and Lender, prepared by an environmental consultant reasonably acceptable to Landlord and Lender, which program shall address any Hazardous Materials (including, without limitation, asbestos-containing material or lead based paint) that may now or in the future be detected on the Leased Premises. Without limiting the generality of the preceding sentence, Landlord may require (i) periodic notices or reports to Landlord and Lender in form, substance and at such intervals as Landlord may specify to address matters raised in the Environmental Reports and/or a "Phase I" or "Phase II" assessment, (ii) an amendment to such operations and maintenance program to address changing circumstances, laws or other matters, (iii) at Tenant's sole cost and expense, supplemental examination of the Leased Premises by consultants reasonably acceptable to Landlord and Lender to address matters raised in the Environmental Reports listed on Exhibit C hereto and/or a "Phase I" or "Phase II" assessment, (iv) access to the Leased Premises upon reasonable notice, by Landlord or Lender, and their respective agents or servicer, to review and assess the environmental condition of the Leased Premises and Tenant's compliance with any operations and maintenance program, and (v) variation of the operation and maintenance program in response to the reports provided by any such consultants.

(h)     If the Leased Premises are located in the State of New Jersey, there is attached hereto as Exhibit D a paragraph entitled "Industrial Site Recovery Act", and all of the provisions, terms and conditions of said paragraph are incorporated herein and made a part hereof.

(i)     The indemnity obligations of the Tenant and the rights and remedies of the Landlord under this Section 26 shall survive the expiration or termination of this Lease, but shall terminate seven years from the date of the expiration (or earlier termination) of this Lease if no Recognized Environmental Conditions (RECs) have been identified in any environmental reports provided to Tenant relating to the Leased Premises, and if any RECs have been identified in any such environmental reports, then on the later of seven years from the expiration (or earlier termination) of this Lease or seven years from the date that Tenant furnishes Landlord with a no further action letter or equivalent from any regulatory agency with jurisdiction over any REC.

27.     Entry by Landlord. Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than five (5) business days except in the case of emergency) to enter the Leased Premises at all reasonable business hours (and at all other times in the event of an emergency):  (a) for the purpose of inspecting the same or for the purpose of doing any work under Paragraph 11(c), and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), and (b) for the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within six (6) months prior to the expiration of the Term of this Lease for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

36

28.    Statements. Tenant shall submit to Lender, when filed with the Securities and Exchange Commission, copies of the Forms 10Q and 10K of Guarantor. If at any time Guarantor is no longer a public company, Tenant shall submit to Lender or its designee (a) any financial statements of Guarantor which are provided by Guarantor to its lenders, and (b) the annual audited financial report and quarterly audited or unaudited financial reports (only to the extent such quarterly reports are produced by Guarantor and provided to any of its lenders) within one hundred twenty (120) days following the close of each fiscal year (in the case of annual reports) or fiscal quarter (in the case of quarterly reports) of Guarantor. Notwithstanding the foregoing, neither Tenant nor Guarantor shall be required to submit such statements if on or before the applicable delivery date thereof such statements shall be available on EDGAR. So long as Original Landlord is the Landlord hereunder, within 60 days after the end of each fiscal year, Tenant shall provide Original Landlord with annual statements of sales for the Leased Premises for the fiscal year just ended certified by an officer of Tenant.

29.    No Usury. The intention of the parties being to conform strictly to the applicable usury laws, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

30.    Separability. Each and every covenant and agreement contained in this Lease is, and shall be construed to be, a separate and independent covenant and agreement, and the breach of any such covenant or agreement by Landlord shall not discharge or relieve Tenant from its obligation to perform the same. If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

31.    Miscellaneous.

(a)    The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

(b)    As used in this Lease the singular shall include the plural as the context requires and the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; (iii) "lien" shall mean "lien, charge, encumbrance, title retention agreement, pledge, security interest, mortgage and/or deed of trust"; and (iv) "obligation" shall mean "obligation, duty, agreement, liability, covenant or condition".

(c)    Any act which Landlord is permitted to perform under this Lease may be performed at any time and from time to time by Landlord or any person or entity designated by Landlord. Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense.

37

(d)    This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

(e)    The covenants of this Lease shall run with the Land and bind Tenant, the successors and assigns of Tenant and all present and subsequent encumbrancers and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns.

(f)    This Lease will be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes.

(g)    This Lease shall be governed by and construed according to the laws of the State in which the Leased Premises is located.

(h)    Wherever the consent or approval of Landlord is required hereunder and the request for consent or approval is provided to Landlord in writing, except as otherwise expressly provided herein, Landlord agrees that it will not unreasonably withhold, condition or delay such consent or approval.

32.    Additional Rent. The term "Additional Rent" as used herein includes all amounts, costs, expenses, liabilities and obligations (including but not limited to Tenant's obligation to pay any Net Awards hereunder) which Tenant is required to pay pursuant to the terms of this Lease other than Basic Rent.

33.    Right of First Refusal. Except in transactions consummated prior to the first anniversary of the Commencement Date, Landlord shall not at any time during the Term sell or convey or agree to sell or convey the Leased Premises without first having complied with the requirements of this Paragraph 33, except that Landlord may enter into a contract to sell the Leased Premises so long as such contract provides that the sale shall not close until and unless Tenant is given notice of such contract and elects not to exercise its right to purchase the Subject Premises hereunder. If Landlord shall desire to sell or convey all or any portion or portions of the Leased Premises, Landlord shall obtain from a third party a bona fide arms' length written offer or sales contract in compliance with the first sentence of this paragraph (the "Offer"), acceptable to Landlord, to purchase all or such portion of the Leased Premises; and Landlord shall submit a written copy of the Offer to Tenant and shall give Tenant twenty (20) days within which to elect to purchase the portion of the Leased Premises which is the subject of the Offer (herein called the "Subject Premises") on the precise terms and conditions of the Offer (except that if the Offer shall be in whole or in part for consideration other than cash, Tenant shall have the right to pay in cash the fair market value of such non-cash consideration). If Tenant elects to so purchase the Subject Premises, Tenant shall give to Landlord written notice thereof ("Acceptance Notice") and closing shall be held within sixty (60) days after the date of the Acceptance Notice, whereupon Landlord shall convey the Subject Premises to Tenant. Tenant's failure to give a timely Acceptance Notice shall be deemed an election not to purchase the Subject Premises. At closing Landlord shall deliver to Tenant a special warranty deed (or local equivalent), sufficient to convey to Tenant fee simple title to the Subject Premises free and clear

38

of all liens, restrictions and encumbrances, except for the Permitted Encumbrances, liens or encumbrances created, suffered or consented to in writing by Tenant or arising by reason of the failure of Tenant to have observed or performed any term, covenant or agreement herein to be observed or performed by Tenant, the lien of any Impositions then affecting the Leased Premises, this Lease and, if the Subject Premises are to be conveyed subject to the outstanding balance of the Loan, the Mortgage and all other Loan documents. This right of first refusal shall continue as to all portions of the Leased Premises until such time as such portions shall have been sold by Landlord to the party making the Offer or its assignee(s). In the event Tenant shall elect not to so purchase the Subject Premises, unless a further Offer is submitted to Tenant in accordance with this Paragraph 33, Landlord may thereafter sell the Subject Premises which are the subject of the Offer only to (a) the party making the Offer or its assignee(s) and only in accordance with the terms thereof or (b) a third party so long as the sale is on terms substantially similar to the Offer and the sale closes within six months after the Offer was submitted to Tenant. To prevent Landlord from defeating the rights of Tenant under this Paragraph 33, Landlord agrees that Landlord will at no time accept an offer to purchase all or any portion of the Leased Premises together with any other property (except other property which is leased to Tenant or an affiliate of Tenant). In no event shall the provisions of this Paragraph 33 or the rights and privileges of Tenant under this Paragraph 33 be construed as limiting in any manner any other rights granted elsewhere in this Lease Agreement to Tenant. Notwithstanding anything to the contrary herein, the provisions of this Paragraph 33 shall not apply to (i) any sale or conveyance of the Leased Premises in foreclosure (or similar proceeding) of a bona-fide mortgage or deed of trust or to any conveyance in lieu of foreclosure of such a mortgage or deed of trust, or (ii) any sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the beneficial ownership interest, membership interest or other equity interest in Landlord, or the change of the trustee, manager or other controlling person of the Landlord.

If Landlord shall obtain an Offer with respect to a sale or conveyance of all or any portion of the Leased Premises, and sells the Leased Premises (to Tenant or anyone else) Tenant hereby acknowledges and consents as follows: (i) any such sale or conveyance during any period in which the Loan may not be prepaid or defeased, as the case may be, shall be subject to the outstanding balance of the Loan, and, if Tenant shall be entitled to, and shall, exercise its rights under this Paragraph 33, the Loan, Note, Mortgage and other Loan documents will be assumed by Tenant, and the lien of the Mortgage may not be released during such period; (ii) such sale shall be in accordance with and subject to the terms and provisions of the Note and Mortgage, whether such purchase contemplates the purchase of the Leased Premises subject to the lien of the Mortgage or for a release of the lien of the Mortgage; and (iii) if the lien of the Mortgage is not released in connection with such sale of the Leased Premises, and if Tenant acquires the Leased Premises, no merger of title shall occur and this Lease and any guaranty of this Lease will remain in full force and effect in accordance with their terms.

If Tenant shall have agreed to purchase the Subject Premises pursuant to an Offer under which the third party offeror was to acquire the Subject Premises under and subject to the lien of the Mortgage, and if such purchase by Tenant of the Subject Premises shall occur at a time when the Loan may be prepaid or defeased, as the case may be, Tenant may purchase the Subject Premises for cash free and clear of the Mortgage but only if (i) the cash portion of the Offer is increased by an amount equal to the principal and interest secured by the Mortgage, and (ii) Tenant pays (in addition to the purchase price) all prepayment premiums or defeasance deposits,

39

DSC:1018882.5

yield maintenance amounts, satisfaction fees and other sums which become owing as a result of such prepayment or defeasance, as the case may be; all to the end and effect that Landlord will net the same amount as Landlord would have netted had the Subject Premises been sold under and subject to the lien of the Mortgage, pursuant to the Offer.

34.     Substitution of Leased Premises. Tenant may elect to effect a Substitution; provided, that, the terms and conditions of this Paragraph 34 are fully satisfied:

(a)     Tenant or Guarantor shall provide Landlord with evidence satisfactory to Landlord that the Substitute Premises shall be used and occupied by Guarantor or one of its subsidiaries;

(b)     No Event of Default by Tenant shall have occurred and be continuing under this Lease either at the time of the request for the proposed Substitution or on the date of the Substitution, and the Guaranty shall be in full force and effect;

(c)     Tenant shall provide Landlord (and so long as a Loan is outstanding, Lender) with written notice of the prospective Substitution not less than sixty (60) days before the date on which such Substitution is sought to be effected. Lender (if any) shall have 15 days after receipt of such notice to approve or disapprove in writing the Substitution in its sole discretion and Landlord shall have 15 days after receipt of such notice to approve or disapprove in writing the Substitution in its reasonable discretion, in each case with a failure to timely respond deemed a disapproval. It shall be deemed reasonable for Landlord to disapprove a Substitution in which the Withdrawn Premises and Substitute Premises are located in different states. So long as a Loan is outstanding no Substitution shall be permitted without Lender's written approval;

(d)     The Substitute Premises must be a property as to which Landlord will hold fee simple title;

(e)     Landlord and Tenant shall either (i) enter into a Substitution Lease and Tenant's obligation to pay rent under the Substitution Lease shall commence not later than the date of the Substitution, or (ii) amend this Lease to include the Substitute Premises as the Leased Premises.

(f)     Tenant shall be required to accept the Substitute Premises in its "as is" condition; and

(g)     Guarantor shall execute and deliver to Landlord a guaranty of payment and performance with respect to the Substitution Lease on the same terms and conditions as the existing Guaranty, or shall amend the existing Guaranty to expressly confirm and ratify the applicability of such Guaranty in respect of the amended Lease described in Paragraph 34(e).

(h)     If Lender gives written approval of the Substitution (or if there is no Loan outstanding), then within 60 days of such approval (or within 60 days of Tenant's notice under subparagraph d above if no Loan is outstanding) Tenant shall deliver to Landlord and Lender the following items (herein, the "Substitution Documents"): (A) a current (as hereinafter defined) appraisal of the Withdrawn Premises performed in accordance with the criteria set forth in

40

Paragraph 34 below, (B) a current appraisal of the Substitute Premises performed in accordance with the criteria set forth in Paragraph 34 below, (C) a current title insurance commitment for the Substitute Premises satisfying the requirements set forth in Paragraph 34 below, (D) a current ALTA survey for the Substitute Premises satisfying the requirements set forth in Paragraph 34 below, (E) a current Phase I Environmental Report for the Substitute Premises satisfying the requirements set forth in Paragraph 34 below and (F) if a Loan is still outstanding, a $5000 nonrefundable fee payable to Lender to cover its internal underwriting costs. For purposes of this paragraph, an appraisal, report, survey, environmental report, or any other document permitted to be delivered hereunder, shall be "current" if it is dated within 30 days prior to its delivery to Landlord.

(i)     The Substitute Premises shall have a Fair Market Value (as hereinafter defined), at least equal to that of the Withdrawn Premises (and in no event less than the outstanding balance of the Loan). Tenant shall have delivered to Landlord and Lender an appraisal of the Substitute Premises by an appraiser which, as required by the Loan documents, is acceptable to Lender and/or the rating agencies, confirming that the Fair Market Value of the Substitute Premises is equal to or greater than the Fair Market Value of the Withdrawn Premises determined using substantially the same methodology as used in the appraisal delivered to Lender in connection with the origination of the Loan. The Fair Market Value of the Withdrawn Premises shall be deemed for this purpose to be equal to the greater of (i) the appraised value of the Withdrawn Premises as of the date of Substitution and (ii) the appraised value of the Withdrawn Premises as of the Commencement Date (including, if construction is anticipated or being accomplished at such time, the appraised value of the completed project assuming that Completion of the project has occurred). At the time of substitution, a Substitute Premises must be one which Tenant intends to operate as a Rite Aid retail store (or as a retail store under the brand name then in use for the majority of Guarantor's stores of comparable size and type).

(j)     The term "Fair Market Value" shall mean the value of the interest held by Landlord in the Withdrawn Premises or the interest to be conveyed to Landlord in the Substitute Premises, unencumbered by this Lease and any Loan (and in the condition required to be maintained pursuant to this Lease) and determined at the time in question. If Landlord is in agreement with the appraisals delivered by Tenant as a part of the Substitution Documents, such appraisals shall be utilized to determine Fair Market Value. If Landlord gives Tenant written notice of its disapproval of an appraisal delivered by Tenant (to be delivered by Landlord within thirty (30) days after receipt of Tenant's appraisal, Fair Market Value shall be determined in accordance with the following procedure:

(i)     Within thirty (30) days after the delivery of notice by Landlord disapproving Tenant's appraisal, Landlord shall submit to Tenant an appraisal of the Withdrawn Premises and/or the Substitute Premises, as applicable, prepared by an appraiser who is both a member of the American Institute of Appraisers and actively engaged in the appraisal of real property in the area where such property is located; in addition, Landlord's appraiser and Tenant's appraiser shall jointly, within fifteen (15) days after delivery of notice by Landlord rejecting Tenant's appraisal, choose a third appraiser who is a member of the American Institute of Appraisers who shall, within twenty days after appointment, choose one of the two appraised values as the Fair Market Value. The Fair Market Value of the Withdrawn Premises and/or the

41

Substitute Project, as determined by the foregoing arbitration procedure, shall be binding upon both Tenant and Landlord. The fees and expenses of the appraisers shall be borne by Tenant.

(ii)     The appraisers shall not, in making their appraisal of the Withdrawn Premises and the Substitute Premises, attribute any value to any of Tenant's Trade Fixtures.

(k)     If any portion of the Loan is outstanding and any securities issued in connection with such Loan are rated, Landlord shall request promptly and as soon thereafter as is reasonably practicable obtain and deliver to Lender (at Tenant's expense) a written confirmation from each rating agency having issued such a rating that such Substitution will not result in a withdrawal, downgrade or qualification of the then current rating of any such securities which are in effect immediately prior to the Substitution;

(l)     Tenant shall have delivered to Landlord and Lender a current as-built ALTA survey for the Substitute Premises including a certification addressed to Landlord, the title insurance company and Lender and their successors and assigns, and conforming to the requirements of the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA, ACSM and NSPS in 1999, and including Items 1-4, 6, 7(a)-(b), 8-10, 11(a), 14, and 16 of Table A thereof, prepared by a professional land surveyor licensed in the state in which the Substitute Premises is located which would be reasonably satisfactory to a prudent lending institution making a loan similar to the Loan. Such survey shall reflect the same legal description which is included in the title insurance policy relating to such Substitute Premises and shall include, among other things, a metes and bounds description of the real property comprising part of such Substitute Premises. The surveyor's seal shall be affixed to such survey, such survey shall show no material encroachments or violations of any setback requirements and shall certify that the surveyed property is not located in a "one-hundred-year flood hazard area" (or, if the surveyed property is located in a "one-hundred-year flood hazard area", flood insurance in an amount equal to the full replacement cost of the Substitute Premises or the maximum amount available through National Flood Program or any successor program, whichever is less, shall be provided if flood insurance is available under the National Flood Insurance Act);

(m)     Tenant shall have delivered to Landlord and Lender a Phase I environmental assessment and, if recommended under the Phase I environmental assessment, a Phase II environmental assessment prepared by a consultant pre-approved by Lender, indicating that the assessment revealed no Hazardous Substances on or under the Substitute Premises in concentrations above applicable standards established under Environmental Laws (other than those used in commercially reasonable quantities in connection with operation of the Substitute Premises and in compliance with environmental laws), and no violation of any environmental law;

(n)     Tenant shall have delivered to Landlord and Lender an irrevocable commitment to issue a policy of owner's title insurance from a title insurer reasonably satisfactory to Landlord containing coverages and title exceptions similar to those contained in the policy for the Withdrawn Premises and a policy of lender's title insurance satisfying the requirements of the Lender as set forth in the Loan documents;

42

(o)     Tenant shall have delivered to Landlord and Lender valid certificates of insurance and copies of related insurance policies indicating that the insurance requirements set forth in this Lease have been satisfied with respect to the Substitute Premises and evidencing the payment of all premiums payable with respect thereto for the existing policy period;

(p)     Tenant shall have delivered to Landlord and Lender the following evidence that the Substitute Premises and its use comply with all applicable Legal Requirements: a letter from the municipality in which such Substitute Premises is located or a certificate of a surveyor that is licensed in the state in which the Substitute Premises is located (with respect to zoning and subdivision laws) or an ALTA 3.1 zoning endorsement to the title insurance policies delivered pursuant hereto (with respect to zoning laws) and a subdivision endorsement to the title policies (with respect to subdivision laws).

(q)     If Guarantor does not maintain a long term unsecured debt rating of BBB- or better by Standard & Poor's, then Tenant shall have delivered to Landlord and Lender a physical conditions inspection report with respect to the Substitute Premises which is reasonably acceptable to Landlord and which would be reasonably satisfactory to a prudent lending institution making a loan similar to the Loan, and stating that the Substitute Premises and its use comply in all material respects with all applicable Legal Requirements (including, without limitation, zoning, subdivision and building laws) and that the Substitute Premises is in good condition and repair and free of damage and waste. If such physical condition report indicates that there are any items of deferred maintenance in excess of $25,000, Tenant shall have deposited into escrow with Lender, as long as any portion of a Loan is outstanding and otherwise with Landlord, an amount equal to the deferred maintenance in excess of such $25,000, together with an agreement to complete such deferred maintenance within six months thereafter;

(r)     Landlord (or a title insurance company satisfactory to Landlord, Tenant and Lender) shall have received, and Lender shall have received a copy of, a deed conveying a fee estate in and to the Substitute Premises to Landlord, and a letter from Landlord (or a title insurance company satisfactory to Landlord, Tenant and Lender) acknowledging receipt of such deed and agreeing to record the same in the real estate records for the county in which the Substitute Premises is located, such deed containing the same types of warranty as in the deed Landlord received for the Withdrawn Premises taking into account differing nomenclature in different states;

(s)     Tenant shall have delivered, and shall have caused Guarantor to deliver, to Landlord, Lender and any applicable rating agency, a certificate which (1) confirms that no Event of Default exists at the time of the Substitution, (2) states that all conditions precedent relating to such Substitution set forth in this Lease have been complied with, (3) contains such other representations and warranties as Landlord or Lender (or any applicable rating agency), may require, provided that such other representations and warranties are generally consistent with the representations and warranties given in the Warranties and Representations Agreement executed by Tenant and dated as of the date of this Lease. If any such certificate cannot be given because it would be inaccurate, such certificate shall disclose the inaccuracy of such representation and warranty and such certificate shall be acceptable if the disclosure therein would be reasonably satisfactory to a prudent lending institution making a loan similar to the Loan;

43

(t)     Tenant shall have delivered to Landlord and Lender (1) updates certified by Tenant of all organization documentation related to such entity and/or the formation, structure, existence, good standing and/or qualification to do business of such entity similar to that delivered to Lender in connection with the origination of the Loan; (2) good standing certificates, or certificates of qualification to do business in the jurisdiction in which the Substitute Premises is located (if required in such jurisdiction) and (3) evidence of the authority of such entity to undertake the Substitution and any actions taken in connection with such substitution;

(u)     Tenant shall have delivered, and shall have caused Rite Aid Corporation to deliver, to Landlord, Lender (and any applicable rating agency) such opinion or opinions of counsel and any additional documents or certificates which are similar to those opinion letters, documents or certificates issued in connection with the execution and delivery of the Lease, the making of the Loan and Landlord's acquisition of its interest in the Withdrawn Premises and which would be reasonably satisfactory to a prudent lending institution making a loan similar to the Loan, including without limitation an opinion letter that the Substitution will not cause Lender to be in violation of any lending or banking laws of the state in which the Substitute Premises are located.

(v)     Tenant shall have paid all reasonable expenses of Lender and all reasonable expenses of Landlord in connection with the Substitution, including, without limitation, title charges, transfer tax charges, recording charges, filing fees, mortgage and intangible taxes, documentary stamp taxes and other related expenses, reasonable legal fees and expenses, appraisal fees, survey costs, costs for Phase I (and, if necessary, Phase II) environmental audits, and all other costs necessary to provide documentation to Landlord and Lender meeting the requirements of Paragraph 34 of this Lease with respect to Substitution and at least equal to the documentation received by Landlord and Lender upon acquisition of the original Premises and the financing thereof and as any applicable rating agency may require.

35.     Disclaimer. For avoidance of doubt, the parties hereby confirm that Tenant has no duty to occupy the Leased Premises or to operate any business in the Leased Premises, and that there is no restriction under this Lease on the location of places of business by Tenant, its sublessors, assigns or subtenants, even if such a place or places of business compete with a business operated in the Leased Premises.

36.     State or City Specific Provisions. If the Leased Premises is located in the State of New Jersey, the State of California, the State of Utah, the State of Maryland or the City of Philadelphia, Pennsylvania, there is attached hereto Exhibit D setting forth provisions which are incorporated into and made a part of this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

DSC:1018882.5

Store No. 3974

### LANDLORD'S SIGNATURE PAGE

Attached to and made a part of Lease dated: _October 1_, 2004

Between:

**CP RAD BRICK, LLC**, Landlord

and

**RITE AID OF NEW JERSEY, INC.**, Tenant

Premises:

Rite Aid Store No. 3974
Location: Brick, NJ

**CP RAD BRICK, LLC,**
a New Jersey limited liability company

By: _____
Howard Sands, Manager

Store No. 3974

TENANT'S SIGNATURE PAGE

Attached to and made a part of Lease dated: *October 1*, 2004

Between:

**CP RAD BRICK, LLC**, Landlord

and

**RITE AID OF NEW JERSEY, INC.**, Tenant

Premises:

Rite Aid Store No. 3974
Location: Brick, NJ

**RITE AID OF NEW JERSEY, INC.**,
a New Jersey corporation

By: _____
     I. Lawrence Gelman, Vice President

Attest: _____
     SANDRA NEUSTADTER  , Assistant Secretary

BRICK, NJ        Store 3974

All that certain Lot, parcel or tract of land, situate and lying in the Township of Brick, County of Ocean and State of New Jersey being more particularly described as follows:

BEGINNING at the point of intersection of the Southerly line of Burnt Tavern Road (100 feet Right-of-Way) and the division line of Lots 5 and 6 in Block 1192.38 and running; thence

(1)  Southeasterly along the Southerly line of Burnt Tavern Road, on a curve to the left having a radius of 1,550.00 feet to an arc distance of 205.13 feet to a point; thence

(2)  South 32 degrees 15 minutes 01 second East, 105.30 feet to a point in the Westerly line of Van Zile Road (60 feet Right-of-Way); thence

(3)  Along same, South 07 degrees 02 minutes 32 seconds West, 461.51 feet to a point in the Southerly line of Van Zile Road; thence

(4)  Along same, South 82 degrees 57 minutes 28 seconds East, 13.50 feet to a point in the Westerly line of Van Zile Road, (33.00 Feet Right-of-Way); thence

(5)  Along same, South 07 degrees 02 minutes 32 seconds West, 108.73 feet to a point; thence

(6)  Continuing along same, South 05 degrees 43 minutes 37 seconds West, 230.13 feet to a point; thence

(7)  North 82 degrees 56 minutes 10 seconds West, 257.93 feet along the division line with Lot 1, Block 1124 to a point; thence

(8)  North 05 degrees 27 minutes 55 seconds East, 934.40 feet along the division line with Lot 5, Block 1192.38, to a point in the Southerly line of Burnt Tavern Road, and point and place of beginning.

EXCEPTING THEREOUT AND THEREFROM THE FOLLOWING DESCRIBED PARCELS OF LAND

PARCEL A:
BEGINNING at a concrete monument marking the Southeast corner of Lot 6, Block 1192.38, said beginning point is set 30 feet West from the centerline of Van Zile Road and running thence from said beginning point;

(1)  North 05 degrees 43 minutes 37 seconds East parallel and 30 feet from the centerline of Van Zile Road 229.97 feet to an angle point marked with a concrete monument; thence

(2)  North 07 degrees 02 minutes 32 seconds East still parallel to the centerline of Van Zile Road 30 feet from the centerline thereof 108.88 feet to a concrete monument; thence

(3)  South 82 degrees 57 minutes 28 seconds East 13.5 feet to a point in Van Zile Road; thence

(4)  South 07 degrees 02 minutes 32 seconds West 108.73 feet to a point; thence

(5)  South 05 degrees 43 minutes 37 seconds West 230.13 feet to a point; thence

(6)  North 82 degrees 56 minutes 10 seconds West 13.50 feet to the point of BEGINNING.

PARCEL 2

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Township of Brick, County of Ocean and State of New Jersey:

BEING KNOWN AND DESIGNATED as New Lots 6.02, 6.03, 6.04, 6.05 and 6.06 in Block 1192.38 as shown on a map entitled "Final Map Final Plat - Major Subdivision, Tax Block 1192.38, Lot 6, Brick Township, Ocean County, New Jersey", duly filed in the Ocean County Clerk's Office on August 22, 2002 as Map No. K-3171.

After taking exceptions into consideration, being Tax Block 1192.38, Lot 6.01

BEING THE SAME AS:  Legal Description (Consolidated)
ALL THAT CERTAIN Lot, Parcel or Tract of Land, Situate and lying in the Township of Brick, County of Ocean and State of New Jersey BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING at a point of intersection of the Southerly line of Burnt Tavern Road (100 Feet Right-of-Way) and the division line of Lots 5 and 6.01 in Block 1192.38 and Running; thence

1.  Southeasterly along the Southerly line of Burnt Tavern Road, on a curve to the left having a Radius of 1,550.00 feet to an arc distance of 205.13 feet to a point; thence

2.  South 32 degrees 15 minutes 01 seconds East, 105.30 feet to a point in the Westerly line of Van Zile Road (60 feet Right-of-Way); thence

3.  Along same, South 07 degrees 02 minutes 32 seconds West, 443.55 feet to a point in the Southerly line of Van Zile Road; thence

4.  North 82 degrees 57 minutes 28 seconds West, 248.97 feet along the division line Lots 6.06 and 6.05, Block 1192.38 and Lot 6.01, Block 1192.38 to a point; thence

5.  North 05 degrees 27 minutes 55 seconds East, 577.61 feet along the division line with Lot 5, Block 1192.38 to a point in the Southerly line of Burnt Tavern Road, and point and place of BEGINNING.

EXHIBIT B – Store # 3974-Brick,NJ
Basic Rent Schedule

1.   Schedule.  Number of Consecutive Renewal Terms: Eight (8)
Duration of each Renewal Term: Five (5) Years

| LEASE YEAR | ANNUAL BASIC RENT | MONTHLY BASIC RENT |
|---|---|---|
| 1-10 | $ 193,875.00 | $ 16,156.25 |
| 11-20 | $ 213,262.56 | $ 17,771.88 |
| 21-30 | $ 234,588.84 | $ 19,549.07 |
| 31-40 | $ 258,047.76 | $ 21,503.98 |
| 41-50 | Fair Market Rent as determined under Paragraph 2 below | Fair Market Rent as determined under Paragraph 2 below |
| 51-60 | Fair Market Rent as determined under Paragraph 2 below | Fair Market Rent as determined under Paragraph 2 below |

2.   Determination of Fair Market Rent:1) In the 41st Lease Year (which is the first year of the fifth Renewal Term), Basic Rent shall be adjusted to fair market rent ("Fair Market Rent") as of the commencement of such Renewal Term and determined in accordance with this Paragraph and in the 51st Lease Year (which is the first year of the seventh Renewal Term), Basic Rent shall be again adjusted to Fair Market Rent as of the commencement of such seventh Renewal Term and determined under this Paragraph 2. In each case Fair Market Rent shall be deemed to be equal to 110% of the Basic Rent applicable to the previous Term unless Landlord or Tenant gives notice ("Appraisal Election Notice") to the other of its election to have Fair Market Rent determined by appraisal under this Paragraph 2, which notice must be given at least 180 days (but not more than 365 days) before commencement of the Renewal Term in question and must be accompanied by a written appraisal setting forth fair market rent for the Leased Premises prepared by an appraiser who is both a member of the American Institute of Appraisers and actively engaged in the appraisal of real property in the area where the Leased Premises is located.

b) If one of the parties (the "Electing Party") gives a timely Appraisal Election Notice in compliance with Paragraph 2(a) of this Exhibit B, then Fair Market Rent for such Renewal Term shall be deemed to be as set forth in the accompanying appraisal unless the other party (the "Non-electing Party") gives the Electing Party written notice of its disapproval of Electing Party's appraisal within sixty days after receipt of Electing Party's appraisal, which notice must be also be accompanied by a written appraisal complying with Paragraph 2(a) of this Exhibit B. If the Non-electing Party gives timely notice of its disapproval of Electing Party's appraisal, Landlord's appraiser and Tenant's appraiser shall jointly, within fifteen days after delivery of Non-electing Party's appraisal, choose a third appraiser who is a member of the American

Exhibit B Rent Schedules II1.DOC

Institute of Appraisers who shall, within twenty days after appointment, choose one of the two appraised values as the Fair Market Rent, which determination shall be binding upon both Tenant and Landlord.  Except as provided in Paragraph 2(c) of this Exhibit B, each party shall bear the fees and expenses of its own appraiser, and the fees and expenses of the third appraiser shall be borne by the party whose appraisal was not chosen by the third appraiser.

c) Notwithstanding anything to the contrary herein, Tenant may cancel any of the last four Renewal Terms by giving a Renewal Term Cancellation Notice on or before the date which is the later of (i) ten business days after determination of Fair Market Rent for such Renewal Term under this Paragraph 2 or (ii) the date occurring ten days after the date on which Landlord shall have given to Tenant a written notice reciting the provisions of Paragraph 5(b) above (relating to automatic renewal). If Tenant cancels one of the last four Renewal Terms, Tenant shall bear the fees and expenses of all appraisers rendering appraisals under this Paragraph 2 in connection with the Renewal Term so cancelled.  Upon the giving of a Renewal Term Cancellation Notice this Lease and the Term shall terminate and come to an end as of the later of (i) the one hundred eightieth (180th) day following the giving of the Renewal Term Cancellation Notice, or (ii) the last day of the then current Term (and if the effect of this sentence is to extend the Term it shall be so extended on the terms and conditions and for the Rent specified herein for the Renewal Term so cancelled).

Exhibit B Rent Schedules III.DOC

Exhibit C
Environmental Reports

| Store# | Address | Document | Date | Consultant |
|--------|---------|----------|------|------------|
| 3974 | 1041 Burnt Tavern Road, Brick, NJ | Phase I | 03/24/97 | The Krydon Group, Inc |
| | | Phase I | 05/21/99 | BL Companies |
| | | Phase I Report | August 2004 | BL Companies |

DSC:1019449.2/RJT021-221016

EXHIBIT D

NEW JERSEY PROVISIONS

INDUSTRIAL SITE RECOVERY ACT

Industrial Site Recovery Act. Tenant agrees as follows with respect to the Industrial Site Recovery Act, found at N.J.S.A. 13:1k-6, *et seq.*, and the regulations pertaining thereto, N.J.A.C. 7:26B-1-1, *et seq.*, as amended ("ISRA"):

Tenant shall not permit any part of the Premises or the improvements thereon to be used as an "industrial establishment" within the current meaning of ISRA. In the event that, in contravention of the foregoing, the Premises or any part thereof constitutes an "industrial establishment" within the current meaning of ISRA, Landlord shall have the right to declare a default and exercise any of the rights and remedies available to it in the case of an Event of Default.

If, during the Term of this Lease, Tenant's activities on the Premises cause the Premises to become an "Industrial Establishment", as that term is defined in ISRA, and if, during the Term of this Lease, there is a transfer of ownership or operations or closing of operations of the Industrial Establishment or any other transaction subject to ISRA and at the expiration or earlier termination of this Lease, and provided that the Landlord notifies Tenant at least thirty (30) days prior to any ownership transfer of Tenant's responsibility to comply with ISRA and that Landlord, at Tenant's sole cost and expense and to accommodate any filings by Tenant, promptly executes any applicable forms as transferor, then Tenant shall comply with all requirements of ISRA, including, without limitation, filing any applicable forms and paying all applicable fees. Tenant shall promptly provide Landlord with copies of all correspondence, reports, test results, notices, orders, findings, declarations and other materials pertinent to Tenant's compliance and the New Jersey Department of Environmental Protection's requirements under ISRA, as any of the same are issued to or received by Tenant from time to time. If Tenant fails to fulfill its obligation to comply with ISRA, Tenant shall indemnify and hold harmless the parties to be indemnified under Section 26(e) of the Lease to which this Exhibit is attached from any claims, damages or losses, including reasonable attorneys' fees, arising from non-compliance with ISRA.

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** ("Amendment") is made this 31st day of October, 2019 by and between **AZTEC INN L.P.,** having an address of 4440 Pacific Highway, San Diego, California 92110 ("Landlord") and **RITE AID OF NEW JERSEY, INC.,** having an address of Post Office Box 3165, Harrisburg, Pennsylvania 17105, Attention: Secretary ("Tenant").

**WHEREAS,** Landlord's predecessor-in-interest and Tenant entered into a Lease dated October 1, 2004 (the "Lease"), for premises located at 1041 Burnt Tavern Road, Brick, New Jersey (the "Premises"); and

**WHEREAS,** by its present terms, the Lease will expire on September 30, 2024; with eight (8) five (5) year options to renew the term of the Lease; and

**WHEREAS,** the parties hereto have agreed to extend the term of the Lease, and to otherwise modify and amend certain terms and conditions of the Lease as set forth herein.

**NOW, THEREFORE, WITNESSETH,** intending to be legally bound hereby, and in consideration of the promises and mutual covenants herein contained the parties do hereby agree as follows:

1. Effective the date hereof, the term of the Lease is extended and shall now expire September 30, 2031 ("Extended Term").

2. Notwithstanding anything to the contrary set forth in the Lease, during the Extended Term Tenant shall pay Basic Rent as follows:

| Period | Annual Rent | Monthly Installment |
|---|---|---|
| 12/1/19 – 9/30/26: | $186,604.80 | $15,550.40 |
| 10/1/26 – 9/30/31: | $205,265.28 | $17,105.44 |

3. Notwithstanding anything to the contrary set forth in the Lease, Landlord and Tenant hereby agree that two (2) of the eight (8) Renewal Terms set forth in the Lease are hereby deleted, and Tenant shall retain six (6) five (5) year Renewal Terms. During the six Renewal Terms, if elected, Tenant shall pay Basic Rent for the same as follows:

| | Period | Annual Rent | Monthly Installment |
|---|---|---|---|
| 1st Renewal Term: | 10/1/31 – 9/30/36 | $234,588.84 | $19,549.07 |
| 2nd Renewal Term: | 10/1/36 – 9/30/41 | $258,047.76 | $21,503.98 |
| 3rd Renewal Term: | 10/1/41 – 9/30/46 | $258,047.76 | $21,503.98 |
| 4th Renewal Term: | 10/1/46 – 9/30/51 | Fair Market Rent | (as defined in Lease) |
| 5th Renewal Term: | 10/1/51 – 9/30/56 | Fair Market Rent | (as defined in Lease) |
| 6th Renewal Term: | 10/1/56 – 9/30/61 | Fair Market Rent | (as defined in Lease) |

-1-

4. Effective the date hereof, Paragraph 34 of the Lease (Substitution of Leased Premises) is hereby deleted in its entirety.

5. Landlord acknowledges and affirms that as of the date of this Amendment, Tenant is not in default under any of the terms, covenants, conditions or provisions of the Lease and Landlord has no offsets, claims or defenses against Tenant with respect to any obligation or duty of Tenant arising pursuant to the Lease.

6. Each party warrants and represents that it has the authority to enter into this Amendment. Landlord warrants and represents that the consent to this Amendment of any ground lessor, mortgagee, other lending institution or any other entity or individual having an interest in the Premises is not necessary. Landlord further agrees to indemnify, defend and hold Tenant harmless from and against any losses or claims arising from Landlord's failure to obtain consent to this Amendment from any such ground lessor, mortgagee, lending institution or other entity or individual.

7. Except for Advanced Real Estate Services, Inc., whose commission shall be paid by Tenant pursuant to a separate agreement, each party represents to the other that it has not dealt with any broker in such a manner as to incur any liability for any commission, fee or compensation whatsoever in connection with this transaction, and each shall indemnify the other against any loss, cost or expense resulting from any such claim and shall hold the other harmless from any liability in connection with such claim as may result from their dealing with brokers.

8. Landlord is duly organized, validly existing and in good standing under the laws of the State of New Jersey, and has the full and sole right, capacity, power and authority to enter into this Amendment.

9. This Amendment may be executed in electronic format and in several counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same Amendment.

10. Except as specifically modified hereby, all of the terms, covenants and conditions of the Lease shall remain in full force and effect and shall be binding on the parties hereto, their successors and assigns. All capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Lease. In the event of any conflict between the terms of the Lease and this Amendment, this Amendment shall control.

**IN WITNESS WHEREOF,** the parties hereto have placed their hands as of the day and year first above written.

-2-

WITNESS:

_____

WITNESS:

_____

LANDLORD:
**AZTEC INN L.P.**

By _R. L. Masters_

Name: _R. L. Masters for Lyon & Lyon, Inc_
Title: _General Partner_

TENANT:
**RITE AID OF NEW JERSEY, INC.**

By: _____
Lisa M. Winnick
Sr. Counsel & Authorized Representative

-3-

**Electronic Proof of Claim Confirmation:** 3870-1-WAPNV-670783598

**Claim Electronically Submitted on (UTC) :** 2025-10-15T20:32:41.62Z

**Submitted by:** Aztec Inn LP
adartiglio@ansell.law

**KROLL**